JUDGE TORRES

15 CV 03934

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUZANNE BOELTER, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>HEARST COMMUNICATIONS, INC.,<br><br>                Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |



RECEIVED
MAY 21 2015
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Suzanne Boelter ("Plaintiff"), individually and on behalf of herself and all others

similarly situated, by and through her attorneys, makes the following allegations pursuant to the

investigation of her counsel and based upon information and belief, except as to allegations specifically

pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1.      Hearst Communications, Inc. ("Hearst" or "Defendant") is an international

media company that publishes over 300 magazines throughout the world, including widely-

circulated magazines such as *Country Living*, *Harper's Bazaar*, *Cosmopolitan*, *Esquire*, *Good

Housekeeping*, *Redbook*, *Seventeen*, and *O, the Oprah Magazine*.

2.      To supplement its sales and advertising revenues, Hearst sells its subscribers'

personal information—including their full names, titles of magazines subscribed to, and home

addresses (collectively "Personal Reading Information"), as well as myriad other personal,

lifestyle, and demographic information such as gender, age, ethnicity, income, religion, parental

status, and political affiliation—to data miners and other third parties without the written consent

1

of its customers.

3.     Hearst's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information allows for highly specific targeting of groups of individuals.  For example, anyone could buy from Hearst a customer list with the names and addresses of all *Good Housekeeping* subscribers over age 50, who are devoted Bible-reading Democrats, with three teenage children and pet cats.   For such a list, Hearst charges approximately $192 per thousand subscribers listed.

4.     While Hearst profits handsomely from the unauthorized sale and disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its subscribers' privacy rights because Hearst does not obtain its customers' written consent prior to selling their Personal Reading Information.

5.     By selling its customers' Personal Reading Information without their written consent, Hearst violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a Michigan customer's purchase of written materials, if the record identifies the customer.

6.     Accordingly, Plaintiff brings this Class Action Complaint against Hearst for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, and for unjust enrichment.

## PARTIES

7.     Plaintiff Suzanne Boelter is a natural person and citizen of the State of Michigan. Plaintiff Boelter is a subscriber to *Country Living* magazine, which is published by Hearst.  Prior to and at the time she subscribed to *Country Living*, Hearst did not notify Plaintiff Boelter that it

discloses the Personal Reading Information of its customers, and Plaintiff Boelter has never authorized Hearst to do so.  Furthermore, Plaintiff Boelter was never provided any written notice that Hearst sells its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Country Living*, and continuing to present, Hearst has disclosed, and continues to disclose, without consent or prior notice, Plaintiff Boelter's Personal Reading Information to data mining companies including Insource and others, who then supplement that information with data from their own files.  Moreover, during that same period, Hearst has sold – and continues to sell and offer for sale – mailing lists containing Plaintiff Boelter's Personal Reading Information to third parties seeking to contact Hearst subscribers, without first obtaining Plaintiff Boelter's written consent or even giving her prior notice of the disclosure and sales.  Because Hearst sold and disclosed her Personal Reading Information, Plaintiff Boelter now receives junk mail and telephone solicitations offering discounted magazine subscriptions, among other things.  These unwarranted offers waste Plaintiff Boelter's time, money, and resources.  These harassing junk mail offerings and phone call solicitations received by Plaintiff Boelter are attributable to Hearst's unauthorized sale and disclosure of her Personal Reading Information.  Because Plaintiff Boelter is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Heart's sale of her Personal Reading Information deprived Plaintiff Boelter of the full set of benefits to which she was entitled as a part of her *Country Living* subscription, thereby causing economic harm.  Accordingly, what Plaintiff Boelter received (a subscription without statutory privacy protections) was less valuable than what she paid for (a subscription with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *Country Living* subscription had she known that Hearst would disclose her Personal Reading Information.

8.      Defendant Hearst Communications, Inc. is a Delaware corporation with its principal place of business at 300 West 57th Street, New York, New York 10019.  Hearst does business throughout Michigan, New York, and the entire United States.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Hearst because Hearst conducts substantial business within New York, such that Hearst has significant, continuous, and pervasive contacts with the State of New York.  Additionally, Hearst's principal place of business is in New York, New York.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Hearst does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Hearst's principal place of business is in this District.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy,

respectively).

13.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B.  No. 5331, 1988 Mich. Legis. Serv. 378 (West).

