IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SUZANNE BOELTER, individually and on behalf
of all others similarly situated,

               Plaintiff,

v.

HEARST COMMUNICATIONS, INC.,
               Defendant.

No. 1:15-cv-03934-AT-JLC

**ORAL ARGUMENT REQUESTED**

**DEFENDANT HEARST COMMUNICATIONS, INC.'S MEMORANDUM
OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

Jonathan R. Donnellan
Kristina E. Findikyan
Stephen H. Yuhan
THE HEARST CORPORATION
  Office of General Counsel
300 West 57th Street, 40th Floor
New York, New York 10019
Tel: (212) 841-7000
Fax: (212) 554-7000
Email: jdonnellan@hearst.com

*Attorneys for Defendant Hearst Communications, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND ......................................................................................5

    A.    The Purpose and History of the Michigan Video Rental Privacy Act. ...................5

    B.    This Action.........................................................................................6

ARGUMENT ........................................................................................................7

  I.   PLAINTIFF CANNOT MEET THE THRESHOLD REQUIREMENTS TO
       PROCEED BEFORE THIS COURT: SHE LACKS ARTICLE III STANDING AND
       THIS COURT LACKS JURISDICTION OVER HER CLAIMS UNDER CAFA. ...........7

    A.    Plaintiff Lacks Standing to Assert Claims Under the Video Rental Privacy
          Act.....................................................................................................8

    B.    The Court Lacks Jurisdiction Over Plaintiff's Claims Under CAFA. ...................14

    1.    Michigan's Bar on VRPA Class Actions Seeking Statutory Damages is
          Substantive State Law:  The VRPA Was Enacted in Light of Michigan Court
          Rule 3.501's Class Action Limitations and Necessarily Incorporates Those
          Limitations............................................................................................15

    2.    Neither CAFA Nor Rule 23 Permits Class Action Jurisdiction Over This
          Action..................................................................................................17

       a)    CAFA's Definition of "Class Action" Does Not Permit Jurisdiction Over
            Class Actions that Cannot Be Maintained in State Court................................17

       b)    Even if CAFA's Definition of "Class Action" Were as Extensive as Rule 23,
            That Rule Cannot Be Applied Here To Override Substantive Michigan
            Law Without Violating the Rules Enabling Act. ..............................................20

  II.  THE COMPLAINT MUST BE DISMISSED BECAUSE THE VRPA VIOLATES
       THE FIRST AMENDMENT ON ITS FACE AND AS APPLIED. ....................................22

    A.    The VRPA Criminalizes a Vast Array of Fully Protected Speech on the Basis
          of Its Content, Discriminates on the Basis of Content and Speaker, and Is
          Subject to the Strictest First Amendment Review. ............................................23

    B.    The VRPA Is Unconstitutionally Overbroad and Invalid on Its Face. .................26

    C.    Plaintiff's VRPA Claim Cannot Survive First Amendment Scrutiny. .................29

  III. PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF
       CAN BE GRANTED. ............................................................................................33

    A.    Plaintiff Fails to State a Claim Under the Video Rental Privacy Act...................33

    1.    The Video Rental Privacy Act Applies Only to Those "Selling at Retail" and
          by Offering Magazine Subscriptions Hearst Is Not "Selling at Retail." ...............34

2.    Hearst Informed Plaintiff that Her Information Could Be Disclosed For Marketing Purposes. ...........................................................35

B.    Plaintiff Fails to State a Claim for Unjust Enrichment. ........................................38

1.    The VRPA Provides Plaintiff's Exclusive Remedy in this Case. .........................38

2.    No Claim for Unjust Enrichment Is Stated on the Facts Alleged. ........................39

CONCLUSION .........................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allor v. DeClark, Inc.*,
No. 300953, 2012 WL 555779 (Mich. Ct. App. Feb. 21, 2012)................................40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................33

*Austin-Spearman v. AMC Network Entertainment LLC*,
No. 14 CIV. 6840 NRB, 2015 WL 1539052 (S.D.N.Y. Apr. 7, 2015)....................9

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987).................................................................................................28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................33, 34

*Bond v. United States*,
134 S. Ct. 2077 (2014)............................................................................................19

*Bose v. Interclick, Inc.*,
No. 10 Civ. 9183 (DAB), 2011 WL 4343517 (S.D.N.Y. Aug. 17, 2011) ..............11

*Brandenburg v. Ohio*,
395 U.S. 444 (1969).................................................................................................23

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973).................................................................................................26

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985).................................................................................................26

*Brockmeyer v. The Hearst Corp.*,
No. 01-Civ-7746(JGK), 2002 WL 1402320 (S.D.N.Y. June 27, 2002) .................34

*Brown v. Entm't Merchs. Ass'n*,
131 S. Ct. 2729 (2011).............................................................................................25

*Cal. Democratic Party v. Jones*,
530 U.S. 567 (2000).................................................................................................31

*Capital Title Ins. Agency Inc. v. Towne Mortg. Co.*,
No. 278712, 2009 WL 609561 (Mich. Ct. App. Mar. 10, 2009)............................40

*Carlsen v. GameStop, Inc.*,
  No. 14-3131, --- F. Supp. 3d ---, 2015 WL 3538906 (D. Minn. June 4, 2015) ...............11, 13

*Chaplinsky v. New Hampshire*,
  315 U.S. 568 (1942) .................................................................................................24

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) .................................................................................................24

*Dep't of Agric. v. Appletree Mktg., L.L.C.*,
  779 N.W.2d 237 (Mich. 2010) .................................................................................39

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965) .................................................................................................28

*Donoghue v. Bulldog Investors General Partnership*,
  696 F.3d 170 (2d Cir. 2012) ......................................................................................9

*In re DoubleClick, Inc. Privacy Litigation*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001) ......................................................................41

*Editorial Caballero, S.A. de C.V. v. Playboy Enters. Inc.*,
  359 S.W.3d 318 (Tex. Ct. App. 2012) ......................................................................34

*Epstein v. JPMorgan Chase & Co.*,
  No. 13 Civ. 4744(KPF), 2014 WL 1133567 (S.D.N.Y. Mar. 21, 2014) .................10

*Fraiser v. Stanley Black & Decker, Inc.*,
  No. 12-1182-WGY, --- F. Supp. 3d ---, 2015 WL 3794377 (D. Conn. June 15,
  2015) ...................................................................................................................20, 21, 22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ...................................................................................................8

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .................................................................................................24

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) .................................................................................................24

*Godin v. Schencks*,
  629 F.3d 79 (1st Cir. 2010) ......................................................................................20

*Goodman v. HTC Am., Inc.*,
  No. C11-1793MJP, 2012 WL 2412070 (W.D. Wash. June 26, 2012) ...................11

*In re Google Privacy Policy Litig.*,
  No. C 12-01384 PSG, 2012 WL 6738343 (N.D. Cal. Dec. 28, 2012)....................11

*Green v. McLaughlin*,
   480 F. App'x 44 (2d Cir. 2012) ...................................................................33

*Haley v. Nunda Twp.*,
   No. 250082, 2005 WL 94791 (Mich. Ct. App. Jan. 18, 2005) ...............................34

*Hollingsworth v. Perry*,
   133 S. Ct. 2652 (2013) ........................................................................10

*Isom v. NE Lots LLC*,
   No. 288378, 2010 WL 143470 (Mich. Ct. App. Jan. 14, 2010) ...........................41

*Jackson v. PKM Corp.*,
   422 N.W.2d 657 (Mich. 1988) .................................................................39

*James River Ins. Co. v. Rapid Funding, LLC*,
   658 F.3d 1207 (10th Cir. 2011) ..............................................................20

*In re JetBlue Airways Corp. Privacy Litig.*,
   379 F. Supp. 2d 299 (E.D.N.Y. 2005) ......................................................12

*Kelleher v. City of Reading*,
   No. Civ. A. 01-3386, 2002 WL 1067442 (E.D. Pa. May 29, 2002) .....................13

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ........................................................................19

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) ..............................................................................35

*Leonard v. Abbott Labs., Inc.*,
   No. 10-cv-4676(ADS)(WDW), 2012 WL 764199 (E.D.N.Y. Mar. 5, 2012) ...........21

*Leslie Salt Co. v. United States*,
   55 F.3d 1388 (9th Cir. 1995) ................................................................35

*Lifetree Trading PTE., LTD. v. Washakie Renewable Energy, LLC*,
   No. 14-CV-9075(JPO), 2015 WL 3948097 (S.D.N.Y. June 29, 2015) ...................37

*Low v. LinkedIn Corp.*,
   900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....................................................11

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .........................................................................9, 10

*In re Lyondell Chem. Co.*,
   505 B.R. 409 (S.D.N.Y. 2014) ...............................................................33

*MAI Sys. Corp. v. UIPS*,
    856 F. Supp. 538 (N.D. Cal. 1994) ............................................................10

*Malcolm v. City of East Detroit*,
    468 N.W.2d 479 (Mich. 1991) ..................................................................16

*Mangini v. R.J. Reynolds Tobacco Co.*,
    793 F. Supp. 925 (N.D. Cal. 1992) ............................................................10

*Marks v. United States*,
    430 U.S. 188 (1977)...................................................................................20

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974)...................................................................................28

*Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*,
    418 F.3d 168 (2d Cir. 2005).......................................................................22

*Miller v. California*,
    413 U.S. 15 (1973).....................................................................................23

*Muick v. Glenayre Elecs.*,
    280 F.3d 741 (7th Cir. 2002) .....................................................................13

*Murray v. Time Inc.*,
    No. C 12-00431JSW, 2012 WL 3634387 (N.D. Cal. Aug. 24, 2012) ....................11

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...................................................................................24

*Near v. Minnesota ex rel. Olson*,
    283 U.S. 697 (1931)...................................................................................24

*New York v. Ferber*,
    458 U.S. 747 (1982)...................................................................................24

*Osborne v. Comm'r*,
    68 T.C.M. (CCH) 273, 1994 WL 394999 (T.C. 1994).............................34

*Estate of Pew v. Cardarelli*,
    527 F.3d 25 (2d Cir. 2008).................................................................17, 19

*Phillips v. Philip Morris Cos. Inc.*,
    290 F.R.D. 476 (N.D. Ohio 2013) .............................................................21

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)...................................................................................25

*Raines v. Byrd,*
    521 U.S. 811 (1997)..................................................................................8

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015)................................................................23, 24, 25

*Schwartz v. Romnes,*
    495 F.2d 844 (2d Cir. 1974).....................................................................35

*Sec'y of Maryland v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984)................................................................................26

*Shady Grove Orthopedic Associates v. Allstate Insurance Co.,*
    559 U.S. 393 (2010)........................................................................ *passim*

*Sikhs for Justice v. Nath,*
    893 F. Supp. 2d 598 (S.D.N.Y. 2012)......................................................14

*Sorrell v. IMS Health Inc.,*
    131 S. Ct. 2653 (2011).................................................................... *passim*

*Spokeo, Inc. v. Robins,*
    No. 13-1339 (U.S.)......................................................................... *passim*

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998)..................................................................................8

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009)..................................................................................9

*Thornhill v. Alabama,*
    310 U.S. 88 (1940)................................................................................26

