**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SUZANNE BOELTER, individually and on behalf of
all others similarly situated,

                     Plaintiff,

      v.

HEARST COMMUNICATIONS, INC.,

                  Defendant.

Civil Action No. 15-cv-03934-AT

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A**
**<u>PRELIMINARY INJUNCTION</u>**

Dated:  November 16, 2015

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
       jmarchese@bursor.com
       pfraietta@bursor.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ..................................................................................................... 1

FACTUAL AND STATUTORY BACKGROUND ...................................................... 5

LEGAL STANDARD ................................................................................................. 6

ARGUMENT .............................................................................................................. 7

I.     ABSENT A PRELIMINARY INJUNCTION, PLAINTIFF WILL
CONTINUE TO SUFFER IRREPARABLE HARM ........................................... 7

II.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ............................ 9

    A.    The Elements Of Hearst's Violation Are Established By
Documented Proof ................................................................................ 9

        1.    Hearst Is Engaged In The Business Of Selling At Retail ............................ 9

        2.    Hearst Disclosed Ms. Boelter's Private Information To
NextMark, Inc., Among Others ................................................ 10

        3.    Hearst's Disclosures To NextMark, Inc. Were For Purpose
Of Resale, And Not Exclusively For Direct Marketing
Purposes ................................................................................... 11

        4.    Hearst Cannnot Avail Itself Of The "Exclusively For Direct
Marketing" Exception Because It Did Not Provide The
Statutory Notice Of Such Use Required By MCL §
445.1713(d) ............................................................................. 11

    B.    Hearst's Challenge To Ms. Boelter's Article III Standing Is A 5-
Time Loser .......................................................................................... 15

        1.    Ms. Boelter Has Article III Standing Based On The Alleged
Violation Of Her Rights Under The PPPA ................................ 16

        2.    Ms. Boelter Has Presented Evidence Of A Concrete And
Particularized Injury Arising From A Barrage Of Unwanted
Junk Mail And Telephone Solicitations Caused By Hearst's
Violation Of The PPPA ............................................................. 19

3.      Ms. Boelter Has Presented Evidence Of Economic Injury
Caused By Hearst's Violation Of The PPPA.............................................20

C.      Hearst's Constitutional Challenge To The PPPA Has No Merit .........................21

1.      Insofar As PPPA Restricts Commercial Speech, It Is
Subject To Intermediate Scrutiny .............................................................21

2.      The PPPA Survives A Facial Challenge .....................................................21

3.      The PPPA Survives An As-Applied Challenge ..........................................24

III.      THE BALANCE OF HARDSHIPS IS IN PLAINTIFF'S FAVOR
BECAUSE HEARST'S CONDUCT IS ALREADY PROHIBITED BY
MICHIGAN LAW .............................................................................................. 26

IV.      A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST ............................. 29

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*832 Corp. v. Gloucester Twp.*,
    404 F. Supp. 2d 614 (D.N.J. 2005) .......................................................................... 25

*Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*,
    508 F.3d 94 (2d Cir. 2007) ..................................................................................... 24

*Anderson v. Treadwell*,
    294 F.3d 453 (2d Cir. 2002) ................................................................................... 21

*Austin-Spearman v. AMC Network Entertainment LLC*,
    2015 WL 1539052 (S.D.N.Y. Apr. 7, 2015) ........................................................... 18

*Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*,
    1996 WL 705786 n.5 (N.D.N.Y. Dec. 5, 1996) ...................................................... 29

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989) ............................................................................................... 25

*Brache v. Westchester Cty.*,
    658 F.2d 47 (2d Cir. 1981) ..................................................................................... 24

*Broadrick v. Okla.*,
    413 U.S. 601 (1973) ............................................................................................... 24

*Cain v. Redbox Automated Retail, LLC*,
    981 F. Supp. 2d 674 (E.D. Mich. 2013) ........................................................... 15, 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980) ............................................................................. 21, 22, 25, 29

*Deacon v. Pandora Media, Inc.*,
    901 F. Supp. 2d 1166 (N.D. Cal. 2012) ............................................................ 15, 16

*Delgado v. Ocwen Loan Servicing, LLC*,
    2014 WL 4773991 (E.D.N.Y. Sept. 24, 2014) ....................................................... 12

*Donoghue v. Bulldog Investors Gen. P'ship*,
    696 F.3d 170 (2d Cir. 2012) ............................................................................. 17, 18

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ............................................................................................... 17

*Educ. Media Co. at Virginia Tech v. Insley*,
  731 F.3d 291 (4th Cir. 2013) ............................................................ 22

*Fish v. Home Depot USA, Inc.*,
  455 F. App'x 575 (6th Cir. 2012) ...................................................... 14

*Florida Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) ............................................................................ 22

*Friedman v. Rogers*,
  440 U.S. 1 (1979) ........................................................................ 22, 23

*Gorran v. Atkins Nutritionals, Inc.*,
  464 F. Supp. 2d 315 (S.D.N.Y. 2006) ................................................ 22

*Griffin v. Sec'y of Veterans Affairs*,
  288 F.3d 1309 (Fed. Cir. 2002) ................................................... 24, 25

*Halburda v. Bauer Pub. Co.*,
  2013 WL 4012827 (E.D. Mich. Aug. 6, 2013) .................. 15, 16, 21, 28

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................ 19

*High v. Capital Senior Living Props. 2-Heatherwood, Inc.*,
  594 F. Supp. 2d 789 (E.D. Mich. 2008) ............................................. 12

*Hirschfeld v. Stone*,
  193 F.R.D. 175 (S.D.N.Y. 2000) .......................................................... 7

*In re Currency Conversion Fee Antitrust Litig.*,
  361 F. Supp. 2d 237 (S.D.N.Y. 2005) ................................................ 29

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
  -- F.3d --, 2015 WL 6875340 (3d Cir. Nov. 10, 2015) ....................... 19

*King v. Gen. Info. Servs., Inc.*,
  903 F. Supp. 2d 303 (E.D. Pa. 2012) ................................................. 23

*Krupp PM Eng'g, Inc. v. Honeywell, Inc.*,
  530 N.W.2d 146 (Mich. Ct. App. 1995) .............................................. 12

*Lawsky v. Condor Capital Corp.*,
  2014 WL 2109923 (S.D.N.Y. May 13, 2014) ................................ 28, 29

*Lonner v. Simon Prop. Grp., Inc.*,
57 A.D.3d 100 (2d Dep't 2008) ............................................. 12

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................. 17

*Lumber Mut. Ins. Co. v. Clarklift of Detroit, Inc.*,
569 N.W.2d 681 (Mich. Ct. App. 1997) ................................ 14

*MediaOne of Delaware, Inc. v. E & A Beepers & Cellulars*,
43 F. Supp. 2d 1348 (S.D. Fla. 1998) ..................................... 28

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ...................................................... 24, 26

*Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*,
2008 WL 207843 (E.D.N.Y. Jan. 24, 2008) ............................ 7

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ............................................................. 24

*Oneida Nation of New York v. Cuomo*,
645 F.3d 154 (2d Cir. 2011) ................................................... 6

*Owens v. Rodale, Inc.*,
2015 WL 575004 (E.D. Mich. Feb. 11, 2015) .................... 15, 16

*Plante v. Gonzalez*,
575 F.2d 1119 (5th Cir. 1978) ................................................ 7

*Rodriguez ex rel. Rodriguez v. DeBuono*,
175 F.3d 227 (2d Cir. 1999) ................................................... 7

*Secs. Industry and Financial Markets Ass'n v. Garfield*,
469 F. Supp. 2d 25 (D. Conn. 2007) ....................................... 8

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011) ................................................ 21, 26, 28

