**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUZANNE BOELTER, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>HEARST COMMUNICATIONS, INC.,<br><br>                   Defendant. | Civil Action No.: 15-cv-03934-AT |
| JOSEPHINE JAMES EDWARDS, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>     v.<br><br>HEARST COMMUNICATIONS, INC.,<br><br>                   Defendant. | Civil Action No.: 15-cv-09279-AT<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Suzanne Boelter and Josephine James Edwards ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1.       Hearst Communications, Inc. ("Hearst" or "Defendant") is an international media company that publishes over 300 magazines throughout the world, including widely-

circulated magazines such as *Country Living*, *Harper's Bazaar*, *Cosmopolitan*, *Esquire*, *Good Housekeeping*, *Redbook*, *Seventeen*, and *O, the Oprah Magazine*.

2.      To supplement its sales and advertising revenues, Hearst sells its subscribers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity, income, religion, parental status, and political affiliation—to data miners and other third parties without the written consent of its customers.

3.      Hearst's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information allows for highly specific targeting of groups of individuals. For example, anyone could buy from Hearst a customer list with the names and addresses of all *Good Housekeeping* subscribers over age 50, who are devoted Bible-reading Democrats, with three teenage children and pet cats. For such a list, Hearst charges approximately $192 per thousand subscribers listed.

4.      While Hearst profits handsomely from the unauthorized sale and disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its subscribers' privacy rights because Hearst does not obtain its customers' written consent prior to selling their Personal Reading Information.

5.      By selling its customers' Personal Reading Information without their written consent, Hearst violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a Michigan customer's purchase of written materials, if the record identifies the customer.

6.      Accordingly, Plaintiffs bring this Consolidated Class Action Complaint against Hearst for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, and for unjust enrichment.

## PARTIES

7.      Plaintiff Suzanne Boelter is a natural person and citizen of the State of Michigan. Plaintiff Boelter is a subscriber to *Country Living* magazine, which is published by Hearst.  Prior to and at the time she subscribed to *Country Living*, Hearst did not notify Plaintiff Boelter that it discloses the Personal Reading Information of its customers, and Plaintiff Boelter has never authorized Hearst to do so.  Furthermore, Plaintiff Boelter was never provided any written notice that Hearst sells its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Country Living*, and continuing to present, Hearst has disclosed, and continues to disclose, without consent or prior notice, Plaintiff Boelter's Personal Reading Information to data mining companies including Insource and others, who then supplement that information with data from their own files.  Moreover, during that same period, Hearst has sold – and continues to sell and offer for sale – mailing lists containing Plaintiff Boelter's Personal Reading Information to third parties seeking to contact Hearst subscribers, without first obtaining Plaintiff Boelter's written consent or even giving her prior notice of the disclosure and sales.  Because Hearst sold and disclosed her Personal Reading Information, Plaintiff Boelter now receives junk mail and telephone solicitations offering discounted magazine subscriptions, among other things.  These unwarranted offers waste Plaintiff Boelter's time, money, and resources.  These harassing junk mail offerings and phone call solicitations received by Plaintiff Boelter are attributable to Hearst's unauthorized sale and disclosure of her Personal Reading Information.  Because Plaintiff Boelter is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Hearst's sale of her Personal Reading Information deprived

Plaintiff Boelter of the full set of benefits to which she was entitled as a part of her *Country Living* subscription, thereby causing economic harm.  Accordingly, what Plaintiff Boelter received (a subscription without statutory privacy protections) was less valuable than what she paid for (a subscription with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *Country Living* subscription had she known that Hearst would disclose her Personal Reading Information.

8.      Plaintiff Josephine James Edwards is a natural person and citizen of the State of Michigan.  Plaintiff Edwards is a subscriber to *Good Housekeeping* magazine, which is published by Hearst.  Prior to and at the time she subscribed to *Good Housekeeping*, Hearst did not notify Plaintiff Edwards that it discloses the Personal Reading Information of its customers, and Plaintiff Edwards has never authorized Hearst to do so.  Furthermore, Plaintiff Edwards was never provided any written notice that Hearst sells its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Good Housekeeping*, and continuing to present, Hearst has disclosed, and continues to disclose, without consent or prior notice, Plaintiff Edwards' Personal Reading Information to data mining companies including Insource and others, who then supplement that information with data from their own files.  Moreover, during that same period, Hearst has sold – and continues to sell and offer for sale – mailing lists containing Plaintiff Edwards' Personal Reading Information to third parties seeking to contact Hearst subscribers, without first obtaining Plaintiff Edwards' written consent or even giving her prior notice of the disclosure and sales.  Because Hearst sold and disclosed her Personal Reading Information, Plaintiff Edwards now receives junk mail and telephone solicitations offering discounted magazine subscriptions, among other things.  These unwarranted offers waste Plaintiff Edwards' time, money, and resources.  These harassing junk mail offerings and phone

