UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #: _____  │
│ DATE FILED:  6/17/2016       │
└─────────────────────────────┘
```

SUZANNE BOELTER, individually and on
behalf of others similarly situated,

                          Plaintiff,

        -against-                                        15 Civ. 3934 (AT)

HEARST COMMUNICATIONS, INC.,

                          Defendant.

JOSEPHINE JAMES EDWARDS, individually
and on behalf of others similarly situated,

                          Plaintiff,

        -against-                                        15 Civ. 9279 (AT)

HEARST COMMUNICATIONS, INC.,                             **MEMORANDUM
                                                         AND ORDER**

                          Defendant.

ANALISA TORRES, District Judge:

        On May 21, 2015, Plaintiff Suzanne Boelter filed a class action complaint against

Defendant Hearst Communications, Inc., alleging violation of the Michigan Video Rental

Privacy Act, H.B. 5331, 84th Leg., Reg. Sess., P.A. No. 378, § 2 (Mich. 1988) (amended 2016)

("VRPA") and unjust enrichment.  *Boelter v. Hearst Commc'ns, Inc.*, No. 15 Civ. 3934, Dkt. No.

1 (S.D.N.Y.).  On November 24, 2015, Plaintiff Josephine James Edwards filed a class action

complaint asserting similar claims.  *Edwards v. Hearst Commc'ns, Inc.*, No. 15 Civ. 9279, Dkt.

No. 1 (S.D.N.Y.).  The complaints were consolidated, and on February 26, 2016, Plaintiffs filed

an amended complaint.  ECF No. 67.  Defendant seeks to dismiss the amended complaint for

lack of jurisdiction and for failure to state a claim pursuant to Federal Rules of Civil Procedure

12(b)(1) and 12(b)(6), respectively.  Alternatively, Defendant moves to strike Plaintiffs' request for injunctive relief.  For the reasons stated below, the motions are DENIED.

## BACKGROUND[1]

In 1988, Michigan enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of" certain goods.[2]  Am. Compl. ("Compl.") ¶ 14, ECF No. 67; H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).  The law's enactment followed the passage of the federal Video and Library Privacy Protection Act, 18 U.S.C. § 2710, and paralleled the enactment of similar consumer privacy laws in eleven other states.[3]  *See* Compl. ¶¶ 13-17.  The Michigan statute prohibits individuals "engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings" from "disclos[ing] to any person, other than the customer," information about the customer that "indicates [her] identity."  VRPA § 2.  This prohibition is subject to exceptions: disclosure is allowed "[w]ith the written permission of the customer"; "[p]ursuant to a court order" or a "search warrant"; to "collect payment" from the customer so long as the customer "has received written notice that the payment is due and has failed to pay . . . within a reasonable time after notice"; and if "the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer," so long as the consumer receives written notice and opportunity to opt out.  *Id.* § 3.  Violation of the law constitutes a misdemeanor, *id.* § 4, and customers who are

---

[1] The following facts are taken from the pleadings and accepted as true for the purposes of this motion.  *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (describing the standard under Rule 12(b)(1)); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (describing the standard under Rule 12(b)(6)).

[2] In May 2016, during the pendency of this action, the Michigan legislature amended the VRPA.  *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016).  For the reasons discussed *infra*, the Court finds that the new law does not retroactively apply to Plaintiffs' claims.  Accordingly, the overview here is of the law as it existed prior to amendment.

[3] *See infra* n.13.

"identified in . . . information that is disclosed in violation of [the] act" may bring a civil action to recover "actual damages, including damages for emotional distress, or $5,000.00, whichever is greater," as well as costs and attorneys' fees, *id.* § 5.

Defendant, a Delaware corporation with its principal place of business in New York, is an international media company that publishes over three hundred magazines and sells them throughout the world.  Compl. ¶¶ 1, 9.  In addition to revenues from magazine sales, Defendant profits from selling demographic information about its consumers to "data miners and other third parties," which allows for targeted marketing, advocacy, and solicitations from businesses, political groups, or non-profit organizations.  *Id.* ¶¶ 2, 3, 40-42; *see also Boelter v. Hearst Commc'ns, Inc.*, No. 15 Civ. 3934, Dkt. No. 1 (S.D.N.Y. May 21, 2015) ("Boelter Compl."), Exs. B–D.  Defendant does not obtain its consumers' written consent or notify them prior to selling their data.  *See* Compl. ¶¶ 4, 7, 8.

Plaintiffs Boelter and Edwards are Michigan citizens who subscribe to *Country Living* and *Good Housekeeping*, respectively, two magazines published by Defendant.  *Id.* ¶¶ 7, 8.  Plaintiffs allege that Defendant discloses information about Plaintiffs to third parties either for the third parties' use or so the third parties can supplement the data with additional information "from [the third parties'] own databases" to enhance the value of the information for Defendant.  *Id.* ¶¶ 7, 8, 58-60.  Neither plaintiff has consented to or been notified of Defendant's disclosure of her identifying information.  *Id.* ¶¶ 7, 8.  As a result of the disclosures, Plaintiffs receive "harassing junk mail offerings and telephone solicitations" that "waste [their] time, money, and resources," *id.*, and they face "risk of serious harm from scammers," *id.* ¶ 42.  Additionally, the disclosure of Plaintiffs' information reduces the value of their magazine subscriptions, and had Plaintiffs known that their information would not be kept private, they would "not have been

willing to pay as much, if at all," for their subscriptions.  *Id.* ¶¶ 7, 8.  Plaintiffs bring two claims against Defendant:  First, the disclosures of Plaintiffs' identifying information constitute a violation of the VRPA.  *Id.* ¶¶ 53-74.  Second, as a result of the disclosures, Defendant was unjustly enriched by the benefit it derived from selling consumer data, a benefit which was not reflected in the purchase price of Plaintiffs' subscriptions.  *See id.* ¶¶ 75-85.

Defendant moves to dismiss the amended complaint on several grounds.  First, it argues that the Court lacks jurisdiction:  Plaintiffs do not have standing because they have not suffered an injury-in-fact; and additionally, the Court does not have jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109–2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.), and Federal Rule of Civil Procedure 23 is rendered inoperative, because of a Michigan court rule that precludes class actions under the VRPA.

Second, Defendant argues that the VRPA is unconstitutional, violating the First Amendment as an impermissible restriction on speech both as applied and on its face.

Third, Defendant contends that the amended complaint fails to state a plausible claim for relief.  Defendant is not a "retailer" of written material, as is required to fall within the statute's scope, and otherwise did not violate the law because its disclosures are only for direct marketing purposes and it provided to Plaintiffs sufficient notice of its information disclosure policies. Defendant also argues that the allegations do not support an unjust enrichment claim, and in any event such a claim is barred by the VRPA, which provides the exclusive remedy for a violation of its terms.  The Court will address each argument in turn.

**DISCUSSION**

I.     Legal Standards

    A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.2000).  To survive a Rule 12(b)(1) motion to dismiss, the party asserting jurisdiction "has the burden of proving by a preponderance of the evidence that [subject matter jurisdiction] exists." *Id.*  On such a motion, "the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  However, "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Id.* (alteration in original).

    B.  Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555.  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*  On a Rule 12(b)(6) motion, the Court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  The court

must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). That said, a court should reject "threadbare recitals" of the elements of a cause of action "supported by mere conclusory statements," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010), and "bald assertions . . . unsupported" by details which are insufficient to meet the minimum pleading requirements for a cause of action, *Lawtone-Bowles v. N.Y.C. Hous. Auth.*, No. 13 Civ. 1434, 2014 WL 705272, at *2-3 (S.D.N.Y. Feb. 20, 2014).

II.     Standing

Defendant argues that Plaintiffs lack standing because they have not suffered an "injury-in-fact"—that is, that violation of the VRPA, as well as the other harms alleged in the amended complaint, do not constitute a particularized, concrete injury sufficient to confer standing.