14.     Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

16.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

17.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes

and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

18.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*,  House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

19.     Despite the fact that thousands of Michigan residents subscribe to Hearst publications, Hearst disregards its legal responsibility by systematically violating the VRPA.

### *The Personal Information Market: Consumers' Personal Information Has Real Value*

20.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

21.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

22.     The FTC has also recognized that consumer data possesses inherent monetary

---

[1] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf  (last visited May 12, 2015).

[2] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited May 12, 2015).

value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

23.     In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers.  Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

24.     The scope of data miners' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

25.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

---

[3] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited May 12, 2015) (emphasis added).

[4] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Mar. 14, 2013).

[5] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 12, 2015).

[6] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012)

26.      Recognizing the serious threat the data mining industry poses to consumers'
privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus
sent a letter to nine major data brokerage companies seeking information on how those
companies collect, store, and sell their massive collections of consumer data.[7]

27.      In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data
> brokers have developed hidden dossiers on every U.S. consumer.
> This large[-]scale aggregation of the personal information of
> hundreds of millions of American citizens raises a number of
> serious privacy concerns.[8]

28.      Data mining is especially troublesome when consumer information is sold to
direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers
often use consumer information to lure unsuspecting consumers into various scams,[9] including
fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Hearst share
information with data miners and direct-mail advertisers, they contribute to the "[v]ast databases
of names and personal information" that are often "sold to thieves by large publicly traded
companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and

---

*available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited May 12, 2015).

[7] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited May 12, 2015).

[8] *Id.*

[9] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited May 12, 2015).

other criminals.[10]

29.        Information disclosures like Hearst's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

30.        Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Hearst's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

31.        Hearst is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

32.        Thus, as consumer data has become an ever-more valuable commodity, the data

---

[10] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited May 12, 2015).

[11] *Id.*

[12] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited May 12, 2015).

[13] *See id.*

mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

33.    As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

34.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

35.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

36.    In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

37.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace:  consumers recognize the economic value of their private

---

[14] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe,  http://www.truste.com/us-consumer-confidence-index-2013/ (last visited May 12, 2015).

[15] *Id.*

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited May 12, 2015).

data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

38.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18]  As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Hearst Unlawfully Sells its Subscribers' Personal Reading Information*

39.     Hearst maintains a vast digital database comprised of its subscribers' Personal Reading Information.  Hearst discloses its subscribers' Personal Reading Information to data mining companies including Insource and others, who then supplement that information with additional sensitive personal information about each Hearst subscriber, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-D**).

40.     Hearst then sells its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing

---

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 12, 2015).

[18] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited May 12, 2015) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

41.    As a result of Hearst's data compiling and sharing practices, companies can purchase mailing lists from Hearst that identify Hearst subscribers by their most intimate details: income, political affiliation, religious practice, and charitable donations.  Hearst's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Hearst will sell—to anyone willing to pay for it—a list with the names and addresses of all *Good Housekeeping* subscribers over age 50, who are devoted Bible-reading Democrats with three teenage children and pet cats.

42.    Hearst does not seek its subscribers' prior written consent to any of these disclosures and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

43.    Consumers can sign up for Hearst subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Hearst never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Hearst uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before disclosing their Personal Reading Information.

44.    As a result, Hearst disclosed and continues to disclose its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[19] – to

---

[19] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3,

anybody willing to pay for it.

45.     By and through these actions, Hearst has intentionally disclosed to third parties its Michigan subscribers' Personal Reading Information without consent, in direct violation of the VRPA with Plaintiff and other members of the Class.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff seeks to represent a class defined as all Michigan residents who had their Personal Reading Information disclosed to third parties by Hearst without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

47.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

48.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Hearst is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines); (b) whether Hearst obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Hearst's disclosure of Plaintiff's and the Class's Personal Reading Information violated the Video Rental Privacy Act, M.C.L. § 445.1712; and (d) whether Heart's sale of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

---

2011), https://www.eff.org/press/archives/2011/10/03 (last visited May 12, 2015).

49.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

50.     Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

51.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Video Rental Privacy Act
### (M.C.L. § 445.1712)

52.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

set forth herein.

53.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Hearst.