*Triplett Grille, Inc. v. City of Akron,*
    40 F.3d 129 (6th Cir. 1994) ...................................................................29

*U.S. West, Inc. v. FCC,*
    182 F.3d 1224 (10th Cir. 1999) .......................................................30, 31

*United States v. Alvarez,*
    132 S. Ct. 2537 (2012)...........................................................................24

*United States v. Stevens,*
    559 U.S. 460 (2010)...............................................................................24

*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994)................................................................................35

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*,
    725 F. Supp. 2d 378 (S.D.N.Y. 2010)................................................................35

*Utility Air Regulatory Group v. EPA*,
    134 S. Ct. 2427 (2014)................................................................................19

*Valley Forge Christian Coll. v. Americans United for Separation of Church &*
    *State, Inc.*,
    454 U.S. 464 (1982)......................................................................................8

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
    529 U.S. 765 (2000)......................................................................................8

*Virginia Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)....................................................................................24

*Virginia v. Black*,
    538 U.S. 343 (2003)....................................................................................29

*Watts v. United States*,
    394 U.S. 705 (1969)....................................................................................24

*Wilson v. Kellogg Co.*,
    No. 14-CV-2817, --- F. Supp. 3d ---, 2015 WL 3937511 (E.D.N.Y. June 25,
    2015) ........................................................................................................37

**Statutes**

18 U.S.C. § 2710....................................................................................3, 5, 9, 22

28 U.S.C. § 1332(d)....................................................................................14, 17

28 U.S.C. § 1711(2)..........................................................................................17

28 U.S.C. § 2072(b)..........................................................................................20

Class Action Fairness Act of 2005 ("CAFA").....................................................4

M.C.L. § 290.669..............................................................................................39

M.C.L. § 445.322(2)..........................................................................................16

M.C.L. § 445.815(2)....................................................................................15, 16

M.C.L. § 445.911(2)..........................................................................................15

M.C.L. § 445.964(2)..........................................................................................15

M.C.L. § 445.1711 *et seq.* ("Video Rental Privacy Act", "VRPA") .................... *passim*

M.C.L. § 600.2919a(2) ............................................................................................39

Public Act. No. 206, Section 5, 1989 Mich. Legis. Serv. 206 ..................................6, 15

Public Law Number 109-2, § 2, 119 Stat. 4 (2005)................................................17, 18

**Other Authorities**

151 Cong. Rec. H723-01 (daily ed. Feb. 17, 2005) ......................................................18

151 Cong. Rec. S1086-01 (daily ed. Feb. 8, 2005)........................................................18

Brief of Attorneys General Amici Curiae in Support of Petitioner, *Spokeo, Inc. v. Robins*,
(No. 13-1339), 2015 WL 4194152 (July 9, 2015) ...........................................10, 14

Country Living Privacy Policy, http://www.countryliving.com/privacy-policy ..........38

Federal Rule of Civil Procedure 12 .................................................................. *passim*

Federal Rule of Civil Procedure 23 .................................................................. *passim*

Hearst Magazines Privacy Policy,
subscribe.hearstmags.com/circulation/shared/privacy.html ...................................38

John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219
(1993) ..........................................................................................................................9

Michigan Court Rule 3.501(A)(5) .................................................................... *passim*

5 Ronald S. Longhofer, *Michigan Court Rules Practice*, Text § 3501.3 (5th ed.
2004) ................................................................................................................15, 16

S. Rep. No. 100-599 (1988) ..........................................................................................5

Defendant Hearst Communications, Inc. ("Hearst"), by and through the undersigned counsel, submits this memorandum of law in support of its motion to dismiss the class action complaint ("Complaint") of plaintiff Suzanne Boelter ("Boelter" or "Plaintiff") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, or, in the alternative, to stay this action pending the Supreme Court's decision in *Spokeo, Inc. v. Robins*, No. 13-1339 (U.S.).

## PRELIMINARY STATEMENT

At the heart of this case is the Michigan Video Rental Privacy Act (the "VRPA" or "Act"), an obscure, unconstitutional state statute passed primarily to regulate speech about video rental practices. Its constitutionality has never been directly challenged, in part because the statute sat on the books untouched—in application, enforcement, and dispute—for almost 30 years.

A few years ago an enterprising set of plaintiffs, all represented by a single firm, began an assault on *magazine* publishers, including Hearst Communications, Inc. ("Hearst"), filing a series of class actions in the Eastern District of Michigan claiming that the publishers' longstanding and well-accepted magazine subscription practices violated the VRPA.[1]  After significant litigation practice and an attack on plaintiff's standing under the Act, the plaintiff in the Hearst action voluntarily dismissed with prejudice his claims and the court vacated all prior orders against Hearst.

---

[1] *See Grenke v. Hearst Communications, Inc*., ECF Nos. 94 & 95, Case No. 2:12-cv-14221-GCS-MKM (E.D. Mich. Feb. 23, 2015); *Halaburda v. Bauer Publ'g Co., LP*, Case No. 1:12-cv-14221; *Fox v. Time, Inc.*, Case No. 2:12-cv-14390; *Fox v. Condé Nast Publ'ns*, Case No. 2:12-cv14312 (dismissed a few days before the complaint in the *Time* action was filed on behalf of the same plaintiff); *Owens v. Rodale*, Case No. 2:14-cv-12688; *Kinder v. Meredith*, Case No. 1:14-cv-11284.  None of the Eastern District of Michigan cases have, to date, proceeded so far as to result in any finding of liability by a judge or jury.

Now a different plaintiff's firm brings this action alleging largely identical claims.[2] Seeking to manipulate what it views as a loophole in the law, counsel for Plaintiff brings this as a class action, in federal court, in New York.  But in passing the Act, the Michigan Legislature was clear that VRPA claims seeking statutory penalties, like this one, are only cognizable on an individual basis.  This is just one of several fundamental reasons why this copycat case must fail.

Hearst is a publisher of magazines, including *Country Living*, and as one of the many ways magazines are offered for sale, Hearst provides consumers the option to purchase magazine subscriptions, where for a significant discount from the retail cover price Hearst sends its magazine to subscribers through the mail.  Unless the subscriber opts out, Hearst, like most other publishers, makes lists of its subscribers available to direct mail marketers.  (Compl. ¶¶ 2, 31, 39-40)

Plaintiff contends that Hearst's alleged disclosure of her *Country Living* subscription purchase (the "Purchase Information") violates the VRPA's proscription against publication of information about the purchase or rental of videos, sound recordings or "written material" (*see* Compl. ¶¶ 18-19), despite the VRPA's exemption from disclosures made for marketing purposes.  Plaintiff's attempt to stretch the law to Hearst's perfectly legal communications is revealing; it opens a window on just how broad the VRPA may be said to extend, with no compelling government need to justify its reach, much less the serious criminal and civil penalties it imposes.  The VRPA was passed as a reaction to concerns about the disclosure of video rental records (specifically, a newspaper article about Judge Bork's unremarkable choice of video rentals during his Supreme Court confirmation hearings) and in the wake of a federal

---

[2] Most recently, Plaintiff Suzanne Boelter, represented by the same counsel who represents her in this case, filed a nearly identical lawsuit against magazine publisher Condé Nast.  *See Boelter v. Advanced Magazine Publishers d/b/a Condé Nast*, No. 1:15-cv-05671-NRB (S.D.N.Y. filed July 20, 2015).

statute prompted by the same concern (*i.e.*, the Video Privacy Protection Act ("Video Privacy Act").  To say that the VRPA was an ill-conceived legislative overreaction is an understatement. Not content with the federal act, Michigan's law is much broader, going far beyond video rental records, sweeping in and criminalizing a vast array of fully protected speech, imposing much higher penalties.

The VRPA's direct assault on fully protected, non-commercial speech cannot survive First Amendment analysis.  In restricting retailers' speech concerning what written materials their customers are purchasing, while at the same time explicitly exempting such speech for direct marketing purposes, it is a content-based statute that discriminates between different types of speech and different speakers, specifically targeting non-commercial speech.  It is void on its face as overbroad under the First Amendment, and it is unconstitutional as applied to Hearst. Under either analysis, the VRPA cannot withstand strict scrutiny.

Nor can the Complaint survive scrutiny under Federal Rule of Civil Procedure 12(b)(6). Plaintiff transparently performs linguistic gymnastics to force application of the VRPA to routine communications that magazine publishers have engaged in openly for decades, but those efforts fail to state a claim.  The sale of magazines by subscription is not a sale at "retail" contemplated by the VRPA.  And the VRPA explicitly excludes from its ambit disclosures made for marketing purposes—the only sort of disclosures alleged in the Complaint.  Finally, under Michigan law, Plaintiff's unjust enrichment claim is preempted by the VRPA, and in any event cannot be sustained on the facts alleged.

But most fundamentally, this case cannot proceed because the plaintiff lacks standing and this Court lacks jurisdiction.  Plaintiff has not alleged that she suffered any viable concrete harm or damage caused by the truthful disclosure of her purchase of *Country Living*, and a statutory

violation without any actual injury is insufficient to establish Article III standing.[3]  Even more

egregious is Plaintiff's attempt to pursue her claims through the class action device.  This federal

court case, asserting claims only under Michigan law on behalf of only Michigan residents, is

barred under Michigan law from proceeding as a class action.  *See* Michigan Court Rule

("MCR") 3.501(A)(5).  Plaintiff's engineered forum shopping is futile.  Under the controlling

opinion in *Shady Grove Orthopedic Associates v. Allstate Insurance Co.*, 559 U.S. 393, 416-36

(2010) (Stevens, J, concurring), the State of Michigan's legislative mandate that VRPA statutory

penalty claims be pursued individually and not as a class action supplants Rule 23, wholly

divesting this Court of jurisdiction under the Class Action Fairness Act of 2005 ("CAFA").

　　This case—which turns on its head Congress's intent in passing CAFA to have *fewer* class

actions—is a poster child for the blatant abuses of the class action system.  It is a concocted case:

brought as a class action notwithstanding the Michigan Legislature's rejection of that device for

VRPA penalty claims; premised on CAFA, which was designed to aid removal of state class

actions but never intended by Congress to *create* class relief where not permitted by the state;

based on an unconstitutional law that Plaintiff has stretched to its limits; and alleging violations

that are within the law's marketing exception and not violations at all.  For these and the reasons

detailed below, this Court should dismiss the Complaint pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).

---

[3] The issue of whether a right to statutory damages is sufficient to invoke the Article III
jurisdiction of a federal court is currently before the Supreme Court in *Spokeo v. Robins*, to be
argued in the October Term.  Because a decision in *Spokeo* may be dispositive of this case, this
court could properly stay this action pending decision on that issue.  *See infra* note 9.

## FACTUAL BACKGROUND

### A.    The Purpose and History of the Michigan Video Rental Privacy Act.

In 1987, the video rental history of United States Supreme Court nominee Judge Robert Bork was leaked to Washington's *City Paper*.  S. Rep. No. 100-599, at 5 (1988).  Denouncing the disclosure, in November 1988 Congress enacted the Video Privacy Protection Act ("Video Privacy Act"), prohibiting the disclosure of video rental records.  *See* 18 U.S.C. § 2710.[4]

Against this backdrop, the Michigan Legislature passed Act 378 of 1988 (M.C.L. § 445.1711 *et seq*., herein the "Video Rental Privacy Act" or "VRPA"), effective March 1989, which states:

> a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.  Under the VRPA, "customer" is defined as "a person who purchases, rents, or borrows a book or other written material, or a sound recording, or a video recording."  M.C.L. § 445.1711(a).