*Sterk v. Redbox Automated Retail, LLC*,
770 F.3d 618 (7th Cir. 2014) ................................................ 18

*Trans Union Corp. v. F.T.C.*,
245 F.3d 809 (D.C. Cir. 2001) .............................................. 26

*Trans Union Corp. v. F.T.C.*,
    267 F.3d 1138 (D.C. Cir. 2001)...................................................................... 23

*United Reporting Pub. Corp. v. Cal. Highway Patrol*,
    146 F.3d 1133 (9th Cir. 1998) ....................................................................... 23

*United States v. Blue Ribbon Smoked Fish, Inc.*,
    179 F. Supp. 2d 30 (E.D.N.Y. 2001) .............................................................. 28

*United States v. Diapulse Corp. of Am.*,
    457 F.2d 25 (2d Cir. 1972) ............................................................................. 28

*United States v. Edge Broad. Co.*,
    509 U.S. 418 (1993) ........................................................................................ 21

*United States v. Stevens*,
    559 U.S. 460 (2010) ........................................................................................ 24

*Va. St. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ........................................................................................ 29

*Vt. Agency of Natural Resources v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) ........................................................................................ 17

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................................ 17

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ................................................................................. 24, 25

*Webb v. Portland Mfg. Co.*,
    29 F. Cas. 506 (C.C.D. Me. 1838).................................................................. 19

*Whalen v. Roe*,
    429 U.S. 589 (1977) ........................................................................................ 26

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003) ........................................................................ 7, 8

*World Book, Inc. v. Dep't of Treasury*,
    590 N.W.2d 293 (Mich. 1999 ......................................................................... 10

*Zauderer v. Office of Disciplinary Counsel of S. Ct. of Oh.*,
    471 U.S. 626 (1985) ........................................................................................ 29

**STATUTES**

Michigan Preservation of Personal Privacy Act, M.C.L. §§ 445.1711, *et seq.* .................... passim

Fair Credit Report Act, 15 U.S.C. § 1681 .................................................................... 23

Video Privacy Protection Act, 18 U.S.C. § 2710 ............................................................. 5

Michigan Uniform Commerical Code, M.C.L. § 440.1201(j) ....................................... 14

**RULES**

Federal Rule of Civil Procedure 65(a) ............................................................................ 5

**OTHER AUTHORITIES**

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983) ............................................. 17

John G. Roberts, Jr. *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219 (1993) ......................................................................................... 17

**INTRODUCTION**

Defendant Hearst Communications, Inc. ("Hearst") sold personal information about Plaintiff Suzanne Boelter's magazine subscription to list brokers, including for example NextMark, Inc., which in turn sold her information to telemarketers and other aggressive advertisers. As a result, Ms. Boelter is being inundated with a barrage of unwanted junk mail and telephone solicitations. *See* Declaration of Suzanne Boelter In Support Of Plaintiff's Motion For A Preliminary Injunction ("Boelter Decl.") ¶ 10 ("Since subscribing to *Country Living* magazine, I have been harassed with junk mail and telephone solicitations on an almost daily basis."). By selling Ms. Boelter's Personal Reading Information, Hearst violated Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711, *et seq.* (the "PPPA").

Documented evidence confirms these facts. NextMark's website offers to provide telemarketers access to the Personal Reading Information of 11,094,919 subscribers from the "Hearst Masterfile Mailing List" at a base price of "$110/M [per thousand]," (*i.e.*, 11 cents apiece).



# Hearst Masterfile Mailing List

Hearst Magazines is one of the world's largest publishers of monthly consumer magazines. Its category leading titles have been merged to present an unduplicated masterfile of consumers living well.

Get Count    Get Pricing    Get More Information

| SEGMENTS | | COUNTS THROUGH 04/30/2015 | POPULARITY: | ▬▬▬▬ 100 |
|---|---|---|---|---|
| 11,094,919 | TOTAL UNIVERSE / BASE RATE | $110.00/M | MARKET: | CONSUMER |
| 5,564,308 | 6 MONTH ACTIVE SUBS | + $12.00/M | CHANNELS: | |
| 3,343,469 | 3 MONTH ACTIVE SUBS | + $14.00/M | SOURCE: | DIRECT MAIL SOLD |
| 1,115,455 | 1 MONTH ACTIVE SUBS | + $17.00/M | PRIVACY: | UNKNOWN |
| 5,312,472 | 6 MONTH OPTED-IN EMAIL * | $150.00/M | DMA?: | YES - MEMBER |
| 2,901,012 | 12 MONTH EXPIRES | $80.00/M | STATUS: | PREFERRED PROVIDER |
| 3,093,182 | CHANGE OF ADDRESS | + $13.00/M | GEO: | USA |
| 335,603 | BUSINESS ADDRESS | + $11.00/M | GENDER: | 70% FEMALE 20% MALE |
| 507,612 | GIFT GIVERS | + $14.00/M | | |
| 3,296,212 | ACTIVE REPUBLICANS | + $20.00/M | SPENDING: | $18.00 AVERAGE ORDER |
| 3,175,685 | ACTIVE DEMOCRATS | + $20.00/M | SELECTS | |

877-972-4876
Mention NextMark
FOR 10% OFF
Niche Audiences

*See* Complaint Ex. B, Doc. No. 1, at 25. For an additional "$20/M" over the base "$110/M" rate (*i.e.*, 13 cents apiece), NextMark offers access to the Personal Reading Information of Hearst subscribers who are "Active Democrats" or "Active Republicans." *See id.*

Hearst also offers access to its "Masterfile - Ethnic & Religious Mailing List" at the same base rate of "$110/M."



# Hearst Masterfile - Ethnic & Religious Mailing List

One of the world's largest publishers of monthly consumer magazines, Hearst Magazines appeal to readers of all ethnic and religious backgrounds. Its category leading titles have been merged and overlayed with ethnic and religious data.

Get Count | Get Pricing | Get More Information

| SEGMENTS | | COUNTS THROUGH 04/30/2015 | POPULARITY: ▪▪▪▪ 97 | |
|---|---|---|---|---|
| 11,094,919 | TOTAL UNIVERSE / BASE RATE | $110.00/M | MARKET: | CONSUMER |
| | *ETHNIC/RELIGIOUS | + $16.00/M | CHANNELS: | |
| | CATALOG RATE | $80.00/M | SOURCE: | DIRECT MAIL SOLD |
| | CHARITABLE FUNDRAISING RATE | $75.00/M | PRIVACY: | UNKNOWN |
| | NON-PROFIT RATE | $85.00/M | DMA?: | YES - MEMBER |

*See* Complaint Ex. D, Doc. No. 1, at 30.  For an additional "$16/M" over the base "$110/M" rate (*i.e.*, 12.6 cents apiece), NextMark offers access to the Personal Reading Information of subscribers who are "African-Americans," or "Hispanic," or "Catholic," or "Jewish."  *See id.*

| Ethnicity (+ $16/M) | Qty | | Religion (+ $16/M) | Qty |
|---|---|---|---|---|
| African American | 639,000 | | Catholic | 2,925,200 |
| Asian - other | 77,700 | | Jewish | 313,000 |
| Chinese | 100,800 | | Protestant | 7,588,000 |
| French | 369,000 | | | |
| Hispanic | 607,800 | | | |
| Irish | 1,003,000 | | | |
| Italian | 509,000 | | | |
| Japanese | 45,000 | | | |

## ORDERING INSTRUCTIONS

- To order this list, contact your List Broker and ask for NextMark List ID #253854 or *click here to place your request.*

Michigan's PPPA clearly prohibits what Hearst has done. Section 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials ... shall not disclose to any person, other than the customer, a record or information concerning the purchase ... of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.