call solicitations received by Plaintiff Edwards are attributable to Hearst's unauthorized sale and disclosure of her Personal Reading Information.  Because Plaintiff Edwards is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Heart's sale of her Personal Reading Information deprived Plaintiff Edwards of the full set of benefits to which she was entitled as a part of her *Good Housekeeping* subscription, thereby causing economic harm.  Accordingly, what Plaintiff Edwards received (a subscription without statutory privacy protections) was less valuable than what she paid for (a subscription with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *Good Housekeeping* subscription had she known that Hearst would disclose her Personal Reading Information

9.      Defendant Hearst Communications, Inc. is a Delaware corporation with its principal place of business at 300 West 57th Street, New York, New York 10019.  Hearst does business throughout Michigan, New York, and the entire United States.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Hearst because Hearst conducts substantial business within New York, such that Hearst has significant, continuous, and pervasive contacts with the State of New York.  Additionally, Hearst's principal place of business is in New York, New York.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Hearst does substantial business in this District, a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District, and Hearst's principal place of business is in this District.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

13. In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

14. Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

15. Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

16. Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and

6

recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

17.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

18.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

19.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*,  House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

20.     Despite the fact that thousands of Michigan residents subscribe to Hearst publications, Hearst disregards its legal responsibility by systematically violating the VRPA.

*The Personal Information Market:  Consumers' Personal Information Has Real Value*

21.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting

and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

22.      More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

23.      The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

24.      In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers.  Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

---

[1] The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited May 12, 2015).

[2] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited May 12, 2015).

[3] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited May 12, 2015) (emphasis added).

[4] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Mar. 14, 2013).

25.    The scope of data miners' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

26.    Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

27.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

28.    In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

---

[5] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 12, 2015).

[6] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited May 12, 2015).

[7] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited May 12, 2015).

[8] *Id.*

29.     Data mining is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Hearst share information with data miners and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

30.     Information disclosures like Hearst's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

31.     Indeed, an entire black market exists where the personal information of

---

[9] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams  (last visited May 12, 2015).

[10] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited May 12, 2015).

[11] *Id.*

[12] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited May 12, 2015).

vulnerable elderly Americans is exchanged.  Thus, information disclosures like Hearst's are
particularly troublesome because of their cascading nature:  "Once marked as receptive to [a
specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host
of scam artists."[13]

32.    Hearst is not alone in jeopardizing its subscribers' privacy and well-being in
exchange for increased revenue:  disclosing subscriber information to data miners, direct
marketers, and other third parties is a widespread practice in the publishing industry.

33.    Thus, as consumer data has become an ever-more valuable commodity, the data
mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this
growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

34.    As the data mining industry has grown, so too have consumer concerns
regarding the privacy of their personal information.

35.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc.
showed that 89 percent of consumers polled avoid doing business with companies who they
believe do not protect their privacy online.[14]  As a result, 81 percent of smartphone users polled
said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

36.    Thus, as consumer privacy concerns grow, consumers are increasingly
incorporating privacy concerns and values into their purchasing decisions and companies viewed

---

[13] *See id.*

[14] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe,  http://www.truste.com/us-consumer-confidence-index-2013/ (last visited May 12, 2015).

[15] *Id.*

as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

37.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

38.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

39.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

---

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited May 12, 2015).
[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited May 12, 2015).

[18] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited May 12, 2015) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

### *Hearst Unlawfully Sells its Subscribers' Personal Reading Information*

40.    Hearst maintains a vast digital database comprised of its subscribers' Personal Reading Information.  Hearst discloses its subscribers' Personal Reading Information to data mining companies including Insource and others, who then supplement that information with additional sensitive personal information about each Hearst subscriber, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-D**).