Standing is a constitutional requirement, grounded in Article III, which requires litigants to have suffered an injury that is traceable to the defendant and that can be redressed by court action. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). The injury must be an "injury-in-fact," meaning it is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted). An injury is particularized if it "affect[s] the plaintiff in a personal and individual way"; it is concrete if it is "tangible." *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548-49 (2016). An "intangible" harm may also be concrete where, for example, it is an otherwise *de facto* harm which the legislature has "identif[ied] and elevat[ed]" such that an individual may seek relief when she suffers the harm. *See id.*

In the order denying Boelter's motion for a preliminary injunction, the Court addressed, and rejected, Defendant's argument that violation of the VRPA does not constitute an injury-in-

fact sufficient to sustain standing.  *See Boelter v. Hearst Commc'ns, Inc.*, No. 15 Civ. 3934, Dkt. No. 65, 2016 WL 361554 (S.D.N.Y. Jan. 28, 2016).  Instead, the Court denied Boelter's motion on the ground that she failed to provide sufficient evidence demonstrating that she had standing to seek the injunction.  *Id.* at *4 (finding that Boelter failed to provide affidavits or other evidence of specific facts to support her claims of harm).  As the Court noted then, however, the burden for establishing standing is less stringent when facing a motion to dismiss than it is when seeking preliminary injunctive relief.  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011).  To survive the motion to dismiss, the pleadings must only "allege facts that affirmatively and plausibly suggest that [Plaintiffs have] standing to sue."  *Amidax Trading Grp.*, 671 F.3d at 145.  The Court must take as true any fact in the complaint, construing all reasonable inferences in the plaintiff's favor, unless contradicted by more specific allegations or documentary evidence.  *Id.*

    In the amended complaint, Plaintiffs allege that Defendant disclosed protected information about Plaintiffs in two ways: by selling it to third parties, and by providing it to "data mining" companies who then supplemented it with additional data to enhance the value of the information for Defendant.  Compl. ¶¶ 7, 8, 58-60.  By its conduct, Defendant deprived Plaintiffs of their right to keep their information private, subjected them to unwanted solicitations and the risk of being victimized by "scammers," and unjustly retained the economic benefit the value of that information conferred.  *Id.* ¶¶ 42, 53-86.  Moreover, had Plaintiffs known that Defendant would disclose their information, they "would not have been willing to pay as much, if at all, for [their magazine] subscriptions."  *Id.* ¶¶ 7, 8, 71.  As alleged, Plaintiffs suffered a particularized, concrete injury-in-fact—the violation of their rights under the VRPA, along with economic harm—that was caused by Defendant and that can be remedied by court action.  At

this stage, the pleadings are sufficient to establish Plaintiffs' standing to sue. *Halaburda v. Bauer Publ'g Co., LP*, No. 12 Civ. 12831, 2013 WL 4012827, at *6 (E.D. Mich. Aug. 6, 2013) (finding that a plaintiff had standing to sue for violation of the VRPA). Accordingly, the motion to dismiss for lack of standing is DENIED.[4]

   III.   <u>The Effect of the Amendment to the VRPA</u>

   While Defendant's motion was pending, the Michigan legislature amended the VRPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (to be codified at M.C.L. § 445.1711 *et seq.*) ("Am. VRPA"). The parties dispute whether the amended law retroactively applies to Plaintiffs' claims. For the reasons stated below, the Court finds that it does not.

   "Retroactivity is not favored in the law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994). Under Michigan law, statutory amendments "are presumed to operate prospectively unless the contrary intent is clearly manifested." *Frank W. Lynch & Co. v. Flex Techs., Inc.*, 624 N.W.2d 180, 182 (Mich. 2001). For a statute to apply retroactively, the legislature's intent must be "clear, direct, and unequivocal as [it] appears from the context of the statute itself." *Davis v. State Emps.' Ret. Bd.*, 725 N.W.2d 56, 60 (Mich. Ct. App. 2006) (citations omitted); *see also LaFontaine Saline, Inc. v. Chrysler Grp., LLC*, 852 N.W.2d 78, 85 (Mich. 2014) (stating that the legislature must "make its intentions clear when it seeks to pass a law with retroactive effect"). A statute may also be retroactive if it is "remedial or procedural in nature," that is, "it is designed to correct an existing oversight in the law or redress an existing grievance." *Davis*, 725 N.W.2d at 61-62. A statute is not merely remedial, however, and cannot apply retroactively, if it

---

[4] Defendant's alternative request that the Court stay its decision pending resolution of *Spokeo, Inc. v. Robins* is moot. In *Spokeo*, the Supreme Court remanded the case to the lower court when it found that the lower court failed to consider the concreteness of the plaintiff's alleged injury. 136 S. Ct. at 1550. That decision does not upset the Court's conclusion here that the violation of a statute by itself is insufficient to confer standing to sue but that Defendant's violation of the VRPA, as alleged, caused a concrete and particular injury to Plaintiffs. *See id.* at 1549; *Boelter*, 2016 WL 361554, at *2-3.

"affect[s] substantive rights," *Frank W. Lynch & Co.*, 624 N.W.2d at 183, or "creates an important new legal burden," *Brewer v. A.D. Transport Exp., Inc.*, 782 N.W.2d 475, 479 (Mich. 2010) (internal quotation marks and citation omitted).

Defendant points to three pieces of evidence that it contends demonstrate the legislature's intent for the amended VRPA to apply retroactively.  First, Defendant argues that the statutory text unambiguously requires the law's retroactive application.  Specifically, Defendant cites enacting language stating that the amendment is "curative and intended to clarify" the law, and language in a particular provision specifying the prospective application of that provision. Neither piece of text, however, compels the conclusion that the amended law is retroactive.

The amended VRPA's second enacting section states that the statute "is curative and intended to clarify" circumstances under which a seller of covered products may disclose consumer identifying information and that only a customer who has "suffered actual damages" may sue under the statute.  The phrases "curative" and "intended to clarify" do not, as Defendant argues, unequivocally indicate that the amendments apply to pre-existing disputes.  Absent additional qualifying language, it is just as likely that the terms denote the amendment's purpose for consideration in future applications of the law.  *Cf., e.g.*, *Daimler Chrysler Servs. of N. Am., LLC v. Dep't of Treasury*, Dkt. No. 288347, 2010 WL 199575, at *2 n.1 (Mich. Ct. App. Jan. 21, 2010) (holding that an amendment applied retroactively in part because it contained an enacting provision stating both that the "amendatory act is curative" and that it "shall be retroactively applied" (citing M.C.L. § 205.54i, Enacting § 1)).

Am. VRPA § 3(d) allows, in addition to the former law's enumerated exceptions, the disclosure of consumer identifying information if the disclosure is "incident to the [discloser's] ordinary course of business."  *Compare* Am. VRPA § 3, *with* VRPA § 3.  This new exception,

however, "only applies to a record or information that is created or obtained after" the amendment's effective date.  Am. VRPA § 3(d).  Defendant contends that construing the rest of the statute to apply prospectively would render the language in § 3(d) superfluous.  *See, e.g.*, *Tiger Stadium Fan Club, Inc. v. Governor*, 553 N.W.2d 7, 15 (Mich. Ct. App. 1996) (cautioning against construing a statute in a way that renders statutory language superfluous or nugatory).

The qualifying language in § 3(d) does not concern the prospective force of the provision itself, however, but only the information to which the exception applies.  The clearest reading of the statutory text is that the legislature intends the amended law to govern the disclosure of consumer data regardless of whether the information pre- or post-dates the amendment—except § 3(d), which applies only where information post-dates the amendment.  In other words, the amendment's prospective regulation of the conduct of magazine publishers, and § 3(d)'s unique demarcation of the consumer identifying information to which that particular exception applies, are not redundant.[5]

Second, Defendant contends that a floor statement made by a Michigan legislator during the debate on the amendment, and the committee hearing testimony of an opponent of the bill, indicate that the legislature intended the statute to be retroactive.  Legislative history, however, should only be considered when construing statutory text that is by itself unclear—which, as discussed above, is not the case here.  *See Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 77 (2d Cir. 2014) ("Legislative interpretation begins with the plain text of the statute and, where the text is unambiguous, also ends there because the judicial inquiry is complete." (internal quotation marks omitted)); *Chmielewski v.*

---

[5] At the very least, the Court will not place such an "extraordinary weight" on § 3(d)'s lone provision to infer that the absence of similar language regarding prospectivity in the rest of the statute indicates the legislature's unequivocal intent to make the amendment retroactive.  *See Landgraf*, 511 U.S. at 258-59.