54.     As a magazine publisher that sells subscriptions to consumers, Hearst is engaged in the business of selling written materials at retail.  *See* M.C.L. § 445.1712.

55.     By subscribing to *Country Living*, Plaintiff purchased written materials directly from Hearst.  *See* M.C.L. § 445.1712.

56.     Because Plaintiff purchased written materials directly from Hearst, she is a "customer" within the meaning of the VRPA.  *See* M.C.L. § 445.1711(a).

57.     At all times relevant, and beginning on the dates Plaintiff initiated her *Country Living* subscription, Hearst disclosed Plaintiff's Personal Reading Information, which identified her as a *Country Living* subscriber, in at least two ways.

58.     First, Hearst disclosed mailing lists containing Plaintiff's Personal Reading Information to data mining companies including Insource, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Hearst.

59.     Second, Hearst sold its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

60.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Hearst was able to increase its profits gained from the mailing list sales.

61.     By selling or otherwise disclosing its subscriber lists, Hearst disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from Hearst.  *See* M.C.L. § 445.1712.

62.     The information Hearst disclosed indicates Plaintiff's name and address, as well as the fact that she subscribed to *Country Living*.  Accordingly, the records or information disclosed by Hearst indicate Plaintiff's identity.  *See* M.C.L.§ 445.1712.

63.     Plaintiff and the members of the Class never consented to Hearst disclosing their Personal Reading Information to anyone.

64.     Worse yet, Plaintiff and the members of the Class did not receive notice before Hearst disclosed their Personal Reading Information to third parties.

65.     On information and belief, Hearst's disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

66.     Hearst's disclosures of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

67.     Hearst's disclosures of Plaintiff's Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Hearst's revenue.  Accordingly, Hearst's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

68.     By disclosing Plaintiff's Personal Reading Information, Hearst violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* M.C.L. § 445.1712.

69.     Additionally, because Plaintiff and the members of the Class paid for their Hearst subscriptions, and Hearst was obligated to comply with the VRPA, Hearst's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Hearst's unlawful sale and disclosure of their Personal Reading Information caused her to receive less value than she paid for, thereby causing her economic harm.

70.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

71.     Accordingly, had Plaintiff been adequately informed of Hearst's disclosure practices, she would not have been willing to purchase her *Country Living* subscription at the price charged, if at all.  Thus, Hearst's unlawful disclosures caused Plaintiff economic harm.

72.     Hearst's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements and marketing calls to her cellular phone.

73.     As a result of Hearst's unlawful and continued disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of herself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant Hearst to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## COUNT II
### Unjust Enrichment

74.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

75.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

76.     Plaintiff and the Class members conferred benefits on Hearst by providing Hearst with their Personal Reading Information and paying Hearst for their magazine subscriptions. Hearst received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to Hearst publications.

77.     Because Hearst received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because Hearst has employees handling customer accounts and billing as well as customer data, Hearst appreciates or has knowledge of such benefits.

78.     Under the VRPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

79.     Under principles of equity and good conscience, because Hearst failed to comply with the VRPA, Hearst should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by selling Plaintiff's and the Class's Personal Reading Information.

80.     Plaintiff and the other Class members have suffered actual damages as a result of Hearst's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

81.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Hearst's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

82.     Further, a portion of the purchase price of each Hearst magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the VRPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

83.     To prevent inequity, Hearst should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Hearst's sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

84.     Accordingly, Plaintiff and the Class members seek an order declaring that Hearst's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of  money obtained by Hearst through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

85.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

> A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.      For an order declaring that Defendant's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

C.      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.      For an award of actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief;

G.      For injunctive relief as pleaded or as the Court may deem proper; and;

H.      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  May 21, 2015

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  _Joseph I. Marchese_
                   Joseph I. Marchese

Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
         jmarchese@bursor.com
         pfraietta@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT A**



**House
Legislative
Analysis
Section**

Washington Square Building, Suite 1025
Lansing, Michigan 48909
Phone: 517/373-6466

PRIVACY: SALES, RENTALS OF VIDEOS, ETC.