The Video Rental Privacy Act contains various exceptions, including one that permits disclosure "for the exclusive purpose of marketing goods and services directly to the consumer." M.C.L. § 445.1713(d).  Under this exception, "written notice that the customer may remove his or her name at any time" shall be provided to the person by the disclosing party.  *Id*.  It provides that "[a] person who violates this act is guilty of a misdemeanor."  M.C.L. § 445.1714.

---

[4] The federal Video Privacy Act prohibits "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials" from knowingly disclosing "to any person, personally identifiable information concerning any consumer of such provider."  *Id.*

In 1989, the VRPA was amended to add section 445.1715, providing a "civil action for damages to the customer identified in a record . . . disclosed in violation of this act," and a remedy permitting a customer to recover "[a]ctual damages, including damages for emotional distress, or $5,000.00, whichever is greater." *See* Public Act. No. 206, Section 5, 1989 Mich. Legis. Serv. 206 (West).

Four years earlier, Michigan had overhauled its class action provisions in Court Rule 3.501, clarifying that "[a]n action for a penalty or minimum amount of recovery without regard to actual damages imposed or authorized by statute *may not be maintained as a class action unless the statute specifically authorizes its recovery in a class action*." MCR 3.501(A)(5) (emphasis added). In enacting the VRPA and adding its civil damages remedy, the Michigan Legislature did not authorize recovery of statutory damages in a class action. *See* M.C.L. § 445.1715.

B.     **This Action.**

Plaintiff's Complaint asserts that Hearst violated the Video Rental Privacy Act by disclosing Boelter's "Personal Reading Information" or "PRI" (*i.e.*, "full names, titles of magazines subscribed to, and home addresses"). (Compl. ¶¶ 2, 62; *see also* ¶ 7[5]) Plaintiff alleges that disclosure of such information constitutes a violation of the Video Rental Privacy Act, which she alleges "prohibits companies from disclosing without permission *any* record or information concerning a Michigan customer's purchase of written materials, if the record identifies the customer." (*Id*. ¶ 5 (emphasis added)) Subject-matter jurisdiction over Plaintiff's state-law action is allegedly predicated on CAFA. (Compl. ¶ 9) But for the fact that she styled

---

[5] The Complaint alleges, without further elaboration, that Personal Reading Information "identif[ies] which individual purchased which magazines." (Compl. ¶ 40; *see also* ¶ 61)

this as a class action, Plaintiff has alleged no basis for federal subject matter jurisdiction over her individual claims.

Plaintiff asserts (based largely on press reports concerning information-sharing practices generally) that Hearst damaged her and the putative class by "depriv[ing them] of the full value of their paid-for subscriptions." [6] (Compl. ¶ 69)  In her Prayer for Relief, among other remedies, Plaintiff seeks an injunction (unavailable under the VRPA) and an award of "actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each Class member." (Compl. ¶ 85 (Prayer for Relief))

**ARGUMENT**

## I.   PLAINTIFF CANNOT MEET THE THRESHOLD REQUIREMENTS TO PROCEED BEFORE THIS COURT: SHE LACKS ARTICLE III STANDING AND THIS COURT LACKS JURISDICTION OVER HER CLAIMS UNDER CAFA.

Plaintiff in this case attempts to manipulate the federal class action device to aggregate thousands of statutory damages claims in contradiction of the state law upon which the action is based, which anticipated only individual remedies and incentivized individuals to pursue those claims in state court.  That attempt fails at the threshold.  Plaintiff cannot establish that she has Article III standing, because she suffered (and alleges) no cognizable "injury in fact" and no injury sufficient for Article III standing can be created solely by fiat of the Michigan Legislature. Indeed, because the Michigan state legislature intended that actions seeking statutory damages under the VRPA be enforced only through individual actions—and not class actions—Plaintiff's lawsuit is not properly maintained under Rule 23, and this Court lacks jurisdiction under CAFA.

---

[6] In this way Boelter's Complaint contrasts with those filed in the *Grenke* and other VRPA cases, which allege that plaintiffs were injured because they were deprived of the chance to sell their own data to third-party advertisers and profit from the value of their personal information.  *See, e.g.*, *Grenke v. Hearst Communications, Inc.*, *supra* note 1, ECF 1 ¶ 73.  The Complaint here makes no such allegation.

**A.** **Plaintiff Lacks Standing to Assert Claims Under the Video Rental Privacy Act.**

Federal Rule of Civil Procedure 12(b)(1) requires dismissal where a plaintiff lacks standing to sue under Article III of the United States Constitution. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998). Because Plaintiff has no concrete and particularized injury under the VRPA and cannot establish the constitutionally required injury in fact, she cannot satisfy one of the fundamental prerequisites to maintain her action in this Court. Accordingly, the Court must exercise its Article III gatekeeping role and dismiss the Complaint.

The "irreducible Constitutional minimum" for establishing standing—which is "an essential and unchanging part of the case-or-controversy requirement of Article III"—is that a "'plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A "private interest" created by a statutory penalty is "insufficient to give a plaintiff standing." *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000).

The Supreme Court has consistently held that Article III's "injury in fact" requirement may not be circumvented by a legislative act. The fact that a statute has authorized a plaintiff to sue by granting a right of action against the defendant therefore does not, without more, satisfy the requirement of injury in fact. *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."); *Valley Forge Christian Coll. v.*

*Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 n.24 (1982)

("Neither the Administrative Procedure Act, nor any other congressional enactment, can lower

the threshold requirements of standing under Art. III.")  Although the legislative branch may be

able to elevate "*injuries* that were not previously legally cognizable to the status of legally

enforceable rights,"[7] "[t]he requirement of injury in fact is a hard floor of Article III jurisdiction

that cannot be removed by statute."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

This is no less true in the Second Circuit.  *Donoghue v. Bulldog Investors General

Partnership*, 696 F.3d 170 (2d Cir. 2012), is illustrative of the particular circumstances under

which a statute can permissibly "'creat[e] legal rights, the invasion of which creates standing.'"

*Lujan*, 504 U.S. at 578 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).  In *Donoghue*, the

Second Circuit recognized that the plaintiff (a shareholder suing derivatively on behalf of the

issuer) had standing not merely because there had been a statutory violation, but because

section 16(b) of the Securities Exchange Act of 1934 created a fiduciary duty on the part of

certain shareholders and "it conferred upon [the issuer] an enforceable legal right to expect

[defendant] to refrain from engaging in any short-swing trading in its stock."  It was the

deprivation of *that* right stemming from a breach of fiduciary duty that established Article III

standing for shareholders bringing a derivative action under section 16(b).  *Donoghue*, 696 F.3d

at 177.[8]

---

[7] John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1228 (1993) (emphasis added) (citing *Lujan*, 504 U.S. at 576-78).

[8] To the extent that the Court in *Austin-Spearman v. AMC Network Entertainment LLC*, No. 14 CIV. 6840 NRB, 2015 WL 1539052, at *4-5 (S.D.N.Y. Apr. 7, 2015) (holding that consumer had standing under federal Video Privacy Act because "[that Act] makes clear that such disclosures alone work an injury deserving of judicial relief") read *Donoghue* more broadly for the proposition that violation of *any* right created by Congress results in an Article III injury, that Court was, respectfully, incorrect.

The "hard floor" of the injury in fact requirement is of particular importance where, as here, Plaintiff has failed to articulate any plausible injury in fact (*see infra*), so instead relies on purported rights created by a *state* statute to satisfy that requirement.  It is axiomatic that states may not "confer an Article III injury where none would otherwise exist."  *MAI Sys. Corp. v. UIPS*, 856 F. Supp. 538, 540-41 (N.D. Cal. 1994) (citations omitted); *Epstein v. JPMorgan Chase & Co.*, No. 13 Civ. 4744(KPF), 2014 WL 1133567, at *10 (S.D.N.Y. Mar. 21, 2014); *Mangini v. R.J. Reynolds Tobacco Co.*, 793 F. Supp. 925, 929 (N.D. Cal. 1992) (state legislatures may not "by way of a state created right, confer injury in the Art. III sense where none would otherwise exist"); *cf. Hollingsworth v. Perry*, 133 S. Ct. 2652, 2667 (2013) ("[T]he fact that a State thinks a private party should have standing to seek relief for a generalized grievance cannot override our settled law to the contrary."); *accord* Brief of Attorneys General Amici Curiae in Support of Petitioner (including Michigan AG) at 23, *Spokeo, Inc. v. Robins*, (No. 13-1339), 2015 WL 4194152 (July 9, 2015) ("AG Amici Br.") ("[A]lthough the violation of a statute can provide a cause of action and a remedy, it cannot, by itself, result in an injury in fact.").

The Michigan Legislature did not and could not have created Article III standing by recognizing a new right under the VRPA.  The VRPA does not provide a cause of action for an injured party; it creates a remedy for individuals for the mere violation of its provisions without the need to demonstrate injury.

As a result, in the absence of a concrete and particularized injury, Plaintiff has no Article III standing to sue under the Video Rental Privacy Act.  *See Lujan*, 504 U.S. at 560.  The Complaint does not set forth any plausible theory of actual damages from the alleged disclosure that Plaintiff purchased a *Country Living* subscription, both as a matter of law and as alleged. Conclusory allegations of "deprivation of value" or "overpayment" (*e.g.*, Compl. ¶¶ 69-71) as a

result of expected privacy interests created by the existence of the VRPA do not suffice to create

an "injury in fact" sufficient to confer Article III standing.

The premise underlying Plaintiff's theory that she suffered actual damages —that the

privacy of her Purchase Information has monetary value because of the VRPA (*see* Compl.

¶¶ 69-71, 80, 82)—is legally untenable.  *See Carlsen v. GameStop, Inc.*, No. 14-3131, --- F.

Supp. 3d ---, 2015 WL 3538906, at *4-5 (D. Minn. June 4, 2015), *appeal filed*, No. 15-2453 (8th

Cir. July 7, 2015) (claim "that [plaintiff] would not have paid as much for the . . . subscription if

he had known how his [personal information] would be handled" did not confer standing); *In re*

*Google Privacy Policy Litig.*, No. C 12-01384 PSG, 2012 WL 6738343, at *5 (N.D. Cal. Dec.

28, 2012) (no injury alleged where claims were "based on nothing more than the unauthorized

disclosure of personal information"); *Murray v. Time Inc.*, No. C 12-00431JSW, 2012 WL

3634387, at *4-5 (N.D. Cal. Aug. 24, 2012), *aff'd*, 559 F. App'x 654 (9th Cir. 2014) (plaintiff

failed to "allege[] sufficient facts to show he suffered an economic injury" finding "Murray does

not connect these general allegations to facts relating to the value of *his* personal information.