On May 21, 2015, Ms. Boelter filed this lawsuit alleging that Hearst had violated the PPPA by disclosing her Personal Reading Information, and seeking damages and injunctive relief. Ms. Boelter did not immediately file a motion for preliminary injunction along with her complaint because she expected Hearst would stop illegally disclosing her information while this lawsuit was pending. *See* Boelter Decl. ¶ 11 ("I thought that filing this lawsuit would prompt Hearst to stop selling my Personal Reading Information."). But Hearst refuses to stop. In October 2015, Hearst made statements suggesting that it continues to disclose Ms. Boelter's

Personal Reading Information.  *See* Declaration of Joseph I. Marchese ("Marchese Decl.") ¶¶ 2-6 & Exs. A-C.  As of today, November 16, 2015, NextMark continues to offer the Private Reading Information of Hearst subscribers through its website.  *Id.* ¶ 7 & Exs. D-F.

Ms. Boelter now brings this motion seeking a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) to enjoin Hearst from continuing to violate the PPPA by disclosing Ms. Boelter's and the putative class members' Personal Reading Information to third parties while this action is pending.

A preliminary injunction is necessary to prevent continued violation of Ms. Boelter's and class members' statutory rights under the PPPA, and also to prevent Hearst's continued disclosure of their Personal Reading Information, which the PPPA was enacted to prevent.

## FACTUAL AND STATUTORY BACKGROUND

The PPPA was enacted in 1988 "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West), Compl. Ex. A.  The PPPA is similar to its federal counterpart, the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, however the PPPA extends protections to consumers of "books and other written materials."  M.C.L. § 445.1712.  It provides that persons "engaged in the business of selling at retail, renting, or lending books or other written materials … shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer."  *Id.*  The Act further provides for a private right of action "to the customer identified in a record or other information that is disclosed in violation of this act."  *Id.* § 445.1715.  The customer "may recover both of the following:  (a) Actual damages, including

damages for emotional distress, or $5,000, whichever is greater [and] (b) Costs and reasonable attorney fees." *Id.*

Plaintiff is a Michigan citizen and a subscriber to Hearst's *Country Living* magazine. Boelter Decl. ¶ 3. Plaintiff alleges that Hearst violated the PPPA by disclosing her Personal Reading Information – including, but not limited to, her name, magazine that she subscribed to, and home address – to third parties. Complaint ¶¶ 2, 5, Doc. No. 1. Plaintiff further alleges that Hearst was unjustly enriched by disclosing her information in that Hearst "sells its mailing lists – which include subscribers' Personal Reading Information identifying which individuals purchased which magazines … to data miners, other consumer-facing organizations, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts." *Id.* ¶ 40. "Plaintiff seeks to represent a class defined as all Michigan residents who had their Personal Reading Information disclosed to third parties by Hearst without consent." *Id.* ¶ 46.

## LEGAL STANDARD

"[A] party seeking a preliminary injunction must establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of hardships tipping decidedly in favor of the moving party." *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotations omitted). "Additionally, the moving party must show that a preliminary injunction is in the public interest." *Id.*

**ARGUMENT**

I.    **ABSENT A PRELIMINARY INJUNCTION, PLAINTIFF WILL CONTINUE TO SUFFER IRREPARABLE HARM**

A showing that irreparable harm is likely in the absence of preliminary relief is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999). Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003). "In other words, the injunction must prevent or remedy the harm." *Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 2008 WL 207843, at *6 (E.D.N.Y. Jan. 24, 2008).

Here, Ms. Boelter and the putative class members will suffer irreparable harm if Hearst continues to disclose their Personal Reading Information. First, their statutory rights pursuant to the PPPA will continue to be violated. *See* M.C.L. § 445.1712. Second, the continued disclosure of Ms. Boelter's and the putative class members' Personal Reading Information will continue to lead to junk mail and telephone solicitations. Complaint ¶ 7, Doc. No. 1.

As Judge Pauley has explained, "[t]he harm at issue here – disclosure of confidential information – is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000). "Public disclosure of highly personal and confidential information, the likes of which are at issue in this case, result in a harm that is both substantial and irreversible." *Id.*; *see also Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978) ("When a legitimate expectation of privacy exists, violation of privacy is harmful without any concrete consequential damages."). Each time Ms. Boelter's and the putative class members' Personal Reading Information is disclosed "the information will be indexed by search engines and widely distributed and archived by various

7

Internet companies, so that it cannot be retrieved." *Secs. Industry and Financial Markets Ass'n v. Garfield*, 469 F. Supp. 2d 25, 41 (D. Conn. 2007). The Michigan Legislature has provided for privacy in its citizens' Personal Reading Information. *See* M.C.L. § 445.1712. "The only way to render th[at] provision truly viable is to enforce it. Otherwise, the stronger part[y] can simply ignore the provision." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003).

Here the harm is imminent as Hearst has already disclosed Ms. Boelter's Personal Reading Information, and refuses to confirm that it has stopped or will stop disclosing it, in the absence of a preliminary injunction. *See, e.g.*, *Garfield*, 469 F. Supp. 2d at 41-42 ("SIFMA has shown that the harm is imminent because the state has already posted the names of top employees of state contractors and their spouses, and had planned to post the dependent children's names as well in the absence of a preliminary injunction."). Even after the filing of this action, the Private Reading Information of Hearst's subscribers continues to be offered for sale by Nextmark, Inc. *See* Marchese Decl. ¶ 7 & Exs. D-F ("As of today, November 16, 2015, the Private Reading Information of Ms. Boelter and other class members continues to be offered for sale through Nextmark's website, lists.nextmark.com."). These illegal disclosures of Ms. Boelter's Personal Reading Information expose her to more and more harassment from telemarketers and other intrusive solicitations.[1]

---

[1] In its pre-motion letter Hearst argues that "Plaintiff herself has filed with this Court numerous public documents under her own name stating that she subscribes to *Country Living* and has taken *no action whatsoever* seeking to restrict the disclosure" of that information. Doc. No. 38, at 4 (emphasis in original). That argument is wrong. *First*, Ms. Boelter <u>has</u> taken action to prevent the disclosure of her Personal Reading Information. She filed this lawsuit. *Second*, Ms. Boelter could not have filed this lawsuit without disclosing to the Court that she is a subscriber, because that information is necessary for her to state her legal claims. To hold otherwise would create a Catch-22 situation making it impossible for a private plaintiff to enforce the PPPA. *Third*, and finally, disclosure of Ms. Boelter's Personal Reading Information – including her home address and other private information – to telemarketers, bundled with thousands of other

## II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### A. The Elements Of Hearst's Violation Are Established By Documented Proof

The PPPA provides that persons "engaged in the business of selling at retail, renting, or lending books or *other written materials … shall not disclose* to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that *indicates the identity* of the customer." M.C.L. § 445.1712 (emphasis added). Thus, Plaintiff must demonstrate that Hearst (a) is engaged in the business of selling written materials at retail, and (b) discloses information concerning the purchase of those materials that indicates the identity of the customer. Plaintiff is likely to establish both elements.

### 1. Hearst Is Engaged In The Business Of Selling At Retail

The PPPA does not define the term "at retail." However, in *Kinder v. Meredith Corp.,* Judge Ludington thoroughly analyzed the "at retail" requirement. *See* 2014 WL 4209575, at *6 (E.D. Mich. Aug 26, 2014). Judge Ludington stated:

> [A]t retail is not defined in the statute, and therefore it should receive 'its ordinary and natural meaning.' … The Oxford English Dictionary defines 'retail' as '[t]he action or business of selling goods in relatively small quantities for use or consumption rather than for resale.' Therefore, if Kinder had purchased her magazine subscription through a third-party, rather than directly from Meredith, she would not have bought them at retail. … Although Kinder did not provide the specific method of subscription, she alleged that she 'purchased written materials directly from Meredith.' … Therefore, Kinder has adequately alleged that she purchased her magazines from Meredith at retail.