41.    Hearst then sells its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

42.    As a result of Hearst's data compiling and sharing practices, companies can purchase mailing lists from Hearst that identify Hearst subscribers by their most intimate details: income, political affiliation, religious practice, and charitable donations.  Hearst's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Hearst will sell—to anyone willing to pay for it—a list with the names and addresses of all *Good Housekeeping* subscribers over age 50, who are devoted Bible-reading Democrats with three teenage children and pet cats.

43.    Hearst does not seek its subscribers' prior written consent to any of these disclosures and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

44.    Consumers can sign up for Hearst subscriptions through numerous media

13

outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer

subscribes, Hearst never requires the individual to read or agree to any terms of service, privacy

policy, or information-sharing policy.  Consequently, Hearst uniformly fails to obtain any form

of consent from – or even provide effective notice to – its subscribers before disclosing their

Personal Reading Information.

45.      As a result, Hearst disclosed and continues to disclose its customers' Personal

Reading Information – including their reading habits and preferences that can "reveal intimate

facts about our lives, from our political and religious beliefs to our health concerns"[19] – to

anybody willing to pay for it.

46.      By and through these actions, Hearst has intentionally disclosed to third parties

its Michigan subscribers' Personal Reading Information without consent, in direct violation of

the VRPA with Plaintiffs and other members of the Class.

## CLASS ACTION ALLEGATIONS

47.      Plaintiffs seek to represent a class defined as all Michigan residents who had their

Personal Reading Information disclosed to third parties by Hearst without consent (the "Class").

Excluded from the Class is any entity in which Defendant has a controlling interest, and officers

or directors of Defendant.

48.      Members of the Class are so numerous that their individual joinder herein is

impracticable.  On information and belief, members of the Class number in the thousands.  The

precise number of Class members and their identities are unknown to Plaintiffs at this time but

may be determined through discovery.  Class members may be notified of the pendency of this

---

[19] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited May 12, 2015).

action by mail and/or publication through the distribution records of Defendant.

49.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Hearst is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines); (b) whether Hearst obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Hearst's disclosure of Plaintiffs' and the Class's Personal Reading Information violated the Video Rental Privacy Act, M.C.L. § 445.1712; and (d) whether Heart's sale of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

50.    The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Personal Reading Information.

51.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

52.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system

presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability.  Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**
**Violation of the Video Rental Privacy Act**
**(M.C.L. § 445.1712)**

53.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully

set forth herein.

54.     Plaintiffs bring this claim individually and on behalf of members of the Class

against Defendant Hearst.

55.     As a magazine publisher that sells subscriptions to consumers, Hearst is engaged

in the business of selling written materials at retail.  *See* M.C.L. § 445.1712.

56.     By subscribing to *Country Living* and *Good Housekeeping*,Plaintiffs purchased

written materials directly from Hearst.  *See* M.C.L. § 445.1712.

57.     Because Plaintiffs purchased written materials directly from Hearst, they are

"customers" within the meaning of the VRPA.  *See* M.C.L. § 445.1711(a).

58.     At all times relevant, and beginning on the dates Plaintiffs initiated their *Country

Living* and *Good Housekeeping* subscriptions, Hearst disclosed Plaintiff's Personal Reading

Information, which identified them as  *Country Living* and *Good Housekeeping* subscribers, in at

least two ways.

59.     First, Hearst disclosed mailing lists containing Plaintiffs' Personal Reading

16

Information to data mining companies including Insource, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Hearst.

60.     Second, Hearst sold its mailing lists containing Plaintiffs' Personal Reading Information—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

61.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Hearst was able to increase its profits gained from the mailing list sales.

62.     By selling or otherwise disclosing its subscriber lists, Hearst disclosed to persons, other than Plaintiffs, records or information concerning their purchases of written materials from Hearst.  *See* M.C.L. § 445.1712.

63.     The information Hearst disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *Country Living* and *Good Housekeeping*.  Accordingly, the records or information disclosed by Hearst indicate Plaintiffs' identities.  *See* M.C.L.§ 445.1712.

64.     Plaintiffs and the members of the Class never consented to Hearst disclosing their Personal Reading Information to anyone.

65.     Worse yet, Plaintiffs and the members of the Class did not receive notice before Hearst disclosed their Personal Reading Information to third parties.

66.     On information and belief, Hearst's disclosures of Plaintiffs' and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand

jury subpoena.

67.    Hearst's disclosures of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

68.    Hearst's disclosures of Plaintiffs' Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Hearst's revenue.  Accordingly, Hearst's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

69.    By disclosing Plaintiff's Personal Reading Information, Hearst violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* M.C.L. § 445.1712.