*Xermac, Inc.*, 580 N.W.2d 817, 824 (Mich. 1998).  Even if the Court were to look to the amendment's history, however, a legislator's floor statement, or an opponent's hearing testimony, is not helpful in discerning the intent of the legislature as a whole, *see People v. Gardner*, 753 N.W.2d 78, 89 (Mich. 2008), especially where the statements, as here, only express the individual's uncertainty about the statute's possible retroactive effect.  *See* Mich. S. Journal, 98th Leg., Reg. Sess., No. 33 at 469-71 (statement of Senator Warren); *S.B. No. 490, a Bill to Amend Mich.'s Preservation of Personal Privacy Act*, H. Comm. On Commerce & Trade, 98th Leg., Reg. Sess. 10 (testimony of Ari J. Scharg, Attorney, Edelson PC) (Mich. Feb. 9, 2016), *available at* http://house.michigan.gov/sessiondocs/2015-2016/testimony/Committee325-2-9-2016.pdf.

Third, Defendant argues that the Court should assume that the law is retroactive because it was enacted amid debates concerning standing and litigation involving the VRPA.  Defendant provides no evidence, however, that the statute was crafted to address any legal controversy contemporaneous with the law's passage.  *Cf., e.g.*, *Romein v. Gen. Motors Corp.*, 425 N.W.2d 174, 176-77 (Mich. Ct. App. 1988) (discussing a law which was expressly amended to correct a judicial interpretation of the law (citing M.C.L. § 418.354(17)).

Notably absent from the amended VRPA is any express language indicating the law's retroactive application.  *See Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 739 (6th Cir. 2013) ("[T]he absence of express retroactive language is a strong indication that the [Michigan] Legislature did not intend a statute to apply retroactively." (citing *Brewer*, 782 N.W.2d at 478)); *Frank W. Lynch & Co.*, 624 N.W.2d at 183 (collecting Michigan statutes containing explicit retroactive language, noting that the legislature "has shown on several occasions that it knows how to make clear its intention that a statute apply

retroactively").  Moreover, the amended law contains text that affirmatively indicates its prospective application.  For example, the amended VRPA's first enacting section states that the amendment is to take "effect 90 days after the date it is enacted into law."  "Providing a specific, future effective date and omitting any reference to retroactivity supports a conclusion that a statute should be applied prospectively only."  *Brewer*, 782 N.W.2d at 479.  Ultimately, considering the "context of the statute itself," there is no "clear, direct, and unequivocal" indication that the legislature intended the Am. VRPA to apply retroactively.  *Davis*, 725 N.W.2d at 60.

Defendant argues alternatively that the amendment is remedial and procedural and therefore applies retroactively.  A law is not remedial, however, if it affects a substantive right. *Frank W. Lynch & Co.*, 624 N.W.2d at 183; *see also In re Certified Questions from U.S. Court of Appeals for the Sixth Circuit*, 331 N.W.2d 456, 463 (Mich. 1982) (finding that a law cannot apply retroactively if it "creates a new obligation and imposes a new duty, or attaches a new disability with respect to transactions or considerations already past").  The amended VRPA no longer allows an individual to sue for statutory damages, and expands, to a significant degree, the circumstances in which a seller can disclose consumer information.  *See* Am. VRPA §§ 5(2), 3. The new law also imposes additional requirements on a seller regarding the notice it must give to customers whose data the seller intends to disclose for marketing purposes.  *See id.* § 3.  These amendments do not merely "change the mechanics or time frame" by which Plaintiffs can assert their rights.  *Kia Motors Am., Inc.*, 706 F.3d at 740.  Rather, they alter the scope of those rights and the recourse available should the rights be violated, while imposing additional burdens on Defendant.  Therefore, the new law is substantive, and should not apply retroactively to Plaintiffs' claims.  *See, e.g.*, *Frank W. Lynch & Co.*, 624 N.W.2d at 183 (finding that an

amendment which permits the recovery of a penalty in addition to damages for an employment

dispute is not remedial because retroactive application would "change significantly the substance

of the parties' agreement and unsettle their expectations"); *Dale Baker Oldsmobile, Inc. v. Fiat*

*Motors of N. Am., Inc.*, 794 F.3d 213, 219 (6th Cir. 1986) (explaining that remedial statutes are

those that only "involve procedural rights or indicate the procedures for effecting a remedy"); *see*

*also Landgraf*, 511 U.S. at 283-84 ("The *extent* of a party's liability, in the civil context as well

as the criminal, is an important legal consequence that cannot be ignored." (emphasis in

original)).  Accordingly, the amendment to the VRPA does not apply to Plaintiffs' claims, and

the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs'

claims accrued.  *See Landgraf*, 511 U.S. at 286.

IV.     The Effect of Michigan Court Rule 3.501(A)(5)

Defendant contends that the Court lacks jurisdiction because Michigan Court Rule

("M.C.R.") 3.501(A)(5) precludes litigants from bringing a class action complaint for violations

of the VRPA in that state's courts.  First, according to Defendant, CAFA was not intended to

permit federal jurisdiction over class actions that could not be maintained in state court.  Second,

Defendant argues that the Michigan rule is substantive law, and therefore displaces Federal Rule

of Civil Procedure 23 under the Rules Enabling Act, 28 U.S.C. § 2072, thus barring Plaintiffs'

class claims.  Both arguments fail, and Defendant's 12(b)(1) motion to dismiss is DENIED.

A.  The Michigan Rule

M.C.R. 3.501(A)(5), enacted prior to the VRPA,[6] is part of Michigan's rules governing

class actions.  It provides that "[a]n action for a penalty or minimum amount of recovery without

---

[6] When construing state statutes, Michigan courts assume that the legislature is aware of existing law when it passes
new law; thus, to the extent relevant, prior law is incorporated into new statutes.  *See Malcolm v. City of E. Detroit*,
468 N.W.2d 479, 482 (Mich. 1991).

regard to actual damages imposed or authorized by statute may not be maintained as a class action unless the statute specifically authorizes its recovery in a class action." M.C.R. 2.501(A)(5). Plaintiffs, and the classes they seek to represent, sue to recover the greater of actual damages or the statutory damages authorized by the VRPA. *See* Compl. ¶ 86(D); M.C.L. § 445.1715. The VRPA does not explicitly authorize persons injured under it to sue for statutory damages on a class-wide basis, and therefore Plaintiffs would be unable to bring the same class complaint in a Michigan court.[7] *Cf., e.g.*, *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014) (finding that a Michigan statute which provides for statutory damages and does not expressly authorize class recovery precludes class suits under that statute in state court).

### B. The Court's Jurisdiction under CAFA

Plaintiffs contend that the Court has jurisdiction under CAFA, a law expanding federal diversity jurisdiction over state-law class claims. *See Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 294 (S.D.N.Y. 2015) (internal quotations and citations omitted). The statutory text is straightforward. District courts shall have "original jurisdiction of any civil action" so long as the aggregated amount in controversy exceeds five million dollars and, in pertinent part, is a class action in which any class member has citizenship diverse from any defendant.[8] 28 U.S.C. § 1332(d). "Class action" is defined as "any civil action filed under [R]ule 23" or a similar state rule authorizing aggregate claims. *Id.* (d)(1)(B). Defendant argues that, in light of

---

[7] Plaintiffs contend that M.C.R. 3.501(A)(5) is inapposite because they are seeking actual damages to the extent they are greater than the statutory damages to which they would be entitled. The Court need not reach this argument, because even assuming that M.C.R. 3.501(A)(5) would bar this action in state court, the Court does not lose the jurisdiction given to it by CAFA, as discussed *infra*.

[8] The statute includes exceptions, but none apply here. *See, e.g.*, 28 U.S.C. § 1332(d)(3) and (4) (excepting claims in which significant numbers of the plaintiff class and defendants are citizens of the state in which the case was brought); *id.* (d)(9) (excepting cases involving only securities claims).