**House Bill 5331** as enrolled
Second Analysis (1-20-89)

Sponsor: Rep. David Honigman
House Committee: Judiciary
Senate Committee: Judiciary

## THE APPARENT PROBLEM:

During the period when Congressional confirmation hearings were being held on the nomination of Robert Bork to the Supreme Court, a Washington weekly obtained and published a list of videotapes rented under Bork's wife's account. Many found this to be an unwarranted invasion of privacy, and the incident prompted the introduction in Congress of a bill to protect the privacy of those who rent or buy videotapes. Many in Michigan also believe that one's choice in videos, records, and books is nobody's business but one's own, and suggest the enactment of a statute to explicitly protect a consumer's privacy in buying and borrowing such items.

## THE CONTENT OF THE BILL:

The bill would create a new public act to preserve personal privacy with respect to the purchase, rental, or borrowing of written materials, sound recordings, and video recordings. Except as otherwise provided by law, a retailer, lender, or renter of such items could not disclose information — such as selections made — on a particular customer to any person other than that customer. Such information could be disclosed with the customer's written permission, under a court order, to the extent reasonably necessary to collect past-due payment, for the exclusive purpose of marketing goods and services directly to the consumer, or under a search warrant. Violation of the bill would be a misdemeanor.

## FISCAL IMPLICATIONS:

The House Fiscal Agency says that the bill would have no fiscal implications. (1-18-89)

## ARGUMENTS:

### For:

The bill would recognize that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else, for that matter. The bill would complement the Library Privacy Act, which exempts library records on a person from disclosure under the Freedom of Information Act and prohibits disclosure absent a court order or the individual's consent.

**Response:** The bill, while laudable in its aims, may be unnecessary for libraries, which already are subject to civil penalties for violating the Library Privacy Act.

### Against:

The bill could offer more in the way of recourse for injured parties if it provided for civil damages as well as criminal misdemeanor penalties. Civil remedies not only offer a person recompense for harm done: they free a person from having to rely on a prosecutor's office to pursue a case.

H.B. 5331 (1-20-89)

**EXHIBIT B**



Exact Data
(877) 488-1373
POSTAL, EMAIL AND TELEPHONE LISTS
Click Here
To Fill Out A Form And Receive
A Free Quote

# Hearst Masterfile Mailing List

Hearst Magazines is one of the world's largest publishers of monthly consumer magazines. Its category leading titles have been merged to present an unduplicated masterfile of consumers living well.

Get Count | Get Pricing | Get More Information

877-972-4876
Mention NextMark
FOR 10% OFF

Niche Audiences

Postal, Email, and Phone Lists

A+ BBB Accredited

CLICK HERE
FOR COUNTS AND PRICING
ON ANY LIST

| SEGMENTS | *COUNTS THROUGH 04/30/2015* |
|---|---|
| 11,094,919 TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 5,564,308 6 MONTH ACTIVE SUBS | + $12.00/M |
| 3,343,469 3 MONTH ACTIVE SUBS | + $14.00/M |
| 1,115,455 1 MONTH ACTIVE SUBS | + $17.00/M |
| 5,312,472 6 MONTH OPTED-IN EMAIL * | $150.00/M |
| 2,901,012 12 MONTH EXPIRES | $80.00/M |
| 3,093,182 CHANGE OF ADDRESS | + $13.00/M |
| 335,603 BUSINESS ADDRESS | + $11.00/M |
| 507,612 GIFT GIVERS | + $14.00/M |
| 3,296,212 ACTIVE REPUBLICANS | + $20.00/M |
| 3,175,685 ACTIVE DEMOCRATS | + $20.00/M |
| CATALOG RATE | $80.00/M |
| CHARITABLE FUNDRAISING RATE | $75.00/M |
| NON-PROFIT RATE | $85.00/M |
| POLITICAL RATE | $90.00/M |
| *DISCOUNTS AVAILABLE ON MULTI-TOUCH CAMPAIGNS, PLEASE INQUIRE! | |

| POPULARITY: | ▮▮▮▮▮ 100 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| GENDER: | 70% FEMALE 20% MALE |
| SPENDING: | $18.00 AVERAGE ORDER |

## DESCRIPTION

As Hearst Magazines continues to build audience across its roster of lifestyle magazines, the Hearst Magazines Masterfile presents a dynamic audience of sophisticated subscribers pursuing goals and loving life. Reach a vast universe of motivated men and women at the forefront of fashion, entertaining, home design, culinary arts, and contemporary culture.