Murray also has not alleged that . . . he would have attempted to sell his information and lost the

opportunity to do so."); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1030 (N.D. Cal. 2012)

("[T]he weight of authority holds that a plaintiff's 'personal information' does not constitute

property."); *Goodman v. HTC Am., Inc.*, No. C11-1793MJP, 2012 WL 2412070, at *7 (W.D.

Wash. June 26, 2012) ("'Demographic information is constantly collected on all consumers by

marketers, mail-order catalogues and retailers,' but courts have not held that 'the value of this

collected information constitutes damage to consumers or unjust enrichment to collectors.'")

(citation omitted); *Bose v. Interclick, Inc.*, No. 10 Civ. 9183 (DAB), 2011 WL 4343517, at *4-6

(S.D.N.Y. Aug. 17, 2011) ("Bose's allegations concerning 'invasion of [her] privacy,' 'trespass,'

and 'misappropriation of confidential data' are also not cognizable economic losses. . . . Bose's claim that Interclick collected her personal information therefore does not constitute cognizable loss sufficient to meet the $5,000.00 statutory threshold."); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("[T]here is absolutely no support for the proposition that the personal information of an individual JetBlue passenger had any value for which that passenger could have expected to be compensated.").

It is also factually untenable.  Plaintiff's conclusory claim that she overpaid for her subscription aside, inherent in Boelter's argument is the idea that the price she paid for her *Country Living* subscription included a "premium" in its price to account for the privacy protections of the VRPA.  But Boelter has not alleged facts that might take such a theory from the implausible to the plausible.  Plaintiff does not allege, for example that she was even aware of the VRPA's "statutory privacy protections" that she claims to have "paid for" before purchasing a subscription to *Country Living* magazine (Compl. ¶¶ 7, 80, 82), much less what "portion of the purchase price . . . was intended to ensure the confidentiality of Plaintiff's . . . [Purchase Information]," or what discount Plaintiff "would have commanded . . . to voluntarily forego" the alleged protections of the VRPA.  (Compl. ¶ 82)  She certainly does not allege that Hearst would have charged less for her subscription to *Country Living* had it not disclosed her Purchase Information.  Nor does she allege that the purchase price of a *Country Living* subscription (let alone newsstand copies) is higher for Michigan residents to account for the "statutory privacy protections" of the Michigan state statute.  Absent such factual allegations, Plaintiff's conclusory allegations of overpayment as an injury are merely that—conclusory allegations entitled to no deference and implausible on their face.  Indeed, the very idea that the price of a *Country Living* subscription includes a "non-disclosure" premium (and not just the

right to receive copies of the magazine) is implausible given both the VRPA's *permissive* disclosures for marketing purposes, and *Country Living*'s own disclosures.  *See* M.C.L. § 445.1713(d) (permitting disclosures for marketing purposes), and *infra* Part III.A.2.  Where a Plaintiff is on notice of possible disclosure of personal information, there can be no reasonable expectation of privacy.  *Cf. Carlsen*, 2015 WL 3538906, at *4 (no unjust enrichment claim stated based on disclosure of personal information where expectation of privacy is not reasonable); *Muick v. Glenayre Elecs.*, 280 F.3d 741, 743 (7th Cir. 2002) (no reasonable expectation of privacy in workplace computer files where employer had announced that he could inspect the computer); *Kelleher v. City of Reading*, No. Civ. A. 01-3386, 2002 WL 1067442, at *8 (E.D. Pa. May 29, 2002) (no reasonable expectation of privacy where employer's guidelines "explicitly informed employees that there was no such expectation of privacy").

In the absence of any cognizable injury, the only injury Plaintiff has alleged is a technical violation of the Act, and a technical statutory violation—even of a privacy statute—without more, does not confer standing.  Because Plaintiff lacks standing, the Court should dismiss the Complaint.[9]

---

[9] In the event the Court denies the motion to dismiss based on Article III standing, it should stay the action pending the outcome of a potentially dispositive case that will be decided by the U.S. Supreme Court in the upcoming October Term.  In *Spokeo, Inc. v. Robins*, No. 13-1339 (U.S.), the Supreme Court will decide whether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute.  The *Spokeo* case is expected to be fully briefed by late September and argued in the October Term.  The brief for petitioner and numerous *amici curiae* have been filed.  Indeed, in the AG Amici Brief, the Michigan Attorney General argued that the Supreme Court should "[r]equir[e] concrete injury in fact for statutory damages" because "[i]t ensures that the plaintiffs seeking statutory damages are those who have been actually harmed by a defendant's conduct and have a stake in the litigation beyond the damage award itself."  (AG Amici Br. at 2) Because *Spokeo* may be dispositive of this case on the fundamental threshold issue of standing, without the need to reach separate issues concerning jurisdiction, state legislative power to confer standing, or the constitutional validity of the VRPA, a stay of proceedings would be particularly appropriate.  *See, e.g.*, *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y.

**B.     The Court Lacks Jurisdiction Over Plaintiff's Claims Under CAFA.**

Even if Plaintiff could demonstrate standing, this case cannot be maintained in federal court.  The sole basis for jurisdiction alleged is Plaintiff's pursuit of her claim as a Rule 23 class action, permitting her to invoke CAFA's more lenient diversity requirements.  *See* Compl. ¶ 9; 28 U.S.C. § 1332(d).  But the Michigan Legislature specifically intended that the VRPA's statutory penalty claims be litigated individually, and designed the law to that end.  The Michigan Legislature could never have envisioned this VRPA case—a class action filed in federal court, brought on behalf of *only* Michigan residents, that is barred from proceeding as a class action under Michigan law.  Nor could Congress have envisioned CAFA being used to *create* class action jurisdiction here.  This case attempts to exploit what Plaintiff's counsel views as a loophole in federal law and a way to end-run around the State of Michigan's decades-long bar against class actions in VRPA cases.  This loophole does not exist.  The Michigan Legislature clearly provided that alleged VRPA violations seeking statutory damages may be litigated only by the State Attorney General or individual plaintiffs.  And Congress never intended to alter state substantive law in enacting CAFA.  CAFA's grant of jurisdiction to class actions was necessarily limited to those not barred as a matter of state substantive law.  Moreover, even if CAFA were not so limited, and its definition of "class action" could be read as co-extensive with Federal Rule of Civil Procedure 23, this action is still barred.  As Justice Stevens' controlling decision in *Shady Grove* made clear, Rule 23 cannot override state substantive law without violating the federal Rules Enabling Act.  *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010).  In short, neither CAFA nor Rule 23

---

2012) ("[A] court may also properly exercise its staying power when a higher court is close to settling an important issue of law bearing on the action.") (collecting Second Circuit cases).

provides a basis for Plaintiff's forum-shopping.  Both must yield to Michigan law.  This Court

therefore lacks jurisdiction over Plaintiff's claims and the Complaint must be dismissed.

      1.        **Michigan's Bar on VRPA Class Actions Seeking Statutory Damages is Substantive State Law:  The VRPA Was Enacted in Light of Michigan Court Rule 3.501's Class Action Limitations and Necessarily Incorporates Those Limitations.**

The Michigan Legislature originally passed the VRPA in 1988 as a criminal statute

without any private cause of action.  A year later the statute was amended to add a civil remedy

provision permitting individual "customers" to bring an action for "the greater of" actual or

statutory damages.  M.C.L. § 445.1715; Pub. Acts No. 206, Section 5, 1989 Mich. Legis. Serv.

206 (West).  Importantly, in amending the VRPA, the Michigan Legislature did not authorize

class actions.

The failure to do so is significant.  Four years *earlier*, in 1985, the Michigan Court Rules

were extensively revised to overhaul the state's treatment of class actions, creating Rule

3.501(A)(5).  5 Ronald S. Longhofer, *Michigan Court Rules Practice*, Text § 3501.3 (5th ed.

2004).  Specifically, that Rule provides that an action for the recovery of a statutory minimum

"without regard for actual damages" cannot be maintained as a class action unless the statute at

issue "specifically authorizes" recovery in a class action.  MCR 3.501(A)(5).

Thus, statutes enacted *prior* to Rule 3.501(A)(5), such as the Michigan Consumer

Protection Act, explicitly provide that statutory damages are *not* available in class actions.  *E.g.*,

M.C.L. § 445.911(2); M.C.L. § 445.964(2).  After the enactment of Rule 3.501(A)(5), such

express provisions in individual statutes prohibiting class actions became unnecessary.  Instead,

statutes enacted after Rule 3.501, must (and where applicable, do) include specific class action

*authorization*.  *E.g.*, M.C.L. § 445.815(2) ("A person who suffers loss as a result of a violation of

this act may bring an individual or a class action to recover actual damages or $50.00, whichever is greater.") (enacted 1988); M.C.L. § 445.322(2) (same, enacted 2011).

The VRPA follows this rule.  In drafting the VRPA's civil remedy provision the Michigan Legislature was well aware that if it wanted to allow Michigan residents to recover statutory damages under the VRPA on a class basis, it would need to specifically authorize such recovery in the text of the statute.  *See, e.g.*, *Malcolm v. City of East Detroit*, 468 N.W.2d 479, 482 (Mich. 1991) (applying the "well-tested principle of construction that the Legislature is held to be aware of the existence of the law in effect at the time of its enactments. . . .").  Instead, the Legislature specifically chose to confine VRPA recoveries to individual actions and to provide a substantial statutory minimum damage provision in the alternative.  *See* Longhofer, *supra*, § 3501.3 ("The committee comment to [MCR 3.501(A)(5)] indicates that the class action device for bringing together many small claims serves the same basic purpose of these minimum recovery statutes, making the minimum damage provisions of the statute unnecessary.  Also, allowing recovery of minimum damage as to each of a large number of class members might often impose an unreasonable and unintended penalty on the defendant."); *compare* M.C.L. § 445.815(2) (permitting class actions, but only $50 statutory recovery).  To further encourage individual actions, the Michigan Legislature included a provision providing for attorney's fees. *See* M.C.L. § 445.1715.  There can be no question that the absence of a class action authorization provision in the VRPA was not only intentional, it was meaningful and substantively impacted the remedies available for violations.[10]

---

[10] It was not until 2005, almost 20 years after the enactment of the VRPA's civil remedy provision, that the U.S. Congress passed CAFA and eased the diversity requirements for certain class actions.

### 2. Neither CAFA Nor Rule 23 Permits Class Action Jurisdiction Over This Action.

Plaintiff cannot avoid Michigan's class action bar under the VRPA by invoking federal jurisdiction under CAFA.

### a) CAFA's Definition of "Class Action" Does Not Permit Jurisdiction Over Class Actions that Cannot Be Maintained in State Court.

The context of CAFA and its legislative history make plain that a CAFA "class action" was never intended to—and does not—include a case that could not have been initiated as a class action in state court first.

Passed as a reaction to abuses of the class action device as practiced in state courts, *see* Public Law Number 109-2, § 2, 119 Stat. 4 (2005), Congress enacted CAFA in 2005 to make it easier for defendants to remove multi-state class actions to federal court by easing some of the requirements for invoking a court's diversity jurisdiction for qualifying "class actions." Under the statute, the term "class action" is defined to include any civil action filed under Rule 23 "or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B); *id.* § 1711(2).