---

individuals targeted for telemarketing calls and junk mail, is a different type of disclosure from a filing in federal court. This Court's docket does not contain Ms. Boelter's home address or phone number. And it is not used for reselling Ms. Boelter's information, or for telemarketing or junk mail purposes.

*Id.* (internal quotations and citations omitted). Thus, Plaintiff must demonstrate that she

purchased her *Country Living* subscription directly from Hearst to satisfy the "at retail"

requirement. Here, she easily does so. *See* Boelter Decl. ¶ 4 ("I purchased my subscription

directly from Hearst."). Plaintiff therefore satisfies the "at retail" requirement.

Moreover, even when Hearst utilizes subscription agents,[2] Hearst is still the actual entity

that sells magazine subscriptions directly to customers "at retail." Hearst is not selling

magazines at wholesale to its subscription agents, who then turn around and resell those

magazines to consumers. Rather, Hearst is simply using its subscription agents to help

funnel new or existing customer subscription orders to it. Therefore, these sales also satisfy

the "at retail" requirement. *See World Book, Inc. v. Dep't of Treasury*, 590 N.W.2d 293, 298

(Mich. 1999) (treating encyclopedia company as having engaged in sales "at retail" under

Michigan law, even though "its independent contractors solicited orders from customers and

entered into tentative agreement with them")

### 2. Hearst Disclosed Ms. Boelter's Private Information To NextMark, Inc., Among Others

Hearst has never disputed that it disclosed Ms. Boelter's or the class members' Personal

Reading Information. Nor could it. Documented evidence demonstrates that Hearst disclosed its

subscribers' Personal Reading Information to NextMark, Inc., among other data-mining

companies. *See supra* Introduction, *see also* Complaint Exs. B-D, Doc. No. 1, at 24-31;

Marchese Decl. Exs. D-F. Hearst's disclosures allow for NextMark, Inc., and other data-miners,

to offer Hearst subscriber mailing lists that are broken down by race, religion, political

affiliation, and the like.

---

[2] Subscription agents are services such as Publishers Clearing House, which allow consumers to
subscribe to magazines.

### 3. Hearst's Disclosures To NextMark, Inc. Were For Purpose Of Resale, And Not Exclusively For Direct Marketing Purposes

The PPPA contains five statutory exceptions excusing the otherwise unlawful disclosure of customer information. M.C.L. § 445.1713. The only exception Hearst has sought to invoke is the "exclusively for direct marketing defense," which provides that a disclosure may be made to a third party if it "is for the exclusive purpose of marketing goods and services directly to the consumer [and] the person disclosing the information … inform[s] the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." *Id.* § 445.1713(d). But Hearst's disclosures were for the purpose of resale, and for other purposes that are not exclusively for direct marketing.

Hearst's disclosures to NextMark are intended for NextMark to resell the Personal Reading Information through "more than 190,000 media plans for thousands of advertisers." http://www.nextmark.com/company/about-nextmark/, Marchese Decl. Ex. G. And the "thousands of advertisers" to whom NextMark resells this information include, among others, charitable organizations, non-profit organizations, and political campaigns (at different prices), which do not exclusively market goods and services to consumers. *See* Complaint Exs. B-D, Doc. No. 1, at 24-31; *see also* Marchese Decl. Exs. D-F.

### 4. Hearst Cannnot Avail Itself Of The "Exclusively For Direct Marketing" Exception Because It Did Not Provide The Statutory Notice Of Such Use Required By MCL § 445.1713(d)

Another reason that Hearst cannot avail itself of the "exclusively for direct marketing" exception is that Hearst did not provide the required statutory notice. For this defense to apply, the statute requires that "[t]he person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the

person disclosing the information."  M.C.L. § 445.1713(d) (emphasis added).  Hearst never provided such notice.

Hearst's purported in-magazine notice is inadequate for many reasons.  First, it is buried in fine print and very difficult to see.  In considering whether a disclosure is sufficient, courts have considered "factors such as font size, placement, or emphasis of" the disclosure.  *Delgado v. Ocwen Loan Servicing, LLC*, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) (citing *Lonner v. Simon Prop. Grp., Inc.*, 57 A.D.3d 100, 110 (2d Dep't 2008)); *see also High v. Capital Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 799 (E.D. Mich. 2008) ("Procedural unconscionability is present where the challenged provision is buried in text of a document, appears in small font, or is not otherwise conspicuous.") (citing *Krupp PM Eng'g, Inc. v. Honeywell, Inc.*, 530 N.W.2d 146, 149 (Mich. Ct. App. 1995)).  Here, the terms of Hearst's "disclosure" are buried in font so small they may not be legible, on pages that – at least on their faces – have nothing to do with information privacy.  An image of Hearst's "disclosure" is included below:



From Rustic Cabins to Custom-Designed Homes...

**Any Home Can be a Log Home**

THE WOODWORKERS SHOPPE
Call (800) 818-9971 • woodworkershoppe.com

**T-shirt Quilts**
We make your T-shirts into a quilt

As Seen On:
Today Show
Real Simple
Rachael Ray
ESPN

• 100% Quilted
• Outstanding Quality
• Made from your T-shirts
• Great Prices!

800-880-8534    Campus Quilt Co.
**www.CampusQuilt.com**

**DAVID AUSTIN® ROSES**

SAVE 15%*
Beautiful, fragrant English Roses.
Quote code CU6   *Offer valid until May 17, 2015
Call 800 328 8893 www.davidaustinroses.com

**REPLACEMENTS, LTD.**
China, Crystal, Silver & Collectibles • Old & New

800-REPLACE    replacements.com

# resource guide

– YOUR GO-TO GUIDE FOR REPLICATING THE LOOKS IN THIS ISSUE –

### THE COLLECTOR'S GUIDE TO ANTIQUE STOVES

**page 23** Alterna engineered stone **tile;** armstrong.com.

### THE ULTIMATE POTTING SHED

**pages 44–47** Vintage aluminum **storage caddy,** $99, vintage handmade **cheese box cabinet,** $399, and **vintage cast-iron milking stool,** $89; all from relique.com. Antique **shutters;** eloquence.com. Antique **glass bottles, bottle drying rack,** European **watering can;** blueocean traders.com for stores. Seagrass matting **rug,** $100 for 8' x 10'; worldmarket.com.

### FARMHOUSE FRESH

**page 54** White **rockers,** $299; berings .com. Tellepsen **Landscaping Services;** tellepsenlandscaping.com. **page 57** Double Sloan street shop **light;** circalighting.com. Pyne Hollyhock **shades;** fschumacher.com. **page 58** Moss Wishbone **chair,** $1,425; design withinreach.com. **page 59** Garden Glories chintz **fabric;** leejofa.com. Dutch industrial square **coffee table,** $715; restorationhardware.com. Cow **painting;** maryhcase.com. **page 60** St. Andrew's canopy **bed,** $3,669; sweetelle.com. Elsie de Wolfe **fabric;** scalamandre.com for stores. Paul **duvet** in taupe, $225, and Elsie de Wolfe **pillow,** $295; both from biscuit-home.com. **page 61** Chene **wallpaper;** nobilis.fr. Biddeford eyelet **fabric,** $100.50; ralphlaurenhome.com. Helena **bed;** olystudio.com. **page 62** Quincy **bed,** $1,899; ethanallen.com. Goose **lamp,** $175, and Dew Drop Confetti **bolster,** $275; both from biscuit-home.com.