70.    Additionally, because Plaintiffs and the members of the Class paid for their Hearst subscriptions, and Hearst was obligated to comply with the VRPA, Hearst's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiffs and the Class members of the full value of their paid-for subscriptions.  Because Plaintiffs and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Hearst's unlawful sale and disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

71.    Likewise, because Plaintiffs and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

72.    Accordingly, had Plaintiffs been adequately informed of Hearst's disclosure

practices, they would not have been willing to purchase their *Country Living* or *Good Housekeeping* subscriptions at the price charged, if at all.  Thus, Hearst's unlawful disclosures caused Plaintiffs economic harm.

73.     Hearst's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements and marketing calls to their home and cellular phones.

74.     As a result of Hearst's unlawful and continued disclosure of their Personal Reading Information, Plaintiffs and the members of the Class have suffered privacy and economic injuries.  On behalf of themselves and the Class, Plaintiffs seek:  (1) an injunction requiring Defendant Hearst to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## COUNT II
### Unjust Enrichment

75.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

76.     Plaintiffs brings this claim individually and on behalf of the members of the Class against Defendant.

77.     Plaintiffs and the Class members conferred benefits on Hearst by providing Hearst with their Personal Reading Information and paying Hearst for their magazine subscriptions.  Hearst received and retained the information and money belonging to Plaintiffs and the Class when Plaintiffs and the Class subscribed to Hearst publications.

78.     Because Hearst received and processed Plaintiffs' and the Class's subscription

payments and Personal Reading Information, and because Hearst has employees handling customer accounts and billing as well as customer data, Hearst appreciates or has knowledge of such benefits.

79.     Under the VRPA, Plaintiffs and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

80.     Under principles of equity and good conscience, because Hearst failed to comply with the VRPA, Hearst should not be allowed to retain the full amount of money Plaintiffs and the Class paid for their subscriptions or the money it received by selling Plaintiffs' and the Class's Personal Reading Information.

81.     Plaintiffs and the other Class members have suffered actual damages as a result of Hearst's unlawful conduct in the form of the value Plaintiffs and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

82.     Additionally, Plaintiffs and the Class members have suffered actual damages inasmuch as Hearst's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

83.     Further, a portion of the purchase price of each Hearst magazine subscription sold to Plaintiffs and the other Class members was intended to ensure the confidentiality of Plaintiffs' and the other Class members' Personal Reading Information, as required by the VRPA.  Because Plaintiffs and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiffs and the Class would have commanded a discount to voluntarily forego those benefits, they

20

incurred actual monetary damages.

84.     To prevent inequity, Hearst should return to Plaintiffs and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Hearst's sale and disclosure of Plaintiffs' and the Class's Personal Reading Information.

85.     Accordingly, Plaintiffs and the Class members seek an order declaring that Hearst's conduct constitutes unjust enrichment, and awarding Plaintiffs and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Hearst through its sale and disclosure of Plaintiffs' and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

86.     WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class.

B.     For an order declaring that Defendant's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

C.     For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D.     For an award of actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiffs and each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper; and;

H.     For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  February 26, 2016                    Respectfully submitted,

                                             **BURSOR & FISHER, P.A.**


                                             By:    */s/ Joseph I. Marchese*
                                                     Joseph I. Marchese

                                             Scott A. Bursor
                                             Joseph I. Marchese
                                             Philip L. Fraietta
                                             888 Seventh Avenue
                                             New York, NY  10019
                                             Telephone: (212) 989-9113
                                             Facsimile:  (212) 989-9163
                                             Email:  scott@bursor.com
                                                     jmarchese@bursor.com
                                                     pfraietta@bursor.com


                                             **CAREY RODRIGUEZ**
                                             **MILIAN GONYA, LLP**
                                             John C. Carey
                                             David P. Milian*
                                             Frank S. Hedin*
                                             1395 Brickell Avenue, Suite 700
                                             Miami, FL 33131
                                             Telephone: (305) 372-7474
                                             Facsimile:  (305) 372-7475
                                             E-Mail: jcarey@careyrodriguez.com
                                             dmilian@careyrodriguez.com
                                             fhedin@careyrodriguez.com
                                             *Pro Hac Vice Application Forthcoming

                                             *Attorneys for Plaintiffs*