the law's purpose of expanding federal court jurisdiction over multi-state class actions, *see, e.g.*, *N.J. Carpenters Vacation Fund v. HarborView Mortg. Loan Tr. 2006-4*, 581 F. Supp. 2d 581, 583-84 (S.D.N.Y. 2008), the jurisdictional grant does not provide a forum for class suits brought on behalf of citizens from a single state that could not be brought as a class suit in that state's courts.

When determining the meaning of statutory text, the Court must "first look to the statute's plain meaning; if the language is unambiguous, [the Court] will not look farther." *Estate of Pew v. Cardarelli*, 527 F.3d 25, 30 (2d Cir. 2008) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). The law defines "class action" with express reference to Rule 23, a federal procedural rule which governs the aggregation of claims regardless of the type of law under which they arise. 28 U.S.C. § 1332(d)(1)(B); *see also* Fed. R. Civ. P. 23. This definition, along with the statute's remaining provisions, show that "by its clear language, CAFA creates original jurisdiction for and removability of *all* class actions that meet the minimal requirements and do not fall under one of the limited exceptions." *N.J. Carpenters Vacation Fund*, 581 F. Supp. 2d at 584 (emphasis in original). It is not for the Court to restrict the jurisdiction granted to it by Congress. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 459 & n.15 (2010) (Ginsburg, J., dissenting) (noting that Congress would have to amend the law if it wanted to "exclude from federal court jurisdiction . . . claims that could not be maintained as a class action in state court"). Plaintiffs' suit meets the statute's minimal requirements, and, therefore, the Court has jurisdiction pursuant to 28 U.S.C. § 1332(d).

C.   The Rules Enabling Act and Plaintiffs' Class Claims

Alternatively, Defendant contends that M.C.R. 3.501(A)(5) is substantive and therefore, under the Rules Enabling Act, precludes Plaintiffs' class claims which would otherwise be

allowed pursuant to Rule 23.  Because this question involves a purported conflict between a federal and state law in a suit brought under diversity jurisdiction, *Erie Railroad Co. v. Tompkins* and its progeny apply.  304 U.S. 64 (1938).

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law."  *Retained Realty, Inc. v. McCabe*, 376 F. App'x 52, 55 (2d Cir. 2010) (summary order) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)).  A federal procedural law will govern "regardless of contrary state law" so long as it is "consonant with the Rules Enabling Act," *id.*, meaning that it does not "abridge, enlarge or modify any [state] substantive right," 28 U.S.C. § 2072(b).  Because Rule 23—the rule that would govern the adjudication of Plaintiffs' class claims—is procedural, *see Shady Grove*, 559 U.S. at 400, 398-99, 405-08 (plurality opinion); *Retained Realty, Inc.*, 376 F. App'x at 55 n.1, and because it would abridge M.C.R. 3.501(A)(5), the pertinent question is whether Michigan's law is substantive.

Distinguishing between a procedural and substantive law is "a challenging endeavor." *Liberty Synergistics, Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013).  A rule is procedural if it "'governs only the manner and the means by which the litigants' rights are enforced,' not "the rules of decision by which the court will adjudicate those rights.'"  *In re Sept. 11 Litig.*, 802 F.3d 314, 340 (2d Cir. 2015) (quoting *Shady Grove*, 559 U.S. at 407 (plurality opinion)). However, the "federal rule . . . cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  *Shady Grove*, 559 U.S.

at 423 (Stevens, J., concurring).[9]  Therefore, if the Michigan bar on class actions is "so intertwined with" the rights and remedies afforded by the VRPA, the rule is substantive and would preclude the Court from entertaining Plaintiffs' amended complaint.

In some cases, state laws limiting class actions are substantive and prohibit class suits under those laws in federal court.  For example, *Leonard v. Abbott Labs, Inc.* involved a provision of Ohio consumer protection law that precludes individuals suing under that law from doing so as a class unless certain criteria are met.  *See* No. 10 Civ. 4676, 2012 WL 764199, at *10 (E.D.N.Y. Mar. 5, 2012).  Although the law appears to be procedural, it is couched within and applies only to claims brought under a single statute.  *Id.* at *13.  The rule is not, in other words, "pan-substantive," and is "so intertwined" with the statute's rights and remedies that it trumps Rule 23.  *Id.*  Similarly, *Fraiser v. Stanley Black & Decker, Inc.*, involved a provision of Connecticut consumer protection law that allows class suits only on behalf of similarly-situated Connecticut residents.  *See* Civ. No. 12-1182, 2015 WL 3794377, at *6 (D. Conn. Jun. 15, 2015) (appeal filed July 7, 2015).  The state's limit to its consumer protection law—again, included within the statutes to which the limit applies—is substantive, and is not displaced by Rule 23.  *Id.* at *6-7.

Both cases involved state laws drafted to include certain procedural limitations, altering the scope of the right enacted by the legislature.  M.C.R. § 3.501(A)(5), on the other hand, is a generally applicable statute governing "the manner and means" by which causes of action might be asserted in Michigan courts.  The rule is substantially similar to the New York rule at issue in *Shady Grove*.  That case involved a class suit brought under New York law in federal court to

---

[9] Most courts consider Justice Stevens' concurrence in *Shady Grove* to be the controlling opinion, *see Leonard v. Abbott Labs., Inc.*, 2012 WL 764199, at *12 (E.D.N.Y. Mar. 5, 2012) (collecting cases); thus, the Court looks to that opinion for guidance.

recover unpaid statutory interest from the defendant.  *Shady Grove*, 559 U.S. at 397 (plurality opinion).  The defendant argued that the federal court lacked jurisdiction because of a separate state procedural rule which provides that "an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action" unless the legislature allows otherwise.  *See id.* at 396 n.1 (citing N.Y. C.P.L.R. § 901(b)).  The Supreme Court found that the New York rule was procedural and did not preclude a federal class suit.  *See id.* at 416 (Stevens, J., concurring).

Like the state rule in *Shady Grove*, the Michigan court rule establishes "whether [a] particular type of claim is eligible for class treatment in the first place," the same procedural work done by Rule 23.  *See id.* at 399, 401 n.4 (plurality opinion).  Because MCR § 3.501(A)(5) is a "rule in [the state's] procedural code about when to certify class actions brought under any source of law," it must give way to "Congress' decision that Rule 23 governs class certification in federal courts."  *See id*. at 436 (Stevens, J., concurring); *see also Am. Copper & Brass, Inc.*, 757 F.3d at 546 (concluding the same); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011) (barring a class action under an Illinois antitrust law that includes a provision limiting class suits because "[u]nlike the . . . law at issue in *Shady Grove*, its limitation is not contained in a generally applicable procedural rule but, rather, in the same paragraph of the same statute that creates the underlying substantive right").  MCR § 3.501(A)(5) is procedural, and does not bar Plaintiffs' class claims in this Court.  Therefore, Defendant's motion to dismiss under Rule 12(b)(1) is DENIED.

V.    First Amendment

    A.  Commercial Speech

    Defendant contends that Plaintiffs' amended complaint must be dismissed because the VRPA suppresses Defendant's speech in violation of the First Amendment.  When a party challenges a law on the basis that it restricts speech, "we first look at the genre of speech involved." *Safelite Grp., Inc. v. Jepsen*, 764 F.3d 258, 261 (2d Cir. 2014).  "[T]he creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011).  Of course, just because Defendant's disclosure of its consumers' identities constitutes protected speech does not mean that it is unregulable.  A central tenet in First Amendment law is that "not all speech is of equal . . . importance"— "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection," whereas "speech on matters of purely private concern is of less First Amendment concern." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 (1985) (citations omitted).  Included in this latter category warranting lesser concern is commercial speech.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y. ("Cent. Hudson")*, 447 U.S. 557, 562-63 (1980).  If the VRPA restricts only commercial speech, as Plaintiffs contend, then it is subject to less demanding scrutiny from the Court.  *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 275 (2d Cir. 2010) (applying intermediate scrutiny to a regulation on commercial speech); *see also Dun & Bradstreet, Inc.*, 472 U.S. at 758 n.5 (explaining why commercial speech receives "reduced protection").