**Subscribers to the following titles comprise the Hearst Magazines Masterfile:** Car and Driver, Cosmopolitan, Country Living, Elle, Elle Decor, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, Popular Mechanics, Redbook, Road & Track, Town & Country, Veranda and Woman's Day.

**Demographics:**

- Age: 46
- Income: $86,765
- 90% Married
- Female 70% / Male 20%

Hearst Magazine readers are passionately involved with 'their' magazines, acting on tips and advice as well as responding to advertisers. Reach large numbers of confident consumers who are ahead of the trends and quick to act on their impulses.

**The Masterfile is enhanced with Insource demographic and ethnic segments, available selections include (please inquire for additional segments & counts):**

| SELECTS | |
|---|---|
| 1 MONTH HL | $17.00/M |
| 3 MONTH HL | $14.00/M |
| 6 MONTH HL | $12.00/M |
| AGE | $16.00/M |
| BLOW-INS | $10.00/M |
| BUSINESS ADDRESS | $11.00/M |
| CHANGE OF ADDRESS | $13.00/M |
| ETHNIC/RELIGIOUS | $16.00/M |
| GENDER | $9.00/M |
| GEO (SCF, ZIP, STATE) | $9.00/M |
| GIFT GIVERS | $14.00/M |
| HOME ADDRESS | $5.00/M |
| INCOME | $16.00/M |
| LIFESTYLE SELECT | $16.00/M |
| MAGAZINE TITLES | $10.00/M |
| NTF/RENEWALS | $13.00/M |
| PAID | $12.00/M |
| POLITICAL PARTY | $20.00/M |
| PRESENCE OF CHILDREN | $16.00/M |
| SOURCE | $12.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $2.00/M |
| FTP | $60.00/F |
| PLEASE INQUIRE FOR ADDITIONAL OUTPUTS | |

### RELATED LISTS

- CONDE NAST - SENIORS
- NATIONAL GEOGRAPHIC SOCIETY ENHANCED MASTERFILE
- ACXIOM INFOBASE NEW HOMEOWNERS LIST
- RODALE, INC. MASTERFILE
- DR. LEONARD'S HEALTHCARE CATALOG BUYERS
- AMERIMARK ENHANCED MASTERFILE
- EXPERIAN CONSUMERVIEW TRIGGERS - NEW MOVERS DATABASE
- CAROL WRIGHT GIFTS ENHANCED CATALOG BUYERS
- CONSUMER REPORTS
- CONDE NAST - ENHANCED DATABASE

| Interest (+ $16/M) | Qty | Interest (+ $16/M) | Qty |
|---|---|---|---|
| Bible Devotional | 705,500 | Outdoor Enthusiasts | 3,994,700 |
| Book Readers | 6,277,100 | Pets: all | 1,329,611 |
| Collectibles | 582,200 | Pets: Cats | 741,300 |
| Contributors/Donors | 91,600 | Pets: Dogs | 1,004,200 |
| Cooking | 2,068,100 | Physical Fitness/Exercise | 1,999,200 |

| | | | |
|---|---|---|---|
| Crafts | 2,261,400 | Sports: all | |
| Do It Yourselfers | 2,525,600 | Sports: Camping/Hiking | 632,000 |
| Gardening | 2,735,200 | Sports: Exercise/Fitness | 1,586,800 |
| Gourmet Food/Cooking | 2,068,100 | Sports: Golf | 766,700 |
| Health/Natural Foods | 4,628,400 | Sports: Hunting | 614,300 |
| Music | 5,942,200 | Travel | |

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #253382 or click here to place your request.

- 7,500 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT

- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($10.00/M RUN CHARGE)

- EXCHANGE IS AVAILABLE

- REUSE IS AVAILABLE

- CANCELLATION FEE AT $100.00/F

**Get Count**    **Get Pricing**    **Get More Information**

**EXHIBIT C**

① Start  ② Results  ③ Data Card  ④ Request  ⑤ Finished



# Hearst Masterfile - Young Families Mailing List

Hearst Magazines is one of the world's largest publishers of monthly consumer magazines. Its category-leading titles have been enhanced to present a masterfile of young families.