It is no secret that in enacting CAFA, "Congress envisioned fewer—not more—class actions overall. Congress surely never anticipated that CAFA would make federal courts a mecca for . . . class actions seeking state-created penalties for claims arising under state law . . . that would be barred from class treatment in the State's own courts." *Shady Grove*, 559 U.S. at 459 (Ginsberg, J., dissenting);[11] *see also Estate of Pew v. Cardarelli*, 527 F.3d 25, 33 (2d Cir. 2008) (Pooler, J., dissenting) ("There is no dispute that CAFA's general purpose is to

---

[11] The Court in *Shady Grove* did not consider what a "class action" is under CAFA. The Court considered a separate question, namely the circumstances under which Rule 23 must give way (or not) to state class action limitations. That decision is discussed *infra* Part I.B.2.b.

significantly expand federal court jurisdiction over *multistate* class action litigation.") (emphasis added); Pub. L. No. 109-2, § 2(a)(4)(C); 151 Cong. Rec. S1086-01, S1103 (daily ed. Feb. 8, 2005) (statement of Sen. Grassley) (CAFA addresses "cases involving large sums of money, *citizens of many different States*, and issues of national concern, [that] have been restricted to State courts even though they have national consequences.") (quoted in *N.J. Carpenters Vacation Fund v. HarborView Mortg. Loan Trust 2006-4*, 581 F. Supp. 2d 581, 584 (S.D.N.Y. 2008) (emphasis added)).  Nor is it subject to dispute that the primary purpose of CAFA was to provide an expanded basis for removing state class actions to federal court—*not* to provide an additional forum in which class action plaintiffs could commence state-law based lawsuits.  *See, e.g.*, Pub. L. No. 109-2, § 4; *Shady Grove*, 559 U.S. at 459 (Ginsberg, J., dissenting); 151 Cong. Rec. H723-01, H727 (daily ed. Feb. 17, 2005) (statement of Rep. Sensenbrenner) ("[CAFA's] provisions should be read broadly, with a strong preference that interstate class actions should be heard in a Federal court *if removed by* any defendant.") (emphasis added).

The statutory definition of "class action" must not be read to create class action jurisdiction over a state statutory claim brought on behalf of a class comprised entirely of Michigan residents, that was not (and could not be) brought as a class action in Michigan state court because the state legislature specifically determined that the claims should be maintained only on an individual basis.  Rather, the purpose and history of CAFA make clear that only "class actions"—brought pursuant to Rule 23 or otherwise—that could have been (or were) asserted as class actions in state court can provide the basis for a federal court's expanded diversity jurisdiction.

To read CAFA's definition of "class action" otherwise would be inconsistent with Congress's legislative plan in passing the statute.  CAFA's tortured legislative history resulted in

language widely acknowledged to be cryptic and ambiguous.  *See Estate of Pew*, 527 F.3d at 33

(quoting *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1187 (11th Cir. 2007), *reh'g denied*, 2008

WL 41327 (11th Cir. Jan. 3, 2008) ("[W]e are 'forced . . . to construe CAFA's cryptic text.'")

(alteration in original)).  The Supreme Court is clear that when interpreting statutes, the context

of the law must be taken into account in interpreting even what seemingly are unambiguous

terms.  *See, e.g.*, *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation

demands a fair understanding of the legislative plan."); *Utility Air Regulatory Group v. EPA*, 134

S. Ct. 2427 (2014) (interpreting statutory phrase in one part of the statute differently in another

part of the statute because any other reading would not be "sensibl[e]"); *Shady Grove,* 559 U.S.

at 433 n.16  ("[W]hen interpreting statutes, context matters.").

 *Bond v. United States* is illustrative.  *Bond* involved a statutory definition— "chemical

weapon"—that seemed clear on its face: any chemical that "can cause death, temporary

incapacitation or permanent harm to humans . . . ."  The question presented in *Bond* was whether

two compounds—both of which can be lethal in high doses—qualified as "chemical

weapons."  The Supreme Court held they did not.  The statute was ambiguous, the Court held,

because of "the improbably broad reach of the key statutory definition . . . ." *Bond v. United

States*, 134 S. Ct. 2077, 2085, 2090 (2014).

 CAFA's "class action" definition presents a similar, "improbably broad" reach and makes

no sense in the context of CAFA's broader aim and purpose to aid removal of multi-state class

actions if read to confer federal jurisdiction over a single-state class claim that Michigan

deliberately rejected and would not permit.  The only plausible reading of CAFA's "improbably

broad" definition of "class action" is that, for diversity purposes, it be limited to class actions that

could have been commenced in state court from the start.  This is not such an action.

**b)** **Even if CAFA's Definition of "Class Action" Were as Extensive as Rule 23, That Rule Cannot Be Applied Here To Override Substantive Michigan Law Without Violating the Rules Enabling Act.**

Even if CAFA's definition of "class action" were read to be co-extensive with Rule 23, and not limited to exclude cases that could not have been brought in state court in the first place, CAFA still could not be applied here.  That is because application of Rule 23 would violate the federal Rules Enabling Act.  As discussed above, Michigan's bar on class actions for statutory damages is incorporated into the VRPA and is a matter of state substantive law.  Michigan Rule 3.501(A)(5) is, in the words of Justice Stevens, "sufficiently interwoven" with the VRPA that to apply Rule 23 would so abridge Michigan's rights or remedies as to violate the Rules Enabling Act, 28 U.S.C. § 2072(b).  *See Shady Grove*, 559 U.S. at 429 (Stevens, J., concurring) ("[I]f a federal rule displaces a state rule that is '"procedural" in the ordinary sense of the term,' but sufficiently interwoven with the scope of a substantive right or remedy, there would be an Enabling Act problem, and the federal rule would have to give way.") (citation omitted). [12]

Under the Rules Enabling Act, a "federal rule . . . cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  *Shady Grove*, 559 U.S. at 423.  As a result, where a limitation on class actions is

---

[12] As numerous courts have observed, Justice Stevens's concurring opinion is the controlling opinion in *Shady Grove* (which was decided by a highly fragmented Court).  *See, e.g.*, *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) ("Justice Stevens concurred, and the Tenth Circuit has understood his concurrence to be the controlling opinion in *Shady Grove*."); *Godin v. Schencks*, 629 F.3d 79, 89-90 (1st Cir. 2010) (relying on Justice Stevens's concurrence in holding, "[b]ecause Section 556 is 'so intertwined with a state right or remedy that it functions to define the scope of the state-created right,' it cannot be displaced . . . ."); *Fraiser*, 2015 WL 3794377, at *6 ("[T]he 'intertwined' test articulated by Justice Stevens is controlling, meaning that Rule 23 only supersedes procedural state law.").  *See generally Marks v. United States*, 430 U.S. 188, 193 (1977).

contained within a substantive statute itself, courts have found the limitation to be sufficiently "intertwined" with a state right or remedy so as to preclude application of Federal Rule of Civil Procedure 23. *See Fraiser v. Stanley Black & Decker, Inc.*, No. 12-1182-WGY, --- F. Supp. 3d ---, 2015 WL 3794377, at *6 (D. Conn. June 15, 2015) (finding class action residency restriction in Connecticut Unfair Trade Practices Act ("CUTPA") "reflects a substantive policy judgment by the Connecticut legislature" and therefore is not "preempted" by Rule 23), *appeal filed*, No. 15-2162 (2d Cir. Jul. 7, 2015) (citation and quotation marks omitted); *Leonard v. Abbott Labs., Inc.*, No. 10-cv-4676(ADS)(WDW), 2012 WL 764199, at *12 (E.D.N.Y. Mar. 5, 2012) (collecting cases); *Phillips v. Philip Morris Cos. Inc.*, 290 F.R.D. 476, 480 (N.D. Ohio 2013) (collecting cases). To hold otherwise and permit Rule 23 to preempt such state laws would mean that Rule 23 is *ultra vires*—an "impermissible result." *Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring).

Because the VRPA prohibits the class action alleged in this case from being heard in Michigan state court, there is no proper Rule 23 class action, and consequently there is no jurisdictional basis for Plaintiff's claims under CAFA. Here, in light of the state's class action overhaul, the Michigan Legislature adopted the VRPA first as a criminal statute and then, when amending, granted only a limited, individual civil remedy. In adopting the VRPA, the legislature knew that it would need to explicitly provide for a class remedy if it intended one. It did not. Because the legislature adopted the substantive VRPA intending that violations be enforced only through individual lawsuits, not class actions, Michigan Court Rule 3.501(A)(5) must be viewed as incorporated into the VRPA itself. In stark contrast, the New York statutory provision at issue in *Shady Grove* did not post-date the New York CPLR's bar on class actions, and there was no argument that the bar was necessarily incorporated into the statute itself.

Because Rule 23 cannot be applied in this case to override Michigan's bar on class action relief, and because Plaintiff has alleged no basis upon which this Court may exercise jurisdiction over her individual claims, her Complaint must be dismissed in its entirety.  *See Fraiser*, 2015 WL 3794377, at *6 (dismissing individual claim for failing to meet amount in controversy requirement where plaintiff had no standing to represent class action under Connecticut Unfair Trade Practices Act).[13]

## II.    THE COMPLAINT MUST BE DISMISSED BECAUSE THE VRPA VIOLATES THE FIRST AMENDMENT ON ITS FACE AND AS APPLIED.

The Michigan VRPA has never been subject to a facial challenge on First Amendment grounds, likely because it appears never to have been the subject of litigation at all until recently. Michigan enacted the VRPA almost thirty years ago, as an overreaction to a newspaper article, seeking to stem future news reports about video rentals by prohibiting speech by those who might inform such reports.  But the VRPA sweeps much broader than that, and much broader than the federal Video Privacy Act that was enacted before it, criminalizing speech by anyone who rents, lends, or sells at retail any "written materials" or "sound recordings," if the speech

_____

[13] Should this Court determine that the case *can* proceed as a class action under Rule 23, the VRPA claims in this case should be limited to actual damages.  Because the VRPA's statutory damages provision extends only to individual claims as a matter of Michigan law, that provision cannot be used to determine whether the amount in controversy requirement has been satisfied for federal class action jurisdiction.  *See infra* Part I.B.1.  Reading the VRPA to provide only for actual damages would comport with Michigan law and the Michigan Attorney General's view that a statute must be read to require a showing of some actual damages to confer standing.  *See supra* n.9; *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005) ("Where, as here, jurisdiction is predicated on diversity of citizenship, a plaintiff must have standing under both Article III of the Constitution and applicable state law in order to maintain a cause of action.") (citations omitted).  Of course, any Rule 23 class under the VRPA that is properly limited to actual damages should be dismissed because (1) Plaintiff has not alleged any plausible theory of actual damage, and (2) even if she had, it would be insufficient to satisfy the "amount in controversy" requirement.  Nor has Plaintiff alleged facts demonstrating that the amount in controversy requirement can be satisfied by the unjust enrichment claim alleged, which in any event is preempted by the VRPA.  *See infra* Part III.B.1.

includes "information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer."  M.C.L. § 445.1712.  This broad scope encompasses everything from news reporting about public figures' media consumption, as was the subject of the Bork article, to speech about any purchase by anyone of anything with writing, from a magazine to a map to a cereal box.  The Michigan VRPA cannot survive strict constitutional scrutiny under the First Amendment.  The law is unconstitutional on its face because of its substantial overbreadth, and it is unconstitutional as applied to Hearst on the specific facts alleged here.