### NEUTRAL TERRITORY

**page 75** Elizabeth green indoor/ outdoor **rug,** from $130; dashandalbert .com. **page 76** Salt & Pepper Carpet Bag **pillow;** adelenesimplecloth.com. Sky Blue Nopoli vintage **pillow,** $110; lillianaugust .com. **page 78** Opal Bond **lamp,** $319; schoolhouseelectric.com.

### AN EASY AND ELEGANT EASTER BRUNCH

**page 93** Berry & Thread scallop **dessert plate,** $38; juliska.com. Sabre Tortoise five-piece **place setting,** $90; yvonne-estelles.com. Bellezza white **dinner plate,** $45; vietri.com.

Country Living (ISSN 0732-2569) is published monthly except January with combined issues in Jul/Aug, 10 times a year by **Hearst Communications, Inc.,** 300 West 57th Street, New York, NY 10019 U.S.A. Steven R. Swartz, President and Chief Executive Officer; William R. Hearst III, Chairman; Frank A. Bennack, Jr. Executive Vice Chairman; Catherine A. Bostron, Secretary. **HEARST MAGAZINES DIVISION:** David Carey, President; John P. Loughlin, Executive Vice President and General Manager; John A. Rohan, Jr., Senior Vice President, Finance. © 2015 by Hearst Communications, Inc. All rights reserved. **TRADEMARKS:** Country Living is a registered trademark of Hearst Communications, Inc. **EDITORIAL OFFICES:** 2901 2nd Ave. S., Suite 270, Birmingham, AL 35233. The magazine assumes no responsibility whatsoever for any unsolicited material, including transparencies. The magazine assumes no liability to return any unsolicited material. Current and previous issues are available for $7.00 postpaid from Single Copy Sales, Hearst Magazines, P.O. Box 6000, Harlan, IA 51593 (Foreign/ Canadian copies, please add $2.75 for postage). Periodicals postage paid at N.Y., NY, and at additional mailing offices. Canada Post International Publications Mail Product (Canadian Distribution) Sales Agreement no. 40012499. Send returns (Canada) to Bleuchip International, P.O. Box 25542, London, Ontario, N6C 6B2. Printed in U.S.A. **SUBSCRIPTION SERVICE:** Country Living magazine will, upon receipt from its reader of a complete new or renewal subscription order, undertake fulfillment of that order so as to provide the first-copy delivery by the Postal Service or alternate carriers within 4 to 6 weeks. If for some reason this cannot be done, you will be promptly notified of the issue date that will begin your subscription, with a request for any further instructions you may have concerning your order. Please address all such orders to us at Country Living, P.O. Box 6000, Harlan, IA 51593. For subscription inquiries, log on to service .countryliving.com, or write to Customer Service Department, Country Living, P.O. Box 6000, Harlan, IA 51593. To assure quickest service, enclose your mailing label when writing to us or renewing your subscription. Renewal must be received at least 8 weeks prior to expiration to assure continued service. **SUBSCRIPTION PRICES:** United States and possessions, $24.00 for 10 issues; $44.00 for 20 issues. Canada and all other countries, $40.00 for 10 issues; $76.00 for 20 issues (GST/HST/QST R126018406 RT). **POSTMASTER:** Please send address changes to: Country Living, P.O. Box 6000, Harlan, IA 51593. From time to time, we make our subscriber list available to companies who sell goods and services by mail that we believe would interest our readers. If you would rather not receive such offers via postal mail, please send your current mailing label or exact copy to Mail Preference Service, P.O. Box 6000, Harlan, IA 51593. You can also visit hearst.ed4.net/profile/login.cfm to manage your preferences and opt-out of receiving marketing offers by email.

Doc. No. 19-1, at 3.

Because the PPPA does not define what constitutes sufficient notice, the Court should look to similar areas of Michigan law for guidance. *See Fish v. Home Depot USA, Inc.*, 455 F. App'x 575, 583 (6th Cir. 2012) (looking to the definitions provided in the Michigan Uniform Commercial Code to interpret the Michigan Consumer Protection Act). In the analogous context of consumer warranty disclaimers, Michigan law requires such disclaimers "be conspicuous." *Lumber Mut. Ins. Co. v. Clarklift of Detroit, Inc.*, 569 N.W.2d 681, 683 (Mich. Ct. App. 1997). The Michigan Uniform Commercial Code defines "conspicuous" as "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." M.C.L. § 440.1201(j). "A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to surrounding text of the same or lesser size" is conspicuous. *Id.* § 440.1201(j)(1). "Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to surrounding text of the same size, or set off from surrounding text of the same size by symbols or other markets that call attention to the language," is also conspicuous. *Id.* § 440.1201(j)(2). Here, Hearst's "disclosure" is not "written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." *Id.* § 440.1201(j). The "disclosure" is not set off by a heading, contrasting type, font, or color, nor is its language set off as such. Therefore, Hearst's in-magazine notice is not "conspicuous" and does not provide sufficient notice under the PPPA's exclusively for directing marketing defense.

Hearst in-magazine notice is also substantively deficient because it requires the subscriber to submit more than "written notice to the person disclosing the information." The subscriber must also submit a "current mailing label or exact copy" to have his or her name

14

removed from the postal mail list.  Thus, a subscriber who submits a letter to Hearst asking to be removed (written notice) will not have his or her name removed.

**B.** **Hearst's Challenge To Ms. Boelter's Article III Standing Is A 5-Time Loser**

Hearst's pending motion to dismiss argues that "Plaintiff has no concrete and particularized injury under the [PPPA] and cannot establish the constitutionally required injury in fact," thus she "lacks standing to sue under Article III."  Doc. No. 18, at 8.  That is the same argument Hearst made, and that Judge Steeh rejected, in *Halburda v. Bauer Pub. Co.*, 2013 WL 4012827, at *3-6 (E.D. Mich. Aug. 6, 2013) ("Here, a statute was created by a state legislature to protect individual consumers from certain disclosures of their personal information.  The court finds that plaintiffs … have satisfied Article III standing requirements.").  Indeed, Hearst's argument is already a 5-time loser, having also been considered and rejected in 4 other recent cases in addition to *Halaburda*.[3]

---

[3] *Owens v. Rodale, Inc.*, 2015 WL 575004, at *4 (E.D. Mich. Feb. 11, 2015) ("Under *Halaburda*, Coulter-Owens only needs to allege a violation of VRPA in order to have Article III standing. She does this; she has Article III standing."), *Kinder v. Meredith Corp.*, 2014 WL 4209575, at *3 (E.D. Mich. Aug. 26, 2014) ("Kinder has alleged that Meredith violated her rights pursuant to the VRPA by improperly disclosing and selling her personal information.  Taking her allegations as true, as this Court must on a motion to dismiss, the allegations would properly allege a violation of the VRPA.  Thus, Kinder has both statutory standing pursuant to VRPA and Article III standing."), *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 683 (E.D. Mich. 2013) ("Judge Steeh's discussion on Article III and statutory standing in *Halaburda* is well-reasoned and persuasive.  …  Here, as with in *Halaburda* … Plaintiffs have sufficiently alleged a violation of their statutory rights under the VRPA to trigger Article III standing."), and  *Deacon v. Pandora Media, Inc.*, 901 F. Supp. 2d 1166, 1172 (N.D. Cal. 2012) ("Plaintiff has sufficiently alleged the disclosure of information governed by the VRPA.  Plaintiff alleges that Pandora disclosed his name and 'listening history,' i.e., a list of the songs he listed to on Pandora's radio service, to the general public.  …  [T]he disclosure of this information is sufficient to constitute an injury for purposes of Article III standing.").