    The "core notion of commercial speech is 'speech which does no more than propose a commercial transaction.'" *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)).  In other words,

commercial speech is speech that is used to solicit business or market goods and services. *See Cent. Hudson*, 447 U.S. at 563 ("The First Amendment's concern for commercial speech is based on the informational function of advertising."). Although traditional advertisements comprise its "core," commercial speech also includes, more generally, "expression related solely to the economic interests of the speaker and its audience." *Conn. Bar Ass'n*, 620 F.3d at 94 (quoting *Cent. Hudson*, 447 U.S. at 561); *see also United Reporting Publ'g Corp. v. Cal. Highway Patrol*, 146 F.3d 1133, 1136-37 (9th Cir. 1998) (explaining that whether speech is advertising is "only the beginning of the inquiry" in distinguishing commercial from noncommercial speech and refraining from "creating bright-line rules"), *overruled on other grounds by L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999). For example, in *Connecticut Bar Association*, the court found that statutorily-compelled disclosures by debt relief agencies to consumer debtors concerning bankruptcy were commercial in nature even though they did not "propose a commercial transaction." The disclosures informed consumers about what to expect in a commercial transaction, were situated in an area (bankruptcy) which is "pervaded by commerce," facilitated the proposal of new commercial transactions, and assisted consumers in making decisions "to their economic advantage." 620 F.3d at 94-95. Assessing the "overall 'nature' and 'effect'" of the speech, the court determined that it constituted commercial speech. *See id.* at 95 (citing *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1988)); *see also Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 326 (S.D.N.Y. 2006) (considering various factors in determining whether speech was commercial).

Defendant's speech is commercial in nature. The VRPA restricts the sellers of certain products from disclosing the identity of individuals who purchase those products. This speech is "solely related to the economic interests of the speaker and the audience." *Conn. Bar Ass'n*, 620

F.3d at 94.  The information relays an individual's economic decisions, elucidates an individual's economic preferences, and "facilitat[es] . . . the proposal of . . . new commercial transactions" on the part of third parties.  *Id.* at 95.  Moreover, businesses' increasing ability to profit from the collection and sale of data supports the conclusion that disclosing consumer information is—primarily, if not entirely—an economic act.  *See United Reporting Publ'g Corp.*, 146 F.3d at 1137; Compl. ¶¶ 22-33; Boelter Compl. Exs. B–D.  Although it is conceivable that Defendant's disclosures may be used for non-economic purposes—for example, as Defendant posits, reporting the reading habits of political candidates—such potential does not dilute the speech's commercial character.  *See Conn. Bar Ass'n*, 620 F.3d at 94 ("[S]peech does not cease to be commercial merely because it alludes to a matter of public debate.").

Even if, as Defendant contends, its disclosures do not fit within the "core" of commercial speech, they share with commercial advertising characteristics which merit their reduced First Amendment protection.  Courts have reached this conclusion in comparable circumstances. Consumer reports—lists containing consumer information sold to target marketers, similar to the information restricted by the VRPA—warrant lesser protection because they "interest only [the report producer] and its target marketing customers," and "the particular information at issue—people's names, addresses, and financial circumstances—is less public" than other information the state is less able to restrict.  *Trans Union Corp. v. F.T.C. ("Trans Union II")*, 267 F.3d 1138, 1140-41 (D.C. Cir. 2001) (finding that, like commercial speech, the regulations restricting consumer reports merited "only intermediate scrutiny").  Likewise, a credit report "concerns no public issue" and is speech "solely in the individual interest of the speaker and its specific business audience."  *Dun & Bradstreet, Inc.*, 472 U.S. at 761-62; *see also id.* (noting that, "like advertising, [the credit report] is hardy [speech that is] unlikely to be deterred by incidental state

regulation").  And selling reports that contain arrestees' identifying information is a "pure economic transaction" entitled to only "a limited measure of [First Amendment] protection." *United Reporting Publ'g Corp.*, 146 F.3d at 1137.  Along with these species of speech exist "numerous examples . . . of communications that are regulated without offending the First Amendment," such as securities information, corporate proxy statements, and the exchange of business information among competitors.  *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (citing cases).

So too should Michigan be afforded greater leeway in regulating the dissemination of consumer data.  This speech concerns strictly private affairs.  *See Bolger*, 463 U.S. at 66-68 & n.15; *see also Trans Union II*, 267 F. 3d at 1140.  And the economic motive driving the disclosure of consumer identifying information makes the speech more "durable" and less likely to be deterred by government regulation.  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 & n.24 (1976).  It is true that "[e]ven dry information, devoid of advocacy, political relevance, or artistic expression," merits constitutional protection.  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 446-47 (2d Cir. 2001).  Ultimately, however, although Defendant's disclosures are not valueless, they are "of less constitutional moment than other forms of speech."  *Cent. Hudson*, 447 U.S. at 562 n.5; *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477-78 (1989) (listing speech that receives less than strict scrutiny protection); *Sorrell*, 564 U.S. at 582-84 (Breyer, J., dissenting) (distinguishing between the treatment of "core" political speech and that of "commercial speech, the speech of [the government's] own employees, or the regulation-related speech of a firm subject to a traditional regulatory program"); *Conn. Bar Ass'n*, 620 F.3d at 100 (distinguishing from commercial speech

political, religious, and artistic speech as those "traditionally accorded the fullest First

Amendment protection").  Therefore, the Court will scrutinize the VRPA accordingly.[10]

    B.  As-applied Challenge

    Defendant argues that the VRPA is unconstitutional as applied to Defendant.[11]  When

reviewing a statute that restricts commercial speech, the Court applies a four-part test:  (1) "[T]he

speech in question must not be misleading and must concern lawful activity"; (2) "the asserted

government interest [justifying the restriction] must be substantial"; (3) "the regulation must

directly advance the governmental interest asserted . . . to a material degree"; and (4) "the

regulation must be 'narrowly drawn,' and may not be more extensive than necessary to serve the

interest."  *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012) (citing, *inter alia*, *Cent.

Hudson*, 447 U.S. at 566).  No party claims that Defendant's speech here is misleading or

concerns unlawful activity.  Therefore, the Court must first determine whether the VRPA is

supported by a substantial state interest.

    The Michigan Legislature's stated interest in enacting the VRPA is the protection of

consumer privacy.[12]  *See* H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West) (describing the

VRPA as "an act to preserve personal privacy with respect to the purchase, rental, or borrowing

---

[10] Defendant contends that the VRPA restricts speech on the basis of its content (consumer-identifying information) and therefore, regardless of whether it is commercial speech, should be subject to strict scrutiny.  Although the Supreme Court has recently reiterated that content-based restrictions are subject to strict scrutiny review, *see Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226-27 (2015), it has not explicitly overturned the decades of jurisprudence holding that commercial speech, and speech like it—which, inherently, requires a content-based distinction—warrants less First Amendment protection.  *See Contest Promotions, LLC v. City & Cty. of San Francisco*, No. 15 Civ. 00093, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015); *Metromedia, Inc. v. City of San Diego*, 530 U.S. 490, 504 n.11 (1981) ("If commercial speech is to be distinguished, it must be distinguished by its content.").  The Court will not take that leap here.  *See Anderson v. Treadwell*, 294 F.3d 453, 460 (2d Cir. 2002) "[The Supreme Court] has rejected the argument that strict scrutiny should apply to regulations of commercial speech that are content-specific.").

[11] Defendant argues that the VRPA violates the First Amendment both as applied and on its face.  The Court will address Defendant's as-applied challenge first.  *See Fox*, 492 U.S. at 484-86.

[12] Although there may be other interests served by the law, the test set forth by *Central Hudson* requires the Court to consider only the interests the state asserts.  *See Edenfield v. Fane*, 507 U.S. 761, 768 (1993).