**Get Count**   **Get Pricing**   **Get More Information**

## SEGMENTS
*COUNTS THROUGH 04/30/2015*

| | | |
|---|---|---|
| 2,296,457 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| | *YOUNG FAMILIES (POC 0-18) | + $16.00/M |
| 1,135,993 | 6 MONTH ACTIVE SUBS | + $12.00/M |
| 650,859 | 3 MONTH ACTIVE SUBS | + $14.00/M |
| 190,536 | 1 MONTH ACTIVE SUBS | + $17.00/M |
| | CATALOG RATE | $80.00/M |
| | CHARITABLE FUNDRAISING RATE | $75.00/M |
| | NON-PROFIT RATE | $85.00/M |

## DESCRIPTION

The Hearst Young Families Masterfile includes families with children age 0-18. These young families are ideal for apparel, books, educational aids, financial/investing, fundraising, insurance, magazines, parenting aids, toys and more.

**Subscribers to the following titles comprise the Hearst Magazines Masterfile:** *Car and Driver, Cosmopolitan, Country Living, Elle, Elle Decor, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, Popular Mechanics, Redbook, Road & Track, Town & Country, Veranda and Woman's Day.*

| | Age 0-3 | Age 4-6 | Age 7-9 | Age 10-12 | Age 13-18 |
|---|---|---|---|---|---|
| **Boys** | 64,000 | 85,000 | 150,000 | 170,000 | 324,000 |
| **Girls** | 53,000 | 60,000 | 81,000 | 106,000 | 280,000 |
| **POC** | 350,000 | 284,000 | 274,000 | 303,000 | 684,000 |

## ORDERING INSTRUCTIONS

- To order this list, contact your List Broker and ask for NextMark List ID #254009 or **click here to place your request.**
- 7,500 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($10.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $100.00/F

POPULARITY: ▬▬▬▬▬ 98

| | |
|---|---|
| **MARKET:** | CONSUMER |
| **CHANNELS:** | 🖳 |
| **SOURCE:** | DIRECT MAIL SOLD |
| **PRIVACY:** | UNKNOWN |
| **DMA?:** | YES - MEMBER |
| **STATUS:** | PREFERRED PROVIDER |
| **GEO:** | USA |
| **SPENDING:** | $18.00 AVERAGE ORDER |

## SELECTS

| | |
|---|---|
| 1 MONTH HL | $17.00/M |
| 3 MONTH HL | $14.00/M |
| 6 MONTH HL | $12.00/M |
| AGE | $16.00/M |
| BLOW-INS | $10.00/M |
| BUSINESS ADDRESS | $11.00/M |
| CHANGE OF ADDRESS | $13.00/M |
| GENDER | $9.00/M |
| GEO (SCF, ZIP, STATE) | $9.00/M |
| HOME ADDRESS | $5.00/M |
| INCOME SELECT | $16.00/M |
| LIFESTYLE SELECT | $16.00/M |
| MAGAZINE TITLES | $10.00/M |
| PAID | $12.00/M |
| PRESENCE OF CHILDREN | $16.00/M |
| RENEWALS | $13.00/M |
| SOURCE | $12.00/M |

## ADDRESSING

| | |
|---|---|
| KEY CODING | $2.00/M |
| FTP | $60.00/F |
| PLEASE INQUIRE FOR ADDITIONAL OUTPUTS | |

## RELATED LISTS

- HIGHLIGHTS FOR CHILDREN
- CONTINUITY BOOK CLUBS FOR KIDS MASTERFILE
- HIGHLIGHTS FOR CHILDREN MAGAZINE SUBSCRIBERS
- ZOOBOOKS
- MINDWARE
- HANNA ANDERSSON
- AMERICAN GIRL CATALOG - EXCHANGE ONLY
- BIRTHDAY EXPRESS BUYERS
- TARGETSOURCE U.S. - MASTERFILE
- HIGHLIGHTS FOR CHILDREN MERCHANDISE BUYERS
- PARENTS MAGAZINE

**Get Count**   **Get Pricing**   **Get More Information**

877-972-4876 Mention NextMark FOR 10% OFF

Niche Audiences

Postal, Email, and Phone Lists

A+ BBB Accredited

CLICK HERE FOR COUNTS AND PRICING ON ANY LIST

**EXHIBIT D**



# Hearst Masterfile - Ethnic & Religious Mailing List

One of the world's largest publishers of monthly consumer magazines, Hearst Magazines appeal to readers of all ethnic and religious backgrounds. Its category leading titles have been merged and overlayed with ethnic and religious data.