A.    **The VRPA Criminalizes a Vast Array of Fully Protected Speech on the Basis of Its Content, Discriminates on the Basis of Content and Speaker, and Is Subject to the Strictest First Amendment Review.**

As a content-based, content-discriminatory statute that discriminates against different speakers and is directed at fully protected speech, the VRPA contains every hallmark of a law that violates the First Amendment.  *See, e.g.*, *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227, 2230 (2015).

First, the VRPA clearly targets speech that is fully protected by the First Amendment. This is apparent on the law's face, and also in its legislative history.  Significantly, the law expressly carves out disclosures for direct marketing.  The Michigan Legislature instead focused the VRPA's regulatory aim directly on non-marketing speech, having been prompted by a newspaper article and determined to prevent such reporting in the future (*see* Compl. Ex. A).

The Supreme Court, however, has made clear that speech is fully protected by the First Amendment if it does not fall within one of several narrow, clearly defined categories:

- "advocacy intended, and likely, to incite imminent lawless action" (*Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam));
- obscenity (*Miller v. California*, 413 U.S. 15 (1973));

- defamation, subject to certain constitutional protections (*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) (providing substantial protection for speech about public figures) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (imposing some limits on liability for defaming a private figure));

- speech integral to criminal conduct (*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949));

- so-called "fighting words" (*Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942));

- child pornography (*New York v. Ferber*, 458 U.S. 747 (1982));

- fraud (*Virginia Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976));

- true threats (*Watts v. United States*, 394 U.S. 705 (1969) (per curiam)); and

- "speech presenting some grave and imminent threat the government has the power to prevent" (*Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931)).

(*all as cited or quoted in United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (noting that "a restriction under the last category is most difficult to sustain"); *see also, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468-69 (2010)).  Only regulations that target speech in one of these historically unprotected categories may escape strict scrutiny.  Quite clearly, none of those limited categories applies to the VRPA.

Moreover, the VRPA does not just target fully protected speech, it does so on the basis of the speech's content.  It prohibits speech on a specific subject matter—namely "information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer" (M.C.L. § 445.1712).  *See Reed*, 135 S. Ct. at 2230.  That is different from a content-neutral regulation that regulates not *what* people can say but *how* people may speak.  *See, e.g.*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (regulation is content-neutral only if it is "justified without reference to the content of the regulated speech . . . .").  Because of their restriction on ideas and the speaker's message, laws like the VRPA that regulate based on the content of speech are presumed unconstitutional.  *See, e.g.*, *Alvarez*, 132 S. Ct. at 2543-44 ("'[A]s a general matter, the First Amendment means that

government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' . . . As a result, the Constitution 'demands that content-based restrictions on speech be presumed invalid . . . .'") (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) and *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004)); *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011) ("It is rare that a regulation restricting speech because of its content will ever be permissible.") (citation and quotation marks omitted); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) ("Content-based regulations are presumptively invalid.").

So too are laws that discriminate on the basis of content.  *See Reed*, 135 S. Ct. at 2230; *R.A.V.*, 505 U.S. at 387.  The VRPA expressly favors direct marketing messages by making them exempt from liability, and discriminates against non-marketing messages of the same type, subjecting them to criminal penalties and civil fines.  In this way the law discriminates against speech that is subject to the greatest protection, leaving the same exact speech exempt from the statute's reach when made for marketing purposes.  M.C.L. § 445.1713(d).

Finally, the VRPA discriminates on the basis of speaker.  It restricts only those who rent, lend, or are in the business of "selling at retail" books or other written materials, sound recordings or video recordings.  M.C.L. § 445.1712.  While this is a vast group, the law does not prohibit the same disclosures when made by many others with access to the same information.  Disfavoring specific speakers in this way is yet another indication of the law's unconstitutionality.  "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *See Brown*, 131 S. Ct. at 2740 (striking statute singling out purveyors of video games for disfavored treatment); *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011).

For each of these reasons, the VRPA is presumed invalid under the First Amendment and subject to the strictest constitutional review. As demonstrated below, it cannot survive that scrutiny.

**B.     The VRPA Is Unconstitutionally Overbroad and Invalid on Its Face.**

The perniciousness of the VRPA is evident in its broad reach, which makes plain its power to chill and deter a vast array of constitutionally privileged activity. Because the VRPA reaches a real and substantial number of instances where it would criminalize protected speech, *see, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973), it must be facially invalidated under the Supreme Court's "overbreadth" doctrine.

The First Amendment overbreadth doctrine stems from the longstanding recognition "that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick*, 413 U.S. at 611-12. The overbreadth doctrine is not concerned with the statute as applied to defendant's conduct—it permits a challenge to a statute on its face because it threatens others not before the court. *E.g.*, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503-04 (1985). The doctrine exists because overbroad statutes impermissibly pose "a danger of chilling free speech." *Sec'y of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). A law is void on its face under the overbreadth doctrine if it "does not aim specifically at evils within the allowable area of [government] control but . . . sweeps within its ambit other activities that . . . constitute an exercise" of protected expression. *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

The VRPA is a classic example of an overbroad law. It is a deliberate and sweeping attempt to criminalize and deter through draconian penalties a broad array of speech protected by

the First Amendment.  The VRPA significantly compromises recognized First Amendment

protections of parties not before the Court.  Restraints on the way in which information might be

used or disseminated clearly implicate the First Amendment.  *Sorrell*, 131 S. Ct. at 2665

(citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)).  The VRPA is just such a

restraint.  As discussed above, it is content-based, discriminates between different types of

speech (marketing and non-marketing) and different speakers (retailers and non-retailers), and

specifically targets non-commercial speech by making direct marketing exempt from its purview.

It broadly covers any non-marketing disclosure of any "information concerning" any person's

purchase, borrowing, or rental of any book, sound recording, video recording, or "other written

materials."  In so doing, it criminalizes speech concerning virtually any imaginable transaction

given the ubiquity of "written material" entwined with products and services of all types, and the

limitless prohibition on disclosing "information concerning" a person's transactions involving

written material.

   Even if there were some constitutional core to the VRPA, the law clearly encompasses a

substantial amount of protected speech that cannot be justified.  As this and numerous other

cases against magazine publishers demonstrate, the VRPA is being used to try to prevent *all* non-

marketing disclosures by publishers that might identify who buys their magazines.  These efforts

begin to suggest the many ways in which the statute might be used by those seeking to exploit its

breadth as a means to extort penalties and punish speech.  By its terms, the VRPA would

criminalize and subject to statutory penalties even mundane daily interactions such as, for

example, a newsstand employee who just sold Hillary Clinton an issue of *Country Living*

magazine from answering the question posed from the next customer in line—"Was that just

Hillary Clinton buying *Country Living* magazine?," even if the third customer in line could

answer "Yes, it was!"  And of course, application of the VRPA to a publisher implicates even more serious constitutional concerns.

Taken to its extreme—as Plaintiff does by claiming that Hearst and anyone who offers publications by subscription is a "retailer" (something Hearst disputes as a matter of law, *see infra* Part III.A.1)—a publisher could be liable under the VRPA for publishing, in any of its magazines or newspapers, a truthful story indicating that someone—including a candidate for a public position in the heat of a campaign—bought one of its publications, no matter how newsworthy the information was, how great the public interest in the information, how potentially unexpected it might be given the candidate's persona and positions.  Indeed, this was the explicit legislative intent in enacting the VRPA—to restrain truthful reporting on individual viewing and reading choices.  (Compl. ¶ 18 & Ex. A)  Such "intrusion into the function of editors" in choosing what material to include in a publication "and the decisions made as to limitations on the size and content of the [publication], and treatment of public issues." is entirely inconsistent with the First Amendment.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  Whatever privacy rationale might be articulated in support of the VRPA, it cannot possibly apply to the vast array of speech criminalized by the law, much less in a compelling or narrowly tailored way.

Because of its broad prohibition on protected speech, there is no possible "saving" construction of the VRPA that can separate or sever the unconstitutional reach of the law from any narrower, constitutionally permissible reach (if one could be found).  *E.g.*, *Dombrowski v. Pfister*, 380 U.S. 479, 491 (1965) (finding that overbreadth analysis applies when there is "no readily apparent construction [that] suggests itself as a vehicle for rehabilitating the statute[] in a single prosecution . . . .");  *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 575

(1987) (a court need not consider a limiting construction when the statute "is not 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'") (citation omitted).[14]  For these reasons, the VRPA is unconstitutionally overbroad on its face and should be invalidated.

### C.    Plaintiff's VRPA Claim Cannot Survive First Amendment Scrutiny.

Even if the VRPA is not unconstitutionally overbroad, it is unconstitutional as applied here.  Hearst is not a video rental outlet; it is "an international media company that publishes over 300 magazines throughout the world."  (Compl. ¶ 1)  The specific violation alleged in this case—disclosing subscriber Purchase Information allegedly to "consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes" (Compl. ¶ 59; *see also* ¶ 61)—challenges speech that is fully protected by the First Amendment.  As the Second Circuit held, and the Supreme Court quoted in upholding that ruling, "'[t]he First Amendment protects even dry information, devoid of advocacy, political relevance, or artistic expression.'"  *See Sorrell*, 131 S. Ct. at 2666-67 (quoting *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271-72 (2d Cir. 2010)).  In adopting this ruling, the Supreme Court explicitly rejected the contention that data disclosure is a mere commodity undeserving of First

---

[14]  Where, as here, a *federal* court is presented with the prospect of providing a saving construction to an allegedly overbroad *state* law, federalism suggests that only a state court may provide such a material limitation on a state law.  *See Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994) ("While loath to find that the . . . ordinance violates the First Amendment, this Court is unable to supply a limiting construction for the regulation. . . .  '[t]he principles of federalism forbid a federal appellate court to arrogate the power to rewrite a municipal ordinance.'" (citations omitted)); *see also Virginia v. Black*, 538 U.S. 343, 367 (2003) (plurality opinion) (finding a state law was overbroad under the First Amendment, though stating that because the state high court had not authoritatively interpreted the law at issue, it was possible on remand the state high court would offer a construction of the law that avoided the overbreadth concerns).  Without an authoritative interpretation of the VRPA by the Michigan Supreme Court or Legislature, this Court is confined to a plain-language interpretation of the scope of the state or local statute for purposes of a First Amendment overbreadth review.

Amendment protection.[15]  This is consistent with the Supreme Court's clear law that speech is fully protected by the First Amendment unless categorically excluded from such protection.  *See supra* pp. 23-24.

Because the VRPA targets fully protected speech based on particular content and particular speakers, it is presumed invalid unless it can survive strict First Amendment scrutiny.  *See supra* pp. 23-26.  Content-based restrictions can survive such scrutiny only if they advance a compelling government interest, and are narrowly tailored to serve that aim.