### 1.    Ms. Boelter Has Article III Standing Based On The Alleged Violation Of Her Rights Under The PPPA

A violation of the PPPA is an injury in fact sufficient to confer Article III standing.  The PPPA has no actual damages requirement.  Rather, the PPPA provides:

> Regardless of any criminal prosecution for a violation of this act, a person who violates this act shall be liable in a civil action for damages to the customer identified in a record or other information that is disclosed in violation of this act.  The customer may bring a civil action against the person and may recover both of the following . . . (a) Actual damages, including damages for emotional distress, *or $5,000, whichever is greater* [plus] (b) Costs and reasonable attorney fees.

M.C.L. § 445.1715 (emphasis added).  In *Halaburda*, Judge Steeh held that violations of the PPPA alone confer Article III standing:

> [A] close reading of the VRPA[4] reveals that it contains absolutely no language to require a claimant suffer any actual injury apart from a violation of the statute.  …  [A] statute was created by a state legislature to protect individual consumers from certain disclosures of their personal information.  The court finds that plaintiffs … have satisfied Article III standing requirements.

*Halaburda*, 2013 WL 4012827, at *4, *6.  Four other courts have agreed with Judge Steeh's interpretation.  *See Kinder*, 2014 WL 4209575, at *3 (holding the alleged disclosure of the plaintiff's information in violation of the statute is sufficient to confer standing ); *Cain*, 981 F. Supp. 2d at 683 (same); *Deacon*, 901 F. Supp. 2d at 1172 (same); *Owens*, 2015 WL 575004, at *4 (same).

Here, Plaintiff alleges that "Hearst had disclosed, and continues to disclose, without consent or prior notice, [her] Personal Reading Information to data mining companies including Insource and others, who then supplement that information with data from their own files.

---

[4] The Preservation Of Personal Privacy Act ("PPPA") is sometimes referred to as the "VRPA," as it is also known as the "Video Rental Privacy Act."

Moreover, during that same period, Hearst has sold – and continues to sell and offer for sale – mailing lists containing [her] Personal Reading Information to third parties seeking to contact Hearst subscribers, without first obtaining [her] written consent or even giving her prior notice of the disclosure and sales."  Complaint ¶ 7, Doc. No. 1.

The allegation that Hearst disclosed Ms. Boelter's information in violation of the statute, by itself, is sufficient to confer Article III standing.  The United States Supreme Court has held that "[t]he injury required by Article III can exist solely by virtue of statutes creating legal rights, the invasion of which creates standing."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *see also Mass. v. E.P.A.*, 549 U.S. 497, 516 (2007) ("Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."); *Vt. Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) ("This is not to suggest that Congress cannot define new legal rights, which in turn will confer standing to vindicate an injury caused to the claimant."); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) ("[T]he injury required by Art[icle] III may exist solely by virtue of statutes creating legal rights.").  *See also*, Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 885 (1983) ("[L]egal injury is by definition no more than the violation of a legal right; and legal rights can be created by the legislature … standing['s] … existence in a given case is largely within the control of Congress."); John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1228 (1993) (stating that statutes may "elevate[] injuries that were not previously legally cognizable to the status of legally enforceable rights").

The Second Circuit expressly endorsed this view in *Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170 (2d Cir. 2012), finding allegations that the defendants violated Section

16(b) of the Exchange Act were sufficient to confer standing. *See id.* at 177, 179. The Second Circuit held that the Exchange Act "conferred upon [the issuer] an enforceable legal right to expect [defendant] to refrain from engaging in any short-swing trading in its stock. The deprivation of this right establishes Article III standing." *Id.* at 177. The Second Circuit further stated that "[w]hile this particular legal right might not have existed but for the enactment of § 16(b), Congress's legislative authority to broaden the injuries than can support constitutional standing is beyond dispute." *Id.* at 179. Here, by analogy, the PPPA conferred upon Plaintiff an enforceable legal right to expect Hearst to refrain from disclosing and/or selling her Personal Reading Information. The deprivation of this right establishes Article III standing.

*Austin-Spearman v. AMC Network Entertainment LLC*, 2015 WL 1539052 (S.D.N.Y. Apr. 7, 2015) is also instructive. There, the plaintiff brought a putative class action claim against AMC for violation of the federal Video Privacy Protection Act. *Id.* at *2. AMC argued that "a plaintiff seeking relief under a statute must plead an injury beyond the statutory violation – i.e., in the context of the VPPA, harm resulting from disclosure rather than simply disclosure itself – in order to have alleged a constitutionally cognizable injury." *Id.* at *3. Judge Buchwald rejected AMC's argument and stated that it "fundamentally underestimates Congress's ability to confer standing through statutory enactment." *Id.* Relying on *Donoghue*, Judge Buchwald held "the Second Circuit does not as a rule require allegations of injury beyond statutory violation. … Thus, because the VPPA creates a specific right to relief for disclosures made in violation of the statute, a plaintiff asserting claims under the VPPA need only assert that her information was wrongfully disclosed to have asserted an 'injury in fact' supporting Article III standing." *Id.* at *5.[5]

---

[5] *See also Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) ("Redbox characterizes plaintiffs' claim as an allegation that Redbox committed a 'mere technical

**2.** **Ms. Boelter Has Presented Evidence Of A Concrete And Particularized Injury Arising From A Barrage Of Unwanted Junk Mail And Telephone Solicitations Caused By Hearst's Violation Of The PPPA**

Ms. Boelter's standing under Article III is also supported by evidence that she has suffered, and continues to suffer, a concrete and particularized injury caused by Hearst's violation of the statute. Hearst's illegal disclosures of her Personal Reading Information have caused Ms. Boelter to be inundated with a steady flow of unwelcome and unwanted junk mail and telephone solicitations. *See* Boelter Decl. ¶ 10 ("Since subscribing to *Country Living* magazine, I have been harassed with junk mail and telephone solicitations on an almost daily basis."). This is exactly the type of injury the PPPA was designed to prevent, and it is sufficient to confer Article III standing. *See Google*, 2015 WL 6875340, at \*4 (holding standing existed where the plaintiffs "base[d] their claims on highly specific allegations that the defendants, in the course of serving advertisements to their *personal* web browsers, implanted tracking cookies on their *personal* computers. … [T]he events that the complaint describes are concrete, particularized, and actual as to the plaintiffs").

---

violation' of the statute, which Redbox argues is insufficient to establish standing. But 'technical' violations of the statute (*i.e.*, impermissible disclosures of one's sensitive, personal information) are precisely what Congress sought to illegalize by enacting the VPPA. … By alleging that Redbox disclosed their personal information in violation of the VPPA, Sterk and Chung have met their burden of demonstrating that they suffered an injury in fact that success in this suit would redress."); *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, -- F.3d --, 2015 WL 6875340, at \*4 (3d Cir. Nov. 10, 2015) [hereinafter, "*Google*"] ("[A] plaintiff need not show actual monetary loss for purposes of injury in fact. Rather, 'the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982)); *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 507-08 (C.C.D. Me. 1838) (Story, J.) ("I am not able to understand, how it can correctly be said, in a legal sense, that an action will not lie, even in a case of a wrong or a violation of a right unless it is followed by some perceptible damage ... Actual, perceptible damage is not indispensable as the foundation of an action. The law tolerates no farther inquiry than whether there has been the violation of a right.").