of certain materials"). Following "the enactment [of] the federal Video Privacy Protection Act," the statute's passage reflects the public's dismay with the revelation of Robert Bork's video rental history during his Supreme Court nomination hearings,[13] *Halaburda*, 2013 WL 4012827, at *2, and the belief that "one's choice in videos, records, and books is nobody's business but one's own," House Legislative Analysis Section, Privacy: Sales, Rentals of Videos, Etc., H.B. 5331, (Jan. 20, 1989).[14]

This constitutes a substantial state interest. *Trans Union Corp. v. F.T.C. ("Trans Union I")*, 245 F.3d 809, 818 (D.C. Cir. 2001) (expressing "no doubt" that the state's interest in protecting "the consumer's right to privacy . . . is substantial"); *see also Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("[T]he protection of potential clients' privacy is a substantial state interest."). "The capacity of technology to find and publish personal information . . . presents serious and unresolved issues with respect to personal privacy and the dignity it seeks to secure." *Sorrell*, 564 U.S. at 579-80. Especially given the increased availability and profitability of data, the people of a state may want to protect from unauthorized disclosure information about a consumer's preferences, curiosities, and interests. *Cf. Stanley v. Georgia*, 394 U.S. 557, 565-66 (1969) (extolling an individual's right to "read and observe what he pleases—the right to satisfy his intellectual and emotional needs in the privacy of his own home"). Moreover, the state may wish to safeguard the consumer from the undesired use of that information. *See, e.g.*, *Whalen v. Roe*, 429 U.S. 589, 599 (1977) (discussing the "individual interest in avoiding disclosure of

---

[13] After the federal law's passage, *see* 18 U.S.C. § 2710, twelve states (including Michigan) passed laws prohibiting the disclosure of consumers' video rental information. *See* Conn. Gen. Stat. Ann. § 53-450 (West 2013); Del. Code Ann. tit. 11, § 925 (West 2013); Iowa Code Ann. § 727.11 (West 2013); La. Rev. Stat. Ann. § 37:1748 (2013); Md. Code Ann., Crim. Law § 3-907 (West 2013); Mass. Gen. Laws Ann. ch. 93, § 106 (West 2013); Minn. Stat. Ann. § 325I.02 (West 2013); N.H. Rev. Stat. Ann. § 351-A:1 (West 2013); N.Y. Gen. Bus. Law § 673 (McKinney 2013); R.I. Gen. Laws Ann. § 11-18-32 (West 2013); and Tenn. Code Ann. § 47-18-2204 (West 2013). Michigan's is the only statute that restricts disclosure by sellers of written materials in addition to sellers of videos and sound recordings. To the Court's knowledge, this suit is the first to challenge the constitutionality of any of these laws.

[14] A copy of this report is attached to Boelter's original complaint as Exhibit A.

personal matters" given the "genuine concern that [certain medical] information will become publicly known and that it will adversely affect [the individuals'] reputations"); *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224, 1235-36 (10th Cir. 1999) (assuming, "notwithstanding . . . reservations, . . . that the government has asserted a substantial state interest in protecting people from the disclosure of sensitive and potentially embarrassing personal information").  Therefore, the VRPA is supported by a substantial state interest.[15]

Having found the state's interest to be substantial, the VRPA may survive only if it "directly advances" that interest.  *Cent. Hudson*, 447 U.S. at 566.  The statute must advance the interest in a "material way," and the government must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them."  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486-87 (1995) (citations omitted).  In other words, a restriction on commercial speech "may not be sustained if it provides only ineffective or remote support for the government's purpose." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996).

The VRPA's data disclosure restrictions directly advance the state's asserted interest in protecting consumer privacy regarding the purchase or rental of videos, audio recordings, and written materials.  The statute brings within its ambit the individuals who sell those goods, restricting the reasons for which they can disclose the identifying information they collect about their customers.  Preventing the disclosure of consumer data to third parties by sellers—those most likely to possess and collect that information—reduces the likelihood of consumers' private

---

[15] There are, of course, competing interests.  A free market is made more robust by, and consumers stand to benefit from, the "free flow of commercial information."  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481-82 (1995).  And the Supreme Court has "rejected the highly paternalistic view" that the government knows better than consumers what commercial information is useful, necessary, or salient.  *See Cent. Hudson*, 447 U.S. at 561-62.  But, as discussed, the interest in unfettered commercial speech is subject to balancing against a state's other legitimate concerns.  *United Reporting Publ'g Corp.*, 146 F.3d at 1138 (noting, in finding that privacy is a substantial state interest, that "the State may legislate to protect . . . [citizens'] ability to avoid intrusions" into their privacy).  The state has conducted such a balancing here, and so long as the law advances the state's interest and is narrowly tailored, *see infra*, it is constitutional.

details becoming public. *See King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 310 (E.D. Pa. 2012) (finding that a law barring disclosure of adverse information by consumer reporting agencies "directly advances the governmental interest in protecting individuals' privacy"). And the statute's narrow, sensible exceptions do not handicap the law's ability to advance the state's goals. *Cf. United Reporting Publ'g Corp.*, 146 F.3d at 1140 (holding that the "myriad of exceptions" to a law restricting the disclosure of arrestee identifying information "precludes the statute from directly and materially advancing the government's purported privacy interest" (citing *Coors Brewing Co.*, 514 U.S. at 487-89)). The VRPA provides direct and material, not ineffective and remote, support for the state's asserted interest.

The Court must finally consider whether the VRPA is narrowly drawn, that is, whether it is "more extensive than necessary" to advance the state's goals. *Caronia*, 703 F.3d at 164 (citing *Cent. Hudson*, 447 U.S. at 565-66). This requires "consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." *Coors Brewing Co.*, 514 U.S. at 486 (1995) (internal quotation marks and citation omitted). The law need not be the "least restrictive means" or the "single best disposition." *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995). Rather, the statute must be a "reasonable" means of accomplishing the state's goal, and its scope must be "in proportion to the interests served." *Fox*, 492 U.S. at 480.

The Court finds that the VRPA is sufficiently tailored to advance the state of Michigan's interests. The law limits the dissemination of precisely the kind of information with which the state is concerned, and targets those most likely to disseminate it. Although the ban is broad, it is not absolute: the statute allows disclosure of identifying information (1) with a consumer's consent; (2) to comply with a court order, search warrant, or subpoena; (3) to collect outstanding payment from a customer; and (4) for the "exclusive purpose of marketing goods and services

directly to the consumer," provided the consumer is given written notice and the opportunity to opt-out.  VRPA § 3.  These carve-outs allow Defendant to use the information obtained from its consumers in ways commensurate with operating a business, including to advertise and get paid for its products and services, and to comply with the law.  Defendant is only prohibited—unless the consumer permits otherwise—from sharing identifying information it obtains with a party unrelated to its transaction with the consumer.  Such a measured restriction advances the state's goals without unduly burdening Defendant's ability to engage in commerce.

Contrast the VRPA's scope with that of the law found unconstitutional in *Sorrell*.  The Vermont law at issue in that case restricted a limited group of individuals, including health insurers and pharmacies, from selling prescriber-identifying information.  *See* 564 U.S. at 558-59.  The law also restricted individuals like pharmaceutical manufacturers and marketers from using that information "for marketing or promoting a prescription drug."  *Id.*  A prescriber could consent to the disclosure of her identifying information, but no consent was necessary for the information to be used in a host of excepted circumstances, including for complying with reporting requirements, and educational and research purposes.  *Id.* at 559-60.  Vermont enacted the law, in part, to impede the success of pharmaceutical marketers who "invest in expensive . . . marketing campaigns to doctors" and dominate the "marketplace for ideas on medicine safety and effectiveness."  *Id.* at 560-61, 580 (citing 2007 Vt. Laws No. 80, § 1).

Three major flaws doomed the statute.  First, the restriction was too narrowly targeted at certain speakers who were but a minority of those able to acquire or use the protected information.  *See id.* at 572-73; *see also id.* at 564 ("Vermont's law thus has the effect of preventing detailers—and only detailers—from communicating with physicians in an effective and informative manner.").  Second, restraining the speech of this group of disfavored speakers

advanced the state's interest only indirectly.  *See id.* at 577.  Third, and most importantly, the government created a "regulation of speech because of disagreement with the message it conveys."  *Id.* at 566, 576-79 (discussing how the Vermont legislature enacted the law as a means of combatting brand-name drug marketing practices).