**Get Count**    **Get Pricing**    **Get More Information**



| SEGMENTS | | *COUNTS THROUGH 04/30/2015* |
|---|---|---|
| 11,094,919 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| | *ETHNIC/RELIGIOUS | + $16.00/M |
| | CATALOG RATE | $80.00/M |
| | CHARITABLE FUNDRAISING RATE | $75.00/M |
| | NON-PROFIT RATE | $85.00/M |

## DESCRIPTION

Hearst Magazines is one of the few publishers that continues to thrive despite a downturn in the publishing market. Much of the company's success is due to the fact that its many titles appeal to all types of people —African American, Hispanic, Asian— of all types of faith—Catholic, Jewish, Protestant. The Hearst Magazines Ethnic & Religious Masterfile presents a dynamic audience of sophisticated men and women of various ethnicities and religious beliefs.

**Subscribers to the following titles comprise the Hearst Magazines Masterfile:**

*Car and Driver, Cosmopolitan, Country Living, Elle, Elle Decor, Esquire, Food Network Magazine, Good Housekeeping, Harper's Bazaar, HGTV Magazine, House Beautiful, Marie Claire, Popular Mechanics, Redbook, Road & Track, Town & Country, Veranda and Woman's Day.*

Tap into ethnic and religious data to reach large numbers of your best customers.

**Ethnic/Religious segments include (*inquire for additional selects):**

| POPULARITY: ▪▪▪▪▪ 97 | |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT MAIL SOLD |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| SPENDING: | $18.00 AVERAGE ORDER |

### SELECTS

| | |
|---|---|
| 1 MONTH HL | $17.00/M |
| 3 MONTH HL | $14.00/M |
| 6 MONTH HL | $12.00/M |
| AGE | $16.00/M |
| BLOW-INS | $10.00/M |
| BUSINESS ADDRESS | $5.00/M |
| CHANGE OF ADDRESS | $13.00/M |
| ETHNICITY | $16.00/M |
| GENDER | $9.00/M |
| GEO (ZIP, SCF, ZIP, STATE) | $9.00/M |
| HOME ADDRESS | $5.00/M |
| INCOME SELECT | $16.00/M |
| MAGAZINE TITLES | $10.00/M |
| PAID | $12.00/M |
| PRESENCE OF CHILDREN | $16.00/M |
| RELIGION | $16.00/M |
| RENEWALS | $13.00/M |
| SOURCE | $12.00/M |

### ADDRESSING

| | |
|---|---|
| KEY CODING | $2.00/M |
| FTP | $60.00/F |
| PLEASE INQUIRE FOR ADDITIONAL OUTPUTS | |

### RELATED LISTS

- ESSENCE MAGAZINE
- AFRICAN AMERICAN MASTERFILE
- CMC - THE CONSUMER MARKETING CONNECTION
- ETHNIC BUYERS GUIDE - AFRICAN AMERICAN CONSUMERS
- NATIONAL MAGAZINE EXCHANGE ACTIVE RESPONDERS
- ETHNIC PREMIUM CATALOG BUYERS
- APPAREL BUYERS
- ESSENTIAL APPAREL - AFRICAN AMERICAN CATALOG BUYERS
- AFRICAN-AMERICAN HOUSEHOLDS
- BLACKAMERICA MOB DATABASE

| Ethnicity (+ $16/M) | Qty |
|---|---|
| African American | 639,000 |
| Asian - other | 77,700 |
| Chinese | 100,800 |
| French | 369,000 |
| Hispanic | 607,800 |
| Irish | 1,003,000 |
| Italian | 509,000 |
| Japanese | 45,000 |

| Religion (+ $16/M) | Qty |
|---|---|
| Catholic | 2,925,200 |
| Jewish | 313,000 |
| Protestant | 7,588,000 |

## ORDERING INSTRUCTIONS

- To order this list, contact your List Broker and ask for NextMark List ID #253854 or click here to place your request.
- 7,500 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT


877-972-4876 Mention NextMark FOR 10% OFF
Niche Audiences
Postal, Email, and Phone Lists
A+ BBB Accredited
CLICK HERE FOR COUNTS AND PRICING ON ANY LIST

- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($10.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $100.00/F

**Get Count**    **Get Pricing**    **Get More Information**