Here, there is *no* governmental interest in prohibiting speech about an individual's *purchase* of a magazine subscription, let alone a compelling one.  A generalized right to privacy is not a sufficient governmental interest to support the type of broad prohibition on speech imposed by the VRPA.  Indeed, Courts have been loath to find even a substantial government interest in the sort of privacy interest to which the VRPA is directed, let alone one that is *compelling.  See, e.g.*, *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1234 (10th Cir. 1999) ("The breadth of the concept of privacy requires us to pay particular attention to attempts by the government to assert privacy as a substantial state interest.").  As the Supreme Court has explained, the "determination [as to whether an interest is compelling] is not to be made in the abstract, by asking whether fairness, privacy, etc., are highly significant values; but rather by asking whether the *aspect* of fairness, privacy, etc., addressed by the law at issue is highly

---

[15] The Supreme Court observed in *Sorrell* that "[t]he State also contends that heightened judicial scrutiny is unwarranted in this case because sales, transfer, and use of [] identifying information are conduct, not speech.  Consistent with that submission, the United States Court of Appeals for the First Circuit has characterized prescriber-identifying information as a mere 'commodity' with no greater entitlement to First Amendment protection than 'beef jerky.'"  *Sorrell*, 131 S. Ct. at 2666 (citing *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 52-53 (1st Cir. 2008)).  The Supreme Court then explicitly rejected this argument, finding instead "[t]his Court has held that the creation and dissemination of information are speech within the meaning of the First Amendment."  *Id.* at 2667 (citation omitted).

significant." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000).  And as the Tenth

Circuit noted in failing to find even a substantial governmental interest based on a general

privacy rationale:

> In the context of a speech restriction imposed to protect privacy by keeping certain information confidential, the government must show that the dissemination of the information desired to be kept private would inflict ***specific and significant harm*** on individuals, such as undue embarrassment or ridicule, intimidation or harassment, or misappropriation of sensitive personal information for the purposes of assuming another's identity.  Although we may feel uncomfortable knowing that our personal information is circulating in the world, we live in an open society where information may usually pass freely.  A general level of discomfort from knowing that people can readily access information about us does not necessarily rise to the level of a substantial state interest . . . .

*U.S. West*, 182 F.3d at 1235 (emphasis added).

Nothing in the statutory language or history of the VRPA demonstrates that the State of

Michigan has any compelling interest in preventing disclosure of the fact that Plaintiff purchased

*Country Living* magazine.  Nor does Plaintiff allege any "specific and significant harm" from the

alleged disclosure.  Moreover, where, as here, the VRPA outlaws disclosures only for some

purposes but not for others, by some people but not by others, it cannot be said that protection of

magazine subscribers from disclosure of their Purchaser Information or subscriber status is

"compelling."  As a matter of law, it is not.  *Cf. Sorrell*, 131 S. Ct. at 2669 (no substantial

government interest in protecting physicians from harassing sales activities); *Jones*, 530 U.S. at

585 (California's asserted interest in protecting the privacy of voters' party affiliations could not

"conceivably be considered a 'compelling' one," because "[i]f such information were generally

so sacrosanct, federal statutes would not require a declaration of party affiliation as a condition

of appointment to certain offices.").

Even if there were a compelling government interest in prohibiting the disclosure of an

individual's purchase of magazines like *Country Living*, the VRPA cannot be viewed as

reasonably drawn to protect that interest.  The law is woefully underinclusive to the extent that it is aimed at protecting against disclosure of subscription purchase information, clearly frustrating that objective.  The VRPA does not bar the disclosure of such information in marketing contexts, and such disclosures result in the very same sort of injury Plaintiff complains of here—the receipt of junk mail and solicitations (Compl. ¶¶ 7, 40, 72).  The fact that direct marketing disclosures *are expressly permitted* under the statute is clear proof that the law is not narrowly tailored to achieve Plaintiff's asserted privacy interest.  The law is underinclusive in other ways as well.  For example, to the extent that Michigan's purpose was to maintain privacy in all reading, listening and viewing choices, it would have extended the law's prohibition to others, including those who do not charge for the materials they make available, and those who may have access to rental, borrowing or Purchase Information but are not covered by the statute.  The VRPA is also impermissibly over-inclusive, as it penalizes disclosure of all Purchase Information regardless of whether an individual regards it as private or sensitive.  The vast majority of transactions subject to the law take place out in the open where there is generally no expectation or effort to maintain privacy.

Because the VRPA is a content-based assault on Hearst's fully protected speech that serves no compelling government interest implicated here, and is not narrowly tailored to serve Plaintiff's asserted privacy interests in any event, it does not survive constitutional scrutiny and the Complaint should be dismissed.[16]

---

[16] This is true of the unjust enrichment claim as well as the VRPA claim, since, as discussed *infra*, Plaintiff's unjust enrichment claim is premised entirely on a purported (but implausible) expectation of privacy created by the VRPA.  *See infra* Part III.B.

### III.   PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

#### A.   Plaintiff Fails to State a Claim Under the Video Rental Privacy Act.

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) where it fails to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[P]lausibility 'depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render [the] plaintiff's inferences unreasonable.'" *Green v. McLaughlin*, 480 F. App'x 44, 46 (2d Cir. 2012) (quoting *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (alteration in original)).

Federal Rule of Civil Procedure 12(b)(6) exists to weed out undeserving complaints *before* parties engage in expensive discovery, particularly in putative class actions likely to generate significant discovery costs. *Twombly*, 550 U.S. at 559. "[F]or purposes for determining the sufficiency of a Rule 12(b)(6) claim, a court may consider: (1) factual claims in the plaintiff's complaint; (2) the exhibits accompanying the complaint or documents incorporated by reference; (3) documents in the plaintiff's possession or of which the plaintiff had knowledge and relied upon in bringing the case; and (4) matters of which judicial notice may be taken." *In re Lyondell Chem. Co.*, 505 B.R. 409, 418 (S.D.N.Y. 2014) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (citation omitted). When a plaintiff has "not

nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.* at 570.

1.    **The Video Rental Privacy Act Applies Only to Those "Selling at Retail" and by Offering Magazine Subscriptions Hearst Is Not "Selling at Retail."**

The Video Rental Privacy Act by its terms applies only to persons "engaged in the business of selling at retail . . . ." M.C.L. § 445.1712.  But Hearst and other magazine publishers are not in the "retail" business as that word is commonly understood.  (Compl. ¶ 1)  As a matter of law, the sale of *subscriptions* is not "at retail," notwithstanding the Complaint's contrary conclusion.  (Compl. ¶ 54)  Unlike point-of-sale transactions for the purchase of published magazines for the full cover price, a subscription is a long-term relationship through which individuals purchase the right to receive yet-to-be-published magazines directly from the publisher, often at a discount off the cover (retail) price.  *Cf. Haley v. Nunda Twp.*, No. 250082, 2005 WL 94791, at *2-*3 (Mich. Ct. App. Jan. 18, 2005) (describing subscriptions), *appeal denied*, 706 N.W.2d 740 (Table) (Mich. 2005); *Brockmeyer v. The Hearst Corp.*, No. 01-Civ-7746(JGK), 2002 WL 1402320, at *10 (S.D.N.Y. June 27, 2002) (in comparing publications, noting that "plaintiff's publication costs more than twice as much as the defendants', even without taking subscription discounts into account."); *Editorial Caballero, S.A. de C.V. v. Playboy Enters. Inc.*, 359 S.W.3d 318, 331 (Tex. Ct. App. 2012) (noting difference in magazine's cover price, newsstand sale price and subscription prices); *Osborne v. Comm'r*, 68 T.C.M. (CCH) 273, 1994 WL 394999, at *3 (T.C. 1994) (noting retail price was "three times that of the subscription" price where taxpayer donated items obtained at subscription price but deducted higher retail price).

34

Plaintiff alleges that she was a subscriber and does not claim to have paid the full cover retail price of *Country Living* magazine.[17] Consistent with the understanding that magazine subscriptions are not the same as retail purchases, no civil or criminal case has been brought against magazine publishers under the VRPA since its enactment, even though the rental of those lists has been a well-known direct marketing practice since long before the Act's passage.[18]

There is simply no basis in law or fact for finding that by making magazine subscriptions available to consumers, Hearst is "engaged in the business of selling at retail."  The Complaint therefore fails to state a claim under the VRPA.

### 2. Hearst Informed Plaintiff that Her Information Could Be Disclosed For Marketing Purposes.

The Court should also dismiss Boelter's claims for violation of the Video Rental Privacy Act because the Act specifically allows disclosure of information about an individual's purchase of written materials for the "exclusive purpose of marketing goods and services directly to the

---

[17] Allegations as to Plaintiff's subscription price and the retail price—let alone the prices paid by Michigan residents—would also belie her allegations that the price of her subscription included any VRPA privacy "premium," since the VRPA would apply to both newsstand and subscription purchases. *See also* discussion *supra* pp. 11-13 and *infra* Part III.B.2.

[18] Under the rule of lenity, the Court should narrowly construe any ambiguity in the Video Rental Privacy Act's civil action provision and resolve it in favor of Hearst.  The rule of lenity, a canon of statutory construction, counsels courts to choose the interpretation of an ambiguous statute that is most "lenient" or favorable to the defendant.  *See, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (holding where a statute has both civil and criminal application the rule of lenity must be applied consistently to both).  Courts have applied the rule of lenity in analogous situations where the claim was based on criminal statutes that created a civil action.  *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 384 (S.D.N.Y. 2010) (applying rule in civil case because the statute creating the private right of action in that case—the Computer Fraud and Abuse Act—was codified as a criminal one); *see also Leslie Salt Co. v. United States*, 55 F.3d 1388, 1398 (9th Cir. 1995) ("[T]he rule of lenity should counsel us to choose the interpretation least likely to impose penalties unintended by Congress.  The rule of lenity has not been limited to criminal statutes, particularly when the civil sanctions in question are punitive in character.") (citations omitted).  The rule is applied with particular scrutiny in cases implicating First Amendment concerns.  *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 71-72 (1994); *Schwartz v. Romnes*, 495 F.2d 844, 849 (2d Cir. 1974).

consumer" as long as the person disclosing the information "inform[s] the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." M.C.L. § 445.1713(d). Plaintiff has alleged no non-marketing uses of her Purchase Information or that she asked that her Purchase Information not be disclosed. *See* M.C.L. § 445.1713(d).[19]

Boelter makes the sweeping conclusory allegation that "[r]egardless of how the consumer subscribes . . . Hearst uniformly fails to obtain any form of consent from—or even provide effective notice to—its subscribers before disclosing their Personal Reading Information." (Compl. ¶ 43) Consent, however, is an *additional* basis on which the VRPA will not apply, but it is not required for the VRPA's marketing exception to apply—only notice and an *opportunity to opt out* is required. *See* M.C.L. § 445.1713(d). There can be no dispute that *Country Living* magazine provides just that. Issues of *Country Living* magazine explicitly state:

> From time to time we make our subscriber list available to companies who sell goods and services by mail that we believe would interest our readers. If you would rather not receive such offers via postal mail, please send your current mailing label or an exact copy to [address].