### 3. Ms. Boelter Has Presented Evidence Of Economic Injury Caused By Hearst's Violation Of The PPPA

Ms. Boelter's Personal Reading Information has economic value. At the rate of "$110/M," or $110 per thousand files, NextMark charged 11 cents for access and use of Ms. Boelter's Personal Reading Information. Complaint Ex. B, Doc. No. 1, at 24-26. NextMark collected at least 11 cents in revenue for each piece of junk mail and each unwanted telephone solicitation that NextMark's customers to Ms. Boelter. Some portion of this revenue went to Hearst, though we do not yet have evidence showing the exact split of these ill-gotten gains between Hearst and NextMark. Ms. Boelter did not expect that her personal information would be re-sold by Hearst. *See* Boelter Decl. ¶ 4 ("I purchased my subscription using a subscription postcard, which required me to provide Hearst with my name and mailing address. I provided this information solely for the purpose of receiving *Country Living* magazine issues in connection with my subscription."); *id.* ¶ 6 ("I did not expect that my personal information would be sold or otherwise disclosed because I became a subscriber to *Country Living* magazine").

Consumers are willing to pay more for purchases from companies that adhere to more stringent policies of protecting their personal data. *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011), Marchese Decl. Ex. H. What Ms. Boelter received here, a magazine subscription <u>without</u> the PPPA's statutory privacy protections, was less valuable than what she paid for, a magazine subscription <u>with</u> the PPPA's statutory privacy protections. *See* Boelter Decl. ¶ 5 ("I would not have subscribed to *Country Living* magazine, or at least would not have paid the full subscription price, had I known that Hearst would disclose my Personal Reading Information.").

## C.  Hearst's Constitutional Challenge To The PPPA Has No Merit

Hearst's pending Motion to Dismiss argues that the PPPA "is unconstitutional on its face because of its substantial overbreadth, and [] is unconstitutional as applied to Hearst on the specific facts alleged here."  Doc. No. 18, at 23.  Judge Steeh has already rejected Hearst's First Amendment challenge to the PPPA.  *See Halaburda*, 2013 WL 4012827, at *7 (rejecting Hearst's argument that the PPPA raises "difficult First Amendment issues").  The speech restricted under the PPPA is commercial speech subject only to intermediate scrutiny.  *See infra* II.C.1.  In addition, the PPPA does not present the kind of real and substantial restrictions on speech needed to justify a facial challenge and it withstands an as-applied challenge because it is narrowly tailored to directly advance the substantial government interest in protecting consumer privacy.  *See infra* II.C.2-3.

### 1.  Insofar As PPPA Restricts Commercial Speech, It Is Subject To Intermediate Scrutiny

It is firmly established that the Constitution "affords a lesser protection to commercial speech than to other constitutionally guaranteed expression."  *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993); *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2663 (2011) ("the government's legitimate interest in protecting consumers from commercial harms explains why commercial speech can be subject to greater governmental regulation than noncommercial speech").

"[F]or commercial speech to merit any First Amendment protection, it must concern lawful activity and not be misleading."  *Anderson v. Treadwell*, 294 F.3d 453, 461 (2d Cir. 2002) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980)).  Once it has been established that the commercial speech is entitled to protection, any government restriction on that speech must satisfy a three-part test:  (1) the restriction must seek

to further a substantial government interest, (2) the restriction must directly advance the government's interest, and (3) the restriction must reach no further than necessary to accomplish the given objective. *Cent. Hudson*, 447 U.S. at 563-66; *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) ("[W]e engage in 'intermediate' scrutiny of restrictions on commercial speech, analyzing them under the framework set forth in *Central Hudson*."). The precedent of *Central Hudson* applies to both facial and as-applied challenges to restrictions on commercial speech. *See Educ. Media Co. at Virginia Tech v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013) ("*Central Hudson* applies to both facial and as-applied challenges.").

All speech subject to the PPPA, including the speech at issue in this case, is commercial speech. "In determining whether speech is commercial, the Court considers three factors: (1) whether the communication is an advertisement, (2) whether the communication refers to a specific product or service, and (3) whether the speaker has an economic motivation for the speech." *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326 (S.D.N.Y. 2006); *Friedman v. Rogers*, 440 U.S. 1, 10 n.9 (1979) ("By definition, commercial speech is linked inextricably to commercial activity."); *Cent. Hudson*, 447 U.S. at 561 (defining commercial speech as "expression related solely to the economic interests of the speaker and its audience"). The PPPA only limits speech "concerning the purchase, lease, rental, or borrowing" of "books or other written materials, sound recordings, or video recordings." M.C.L. § 445.1712. Accordingly, all of the speech limited by the PPPA necessarily "refers to a specific product." Here, for instance, all of the information sold by Hearst expressly lists specific products (Hearst publications) purchased by consumers. All of the information constituting the speech restricted under the PPPA, moreover, is obtained through commercial transactions (magazine

subscriptions) and is thus "linked inextricably to commercial activity." *Friedman*, 440 U.S. at 10 n.9.

In nearly all instances, including this case, the speech restricted by the PPPA is also economically motivated. As Plaintiff has demonstrated, Hearst's speech constitutes the selling of subscribers' "Personal Reading Information," and other personal data. *See supra* Introduction. As detailed above, Hearst sells subscriber lists by race, religion, and political affiliation. *See id.*

Courts that have addressed similar restrictions on disseminating consumer information have uniformly assessed those restrictions as commercial speech. In *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303 (E.D. Pa. 2012), for instance, a consumer reporting agency who sold consumer reports to businesses investigating potential employees challenged provisions of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FRCA") limiting the types of information that it could disseminate. In upholding the FRCA's limits, the *King* court ruled that "[t]he appropriate test for analyzing the reduced First Amendment protection accorded to consumer report information is the Supreme Court's commercial speech doctrine." *King*, 903 F. Supp. 2d at 307; *Trans Union Corp. v. F.T.C.*, 267 F.3d 1138, 1141 (D.C. Cir. 2001) (FTC's restrictions on the sale of consumer reports was commercial speech subject to intermediate scrutiny). Similarly, in *United Reporting Pub. Corp. v. Cal. Highway Patrol*, 146 F.3d 1133 (9th Cir. 1998) *rev'd on other grounds sub nom. Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999), the Ninth Circuit held that selling information about recent arrestees to attorneys and others seeking new clients qualified as commercial speech that should be assessed under the *Central Hudson* framework. *Id.* at 1137 ("United Reporting sells arrestee information to clients; nothing more. … This is a pure economic transaction … comfortably within the core notion of

commercial speech.") (internal quotations and citations omitted). The sale of consumer data here is no different. The data being sold contains information about subscribers' economic activity and defendant sells that data for its own economic gain. These sales thus have all the hallmarks of commercial speech.

### 2.    The PPPA Survives A Facial Challenge

A party raising a facial challenge under the First Amendment shoulders a "heavy burden." *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 98 (2d Cir. 2007). "Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) ("Facial challenges are disfavored."). "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Okla.*, 413 U.S. 601, 613 (1973).

"[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). "Even when First Amendment rights are asserted, a litigant is denied standing to litigate an overbreadth challenge to a statute that can constitutionally be applied to his conduct unless a ruling is necessary to avert a 'real' and 'substantial' restraint on protected expression." *Brache v. Westchester Cty.*, 658 F.2d 47, 53 (2d Cir. 1981) (citing *Broadrick*, 413 U.S. at 615); *Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1321 (Fed. Cir. 2002) ("[I]n order to consider his facial challenge, [plaintiff] must still show a realistic possibility that application of [the regulation that he challenges] will suppress a substantial amount of constitutionally protected speech."); *United States v. Stevens*, 559 U.S. 460, 473 (2010) ("[A] law may be invalidated as overbroad if 'a

substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'") (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

In the context of commercial speech, in particular, the "strong medicine" of a facial challenge generally is not warranted. *Cent. Hudson*, 447 U.S. at 564 n.6 ("[C]ommercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation.") (internal quotations omitted); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989) ("[C]ommercial speech is more hardy, less likely to be 'chilled,' and not in need of surrogate litigators."); *832 Corp. v. Gloucester Twp.*, 404 F. Supp. 2d 614, 633 (D.N.J. 2005) ("Plaintiffs have raised no argument or evidence that persuades this Court to deviate from the general rule that facial challenges are not permitted for commercial speech restrictions.").