In contrast, Michigan's law restricts, indiscriminately, the group of individuals most likely to reveal consumer identifying information.  At the same time, the VRPA is as targeted as it is comprehensive, protecting consumer data while "allowing the information's . . . disclosure in only a few narrow and well-justified circumstances."  *Id.* at 573 (stating that a statute crafted in such a way "would present quite a different case than the [Vermont law]," and citing as an example the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d–2; 45 CFR pts. 160 and 164 (2010)); *cf. id.* (disapproving of Vermont's restraint of "a narrow class of disfavored speakers" while the identifying information remained "available to an almost limitless audience").  Additionally, there is no evidence that the Michigan legislature enacted the VRPA because it disagreed with the message of those who use consumer identifying information.  *See id.* at 578-79 ("Vermont may be displeased that [marketers] . . . are effective in promoting brand-name drugs . . . .  But [it cannot] burden the speech of others in order to tilt public debate in a preferred direction."); *see also King*, 903 F. Supp. 2d at 309 ("[T]he *Sorrell* decision largely rested on the fact that Vermont was restraining a certain form of speech communicated by a certain speaker solely because of the State's disagreement with it.").

Defendant argues that there are less restrictive means available to the government to protect consumer privacy.  Specifically, Defendant recommends that the state could have crafted the statute to allow consumers to opt to have their information kept private.  Such a measure may indeed impose a lesser burden on Defendant's speech.  *Trans Union II*, 267 F.3d at 1143.  But

"intermediate scrutiny does not obligate courts to invalidate a 'remedial scheme because some alternative solution is marginally less intrusive on a speaker's First Amendment interests.'" *Id.* (citing *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 217-18 (1997)).  The state "need not use the least restrictive means, nor must it select the very best alternative." *Clear Channel Outdoor, Inc. v. City of N.Y.*, 608 F. Supp. 2d 477, 503 (S.D.N.Y. 2009).  So long as the statute is tailored to the state's goals, "[w]ithin those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Id.* at 503-04 (citing *Fox*, 492 U.S. at 480). The VRPA is sufficiently tailored to meet the state's goals without intolerably burdening Defendant's speech.  Therefore, the VRPA is not unconstitutional as applied to Defendant.

C.  Facial Challenge

Defendant also contends that the VRPA is overbroad, criminalizing and restricting protected speech in a number of circumstances other than those at issue in this case.  This amounts to a "facial attack on the statute." *Expressions Hair Design v. Schneiderman*, 808 F.3d 118, 129 (2d Cir. 2015).  A party may bring two types of facial challenges: either "that the law is unconstitutional in all of its applications," or "that a 'substantial number' of its applications are unconstitutional 'judged in relation to the statute's plainly legitimate sweep.'" *Id.* (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 & n.6 (2008)).  Having found that the VRPA is constitutional as applied to Defendant, the only remaining question is whether Defendant establishes that, notwithstanding the VRPA's legitimate constitutional applications, the statute "prohibits a substantial amount of protected speech," *United States v. Williams*, 553 U.S. 285, 292 (2008). *See Expressions Hair Design*, 808 F.3d at 129.

In general, "[f]acial challenges are disfavored." *Wash. State Grange*, 552 U.S. at 450. They involve assessing "a statute's constitutionality as applied to hypothetical situations not

before the court," *Expressions Hair Design*, 808 F.3d at 129, and therefore are "departure[s] from traditional rules of standing," *Fox*, 492 U.S. at 484.  Moreover, "overbreadth analysis does not normally apply to commercial speech." *Id.* at 481 (citing cases).  Therefore, a litigant can bring a facial challenge to a statute that restricts commercial speech only if "the [restriction's] alleged overbreadth consists of its application to non-commercial speech." *Id.*  Defendant must show that there is "a realistic danger than the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984).  To that end, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Williams*, 553 U.S. at 303.

The examples Defendant proffers do not amount to a showing that the VRPA prohibits a substantial amount of protected speech.  Defendant suggests that the statute prohibits even "mundane daily interactions," such as a newsstand merchant confirming the identity of a celebrity customer to the customer behind her in line. *See* Def. Mem. 27-28, ECF No. 72-1.  Or, Defendant urges, the law might preclude a publisher like Defendant from printing an article identifying a political candidate as one of its subscribers.[16] *Id.*  Indeed, this is precisely what the law was designed to do—to preclude sellers of certain goods from being the source that discloses

---

[16] Defendant also contends that the term "written materials" in the statute is so broad, given that most products feature some type of writing, that the statute restricts the speech of sellers of virtually any product.  First, the Court is skeptical that construing the statute expansively renders it an impermissible restriction on speech, given the state's substantial interest in limiting the disclosure of identifying data about consumers.  That said, the statutory language can be construed to include only those goods for which the writing itself is the product—such as books and magazines—as opposed to goods which merely feature writing—for example, as Defendant argues, maps and cereal boxes. *See Expressions Hair Design*, 808 F.3d at 130 (finding that a statute was not unconstitutional because it was "readily susceptible to a construction under which its application is limited to [a constitutional] context.").  Although a federal court should abstain from "constru[ing] a novel state [a]ct not yet reviewed by the State's highest court," *id.* at 137, this principle does not favor Defendant's overbreadth challenge.  Rather, "a state law should not be struck down as substantially overbroad if a 'readily apparent' narrowing construction is available." *Id.* at 138.  Along with the general rule that a court should "interpret statutes so as to avoid constitutional difficulties," *id.* at 139, the Court should not "presume that a state court would construe the statute in an unconstitutional manner," *id.* (citation omitted).

that a certain individual purchased those goods.  A state is not restricted from imposing duties on

individuals simply because those individuals are numerous.  *See, e.g.*, *Sorrell*, 564 U.S. at 573

(citing as an example of a well-crafted law HIPAA, an expansive health privacy law that broadly

encompasses, *inter alia*, any "provider of medical or health services" and "any other person or

organization who furnishes, bills, or is paid for health care in the normal course of business," *see*

45 C.F.R. § 160.103).

Moreover, concerns about limiting the reporting of a consumer's identifying information

in which the public may have some heightened interest do not render the statute overbroad.  As

discussed above, commercial speech does not become non-commercial—and thus less subject to

regulation—because it may implicate matters of public concern.  And it is not the case that

consumer information will never be available for the public consumption.  After all, any

individual other than the seller of the written material, sound recording, or video to the consumer

can report about the consumer's purchases; and of course the seller itself may report the

information, so long as it obtains the consumer's consent.  In sum, Defendant does not establish

that there is a "realistic danger" that the statute's reach is "substantially overbroad."  *Williams*,

533 U.S. at 302-03.  Because in "the vast majority of [the statute's] applications, [it] raises no

constitutional problems whatsoever," the VRPA is not overbroad and is not facially

unconstitutional.  *Id.*  Accordingly, Defendant's motion to dismiss the complaint on the grounds

that the VRPA is unconstitutional is DENIED.

VI.  <u>Defendant's Rule 12(b)(6) Motion</u>

A.  The Applicability of the VRPA

Defendant contends that Plaintiffs' claims fail because the VRPA does not apply to

Defendant.  The VRPA encompasses those "engaged in the business of selling at retail . . . books

or other written materials."  VRPA § 2.  Defendant sold magazines to Plaintiffs through subscriptions which, Defendant argues, is different than selling its products at retail.

First, the pleadings allege—and therefore the Court takes as true—that Plaintiffs purchased the magazines directly from Defendant.  Compl. ¶¶ 55, 56.  As other courts to consider the question have determined, this direct relationship between consumer and seller is what qualifies an individual as a retailer for purposes of the statute.  *See Kinder v. Meredith Corp.*, No. 14 Civ. 11284, 2014 WL 4209575, at *6 (E.D. Mich. Aug. 26, 2014) (defining "retail" as "the action or business of selling goods in relatively small quantities for use or consumption rather than for resale," and concluding that an individual is not liable under the statute if a consumer purchased its goods through an intermediary); *Coulter-Owens v. Time, Inc.*, No. 12 Civ. 14390, 2016 WL 612690, at *3 (E.D. Mich. Feb. 16, 2016) (finding that the defendant was not liable to the class of plaintiffs who purchased magazine subscriptions through third-party websites); *Halaburda*, 2013 WL 4012827, at *7 ("[T]he court is persuaded by [the] argument that the defendants to these actions are in the business of publishing magazines, and sell them to the ultimate consumer of the products[, which] appears to satisfy the 'selling at retail' requirement of the statute.").  Given the many provisions of the statute that assume the existence of a direct relationship—such as the exceptions for when a seller can disclose a "customer's" record—including Defendant within the statute's ambit "makes common sense." *Coulter-Owens*, 2016 WL 612690, at *4.