Decl. of Kristina E. Findikyan, Ex. A.[20] Moreover, the Privacy Policy available at the *Country Living* subscription website (the "Website") states:

---

[19] Plaintiff's allegations make clear that even any "disclosures" to "data miners" are tied to the "sale" of subscription lists for the purpose of marketing to subscribers. (*See, e.g.*, Compl. ¶¶ 39-41)

[20] This Court can take judicial notice of the contents of this disclosure (and of *Country Living* magazine) because the contents of *Country Living* and its subscription website are integral to the Complaint. *See, e.g.*, *Lifetree Trading PTE., LTD. v. Washakie Renewable Energy, LLC*, No. 14-CV-9075(JPO), 2015 WL 3948097, at *4 (S.D.N.Y. June 29, 2015) (citing *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)). Notably, Plaintiff has not alleged any details of her alleged subscription, including the date(s) on which she subscribed or the method of her subscription. Plaintiff cannot, however, avoid consideration of relevant documents that would reasonably be expected to be referenced in a complaint by carefully omitting such references. *E.g.*, *Wilson v. Kellogg Co.*, No. 14-CV-2817, --- F. Supp. 3d ---, 2015 WL 3937511, at *3 (E.D.N.Y. June 25,

> For the purposes of this policy, "Personally Identifiable Information" is information that we can use to identify or contact you as an individual, and includes your name, email address, address, telephone number and any other information that we associate with any of the foregoing. By submitting Personally Identifiable Information through any of our Covered Sites, you agree to the terms of this privacy policy and you expressly consent to the collection, use and disclosure of your Personally Identifiable Information in accordance with this privacy policy.

*See* Country Living Privacy Policy, http://www.countryliving.com/privacy-policy and Hearst

Magazines Privacy Policy, subscribe.hearstmags.com/circulation/shared/privacy.html ¶ 1(a).

The Privacy Policy further discloses, *inter alia*, that:

> From time to time we may disclose your contact information to third parties to allow them to market their products or services to you or for other marketing purposes.  This may be information we received from you offline and online.

*Id.* ¶ 5(d).  The Privacy Policy also provides details on how to "opt out of having your

information shared with marketing services companies."  *Id.*

Here, it is clear from both the Website and *Country Living* itself that Hearst provided

explicit written notice to Boelter that her "Personally Identifiable Information" (including her

Purchase Information) could be disclosed for marketing purposes, and that she could opt out.[21]

This is exactly the activity permitted by the VRPA.  *See* M.C.L. § 445.1713(d).  Accordingly,

Plaintiff's First Cause of Action should be dismissed.

---

2015) ("'Plaintiff['s] failure to include matters of which as [ ] pleader[ ] [he] had notice and which were integral to [his] claim—and that [he] apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on [a 12(b)(6) ] motion.'") (alterations in original) (quoting *L–7 Designs*, 647 F.3d at 422), *appeal filed*, No. 15-2237 (2d Cir. July 15, 2015).  There can be no doubt that *Country Living* magazine itself and its disclosures are central to Plaintiff's allegations.

[21] Boelter effectively concedes this in paragraph 43 of her Complaint, where she conspicuously fails to contend that *no* notice was provided, and conclusorily alleges (with no factual support) that *the notice* was not "effective."

### B.      Plaintiff Fails to State a Claim for Unjust Enrichment.

Finally, Boelter fails to state a claim for unjust enrichment.  As an initial matter, because the VRPA provided a new cause of action and remedy for disclosure of an individual's status as a purchaser of specific "written materials," its provisions provide the exclusive remedy to Plaintiff based on any disclosure of her purchase of a *Country Living* subscription, and her unjust enrichment claim cannot lie.  More substantively, Plaintiff's cause of action for unjust enrichment relies entirely on the theory that the VRPA created an entitlement to confidentiality in Plaintiff's Purchase Information, and that Plaintiff paid more for her subscription than she otherwise would have in expectation of that privacy.  (Compl. ¶¶ 78-80)  No such cause of action, however, can be sustained under the facts alleged.

### 1.      The VRPA Provides Plaintiff's Exclusive Remedy in this Case.

Plaintiff's unjust enrichment claim is premised exclusively on her theory that the price she paid for her *Country Living* subscription included a "premium" for non-disclosure of her Purchase Information.[22]  (Compl. ¶¶ 7, 78, 82-83; Pl.'s Letter to Judge Torres at 5, July 20, 2015, ECF No. 12)  Any purported expectation of privacy, however, is only alleged to arise from—and can only arise from—the VRPA's prohibition on disclosure of Plaintiff's Purchase Information.[23]  (Compl. ¶¶ 7 (noting Plaintiff is "entitled by law to privacy in her [PRI]"), 78-79, 82)  As a result, any privacy interest in non-disclosure of Plaintiff' PRI is covered by the VRPA, which provides her exclusive remedy, and Plaintiff's unjust enrichment claim is preempted.  *See, e.g.,*

---

[22] In this respect, the allegations underlying Plaintiff's unjust enrichment claim differ significantly from those alleged (and ruled on) in prior VRPA cases.  *See supra* note 6.

[23] Any argument that Plaintiff's unjust enrichment claim is not predicated on a VRPA violation, but on some other, unidentified, expectation of privacy is facially implausible and contradicted by the allegations in, *inter alia*, paragraphs 7, 78, 79 and 82 of the Complaint.  Paragraph 7 could not be more clear:  Plaintiff alleges that what she "received (a subscription without *statutory* privacy protections) was less valuable than what she paid for (a subscription with accompanying *statutory* privacy protections)" (emphases added).

*Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 241-43 (Mich. 2010) (recognizing as the "correct statement of law" that "[i]f a statute gives new rights and prescribes new remedies, such remedies must be strictly pursued; and a party seeking a remedy under the act is confined to the remedy conferred thereby and to that only," but finding common law claims could be pursued where statute at issue explicitly provided that its remedies were "in addition to any other remedy provided by law") (alteration in original) (citation and quotation marks omitted); *Jackson v. PKM Corp.*, 422 N.W.2d 657, 665 (Mich. 1988) ("The allegations in plaintiff's complaint clearly reveal that her common-law action is predicated on defendant's alleged wrongful furnishing of intoxicants to her.  Therefore, her [gross negligence] claim is preempted by the dramshop act's exclusive remedy.").  The VRPA, unlike other Michigan statutes, contains no savings provision providing that its remedies are in addition to those at common law.  *Compare, e.g.*, M.C.L. § 600.2919a(2); *Appletree Mktg.*, 779 N.W.2d at 241 (discussing Michigan Commodities Marketing Act, M.C.L. § 290.669).  In other words, Plaintiff either has a claim under the VRPA for Hearst's allegedly improper disclosure of her Purchase Information (in which case the VRPA provides her a complete and adequate remedy), or she does not (in which case, Hearst cannot have been unjustly enriched under Plaintiff's theory).  Because the VRPA provides the exclusive remedy, if any, for Plaintiff's claims, Count II of the Complaint (Unjust Enrichment) must be dismissed.

### 2. No Claim for Unjust Enrichment Is Stated on the Facts Alleged.

Even if Plaintiff were permitted to seek remedies in addition to those provided under the VRPA for the allegedly improper disclosure of her *Country Living* subscription purchase, no cause of action is stated on the facts alleged.

As set forth in Part I.A., the premise underlying Plaintiff's unjust enrichment claim—that the privacy of her Purchase Information has intrinsic monetary value (*see* Compl. ¶¶ 7, 69, 80,

82)—is both legally and factually untenable and accordingly cannot support any claim for unjust enrichment.  *See supra* pp. 11-13 and cases cited therein.  To the extent that Plaintiff rests her unjust enrichment claim on any purported statutory right to be free of "unwarranted offers" from advertisers and other marketers (*e.g.*, Compl. ¶¶ 7, 72), the VRPA specifically exempts such marketing from its scope (M.C.L. § 445.1713(d)) and therefore could not support a claim for unjust enrichment.  Tellingly, the Complaint is devoid of any allegation that Plaintiff cancelled her subscription upon receiving the "junk mail offerings and phone call solicitations" that were allegedly (a) unwanted and (b) caused by Hearst's disclosure of her Purchase Information.[24] (Compl. ¶¶ 7, 72)

Finally, Plaintiff's cause of action for unjust enrichment also must fail because she does not adequately allege that Hearst was *unjustly* enriched.  Hearst can hardly be deemed to have enriched itself unjustly given that Boelter was notified by Hearst that it would disclose her information to third party marketers.  *See* Point III.A.2, *supra*.  Moreover, the "correct measure of damages in an unjust enrichment claim is the value of the benefit received by the defendant." *Allor v. DeClark, Inc.*, No. 300953, 2012 WL 555779, at *2 (Mich. Ct. App. Feb. 21, 2012), *appeal denied*, 825 N.W.2d 79 (Mem.) (Mich. 2013) (unpublished) (citations omitted).  But that benefit must be an *unjust* benefit—not one the defendant would otherwise be entitled to, such as a fee for a magazine subscription.  *See Capital Title Ins. Agency Inc. v. Towne Mortg. Co.*, No. 278712, 2009 WL 609561, at *2 (Mich. Ct. App. Mar. 10, 2009) ("[T]he allegedly unjust benefit is the same benefit that MFM expected and not an independent benefit unjustly received as a result of plaintiff's transaction with [a third party].").  The Complaint fails to allege any unjust benefit that Hearst received here.  As noted *supra*, for example, there are no allegations in the Complaint that

---

[24] Allegations referring to unwanted phone calls notwithstanding, Plaintiff nowhere alleges that Hearst disclosed her telephone or cell phone number.

Hearst charged Boelter more than non-Michigan subscribers, or that it would have charged less for her subscription to *Country Living* had it not disclosed her information or if the VRPA did not exist. *Cf. In re DoubleClick, Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) ("[W]e are unaware of any court that has held the value of this collected [demographic] information constitutes damage to consumers or unjust enrichment to collectors."). Nor is there any plausible factual allegation that Hearst did not provide Plaintiff with value in return for her subscription price—a subscription to *Country Living* magazine. *See Isom v. NE Lots LLC*, No. 288378, 2010 WL 143470, at *6 (Mich. Ct. App. Jan. 14, 2010) (unpublished) (no unjust enrichment counterclaim stated where defendant received the benefit of its bargain). And as discussed *supra*, any expectation that the purchase price included more than the right to receive copies of *Country Living* magazine is contradicted by the text of the VRPA itself (M.C.L. § 445.1713(d)) and the magazine's disclosures, and is therefore insufficient to support Plaintiff's unjust enrichment claim.

For these reasons, Count II of the Complaint (Unjust Enrichment) is entirely without merit and should be dismissed.

## CONCLUSION

For the reasons set forth above, defendant Hearst respectfully requests the Court grant its motion to dismiss the Complaint in its entirety with prejudice, together with costs, attorneys' fees, and such other relief as the Court deems appropriate.

Dated:  August 17, 2015

/s/ Jonathan R. Donnellan
Jonathan R. Donnellan
Kristina E. Findikyan
Stephen H. Yuhan
The Hearst Corporation
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 841-7000
Fax: (212) 554-7000
jdonnellan@hearst.com

*Attorney for Defendant Hearst*
*Communications, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on August 17, 2015.

/s/ Jonathan R. Donnellan
Jonathan R. Donnellan