In its Motion to Dismiss, the single example of the PPPA's supposedly chilling effect on constitutionally protected speech cited by Hearst does not begin to approach the bar required for a facial challenge. *See* Doc. No. 18, at 28. Hearst's concern – that it may want to disclose that "a candidate for public office . . . bought one of its publications" – does not present "a realistic possibility that application" of the PPPA "will suppress a substantial amount of constitutionally protected speech." *Griffin*, 288 F.3d at 1321. Indeed, Hearst does not provide a single example of any such publication ever taking place. And, Hearst fails to demonstrate that its hypothetical is in fact an impermissible application of the statute. It is thus extremely doubtful that the PPPA would ever have a chilling restraint on "truthful reporting" or any other kind of constitutionally protected speech. It is also clear that the single hypothetical application conceived by Hearst "is

not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800.

### 3. The PPPA Survives An As-Applied Challenge

The PPPA also survives an as-applied challenge under *Central Hudson*.

<u>First</u>, the PPPA's restriction on speech seeks to further a substantial government interest: protecting the privacy of consumers. *Whalen v. Roe*, 429 U.S. 589, 599 (1977) (referring broadly to the constitutional privacy "interest in avoiding disclosure of personal matters"); *Sorrell*, 131 S. Ct. at 2672 (describing privacy as "a concept . . . integral to the person and a right . . . essential to freedom"); *Trans Union Corp. v. F.T.C.*, 245 F.3d 809, 818 (D.C. Cir. 2001) ("[W]e have no doubt that this interest – protecting the privacy of consumer credit information – is substantial.").

<u>Second</u>, the PPPA directly advances the substantial government interest of protecting the privacy of consumers. Information about publication purchases can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns." Complaint ¶ 44, Doc. No. 1.[6] Michigan's protection of Personal Reading Information thus reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy – of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." *Id.* ¶ 15.[7] The PPPA expressly prohibits the unauthorized dissemination of this private reading

---

[6] Citing California's Reader Privacy Act Signed into Law, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited May 12, 2015).

[7] Citing S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

information and thus directly advances the substantial government interest of protecting the privacy of consumers.

Third, the PPPA reaches no further than necessary to accomplish this objective. The PPPA is narrowly tailored because its language limits dissemination of precisely the kind of private consumer information subject to the government's substantial interest and no more. The PPPA also includes five exceptions that limits its scope:

> A record or information described in section 2 may be disclosed only in 1 or more of the following circumstances:
>
> (a) With the written permission of the customer.
>
> (b) Pursuant to a court order.
>
> (c) To the extent reasonably necessary to collect payment for the materials or the rental of the materials, if the customer has received written notice that the payment is due and has failed to pay or arrange for payment within a reasonable time after notice.
>
> (d) If the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer. The person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information.
>
> (e) Pursuant to a search warrant issued by a state or federal court or grand jury subpoena.

M.C.L. § 445.1713. These exceptions are carefully crafted to serve the statute's purpose of protecting consumer privacy while ensuring that it is no broader than necessary. None of these exceptions are based on viewpoint, and they take into account the needs of businesses like Hearst to collect payments, market goods and services directly, or to release information with written consent.

In fact, the law at issue in *Sorrell* – a seminal case on the interplay between the First Amendment and information privacy – would have survived if it had contained precisely these kinds of exceptions. The Supreme Court noted that if Vermont had limited "the information's sale or disclosure in only a few narrow and well-justified circumstances," rather than "allow[ing] the information to be studied and used by all but a narrow class of disfavored speakers," it "would present quite a different case." *Sorrell*, 131 S. Ct. at 2668. And, Judge Steeh has already rejected a First Amendment challenge to the PPPA on the basis of this distinction. *Halaburda*, 2013 WL 4012827, at *7 ("[T]he court finds dismissal under *Sorrell* to be inappropriate based on the significant distinctions between the two cases.").

## III. THE BALANCE OF HARDSHIPS IS IN PLAINTIFF'S FAVOR BECAUSE HEARST'S CONDUCT IS ALREADY PROHIBITED BY MICHIGAN LAW

Hearst cannot demonstrate any hardship it will suffer if a preliminary injunction is granted. Hearst is already prohibited from disclosing its Michigan subscribers' Personal Reading Information by Michigan law. *See Lawsky v. Condor Capital Corp.*, 2014 WL 2109923, at *13 (S.D.N.Y. May 13, 2014) (finding balance of hardships was in plaintiff's favor where defendant "kept money that should have been refunded to customers" and failed to present any evidence contradicting allegations regarding its "mishandling of customer information"); *United States v. Blue Ribbon Smoked Fish, Inc.*, 179 F. Supp. 2d 30, 50 (E.D.N.Y. 2001) ("A business 'can have no vested interest in a business activity found to be illegal.'") (quoting *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972)); *MediaOne of Delaware, Inc. v. E & A Beepers & Cellulars*, 43 F. Supp. 2d 1348, 1354 (S.D. Fla. 1998) ("In balancing the parties' respective hardships, an issuance of a preliminary injunction will merely enjoin Defendants from conducting a business which is already prohibited by state and federal law."). Thus, a

preliminary injunction will merely prevent Hearst from engaging in conduct that is already prohibited by Michigan law.

The only hardship Hearst has identified is the purported restraint on Hearst's First Amendment rights. *See* Hearst's Pre-Motion Letter, at 5, Doc. No. 38. But Hearst's sale of class members' Private Reading Information is commercial speech, to which the First Amendment's prior restraint doctrine does not apply. *See, e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 571 n.13 (1980) ("We have observed that commercial speech is such a sturdy brand of expression that traditional prior restraint doctrine may not apply to it."); *Va. St. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 n.24 (1976) (the "hardiness of commercial speech … may also make inapplicable the prohibition against prior restraints"); *Zauderer v. Office of Disciplinary Counsel of S. Ct. of Oh.*, 471 U.S. 626, 668 n.13 (1985) ("[T]raditional prior restraint principles do not fully apply to commercial speech."); *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 1996 WL 705786, at *2 n.5 (N.D.N.Y. Dec. 5, 1996) ("The 'prior restraint' doctrine, however, is not applicable in the commercial speech context."); *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 253 n.8 (S.D.N.Y. 2005) ("Defendants' communications with cardholders were commercial in nature, and therefore this Court may restrict it to ensure that the cardholders' rights in this litigation are not vitiated."). Accordingly, the balance of hardships is in Plaintiff's favor.

## IV.     A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

"The public has an interest in halting unlawful policies and practices that deprive consumers of money that is rightfully theirs, and in being protected from further harm from those practices." *Lawsky*, 2014 WL 2109923, at *13. Here, Hearst's unlawful disclosures of its Michigan subscribers' Personal Reading Information impact every Michigan subscriber. Accordingly, a preliminary injunction is in the public interest.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court preliminarily enjoin Hearst from disclosing Ms. Boelter's and class members' Private Reading Information to any third party while this action is pending.

Dated: November 16, 2015

Respectfully submitted,

By:     */s/ Scott A. Bursor*
            Scott A. Bursor

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
            jmarchese@bursor.com
            pfraietta@bursor.com

*Attorneys for Plaintiff*