Besides, if Defendant were exempt from the VRPA, it would mean that any business that sells covered products through subscriptions would be free, unlike peers who sell the same goods through different means, to disclose consumer identifying information.  "Under the canon of constitutional avoidance, where an otherwise acceptable construction of a statute would raise

serious constitutional problems, a court should construe the statute to avoid such problems unless such construction is plainly contrary to the intent" of the legislature. *Pierre v. Holder*, 738 F.3d 39, 48 (2d Cir. 2013) (internal quotation marks and citation omitted). Distinguishing between subscription-based sellers and "retailers" renders the statute constitutionally suspect in at least two ways. First, the statute becomes underinclusive, precluding the speech of some speakers while leaving unchecked that of other materially similar speakers. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011) ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."). Second, construing the statute to include such a broad exception would hobble the law's ability to promote the protection of consumer privacy. *See, e.g.*, *44 Liquormart, Inc.*, 517 U.S. at 505 (explaining that a law is unconstitutional if "it provides only ineffective or remote support for the government's purpose"). Under Defendant's theory, the VRPA would impermissibly allow consumer identifying information to be disclosed "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573. Therefore, the Court concludes that the VRPA applies to Defendant.

Alternatively, Defendant contends that if it is covered by the VRPA then it is excepted from liability because it only uses Plaintiffs' consumer data for direct marketing. VRPA § 3(d). Disclosure of identifying information is allowed under the statute if it is for "the exclusive purpose" of marketing to the consumer provided the person disclosing the information "inform[s] the customer by written notice" that the customer may opt-out of having her information disclosed. *Id.* First, Defendant's claim that its conduct falls within a statutory exemption constitutes an affirmative defense to liability, *Gjoni v. Orsid Realty Corp.*, No. 14 Civ. 8982, 2015 WL 4557037, at *7 (S.D.N.Y. July 22, 2015), which may only be "raised by a

33

pre-motion answer to dismiss . . . if the defense appears on the face of the complaint," *Pan v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).  Given that there do not exist sufficient undisputed facts in the record to determine whether Defendant meets § 3(d), dismissal on those grounds is inappropriate.  *See Gjoni*, 2015 WL 4557037, at *7.  Regardless, Defendant's argument fails because the pleadings contradict Defendant's assertion that disclosures were made exclusively for marketing purposes.  *See, e.g.*, Compl. ¶ 41 ("Hearst . . . sells its mailing lists [which contain consumer identifying information] to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts.").  Defendant's argument that it is not liable because it provided notice to Plaintiffs fails for the same reasons.  *See, e.g.*, *id.* ¶¶ 7, 8.  Accordingly, Defendant's motion to dismiss the claim that it violated the VRPA is DENIED.

B.  Unjust Enrichment

Defendant seeks dismissal of Plaintiffs' unjust enrichment claim on two grounds.  First, Defendant argues that the VRPA provides the exclusive remedy for the harms Plaintiffs allege, precluding the common law claim.  Alternatively, Defendant contends that the pleadings otherwise fail to allege unjust enrichment.

A statutory remedy will "preempt" a common law claim if the statute "exclude[s] the availability of alternative common-law remedies."  *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 907 (Mich. Ct. App. 2006).  Under Michigan law, "[w]hether or not a statutory scheme preempts the common law on a subject is a matter of legislative intent."  *Kraft v. Detroit Entm't, L.L.C.*, 683 N.W.2d 200, 206 (Mich. Ct. App. 2004) (citations omitted).  A statutory remedy will only exclude common law claims if it is granted pursuant to "comprehensive

legislation [that] prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions." *Id.*; *see also Hoerstman Gen. Contracting, Inc. v. Hahn*, 711 N.W.2d 340, 346 (Mich. 2006) ("When [the legislature abrogates the common law], it should speak in no uncertain terms.").  Therefore, statutes only operate to exclude common law claims when they feature express language to that effect, or when they are part of a "comprehensive" legislative scheme.  *See, e.g., id.* at 207-09 (finding that a law precluded the plaintiff's common law claims related to a casino's deceptive practices because it prescribed that "[a]ny other law that is inconsistent with this act does not apply to casino gambling" and because the law gave a state agency "expansive and exclusive authority to regulate all aspects of casino gambling"); *Morris Pumps*, 729 N.W.2d at 907 ("Because the remedy provided by the [statute at issue] does not exclude the availability of alternative common-law remedies, [the] plaintiffs' unjust enrichment claims . . . were not barred."); *Jackson v. PKM Corp.*, 422 N.W.2d 657, 663 n.12 (Mich. 1988) (noting that, in concluding that the dramshop act provided the exclusive remedy for injuries arising from the provision of alcohol, the legislature "expressly" stated that the law "provides the exclusive remedy for money damages against a licensee arising out of" the provision of alcohol).  The VRPA does not include express language limiting a plaintiff's other potential remedies and is not part of a comprehensive legislative scheme.  Therefore, it does not preclude Plaintiffs' unjust enrichment claim.

    The Court must now determine whether the pleadings support an unjust enrichment claim.  To state a claim for unjust enrichment under Michigan law, the plaintiff must establish "(1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party."

*Karaus v. Bank of N.Y. Mellon*, 831 N.W.2d 897, 905 (Mich. Ct. App. 2012). The facts alleged here are similar to those found by other courts to state plausible unjust enrichment claims. *See Kinder*, 2014 WL 4209575, at *7 ("[Plaintiff] alleges that [Defendant] was unjustly enriched when it retained her subscription fees but disclosed her personal reading information[,] . . . sufficiently alleg[ing] that [Defendant] was unjustly enriched."); *see also, e.g.*, *Coulter-Owens v. Rodale, Inc.*, No. 14-12688, 2015 WL 575004, at *5 (E.D. Mich. Feb. 11, 2015); *Halaburda*, 2013 WL 4012827, at *8. Plaintiffs' claims are not distinguishable. Plaintiffs allege that because they paid for their subscriptions, and Defendant was obligated to protect their identifying information, Defendant's "unlawful disclosure of [that] information deprived Plaintiffs . . . of the full value of their paid-for subscriptions." Compl. ¶ 70. In other words, Plaintiffs "conferred benefits on [Defendant] by providing [Defendant] with their [identifying] information," and Defendant unjustly retained those benefits even though it unlawfully disclosed that information. *Id.* ¶¶ 77-80. At this stage in the proceedings, the allegations are sufficient to state an unjust enrichment claim. Accordingly, Defendant's motion to dismiss Plaintiffs' claims is DENIED.

VII.   Motion to Strike

Defendant moves to strike from the complaint Plaintiffs' request for injunctive relief. Federal Rule of Civil Procedure 12(f) allows a court, in its discretion, to "strike from a pleading" any material that is "redundant, immaterial, impertinent, or scandalous." A party seeking to strike pleadings must demonstrate that "to permit the allegations to stand would result in prejudice to the movant." *In re Tronox, Inc. Secs. Litig.*, No. 09 Civ. 6220, 2010 WL 2835545, at *4 (S.D.N.Y. June 28, 2010). Generally, "[m]otions to strike are . . . disfavored, and should be granted only when there is a strong reason for doing so." *Id.*; *see also Kassman v. KPMG LLP*,

925 F. Supp. 2d 453, 462 (S.D.N.Y. 2013).  Although Defendant raises legitimate arguments as to why injunctive relief may not be proper should Plaintiffs prevail on their claims, they do not establish why leaving the pleadings intact would "significantly prejudic[e]" them.  *Citigroup, Inc. v. Wachovia Corp.*, 613 F. Supp. 2d 485, 489 (S.D.N.Y. 2009).  Moreover, it is premature to adjudicate the relief to which Plaintiffs may be entitled at this stage in the proceedings.  *See Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 405 (W.D.N.Y. 2010).  Accordingly, Defendant's motion to strike is DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motions are DENIED.  The Clerk of Court is directed to terminate the motions at Case No. 15 Civ. 03934, ECF Nos. 33 and 72, and Case No. 15 Civ. 09279, ECF No. 18.

SO ORDERED.

Dated: June 17, 2016
New York, New York

_____
ANALISA TORRES
United States District Judge