IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JOSEPHINE JAMES EDWARDS, individually
and on behalf of all others similarly situated,

               Plaintiff,

v.

HEARST COMMUNICATIONS, INC.,
               Defendant.

No. 1:15-cv-09279-AT-JLC

**ORAL ARGUMENT REQUESTED**

### DEFENDANT HEARST COMMUNICATIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS <u>MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT</u>

Jonathan R. Donnellan
Kristina E. Findikyan
Stephen H. Yuhan
THE HEARST CORPORATION
  Office of General Counsel
300 West 57th Street, 40th Floor
New York, New York 10019
Tel: (212) 841-7000
Fax: (212) 554-7000
Email: jdonnellan@hearst.com

*Attorneys for Defendant Hearst
Communications, Inc.*

Of Counsel:

Andrea R. Butler
Kristen L. Hauser
Evan J. Saucier

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

PERTINENT FACTS & THE MICHIGAN VRPA ...................................................9

    A. The Michigan VRPA. ...............................................................................9

    B. Plaintiff Josephine James Edwards................................................................10

    C. Hearst's Consumer Marketing Practices & Relationships with Its Third Party Service Providers & Partners. ...................................................................................14

        1. Hearst's Relationship with Its Database Host, Acxiom Corporation. ..................15

        2. Hearst's Relationship with Experian Marketing Solutions, Inc............................16

        3. Hearst's Relationships with █████████ and Dunn Data.............................16

ARGUMENT ...........................................................................................................19

I.      PLAINTIFF'S FAILURE TO PRODUCE ANY EVIDENCE TO SUPPORT HER CLAIM OF ACTUAL INJURY REQUIRES DISMISSAL FOR LACK OF ARTICLE III STANDING UNDER *SPOKEO* AND SECOND CIRCUIT LAW. ....................................................................................................19

    A. Motion to Dismiss Standard Applicable to Standing........................................19

    B. *Spokeo* and Second Circuit Law Require Actual Evidence of Concrete Injury or Risk of Material Harm, Neither of Which Is Present Here. .......................................21

II.     EVEN IF THE COURT FINDS THAT PLAINTIFF HAS ARTICLE III STANDING, HEARST IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE VRPA STATUTE DOES NOT APPLY TO HEARST'S CONFIDENTIAL COMMUNICATIONS................................................................25

    A. Summary Judgment Standard. .....................................................................25

    B. There Is No Evidence of Any Actionable Disclosure Under the Statute..........................26

        1. Hearst Did Not Maintain, Much Less Disclose, *a Record or Information Concerning the Purchase* of Plaintiff's Subscription *that Identified Her as the Purchaser*, Which Is All that the VRPA Prohibits. .............................................27

        2. Hearst's Confidential Transmissions Were Not "Disclosures" under the VRPA, Which Prohibits Public Disclosure or Publicity......................................29

        3. Hearst's Transmissions to Statutory "Employees" and "Agents" Bound to Maintain Confidentiality Were Not "Disclosures" under the VRPA. ..................32

    C. Interpreting the VRPA to Find a "Disclosure" on the Facts of This Case Would Violate Due Process by Rendering the VRPA Unconstitutionally Vague. ......................37

III.     APPLICATION OF THE VRPA TO PUNISH CONFIDENTIAL
         COMMUNICATIONS OF SUBSCRIPTION INFORMATION TO TRUSTED
         BUSINESS ASSOCIATES CHARGED WITH SAFEGUARDING THAT
         INFORMATION FROM PUBLIC DISCLOSURE WOULD VIOLATE THE
         FIRST AMENDMENT. ........................................................................................40

    A.  Michigan's Stated Interest Is Substantial Only Insofar as It Is Limited to Public
        Disclosures of Genuinely Private Information, and Does Not Apply to the
        Confidential Transmissions at Issue Here ...........................................................42

    B.  Discovery Has Shown that Applying the VRPA to This Case Would Not Directly
        Advance Any Substantial Interest in Privacy to a Material Degree. ..................46

    C.  The VRPA Is Not Narrowly Tailored to Survive First Amendment Scrutiny If Held
        to Apply to the Facts Here. ................................................................................49

IV.     HEARST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
        DERIVATIVE UNJUST ENRICHMENT CLAIM. ..................................................51

V.      THERE IS NO BASIS TO TOLL THE THREE-YEAR STATUTE OF
        LIMITATIONS IN THIS CASE. ..............................................................................55

CONCLUSION ...........................................................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996)..................................................................................................41, 48

*Advanced Video Techs., LLC v. HTC Corp.*,
  103 F. Supp. 3d 409 (S.D.N.Y. 2015)...................................................................................20

*Ali v. N.Y.C. Dep't of Transp.*,
  No. 14-cv-313, 2014 WL 5822625 (E.D.N.Y. Nov. 7, 2014) ..........................................20, 21

*All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*,
  436 F.3d 82 (2d Cir. 2006)........................................................................................19, 20, 41

*Allgire v. HOVG, LLC*,
  No. 1:16-cv-981-WTL-DKL, 2017 WL 1021394 (S.D. Ind. Mar. 16, 2017).........................22

*Allor v. DeClark, Inc.*,
  No. 300953, 2012 WL 555779 (Mich. Ct. App. Feb. 21, 2012).............................................54

*Aydinyan v. Bogomolova*,
  No. 16 CV 126 (LDH) (LB), 2016 WL 7337953 (E.D.N.Y. Sept. 7, 2016) ..........................20

*Bad Frog Brewery Inc. v. N.Y. State Liquor Auth.*,
  134 F.3d 87 (2d Cir. 1998).........................................................................................46, 48, 49

*Barrett Comput. Servs., Inc. v. PDA, Inc.*,
  884 F.2d 214 (5th Cir. 1989) ................................................................................................21

*Barton-Spencer v. Farm Bureau Life Ins. Co. of Mich.*,
  No. 324661, 2016 WL 1125968 (Mich. Ct. App. Mar. 22, 2016).........................................35

*Bd. of Trs. of the State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989)..............................................................................................................49

*Beaumont v. Brown*,
  257 N.W.2d 522 (Mich. 1977)........................................................................................31, 45

*Boelter v. Advance Magazine Publishers Inc.*,
  No. 15 Civ. 5671 (NRB), --- F. Supp. 3d ---, 2016 WL 5478468 (S.D.N.Y.
  Sept. 28, 2016) ....................................................................................................8, 40, 44, 47

*Boelter v. Hearst Commc'ns, Inc.*,
  192 F. Supp. 3d 427 (S.D.N.Y. 2016)............................................................................ *passim*

*Burns v. City of Detroit*,
   660 N.W.2d 85 (Mich. Ct. App. 2002) ...................................................................40

*Cahaly v. LaRosa*,
   796 F.3d 399 (4th Cir. 2015) .................................................................................41

*Capital Title Ins. Agency Inc. v. Towne Mortg. Co.*,
   No. 278712, 2009 WL 609561 (Mich. Ct. App. Mar. 10, 2009) .............................54

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016)......................................................................................20

*Casey v. Merck & Co.*,
   653 F.3d 95 (2d Cir. 2011)......................................................................................57

*Cent. Radio Co. v. City of Norfolk, Va.*,
   811 F.3d 625 (4th Cir. 2016) ..................................................................................42

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
   447 U.S. 557 (1980)........................................................................................ *passim*

*In re Certified Question from U.S. Court of Appeals for Ninth Circuit (Deacon v. Pandora Media, Inc.)*,
   885 N.W.2d 628 (Mich. 2016) ....................................................................27, 30, 32

*Chatin v. Coombe*,
   186 F.3d 82 (2d Cir. 1999).............................................................................38, 39

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993)..........................................................................................44, 49

*Colen v. Corizon Med. Servs.*,
   No. 14-12948, 2017 WL 389960 (E.D. Mich. Jan. 25, 2017) ................................57

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975)................................................................................................47

*Cruper-Weinmann v. Paris Baguette Am., Inc.*,
   No. 13 CIV. 7013 (JSR), --- F. Supp. 3d ---, 2017 WL 398657 (S.D.N.Y. Jan. 30, 2017) .............................................................................................................21

*Dep't of Agric. v. Appletree Mktg., L.L.C.*,
   779 N.W.2d 237 (Mich. 2010)................................................................................53

*Devillers v. Auto Club Ins. Ass'n*,
   702 N.W.2d 539 (Mich. 2005)................................................................................58

*Dilday v. DIRECTV, LLC*,
  No. 3:16cv996-HEH, 2017 WL 1190916 (E.D. Va. Mar. 29, 2017)......................................24

*Doe v. Henry Ford Health Sys.*,
  865 N.W.2d 915 (Mich. Ct. App. 2014) ...............................................31

*Doe v. Mills*,
  536 N.W.2d 824 (Mich. Ct. App. 1995) ...............................................31

*In re DoubleClick, Inc. Privacy Litig*,
  154 F. Supp. 2d 497 (S.D.N.Y. 2001)...................................................55

*Douglas v. Pontiac Gen. Hosp.*,
  452 N.W.2d 845 (Mich. Ct. App. 1990) ...............................................35

*Duffie v. The Mich. Grp., Inc.*,
  No. 14-cv-14148, 2016 WL 28987 (E.D. Mich. Jan. 4, 2016) ...............................52

*Edenfield v. Fane*,
  507 U.S. 761 (1993).................................................................... *passim*

*Elezovic v. Bennett*,
  731 N.W.2d 452 (Mich. Ct. App. 2007) ...............................................34

*Elezovic v. Ford Motor Co.*,
  697 N.W.2d 851 (Mich. 2005)...........................................................33

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) ...........................................................28

*Evans v. United States*,
  504 U.S. 255 (1992)......................................................................31

*Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*,
  544 F.2d 1126 (2d Cir. 1976).............................................................20

*Fambro v. Henry Ford Health Sys.*,
  No. 257556, 2006 WL 707483 (Mich. Ct. App. Mar. 21, 2006) ...........................59

*Fighting Finest, Inc. v. Bratton*,
  95 F.3d 224 (2d Cir. 1996)................................................................41

*Fla. Star v. B.J.F.*,
  491 U.S. 524 (1989)......................................................................47

*Forte v. Liquidnet Holdings, Inc.*,
  No. 15-3465-CV, 2017 WL 104316 (2d Cir. Jan. 10, 2017) ................................25

*Frankenmuth Mut. Ins. Co. v. Marlette Homes, Inc.*,
573 N.W.2d 611 (Mich. 1998) ................................................................7, 29

*Free Speech Coal., Inc. v. Att'y Gen. United States*,
825 F.3d 149 (3d Cir. 2016) ................................................................42

*Fullwood v. Wolfgang's Steakhouse, Inc.*,
No. 13 CIV. 7174 (KPF), 2017 WL 377931 (S.D.N.Y. Jan. 26, 2017) ....................22

*Geiling v. Wirt Fin. Servs., Inc.*,
No. 14-11027, 2014 WL 8473822 (E.D. Mich. Dec. 31, 2014) ............................45

*Matter of Gentry*,
369 N.W.2d 889 (Mich. Ct. App. 1985) ................................................38

*In re Google, Inc. Privacy Policy Litig.*,
No. 5:12-cv-1382, 2015 WL 4317479 (N.D. Cal. July 15, 2015) .........................55

*Greater New Orleans Broad. Ass'n v. United States*,
527 U.S. 173 (1999) ................................................................46, 49

*Guastello v. Lafon*,
No. 313725, 2014 WL 10588248 (Mich. Ct. App. Sept. 23, 2014) .......................58

*Hayes v. Emerick*,
416 N.W.2d 350 (Mich. Ct. App. 1987) ................................................35

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*,
512 U.S. 136 (1994) ................................................................43, 46

*IMS Health Inc. v. Sorrell*,
630 F.3d 263 (2d Cir. 2010) ................................................................40, 41

*Isom v. NE Lots LLC*,
No. 288378, 2010 WL 143470 (Mich. Ct. App. Jan. 14, 2010) ...........................55

*Johnson v. City of Kalamazoo*,
124 F. Supp. 2d 1099 (W.D. Mich. 2000) ................................................38

*Kramer v. N.Y.C. Bd. of Educ.*,
715 F. Supp. 2d 335 (E.D.N.Y. 2010) ................................................38, 39

*Lansing Ass'n of Sch. Adm'rs v. Lansing Sch. Dist. Bd. of Educ.*,
549 N.W.2d 15 (Mich. Ct. App. 1996) ................................................31, 45

*Life Techs. Corp. v. Promega Corp.*,
137 S. Ct. 734 (2017) ................................................................39

*Lorillard Tobacco Co. v. Reilly*,
 533 U.S. 525 (2001)................................................................46, 49

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)................................................................21

*Mackensworth v. S.S. Am. Merch.*,
 28 F.3d 246 (2d Cir. 1994).......................................................20

*Makhoul v. Watt, Tieder, Hoffar & Fitzgerald, L.L.P.*,
 662 F. App'x 33 (2d Cir. 2016) ...............................................25

*McCarthy v. Dun & Bradstreet Corp.*,
 482 F.3d 184 (2d Cir. 2007).....................................................25

*McLaughlin v. Aetna Life Ins. Co. of Hartford, Conn.*,
 191 N.W. 224 (Mich. 1922)......................................................57

*Menominee Cmty. Bldg. Co. v. Rueckert*,
 222 N.W. 162 (Mich. 1928)......................................................28

*Meyers v. Nicolet Rest. of de Pere, LLC*,
 843 F.3d 724 (7th Cir. 2016) ...........................................5, 21, 22

*Mich. Beer & Wine Wholesalers Ass'n v. Att'y Gen.*,
 370 N.W.2d 328 (Mich. Ct. App. 1985)...............................40, 49

*Multistack LLC v. Arctichill Inc.*,
 No. 05 CIV. 3865 (PAC), 2006 WL 510506 (S.D.N.Y. Mar. 1, 2006)..................19

*NAACP v. Button*,
 371 U.S. 415 (1963).................................................................51

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
 132 S. Ct. 2566 (2012)..............................................................39

*Niedoliwka v. Inglin*,
 No. 327576, 2016 WL 6127696 (Mich. Ct. App. Oct. 18, 2016)...........................58

*Nuchman v. City of N.Y.*,
 639 F. App'x 48 (2d Cir. 2016) ...............................................25

*Ocheesee Creamery LLC v. Putnam*,
 No. 16-12049, --- F.3d ---, 2017 WL 1046104 (11th Cir. Mar. 20, 2017) ...........................41

*Pace v. DiGuglielmo*,
 544 U.S. 408 (2005).................................................................57

*Pacheco v. Boar's Head Provisions Co.*,
No. 1:09-CV-298, 2010 WL 1323785 (W.D. Mich. Mar. 30, 2010)......................................53

*Pasieka v. Chaves*,
No. 304190, 2012 WL 5233619 (Mich. Ct. App. Oct. 23, 2012)............................................34

*People v. Couch*,
461 N.W.2d 683 (Mich. 1990)..........................................................................................31

*Radio-Elecs. Officers Union v. Radio Officers Joint Emp't Comm.*,
No. 91 Civ. 1499 (LAP), 1992 WL 380917 (S.D.N.Y. Dec. 10, 1992) ................................20

*Rajamin v. Deutsche Bank Nat'l Trust Co.*,
757 F.3d 79 (2d Cir. 2014)..............................................................................................21

*Reed v. Town of Gilbert, Arizona*,
135 S. Ct. 2218 (2015)...........................................................................................40, 41, 42

*Rent Stabilization Ass'n of City of N.Y. v. Dinkins*,
5 F.3d 591 (2d Cir. 1993) ...............................................................................................21

*Retail Digital Network, LLC v. Appelsmith*,
810 F.3d 638 (9th Cir. 2016) ...........................................................................................41

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015).................................................................................29

*Ross v. AXA Equitable Life Ins. Co.*,
--- F. App'x ---, 2017 WL 730266 (2d Cir. Feb. 23, 2017) ...................................5, 21, 23, 24

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995)...................................................................................41, 43, 46, 49

*Saleem v. Corp. Transp. Grp.*,
52 F. Supp. 3d 526 (S.D.N.Y. 2014).................................................................................21

*Secura Ins. Co. v. Auto-Owners Ins. Co.*,
605 N.W.2d 308 (Mich. 2000).........................................................................................58

*Smith v. Glenmark Generics, Inc., USA*,
No. 315898, 2014 WL 4087968 (Mich. Ct. App. Aug. 19, 2014)..........................................55

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)......................................................................................................40

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ...................................................................................... *passim*

*St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n/Mich. Educ. Ass'n*,
   581 N.W.2d 707 (Mich. 1998) ................................................................34

*State v. Pacquin*,
   389 P.3d 897 (Haw. 2016) ....................................................................37

*Stone v. Williamson*,
   753 N.W.2d 106 (Mich. 2008) ...............................................................37

*Strubel v. Comenity Bank*,
   842 F.3d 181 (2d Cir. 2016) .......................................................... *passim*

*Susan B. Anthony List v. Driehaus*,
   814 F.3d 466 (6th Cir. 2016) ................................................................42

*Thibodeau v. Portuondo*,
   486 F.3d 61 (2d Cir. 2007) ...................................................................38

*Tobin v. Mich. Civil Serv. Comm'n*,
   331 N.W.2d 184 (Mich. 1982) ...............................................................45

*Trentadue v. Buckler Lawn Sprinkler*,
   738 N.W.2d 664 (Mich. 2007) ...............................................................58

*Trilogy Mktg., Inc. v. Memsic, Inc.*,
   No. 12-13967, 2014 WL 4265788 (E.D. Mich. Aug. 29, 2014) .............................53

*United States v. Caronia*,
   703 F.3d 149 (2d Cir. 2012) ...........................................................41, 49

*United States v. Santos*,
   No. 02 CR 798(RPP), 2003 WL 22479224 (S.D.N.Y. Oct. 31, 2003) ...................28

*United States v. Strauss*,
   999 F.2d 692 (2d Cir. 1993) ..................................................................39

*Wall v. Mich. Rental*,
   No. 16-1988, --- F.3d ---, 2017 WL 888322 (6th Cir. Mar. 6, 2017) .....................22

*Washington v. Afify*,
   No. 15-4145, 2017 WL 730268 (2d Cir. Feb. 23, 2017) .......................................25

*Weathers v. Holland Police Dep't*,
   No. 13-cv-1349, 2015 WL 357058 (W.D. Mich. Jan. 27, 2015) ............................58

*Windsor Charter Twp. v. Remsing*,
   No. 249688, 2004 WL 2413791 (Mich. Ct. App. Oct. 28, 2004) ............................................34

*Wollschlaeger v. Governor, Fla.*,
   848 F.3d 1293 (11th Cir. 2017) ...................................................................................41, 43, 47

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985) ...........................................................................................................51

**Statutes**

18 U.S.C. § 2710 ................................................................................................. *passim*

M.C.L. § 290.669 ........................................................................................................53

M.C.L. § 600.2919a(2) ..................................................................................................53

M.C.L. § 600.5805(10) ..................................................................................................55

M.C.L. § 600.5856 ........................................................................................................58

Michigan Video Rental Privacy Act, M.C.L. §§ 445.1711 *et seq.* ....................................... *passim*

**Other Authorities**

45 C.F.R. § 164.308(b) ..................................................................................................50

45 C.F.R. § 164.502(e)(1) ..............................................................................................50

41 Am. Jur. 2d *Independent Contractors* § 2 ...............................................................29, 35

Brief of States Attorneys General, *Spokeo v. Robins*, 136 S. Ct. 1540 (2016) (No.
   13-1339) ...............................................................................................................44

Cambridge English Dictionary, *available at*
   http://dictionary.cambridge.org/us/dictionary/english/disclose; .........................................7, 30

Fed. R. Civ. P. 12 ......................................................................................................6, 20

Fed. R. Civ. P. 56 ....................................................................................................20, 25

Mich. Const. art. 1, § 17 ...............................................................................................38

Michigan Court Rule 3.501 ........................................................................................58, 60

Restatement (Second) of Agency § 2(3) (1958) ...................................................................35

Restatement (Second) of Torts § 652D cmt. a (1977) ..............................................................31

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* (PLI 4th ed. 2010 [updated 4/16]) ............................................................................................30, 45

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. (1890) ..............................................................................................................................45

Standards for Privacy of Individually Identifiable Health Information, 67 Fed. Reg. 53182, 53248 (Aug. 14, 2002)......................................................................................50

Webster's Ninth New Collegiate Dictionary (1986) ....................................................7, 30, 33, 34

William B. Murphy & John VandenHombergh, *Michigan Non-Standard Jury Instructions Crim.* § 44:3 (Aug. 2016) ............................................................................32

Defendant Hearst Communications, Inc. ("Hearst") submits this memorandum of law in support of its motions to dismiss the Consolidated Amended Complaint, No. 15-cv-03934-AT, ECF No. 67, (the "Consol. Compl.") and for summary judgment *in Edwards v. Hearst Communications, Inc.*, No. 1:15-cv-09279-AT-JLC.[1]

## PRELIMINARY STATEMENT

This case is ripe for summary judgment.  Discovery has debunked Plaintiff's attempts to tie Hearst's secure and responsible handling of subscriber information to the Michigan Video Rental Privacy Act, M.C.L. §§ 445.1711 *et seq*. (the "VRPA"), and to frightening headlines about misuse and dissemination of private information that have nothing to do with this case.  The great unknown conjured by the complaint is now known, and its rhetoric and scare tactics have no substance.  What discovery has revealed is that the actual facts of this case have no relation to the purpose or scope of the Michigan VRPA, which was enacted before the dawn of the internet age to prevent public revelation of personal reading and viewing choices through the news media and other means of publicity.  It is undisputed that there has never been any public disclosure of Plaintiff's reading choice of *Good Housekeeping* magazine (or any other title) by Hearst, and perhaps none at all until she herself chose to publicly reveal that fact by filing her unsealed complaint in this action.  Discovery has also shown that this case has nothing to do with the parade of horribles invoked by the complaint, which stokes fears of Big Data run amok, by engaging in speculation about identity theft, fraudulent scams, and exploitation of the elderly.  Consol. Compl. ¶¶ 24-31.  Whatever credence those fears may warrant elsewhere, the undisputed facts show that Plaintiff's speculation is without basis as relates to Hearst's handling of her

---

[1] Plaintiff filed the Consolidated Complaint only in the now-dismissed *Boelter* action.

subscriber information.  Hearst secured and safeguarded her reading choice of magazines as confidential information at all times.

Plaintiff's theories of harm are similarly baseless.  They have necessarily shifted as the case has progressed, the true facts have become known, and Plaintiff's burden on the issue of standing has increased.  But the same theories relied upon to avoid dismissal at the motion to dismiss and preliminary injunction stages fail now that discovery on Plaintiff's claims is complete.  There is no escaping the facts.  Plaintiff speculated in the complaint that Hearst had "sold" her name, address and the title of the magazine to which she subscribed (defined in the complaint as her "personal reading information" or "PRI") on mailing lists to direct mail marketers, directly resulting in her mail box being filled with junk mail every day.  Consol. Compl. ¶¶ 8, 60.  It is undisputed, however, that Hearst never provided her name and address to any direct mail marketer during any relevant period.  It therefore comes as no surprise that Plaintiff has failed to establish that she received a single piece of unwanted mail as a result of Hearst's handling of her name, address, and magazine title information.  Discovery revealed that Hearst has no record of, much less disclosed, Plaintiff's telephone number, disproving her allegation that she was subjected to harassing telemarketing calls caused by Hearst.  (*Id*. ¶ 8) Discovery also established that Plaintiff has never been the victim of identity theft.  Finally, discovery showed that there is absolutely no basis for Plaintiff's allegation that a portion of the purchase price paid for her subscription was intended to ensure confidentiality consistent with the VRPA (*id*. ¶ 83), nor was she able to specify in economic terms the value she claims that would be.  There is no evidence that Hearst allocated a portion of any subscription price to the VRPA, and Plaintiff did not even know about the VRPA before any of her subscriptions.  In

short, there is no factual basis for any of Plaintiff's theories of actual injury, even if she were able to establish a statutory violation.

Of greatest significance, perhaps, is Plaintiff's admission under oath that she never treated the fact that she read *Good Housekeeping* as a secret, or considered it embarrassing; to the contrary, she had read copies of the magazine in public places. In other words, she did not consider or treat her readership of *Good Housekeeping* magazine as private information. This undermines both her claims of actual injury, as well as the merits of her privacy-based claims. It is also consistent with her practice of openly sharing other reading choices publicly on social media. The essence of any privacy claim is the public disclosure of embarrassing, intimate or other sensitive personal information maintained as non-public. Plaintiff's own testimony makes clear there is no genuine privacy interest at issue here.

What this case is really about now is a far cry from the practices purportedly challenged by the Consolidated Complaint, and the litany of harms they allegedly caused. Discovery has shown that, at most, Hearst only shared Plaintiff's basic subscription information with its third-party employees and agents subject to strict confidentiality agreements that forbid them from sharing Plaintiff's magazine title information with anyone else. None of these business associates ever shared Plaintiff's magazine title information with anyone else at any time. It remained secure. These facts are undisputed.

Imposition of liability on Hearst under these circumstances would be tantamount to a judicial finding that a publisher is prohibited from outsourcing any business functions that involve access to basic subscription information, even when subject to strict confidentiality agreements. It would mean that Hearst and others could be civilly liable and criminally punished for contracting with outside vendors to perform necessary functions such as hosting its

subscriber database, analyzing information in that database, conducting public record research and adding information to entries in that database.  That is what this case comes down to now that the hyperbole of the complaint has been brushed aside and the true facts have been revealed. The implications are even more far-reaching when one considers all those who may be subject to the Michigan VRPA, and all the third party vendors upon which they rely, from printing houses that prepare magazine address labels, to the postal service that delivers the magazines to subscribers.  What Plaintiff seeks from this Court is extraordinary, and is far beyond what the language or purpose of the Michigan VRPA can bear.  It would make the Michigan VRPA perhaps the most restrictive privacy statute in the nation, notwithstanding the relatively modest, if any, privacy interest in one's name, address and the fact of a subscription to *Good Housekeeping* magazine.  It would necessarily force magazine publishers and others to forego any outsourcing for any function that might bring one into contact with basic subscriber information, requiring them to hire permanent employees for all such functions to avoid civil and criminal punishment.  This would make the VRPA even more restrictive than the Health Insurance Portability and Accountability Act ("HIPAA"), the notoriously strict federal statute and regulatory regime that, among other things, covers personal medical information.  Even HIPAA permits covered information to be shared with business associates and professionals to whom various functions are outsourced, so long as they are subject to confidentiality agreements. The Michigan VRPA could not possibly require more.

Plaintiff's VRPA claim, and tag-along claim for unjust enrichment, fail for multiple reasons:

As Hearst has contended from the very beginning, Plaintiff lacks standing under Article III of the Constitution.  Discovery has established that Plaintiff suffered no actual concrete

injury-in-fact (*i.e.*, actual harm).  Both the law of this case and more recent Second Circuit law clearly require that Plaintiff prove more than a violation of the VRPA "by itself" in order to establish standing.[2]  "[W]hether the right is characterized as 'substantive' or 'procedural', its violation must be accompanied by an injury-in-fact.  A violation of a statute that causes no harm does not trigger a federal case.  That is one of the lessons of *Spokeo*."  *Meyers v. Nicolet Rest. of de Pere, LLC*, 843 F.3d 724, 727 n.2 (7th Cir. 2016).  Here, Plaintiff has not established any injury-in-fact.  Plaintiff contended that Hearst violated the VRPA by including her name, address, and status as a subscriber to *Good Housekeeping* on mailing lists of magazine subscribers that Hearst rents to direct mail marketers, *see, e.g.*, Consol. Compl. ¶¶ 2, 3, 5, 8, 40-46, 59-66, and as a result Plaintiff received "harassing junk mail offerings and phone call solicitations", *id.* ¶¶ 8, 73, increased susceptibility to "serious harm from scammers", *id.* ¶ 42, and "economic harm" because Plaintiff was "deprived" of the "full value of [her] paid-for subscription[]".  *Id.* ¶ 70.  *See also* ECF No. 26 at 7; ECF No. 24 at 9-12.[3]  Full discovery on her claims yielded no facts to support those allegations.

As the Second Circuit recently stressed, "where a violation of a statute 'may result in no harm' or not 'present any material risk of harm[,] a plaintiff will not be able to 'satisfy the demands of Article III by alleging a bare [statutory] violation."  *Ross*, 2017 WL 730266, at *2 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1550 (2016)) (alterations in original).  That is

---

[2] *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 438 n.4 (S.D.N.Y. 2016); *Ross v. AXA Equitable Life Ins. Co.*, --- F. App'x ---, 2017 WL 730266, at *2 (2d Cir. Feb. 23, 2017) (allegation of violation of New York statute "and the injury inherent in the statutory violation" not sufficient to constitute injury in fact); *Strubel v. Comenity Bank*, 842 F.3d 181, 188 (2d Cir. 2016) ("[E]ven where . . . Congress has statutorily conferred legal interests on consumers, a plaintiff only has standing to sue if she can allege concrete and particularized injury to that interest.").

[3] Unless otherwise noted, all cites to "ECF" are to the docket in *Edwards v. Hearst Commc'ns, Inc.*, No. 1:15-cv-09279-AT-JLC.

the case here.  Plaintiff has failed to adduce evidence of any concrete injury, let alone the type

the Michigan VRPA was meant to prevent—the public disclosure of a record of her purchase of

any Hearst magazine.  *See* ECF No. 91.  Because Plaintiff lacks a threshold injury-in-fact, her

lawsuit must be dismissed.  *See, e.g.*, *Strubel*, 842 F.3d at 190 (even where Congress has

accorded a means of protecting a concrete interest, "a plaintiff may fail to demonstrate concrete

injury where violation of the procedure at issue presents no material risk of harm *to that

underlying interest*") (emphasis added); *see also* Fed. R. Civ. P. 12(b).  *See* Part I below.

      Discovery also made clear that Hearst is entitled to summary judgment on the merits of

Plaintiff's claims.  There is no evidence of any actionable disclosure under the Michigan VRPA.

*First*, Hearst does not even store in its Consumer Marketing database the precise information

prohibited from disclosure under the VRPA (*i.e.*, the identity of magazine subscription

*purchasers*), much less share it with others.  The VRPA quite specifically bars disclosure of

information identifying the "purchaser" of written materials, but does not prohibit disclosure

identifying "subscribers" to those materials.  The distinction between the two is clear—a

magazine subscriber need not be the purchaser and vice versa—and is most apparent in the

federal Video Privacy Protection Act ("VPPA") that was the model for the VRPA.  The VPPA

bars disclosures with respect to both "purchasers" and "subscribers".  The VRPA does not; it is

limited to "purchaser" information only.  There is no evidence that Hearst ever disclosed "*a

record or information concerning the purchase*" of any Hearst magazine subscription identifying

Plaintiff as the purchaser, as required by the VRPA.  *See* M.C.L. § 445.1712 (2015) (emphasis

added).  *See* Part II(B)(1) below.

      *Second*, there is no evidence of any public disclosure of information concerning any

purchase by Plaintiff, as required by the statute.  The terms "disclose" and "disclosure" are not

defined in the statute, and so carry their common meaning, which is to make public information that was not previously known.  *See, e.g.*, *Disclose*, Cambridge English Dictionary, *available at* http://dictionary.cambridge.org/us/dictionary/english/disclose; *Disclose*, Webster's Ninth New Collegiate Dictionary (1986) ("disclose" is "to make known or public"); *see also Frankenmuth Mut. Ins. Co. v. Marlette Homes, Inc.*, 573 N.W.2d 611, 613 (Mich. 1998) (language in statute "must be given its ordinary meaning" and "the reasonable construction that best accomplishes the purpose of the statute").  This is also consistent with the use of the term "disclosure" in privacy law more generally, which means to give publicity to information, typically through mass media.  It is a fundamental tenet of privacy law that there is no invasion of privacy absent a disclosure that is itself public, or substantially certain to become public knowledge.  Any different interpretation of the word "disclose" as it relates to private information would be at odds with its established meaning.  *See* Part II(B)(2) below.

*Third*, there was no prohibited "disclosure" under the VRPA in any event because, *inter alia*, the only transmissions at issue were made to statutory "employees" or "agents".  *See* Part II(B)(3) below.  Just as HIPAA allows health care providers to share personal medical information with business associates and professionals subject to strict confidentiality agreements, so too does the VRPA.  Hearst's business associates were all "agents" and/or "employees" under the VRPA who were charged with safeguarding subscriber records and did so.

*Fourth*, Plaintiff's overbroad reading of the VRPA, which urges judicial construction of key statutory terms in a manner that is counter to their clear meaning and Michigan rules of statutory interpretation, would violate the Due Process clause of the Fourteenth Amendment, by rendering the VRPA unconstitutionally vague.  *See* Part II(C) below.

*Finally*, even if Plaintiff did have standing and could substantiate a claim under the VRPA, summary judgment is warranted because application of the VRPA to Hearst based on the facts learned during Phase I discovery would violate the First Amendment.  *See Boelter v. Advance Magazine Publishers Inc.*, No. 15 Civ. 5671 (NRB), --- F. Supp. 3d ---, 2016 WL 5478468, at *14 n.16 (S.D.N.Y. Sept. 28, 2016).  Assuming for purposes of this motion that Hearst's challenged transmission of Plaintiff's PRI was only commercial speech, that intermediate constitutional scrutiny applies, and that the Michigan VRPA reflects a substantial state interest in privacy (*see* ECF No. 26 at 19-25), Plaintiff cannot meet her burden under the applicable test.  There is no evidence in the record that application of the VRPA to the facts here would directly advance any substantial privacy interest to a material degree, as is necessary for Plaintiff's claim to survive constitutional scrutiny.  In fact, the opposite is true.  Plaintiff herself did not treat and does not consider the fact she subscribed to *Good Housekeeping* to be private, and Hearst never publicly shared that information.  Moreover, to the extent the VRPA could be read to prohibit the transmissions in this case, which never publicized the fact that Plaintiff purchased *Good Housekeeping* magazine, the law would not be a narrowly tailored means of accomplishing Michigan's stated goal; it would criminalize secure and confidential communications with trusted business associates to whom publishers outsource important back-office functions, and would not be in proportion to any substantial interest served by the VRPA. *See* Part III below.

For all of these reasons, Plaintiff's Consolidated Complaint—including her derivative unjust enrichment claim (*see* Part IV below)—should be dismissed.

## PERTINENT FACTS & THE MICHIGAN VRPA

While Hearst and Plaintiff have fundamentally different views of the law and the facts discovered in this case (*see infra* Part II), there is little, if any, dispute about the facts that are relevant to Hearst's motions.

### A.    The Michigan VRPA.

The Michigan Video Rental Privacy Act (the "VRPA"), M.C.L. § 445.1711 *et seq.*, enacted in 1988 in the wake of the federal VPPA, was a reaction to a newspaper article published during debate over Judge Robert Bork's Supreme Court nomination that publicly revealed the titles of videos he had rented from his neighborhood video store. *See* 15-cv-03934-AT-JLC at ECF No. 1 Ex. A.

At the time Plaintiff initiated her suit,[4] the VRPA provided that persons "engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer."  M.C.L. § 445.1712 (emphasis added).  Violation of the VRPA was punishable criminally as a misdemeanor (§ 445.1714), and also carried a minimum civil penalty of $5,000—providing for "the greater of" that penalty or actual damages caused by disclosure (§ 445.1715).  Liability under the VRPA is tied to "disclosure".  The VRPA imposes liability on persons "engaged in the business" of selling, *inter alia*, "written materials" "at retail", as well as on their "employees" and "agents".  *See* M.C.L. § 445.1712.  Although "agent" is not defined in the statute, "employee" is:  "a person who works for an employer in exchange for wages *or other remuneration*."  M.C.L. § 445.1711(b) (emphasis added).

---

[4] Plaintiff initiated her suit prior to the VRPA's amendment in May 2016 and this Court has ruled that the pre-amendment version of the VRPA applies here.  *See* ECF No. 26 at 8.

The Michigan Legislature's sole justification for the statute's original passage related to preventing publicity of the sort that resulted from the newspaper article about Judge Bork's video rental history. Specifically, the Legislature reasoned that "a person's choice in reading, . . . is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *See* Consol. Compl. ¶ 19 (citing Michigan H.B. No. 5331, Jan. 20, 1989). There is no legislative history suggesting the Michigan Legislature intended the VRPA to regulate a publisher's use of third party agents or employees to outsource magazine subscription fulfillment or other functions. Nor is there any civil or criminal enforcement history targeting such practices since the law's enactment in 1988.

     **B.**    **Plaintiff Josephine James Edwards.**

     ***Plaintiff's Open Treatment of her Own PRI and Other Personal Information***.

Plaintiff's names and addresses are matters of public record. Hearst's Statement of Undisputed Material Facts dated April 3, 2017 ("HSOF") ¶¶ 18, 20, 93-95. Prior to sometime in 2015, Plaintiff Josephine James Edwards was known as Josephine James. HSOF ¶ 16. At all times relevant to her claims, she has resided at one of two addresses in the State of Michigan. HSOF ¶¶ 14-15, 17, 19. Over time, Plaintiff has been a prolific subscriber to magazines and has had a social media presence where she has freely disclosed facts about her personal life to anyone who chose to visit her public Facebook page, including magazines, books, and other written materials that she reads and "likes". HSOF ¶¶ 51, 83-92. Prior to subscribing to *Good Housekeeping* magazine, Plaintiff would read the magazine in public locations. HSOF ¶ 21. She testified there is nothing embarrassing about reading *Good Housekeeping* and she doesn't keep the fact that she was a subscriber hidden; it's not a secret. HSOF ¶¶ 23-25. In addition to publicly sharing what she reads, the public-facing part of Plaintiff's Facebook page disclosed her ethnicity, her familial status (married with two daughters), music and musicians that she "likes",

10

an anti-Republican group that she "likes" and certain medical information about her.  HSOF

¶¶ 87-92.

### *The Many Potential Sources of Plaintiff's Unwanted Mail*.

Plaintiff freely provided her name, address and other information to many different

potential sources of the unwanted mail she claims to have received (but for which there is no

evidence).  Plaintiff has subscribed to non-Hearst magazines such as *Ladies' Home Journal,*

*Lucky, People* and *Reader's Digest*.  HSOF ¶ 51; *see also* Declaration of Kristina E. Findikyan

("Findikyan Decl.") Ex. K (Dunn Dep.) at 22:11-23:14, 102:3-103:19, 120:18-121:19 (noting

Plaintiff's subscriptions to magazines published by other publishers).  She has also donated

money to charities, including Paralyzed Veterans of America and Wounded Warriors.  HSOF

¶¶ 27-28.  Plaintiff has shopped online and had memberships or accounts with AARP,

Automobile Association of America, Living Social and TripAdvisor.  HSOF ¶¶ 53-59, 96-97.  In

signing up for certain groups, Plaintiff has provided her name and email address to those entities.

HSOF ¶¶ 98-99.  When she shops online, she provides her name, address and credit card number

to the retailer.  HSOF ¶¶ 55-59.

Of the non-Hearst entities with whom Plaintiff transacts, she is not sure what kind of

information is collected about her and she either does not remember, has not read or has not

made inquiries about their privacy policies, which explain how those entities may use or share

that information.  HSOF ¶¶ 60, 84-85, 100-03.

### *Plaintiff's Hearst Subscription History*.

Under the name Josephine James, Plaintiff subscribed to various magazines published by

Hearst.  HSOF ¶¶ 14-16, 47-48.  Specifically, prior to April 2010, orders were placed or renewed

for Plaintiff for *Good Housekeeping* five times, *O, The Oprah Magazine* three times, and

*Redbook* six times.[5]  HSOF ¶¶ 47-48; Findikyan Decl. Ex. B ¶ 27.  Plaintiff also had a

subscription to *Woman's Day* before November 2007, prior to Hearst's acquisition of that title

from its previous owner.  HSOF ¶¶ 2-4, 46.  From April 2010 through September 2015, Plaintiff

was <u>not</u> an active subscriber to any Hearst magazine.  HSOF ¶ 45.  After a lapse of more than

five years without any Hearst magazine subscription, she resumed her *Good Housekeeping*

subscription six weeks before filing this lawsuit in November 2015.  *Compare* Findikyan Decl.

Ex. L *with* ECF No. 1 (Class Action Complaint).

Plaintiff also provided her email address to Hearst to receive email communications,

which she received from at least January 2012 until at least July 2016.  HSOF ¶¶ 61-62.

### *Plaintiff's Notice of Hearst's Privacy Policy*.

Hearst has been transparent that it shares subscriber information with its third-party

partners in the normal course of conducting its business, as well as to third parties for marketing

purposes.  HSOF ¶¶ 49, 62-63, 66-70.  Hearst also provides all of its subscribers with the

opportunity to opt out of receiving third-party promotional mailings.  HSOF ¶¶ 50, 71-74.

Nevertheless, unlike numerous others, Plaintiff never availed herself of the option to opt out of

receiving third-party promotional mailings.  HSOF ¶¶ 77-78.

Like all subscribers to Hearst magazines and all recipients of Hearst emails, Plaintiff

received notice of Hearst's consumer marketing practices through its Privacy Policy and notices

in its magazines.  HSOF ¶¶ 49-50, 62-73; Findikyan Decl. Exs. L, M, N, DD, MM.  Every issue

of *Good Housekeeping* mailed to Plaintiff expressly stated that from time to time, Hearst shares

lists of subscribers to third parties and provided instructions on how to opt-out of being included

---

[5] Plaintiff does not claim that any transmissions of "Personal Reading Information" after October
2015 violated the VRPA.  *See* ECF No. 95 at 6.

on certain lists that might result in receipt of third-party marketing solicitations.  HSOF ¶¶ 49-50; Findikyan Decl. Ex. I (Murphy Dep.) at 333:22-335:4; Ex. MM.  In addition, each email that Plaintiff produced as having been sent to her from Hearst from 2012 to 2016 included a link to Hearst's Privacy Policy.  HSOF ¶¶ 62-63; Findikyan Decl. Ex. M.

That Privacy Policy notified consumers (including Plaintiff), among other things, that Hearst may make subscribers' names and addresses available to third parties for marketing purposes, that it uses third-party service providers to provide products, services or functions on Hearst's behalf, and that Hearst asks those service providers to agree to maintain the confidentiality of the information provided to them and not use it for any reason other than the purpose(s) for which Hearst contracted with them.  HSOF ¶¶ 65-70.  Hearst's Privacy Policy also informed consumers of some of the ways in which they could opt out of having information shared for marketing products or services to them.  HSOF ¶¶ 71-74.

There are multiple methods by which Hearst's current or former subscribers can opt out of receiving third party promotional mailings; Plaintiff never submitted such a request by any of those methods.  HSOF ¶¶ 72-78.  Some 300,000 other Hearst subscribers made opt-out requests in 2016.  HSOF ¶ 77.  Even if a subscriber opted out of having information shared for marketing products or services to them, the Privacy Policy stated that their information may be shared with third-party service providers.  HSOF ¶ 73.

Plaintiff claims never to have seen Hearst's Privacy Policy, a link to which was contained in each of the emails she received between 2012 and 2016, and was easily accessible on Hearst magazine websites.  *See* HSOF ¶¶ 62, 63, 65-73; Findikyan Decl. Ex. H (Edwards Dep.) at 169:19-171:1, 173:18-22, 198:2-13; Ex. L; Ex. M.

13

C.     **Hearst's Consumer Marketing Practices & Relationships with Its Third Party Service Providers & Partners.**

Hearst has a Consumer Marketing department that is responsible for, among other things, acquiring and retaining subscribers to Hearst's magazines.  Findikyan Decl. Ex. A ¶ 5.  To support these functions, the department maintains and uses in its day-to-day operations a database of current and former subscribers to Hearst magazines, which it refers to as the "Consumer Marketing database".  HSOF ¶¶ 5-6.  The database contains certain records relating to Hearst subscribers, including, *inter alia*, names, mailing addresses, subscription information, promotional history, and demographic data.  HSOF ¶¶ 7, 9.  Subscription records in the database include the name and address of the person to whom the magazine is mailed.  HSOF ¶ 8.

Hearst does not maintain purchaser information in its database.  There is no code or data field in the Consumer Marketing database indicating who paid for Plaintiff's subscriptions. HSOF ¶¶ 8, 10.

The Consumer Marketing database contains two records for Josephine James, one at her current address and another at a former address.  HSOF ¶¶ 14-17, 19.  No phone number exists in the database that is associated with either of those records.  HSOF ¶ 12.  Contrary to the allegations in the complaint, Plaintiff's name (or PRI) was not included on any list rentals since at least June 2011.[6]  HSOF ¶¶ 192, 194-96.

Like many companies, Hearst outsources various functions and has relationships with a number of third-party business associates, who are provided access to certain subscriber records

---

[6]  For discovery purposes only, Magistrate Judge Cott determined that June 25, 2011 (reflecting a period of approximately 517 days of tolling) would be the outer date that any tolling of the statute of limitations would reach, even assuming that Plaintiff was entitled to tolling for both the *Grenke* and *Boelter* actions.  He therefore permitted certain discovery to extend to that date, without deciding whether tolling was in fact appropriate in determining the merits of this case. *See* ECF No. 77 at 8-10 and *infra* Part V.

subject to strict confidentiality agreements.  *See generally* HSOF ¶¶ 106-91.  It is undisputed that

none of the five business associates at issue here ever made Plaintiff's PRI public.  HSOF

¶¶ 125-27, 137-44, 152-60, 165-70, 179-88; Findikyan Decl. Ex. D ¶ 3; Ex. E ¶ 14; Ex. F ¶¶ 3-4;

Ex. G ¶ 4-7; Ex. K (Dunn Dep.) at 147:3-149:16.  Those business associates are as follows:

### 1.   Hearst's Relationship with Its Database Host, Acxiom Corporation.

Since mid- to late 2008, Hearst's Consumer Marketing database has been hosted and

maintained by Acxiom Corporation ("Acxiom") on Hearst's behalf.  HSOF ¶¶ 106-08; ECF No.

81 at 2 (citing ECF No. 78 Ex. B).  Hearst owns or licenses the data residing in the database and

has employed Acxiom (through a Master Services Agreement and a series of Statements of

Work), paying Acxiom for the services it provides.  HSOF ¶¶ 110-11, 115.  In performing its

services, which include, among others, receiving and inputting data from Hearst or its other

service providers, hosting, modifying and maintaining the database, transmitting certain data

extracts to Hearst's partners, operating a preference center, and providing analyst tools, software

and customer service, Acxiom acted at Hearst's direction and functioned as (and viewed itself

as) the equivalent of an in-house IT department; it was (and continues to be) an extension of

Hearst's workforce.  HSOF ¶¶ 106-32; ECF No. 81 at 2.

At all times, Acxiom has been required to maintain the confidentiality of Hearst's

subscriber data, to take security measures to protect the data and to only use the data as required

to perform services for Hearst and not for its own commercial or other purposes.  HSOF ¶¶ 110,

121-22, 125.  It has done so; Acxiom has never publicly shared subscriber data or used it for its

own purposes.  HSOF ¶¶ 126-28.  Specifically when facilitating transmissions of extracts to third

parties, Acxiom follows instructions provided to it by Hearst and it has not shared Hearst's

subscriber data with any third party except as directed or permitted by Hearst.  HSOF ¶¶ 116-22,

125-27.  Any transmittals of Hearst subscriber PRI were done only at Hearst's direction pursuant

to instructions provided by Hearst.  HSOF ¶¶ 112, 113, 116-27.  Acxiom has no discretion with

respect to the transmission of Hearst's data.  HSOF ¶¶ 118-20, 122.

### 2.   Hearst's Relationship with Experian Marketing Solutions, Inc.

To learn more about its subscribers in order to market additional Hearst products to those

individuals, Hearst has employed Experian Marketing Solutions, Inc. ("Experian") to append

demographic and probabilistic lifestyle data owned by Experian to Hearst's consumer marketing

records.  HSOF ¶¶ 133-35.  Pursuant to a Master Services Agreement and associated addenda,

Statements of Work and change orders, at all times Experian has been required to maintain the

confidentiality of any data provided to it by Hearst, prohibited from sharing that data publicly or

with any third party, and has only been permitted to use the data to provide data append services

to Hearst, not for its own purposes.  HSOF ¶¶ 136-37, 139, 141, 143, 145.  It is undisputed that

Experian has maintained the confidentiality of data provided to it by Hearst, not shared it

publicly or with a third party and has not used any data, including PRI, for its own purposes.

HSOF ¶¶ 138, 140, 142, 144.  Hearst has paid Experian for its services.  HSOF ¶ 146.

### 3.   Hearst's Relationships with ▮▮▮▮▮▮▮ and Dunn Data.

Hearst has also entered contractual relationships with other business associates,



specifically, ▮▮▮▮▮▮▮▮▮▮▮▮ which operates the ▮▮▮▮ data cooperative

(▮▮▮ and the ▮▮▮▮ co-op are referred to herein as "▮▮▮▮"),[7] ▮▮▮▮▮▮, and Dunn

---

[7] Hearst pays ▮▮▮▮ pursuant to negotiated rates when it wants to acquire prospect names from
the ▮▮▮ co-op.  HSOF ¶ 158.

DataCo., Inc. ("Dunn Data").[8]  HSOF ¶¶ 147-48, 161, 173-75.  What is common to each of these relationships is the business associate's contractual obligation to Hearst to safeguard Hearst's subscriber information.  HSOF ¶¶ 149, 151, 162-64, 181-84.  More specifically, these business associates are obligated to act on Hearst's behalf to keep confidential at all times the title of any magazine subscribed to by Hearst's subscribers, and may not share that information with anyone. HSOF ¶¶ 149-56, 159, 162-70, 179-85, 187-88.  In particular, title information—and thus "PRI"—is always, by contract and practice, within Hearst's exclusive control.  HSOF ¶¶ 149-56, 159, 162-70, 179-85, 187-88; Findikyan Decl. Ex. E ¶¶ 8-9, 11; Ex. G ¶¶ 4-8; Ex. I (Murphy Dep.) at 287:10-25, 289:5-290:20 (errata), 292:12-294:15; Ex. K (Dunn Dep.) at 147:3-149:16; Ex. EE 2nd whereas clause, ¶¶ 4-5, Attachment A; Ex. PP ¶¶ A(2), A(6), A(7), F; Ex. TT at 2 ¶¶ 1, 3, 10, at 3 ¶¶ 1-3.  Each of Hearst's business associates has abided by those terms and maintained the data's confidentiality.  HSOF ¶¶ 152, 159-60, 165-67, 184-85, 188; Findikyan Decl. Ex. E ¶¶ 8-9, 14; Ex. G ¶¶ 4-8; Ex. K (Dunn Dep.) at 147:3-149:16.

Hearst's business associates' ability to use Hearst's subscriber information has always been strictly limited, subject to the parties' confidentiality agreements.  Those limitations ensure that subscribers' magazine title information is protected.  To begin with, the business associates may <u>not</u> utilize any data associated with any individual (or incorporate them into their databases) unless they have previously received data about that same individual from more than one source and, accordingly, they do not incorporate a record into their database unless there is a match. HSOF ¶¶ 150, 153, 162, 178-81, 186; Findikyan Decl. Ex. I (Murphy Dep.) at 285:16-286:20. With respect to Plaintiff specifically, the ███ co-op received information about her from over

---

[8] Hearst's terminated its relationship with Dunn Data in 2013.  HSOF ¶ 174.  It is undisputed that Hearst ceased transmitting the PRI of any Michigan residents to, *inter alia*, Experian, ███ and ███ as of April 2015.  HSOF ¶¶ 192-95.

█ unique co-op members and Dunn Data received information about Plaintiff from approximately ten sources, including non-Hearst publishers and Equifax. HSOF ¶¶ 157, 178; *see also* Findikyan Decl. Ex. K (Dunn Dep.) at 11:12-24, 17:22-19:5, 22:11-23:14, 102:3-103:19, 120:18-121:19.

Significantly, these companies are prohibited from identifying Hearst (or any magazine title) as a source of information generally, or as associated with any individual record in their database, or from disclosing that any individual was a subscriber to a particular magazine. HSOF ¶¶ 149, 151-60, 162-70, 179-80. ████████████████████
████████████████████████████████████ HSOF ¶¶ 154-56, 162-63, 165-66, 168-70, 180, 187. Each has established and maintained processes to prevent the sharing of magazine title information, including not incorporating magazine titles into their respective databases. HSOF ¶¶ 154, 156, 159-60, 168-70, 180, 186-88; *e.g.*, Findikyan Decl. Ex. K (Dunn Dep.) at 14:15-25. None has shared publicly or with any third party that Plaintiff subscribed to any Hearst magazine. HSOF ¶¶ 152, 160, 165-68, 182-85, 187-88; Findikyan Decl. Ex. E ¶¶ 8-9, 11, 14; Ex. G ¶¶ 4-8; Ex. K (Dunn Dep.) at 147:3-149:16.

While Plaintiff's expired subscriptions[9] were eligible for transmissions to Experian, ████████████████ or Dunn Data at certain points in time, no data field transmitted to any of these

---

[9] While Plaintiff's claims in the Consolidated Complaint arise out of her subscription to *Good Housekeeping* magazine, pursuant to Order by Judge Cott, discovery included information related to all of Plaintiff's current and former magazine subscriptions. While Plaintiff's claims pertain to *Good Housekeeping* magazine and accordingly this brief refers to that subscription, the facts—that Plaintiff's name (or PRI) was never included on any list rental since at least June 2011, that there have been zero statutory disclosures, and that the only transmissions of Plaintiff's PRI (if at all) have been to third-party business associates in the normal course of business—are the same with respect to all of Plaintiff's Hearst magazine subscriptions.

entities identified who paid for any magazine subscriptions.  HSOF ¶¶ 10, 132; Findikyan Decl.

Ex. HH.

## ARGUMENT

**I.   PLAINTIFF'S FAILURE TO PRODUCE ANY EVIDENCE TO SUPPORT HER CLAIM OF ACTUAL INJURY REQUIRES DISMISSAL FOR LACK OF ARTICLE III STANDING UNDER *SPOKEO* AND SECOND CIRCUIT LAW.**

This Court found at the motion to dismiss stage that Plaintiff had satisfied her then-burden

with respect to Article III standing by alleging a "concrete injury-in-fact—the violation of [her]

rights under the VRPA, along with economic harm . . . ." *Boelter v. Hearst Commc'ns, Inc.*, 192

F. Supp. 3d 427, 438 (S.D.N.Y. 2016); *see also id*. at 438 n.4.  But the truth of Plaintiff's

allegations can no longer be assumed.  Without the benefit of the favorable inferences previously

accorded her baseless allegations, Plaintiff cannot meet her threshold burden.  Discovery has

revealed that Plaintiff did not suffer the requisite injury-in-fact.  Plaintiff alternately claimed that

she received a deluge of junk mail attributable to Hearst, that her PRI was rented to marketers

without notice, that she was exposed to risk of identity theft, and that she failed to receive the full

value of her magazine subscription.  Discovery has shown none of these claims to be true.  As a

result, Plaintiff has no standing under Article III of the Constitution to pursue this claim in federal

court.

### A.   Motion to Dismiss Standard Applicable to Standing.

This Court should not (and cannot) reach Plaintiff's proposed motion for summary

judgment until it determines whether Plaintiff *in fact* has standing under Article III of the U.S.

Constitution.  *See, e.g.*, *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co*., 436 F.3d 82, 87-

88 (2d Cir. 2006) (issues of Article III standing must be determined prior to issues related to the

merits of a claim); *Multistack LLC v. Arctichill Inc.*, No. 05 CIV. 3865 (PAC), 2006 WL 510506,

at *3 (S.D.N.Y. Mar. 1, 2006).  Plaintiff's standing to pursue this action is analyzed under

Federal Rule of Civil Procedure 12, notwithstanding that Hearst has answered the Consolidated

Complaint.  *See* Fed. R. Civ. P. 12(b)(1) & 12(h)(3); *Radio-Elecs. Officers Union v. Radio*

*Officers Joint Emp't Comm.*, No. 91 Civ. 1499 (LAP), 1992 WL 380917, at *1 (S.D.N.Y. Dec.

10, 1992); *Aydinyan v. Bogomolova*, No. 16 CV 126 (LDH) (LB), 2016 WL 7337953, at *1 n.1

(E.D.N.Y. Sept. 7, 2016) ("As defendants have answered the complaint, the correct procedural

vehicle for evaluating the Court's subject matter jurisdiction is Rule 12(h)(3) and not Rule

12(b)(6).").[10]

Affidavits and other evidence submitted on a Rule 12(b)(1) motion does not convert it

"into a motion for summary judgment under Rule 56." *All. for Envtl. Renewal*, 436 F.3d at 88

n.8; *see also Ali v. N.Y.C. Dep't of Transp.*, No. 14-cv-313, 2014 WL 5822625, at *4 (E.D.N.Y.

Nov. 7, 2014).[11]  On a motion to dismiss for lack of standing, unlike a motion for summary

judgment, it is the district court's role (and not a jury's) to resolve any disputed facts.  *See Carter*

*v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016); *Mackensworth v. S.S. Am. Merch.*, 28

---

[10]  When a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) puts a plaintiff's Article III standing in issue, "the District Court has leeway as to the procedure it wishes to follow."  *All. for Envtl. Renewal*, 436 F.3d at 87-89.  After discovery, "the matter might be appropriate for resolution on motion supported by affidavits, or, if a genuine dispute of material fact exists, the Court may conduct a hearing limited to Article III standing." *Id.* (citation omitted); *see also Advanced Video Techs., LLC v. HTC Corp.*, 103 F. Supp. 3d 409, 425 (S.D.N.Y. 2015), *aff'd*, --- F. App'x ---, 2017 WL 745727 (Fed. Cir. Feb. 27, 2017) (where Plaintiff "raises no genuine issue of material fact, there is no need to conduct any hearing at all— let alone impanel a jury to deliver what would be a wholly advisory verdict."  Instead, a court can "proceed in a manner the Second Circuit has recognized as appropriate: after discovery concerning the jurisdictional issue . . . , and on a motion supported by affidavits and exhibits . . . ."); *Ali*, 2014 WL 5822625, at *4.

[11]  "The only relevance of Rule 56 to a motion under Rule 12(b)(1) is that a body of decisions has developed under Rule 56 that offer guidelines which assist in resolving the problem encountered if the affidavits submitted on a 12(b)(1) motion should reveal the existence of factual problems. . . . But just as under Rule 56, a party opposing a Rule 12(b)(1) motion cannot rest on the mere assertion that factual issues may exist."  *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976).

F.3d 246, 252 (2d Cir. 1994); *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 85 (2d

Cir. 2014); *Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993)

("[I]t may become necessary for the district court to make findings of fact to determine whether a

party has standing to sue."); *accord Barrett Comput. Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 220

(5th Cir. 1989) (district court should resolve disputed factual issues determining standing).

      Because Plaintiff bears the burden of proving her case, and because Phase I discovery has

been completed, Hearst's burden is met "if [it] can point to an absence of evidence to support an

essential element of [Plaintiff's] claim." *Saleem v. Corp. Transp. Grp.*, 52 F. Supp. 3d 526, 535

(S.D.N.Y. 2014) (citation omitted); *see also, e.g.*, *Ali*, 2014 WL 5822625, at *4; *Lujan v.

Defenders of Wildlife*, 504 U.S. 555, 261 (1992).

### B.    *Spokeo* and Second Circuit Law Require Actual Evidence of Concrete Injury or Risk of Material Harm, Neither of Which Is Present Here.

      Under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), a "violation of a statute by itself is

insufficient to confer standing to sue . . . ." *Boelter v. Hearst*, 192 F. Supp. 3d at 438 n.4; *accord

Meyers v. Nicolet Rest. of de Pere, LLC*, 843 F.3d 724, 727-28 n.2 & n.4 (7th Cir. 2016).  The

Second Circuit, consistent with this Court's ruling on Hearst's motion to dismiss, has taken a

stricter view of what is required to establish standing post-*Spokeo* than many district courts did

in the initial months following the Supreme Court's decision.  *See Strubel v. Comenity Bank*, 842

F.3d 181, 188 (2d Cir. 2016) ("[E]ven where . . . Congress has statutorily conferred legal

interests on consumers, a plaintiff only has standing to sue if she can allege concrete and

particularized injury to that interest."); *Ross v. AXA Equitable Life Ins. Co.*, --- F. App'x ---,

2017 WL 730266, at *2-3 (2d Cir. Feb. 23, 2017); *Cruper-Weinmann v. Paris Baguette Am.,

Inc.*, No. 13 CIV. 7013 (JSR), --- F. Supp. 3d ---, 2017 WL 398657, at *3, *5 (S.D.N.Y. Jan. 30,

2017) ("*Strubel* makes clear that there still must be some showing that the violation of the right

actually threatened the harm in question if the plaintiff is to have standing."); *Fullwood v. Wolfgang's Steakhouse, Inc.*, No. 13 CIV. 7174 (KPF), 2017 WL 377931, at *6 (S.D.N.Y. Jan. 26, 2017); *accord Meyers*, 843 F.3d at 729 (collecting appellate cases from "sister circuits", including the *Strubel* decision, finding that statutory violations without evidence of harm did not create Article III standing, and holding that "the violation of a statute, completely divorced from any potential real-world harm, is [not] sufficient to satisfy Article III's injury-in-fact requirement"); *Wall v. Mich. Rental*, No. 16-1988, --- F.3d ---, 2017 WL 888322, at *2 (6th Cir. Mar. 6, 2017) ("The claimant must connect the violation [of the Michigan law] to a concrete injury in fact.  Notably, the Michigan law does not even purport to identify any injury flowing from the alleged violations."); *Allgire v. HOVG, LLC*, No. 1:16-cv-981-WTL-DKL, 2017 WL 1021394, at *3-4 (S.D. Ind. Mar. 16, 2017) ("[I]t is possible to allege the statutory violations the Plaintiff alleges with no resulting harm or risk of harm . . . [m]ere speculation is not enough to establish an injury in fact.") (citations omitted).

Spokeo and *Strubel* recognize that a legislature's "role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."  *Strubel*, 842 F.3d at 189 (quoting *Spokeo*, 136 S. Ct. at 1549).  In the Second Circuit, a bare statutory violation can constitute "concrete injury" only where the legislature conferred the right "to protect a plaintiff's concrete interests and where the procedural violation presents a 'risk of real harm' to that concrete interest. . . . [A] plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest."  *Strubel*, 842 F.3d at 190.

In other words, there must be some nexus between the harm identified by the legislature as being addressed by the statute, and the injury (or risk of injury) claimed by the plaintiff.  The Second Circuit's recent order in *Ross* is instructive.  In *Ross*, plaintiffs alleged violations of a New York Insurance Law provision that made an insurer liable for "mak[ing] any misleading representation, or any misrepresentation of the financial condition of any [] insurer" and based its claim of standing on a purported violation of that provision.  2017 WL 730266, at *2 (citation omitted).  The Second Circuit found, however, that a violation of the provision "does not inherently present any material risk of harm", and that "[t]he mere fact that an insurer may make a misleading representation does not require or even lead to the necessary conclusion that the misleading representation is material or even likely to cause harm."  *Id.*

Here, the *only* goal of the VRPA is to prevent disclosure of certain information relating to the purchase of video or written materials to "gossipy" publications and others (like the disclosure of Bork's video rental history for publication in a newspaper, which provided the genesis of this law's passage)—in other words, "public" disclosure of reading and viewing habits or preferences.  Consol. Compl. ¶ 19, citing Michigan H.B. No. 5331, Jan. 20, 1989.  There is no evidence of any such disclosures in this case.  *See*, *infra*, Part II.  Indeed, Plaintiff has come forward with no evidence to meet her burden of demonstrating anything more than—*at best*—a mere technical violation of the VRPA.  There is *no* evidence that she suffered *any* harm, economic or otherwise, as a result of any purported transmission of her subscription information by Hearst.  There is no evidence, for example, that Plaintiff received junk mail tied to any conduct by Hearst (let alone any telemarketing calls) (*see, e.g.*, HSOF ¶¶ 12, 30-38), or that she has ever been the victim of identity theft (much less because Hearst transmitted to its business partners the fact of her subscription to *Good Housekeeping* or any other magazine) (*see, e.g.*,

HSOF ¶¶ 79-81), or that she (or anyone) was offered or could or would choose to pay less money for a magazine subscription if the magazine publisher shared the identities of its subscribers. Plaintiff has not offered any evidence that her privacy was in any way invaded by Hearst's handling of her PRI.

Under the law of this case, and at this stage following Phase I discovery, Plaintiff's failure to substantiate her allegation of injury is fatal to her claim. Even assuming—contrary to the evidence, *see infra* Part II—that Plaintiff could demonstrate some technical violation of the VRPA, in the absence of evidence of any actual injury-in-fact, Plaintiff has no Article III standing. *See Strubel*, 842 F.3d at 190 (even where Congress has accorded a means of protecting a concrete interest, "a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest."); *Dilday v. DIRECTV, LLC*, No. 3:16cv996-HEH, 2017 WL 1190916, at *4 (E.D. Va. Mar. 29, 2017) ("Because the common law does not permit suit for merely sharing private information with a single third party, a violation of the FCRA's prohibition on furnishing a consumer report absent a permissible purpose cannot, standing alone, be understood to constitute a concrete injury.").

Far from uncovering any violation of the VRPA, discovery has validated what Hearst has argued all along—that Plaintiff suffered no concrete injury-in-fact and does *not* have Article III standing to pursue her claims. The inquiry in this case is far easier than in *Spokeo*. Here it is evident that Plaintiff's specious claims of "actual injury" in the form of unwanted mail and marketing calls stemming from Hearst (*see* Consol. Compl. ¶ 73) have no factual basis. Because there is no evidence of a concrete injury-in-fact, this case must be dismissed. *See Spokeo*, 136 S. Ct. at 1548-50; *Strubel*, 842 F.3d at 187-88; *Ross*, 2017 WL 730266 at *2-3.

24

## II. EVEN IF THE COURT FINDS THAT PLAINTIFF HAS ARTICLE III STANDING, HEARST IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE VRPA STATUTE DOES NOT APPLY TO HEARST'S CONFIDENTIAL COMMUNICATIONS.

Even if Plaintiff can establish threshold injury-in-fact as required by Article III of the Constitution, Hearst is entitled to summary judgment.

### A. Summary Judgment Standard.

The standard for granting summary judgment is well established, and is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (other quotation marks and citations omitted).  "Although the evidence is viewed in favor of the non-moving party, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'  It is insufficient to 'rely on conclusory allegations or unsubstantiated speculation' to defeat a motion for summary judgment."  *Makhoul v. Watt, Tieder, Hoffar & Fitzgerald, L.L.P.*, 662 F. App'x 33, 34 (2d Cir. 2016) (citation omitted); *Washington v. Afify*, No. 15-4145, 2017 WL 730268, at *1 (2d Cir. Feb. 23, 2017); *Forte v. Liquidnet Holdings, Inc.*, No. 15-3465-CV, 2017 WL 104316, at *3 (2d Cir. Jan. 10, 2017) (granting summary judgment to defendant where plaintiff did not cite to concrete evidence, only her own conclusory testimony); *Nuchman v. City of N.Y.*, 639 F. App'x 48, 49 (2d Cir. 2016) (granting summary judgment to defendant where plaintiff relied on "conclusory allegations supported by weak circumstantial evidence").

Here, the undisputed facts permit only one conclusion:  that Hearst never disclosed any information about Plaintiff in violation of the Michigan Video Rental Privacy Act.

> **B.       There Is No Evidence of Any Actionable Disclosure Under the Statute.**

Given the absence of any public sharing of Plaintiff's PRI, and the absence of any list rental of Plaintiff's PRI, Plaintiff is reduced to arguing that all that is needed to establish a violation of the VRPA is that Hearst shared her PRI (name, address and the title of a magazine subscribed to) with some third party, without regard to who that third party is and what their relationship with Hearst is, or whether the information was kept confidential and secure the entire time for the precise purpose of avoiding public sharing.  Plaintiff's overbroad reading of the statute is inconsistent with its plain language and would result in absurdity.  It is also at odds with Michigan law.

Plaintiff cannot insist on a strict reading of the statute while, at the same time, ignoring its express terms.  Those terms limit its scope.  As detailed below, the record is clear that Hearst did not make any statutory "disclosure" of information concerning Plaintiff that is prohibited by the VRPA.  *First*, at the most fundamental level, Hearst never transmitted any information about Plaintiff that is covered by the VRPA.  As discussed in Part II.B.1, a violation of the VRPA requires more than "proof that the disclosed record or information indicated Plaintiff's identity." ECF No. 113 at 5, § III.D.  It requires disclosure of "a record or information *concerning the purchase*" of written materials by a "customer", which is defined in the law as a purchaser. M.C.L. § 445.1712 (emphasis added).  Hearst could not have disclosed information identifying Plaintiff as the purchaser of her *Good Housekeeping* subscription, because the subscription information in the Consumer Marketing database does not identify her (or anyone else) as the purchaser—those records simply do not include that information.  *See* HSOF ¶¶ 10, 132. Because the VRPA by its express terms only prohibits disclosure of purchase information

identifying a purchaser, Hearst could not have violated the law.  *Second*, as discussed in Part II.B.2, Hearst's transmission of Plaintiff's subscription record to trusted business associates subject to strict confidentiality agreements requiring them to safeguard and protect that information against disclosure does not amount to a statutory "disclosure" under the VRPA in any event.  A "disclosure" under the statute necessitates that the information be made public or given publicity, consistent with the dictionary definition of that term and how it is understood in Michigan privacy law.  No such disclosure took place.  *Third*, as discussed in Part II.B.3, Hearst's business associates were statutory "employees" or "agents" under the VRPA, meaning that any transmission of Plaintiff's PRI to them was not a "disclosure" under the statute.

### 1. Hearst Did Not Maintain, Much Less Disclose, *a Record or Information Concerning the Purchase* of Plaintiff's Subscription *that Identified Her as the Purchaser*, Which Is All that the VRPA Prohibits.

The language of the VRPA is crystal clear:  the only prohibited disclosures are those of a "record or information" concerning a *purchase* of, in this case, a magazine subscription, *by a customer* and *identifying* the customer.  *See* M.C.L. §§ 445.1711 (defining customer as "a person who purchases"), 445.1712, 445.1715; *In re Certified Question from U.S. Court of Appeals for Ninth Circuit (Deacon v. Pandora Media, Inc.)*, 885 N.W.2d 628, 631 (Mich. 2016).[12]  But nothing in any of the transmissions at issue in this case identify Plaintiff as the purchaser of any of her magazine subscriptions.  There is good reason for this.  It is undisputed that although Hearst's Consumer Marketing database includes codes indicating whether a subscription is paid or unpaid, Hearst's database does not include any code or data field identifying *who* paid for a

---

[12]  A civil action is provided under the VRPA only "to the customer identified in a record or other information that is disclosed in violation of this act."  M.C.L. § 445.1715.  And it is only a "record or other information" "*concerning the purchase*" of specified materials that is prohibited.  M.C.L. § 445.1712.  And the "Customer" identified must be the person "who purchases, rents, or borrows" the materials.  M.C.L. § 445.1711; *Deacon*, 885 N.W.2d at 631.

given subscription.  HSOF ¶¶ 10, 132.  One cannot disclose a record that one does not maintain.  As a result, there is no evidence that Hearst ever disclosed (or even could have ever disclosed) "*a record or information concerning the purchase . . . by* [Plaintiff]" of any subscription to a Hearst magazine, as required by the VRPA.  *See* M.C.L. §§ 445.1711, 445.1712 (emphasis added); HSOF ¶¶ 10, 132.[13]  The only evidence in the record is that Hearst may have shared Plaintiff's basic subscription information in the past with certain of Hearst's trusted business partners subject to strict confidentiality agreements.  But identifying Plaintiff as an expired magazine subscriber is not information (let alone a "record") identifying her as having been the *purchaser* of that subscription.  *See, e.g.*, Findikyan Decl. Ex. H (Edwards Dep.) at 37:2-8 (subscribing to a magazine means receiving it in the mail every month); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) ("[P]ayment is not a necessary element of subscription."); *United States v. Santos*, No. 02 CR 798(RPP), 2003 WL 22479224, at *5 n.6 (S.D.N.Y. Oct. 31, 2003) (recognizing subscriber information and purchaser information for cell phone can be different), *aff'd sub nom. United States v. Rodriquez*, 114 F. App'x 23 (2d Cir. 2004); *cf. Menominee Cmty. Bldg. Co. v. Rueckert*, 222 N.W. 162, 163 (Mich. 1928) ("Subscribers are not purchasers of stock within the purview of the securities statute.") (citation omitted).  The two concepts are distinct and independent; the VRPA only prohibits "disclosures" of information identifying someone as "a person who purchases, rents, or borrows a book or other written material" (M.C.L. §§ 445.1711, 445.1712), and there is no evidence that Hearst maintains—let alone shared—information about who purchased Plaintiff's subscriptions.  *See* HSOF ¶¶ 7-8, 10-11, 132.

---

[13]   As an even more basic matter, there is no evidence in the record that Plaintiff herself paid for any of her subscriptions, let alone for any subscription that could have given rise to a potentially actionable "disclosure".  *See* HSOF ¶¶ 7-8, 10-11, 45-48, 132; Findikyan Decl. Exs. GG, LL, JJ.

The Michigan legislature could have paralleled the language used in the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, to make liability turn on subscription as well as "purchase".  It did not.[14]  Like the VPPA, the VRPA is intended to be transaction-oriented.  "It is information that identifies a *particular person* as having engaged in a *specific transaction*" that gives rise to liability.  *Robinson*, 152 F. Supp. 3d at 179-80 (emphasis added) (citation omitted).  And in the case of the VRPA, unlike the VPPA, that transaction is purchase, *not* subscription.  M.C.L. §§ 445.1711, 445.1712, 445.1715.  The VRPA even goes one step further than the VPPA.  Not only must it be a purchase to give rise to potential liability, it is more than PII that must be disclosed—it is a "record or information *concerning the purchase . . . by a customer* that indicates the identity of *the customer*."  *See* M.C.L. § 445.1712; *see also id.* § 445.1713 ("A record or information *described in section 2* may be disclosed only in 1 or more of the following circumstances") (emphasis added); § 445.1715 (liability is to the person identified in "record or other information that is disclosed in violation of this act").  In other words, if the records that Hearst shared with third parties in this case did not disclose Plaintiff's identity as the purchaser of her subscriptions, there is no violation of the VRPA.  Because there is no evidence of such a disclosure, Hearst is entitled to summary judgment on Plaintiff's claims.

### 2. Hearst's Confidential Transmissions Were Not "Disclosures" under the VRPA, Which Prohibits Public Disclosure or Publicity.

While disclosure is what triggers a violation of the VRPA, the terms "disclose" and "disclosure" are not defined in the statute, and so carry their common meaning.  *Frankenmuth*

---

[14] The VPPA imposes liability on "any renter, purchaser, or subscriber of goods or services from a video tape service provider," 18 U.S.C. § 2710(a)(1), for disclosure of "personally identifiable information" ("PII"), defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider," 18 U.S.C. § 2710(a)(3) (quoted in *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015)).

*Mut. Ins. Co. v. Marlette Homes, Inc.*, 573 N.W.2d 611, 613 (Mich. 1998) (language in statute "must be given its ordinary meaning" and "the reasonable construction that best accomplishes the purpose of the statute").  Michigan law provides that the ordinary meaning of undefined statutory terms may be found in a dictionary.  *Deacon*, 885 N.W.2d at 631 ("When considering the meaning of a nonlegal word or phrase that is not defined in a statute, resort to a lay dictionary is appropriate.") (citation omitted).  The dictionary definition of "disclose" is to make public information that was not previously known.  *See, e.g.*, *Disclose*, Cambridge English Dictionary, *available at* http://dictionary.cambridge.org/us/dictionary/english/disclose; *Disclose*, Webster's Ninth New Collegiate Dictionary (1986) ("disclose" is "to make known or public").

The dictionary meaning of "disclose"—to make public—is fully consistent with its meaning in U.S. privacy law.  As noted by Second Circuit Judge Sack in his renowned treatise on the subject, all three common law privacy torts that arise from the disclosure of private information share a common requirement of public disclosure.  Citing voluminous authority, Judge Sack demonstrates how the concept of disclosure has developed a very specific meaning in the realm of privacy law, referring to mass media or other disclosure that itself makes the information public, or substantially certain that the information will become public.  *See* Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 12:4.2 at 12-38 (PLI 4th ed. 2010 [updated 4/16]) (disclosure of private facts requires "publicity", "which means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge") (footnote with citations omitted); § 12.3.1[A] at 12-16 & n.59 (false light requires that "[t]he statement must be made public") (citing cases); § 12:5.1 at 12-83 to 12-84 (right of publicity requires publicity, *i.e.*, "published advertisement").  The closest analogue to the VRPA among the privacy

torts is disclosure of private facts.  With regard to private facts claims in particular, "disclosure" is synonymous with "publicity".  *See, e.g.*, Restatement (Second) of Torts § 652D cmt. a (1977). The broad consensus on this meaning is reflected in case law across the country, as cited by Judge Sack.

Michigan is no exception.  Under Michigan law, to state a claim for the tort of private facts, a plaintiff must show "(1) the *disclosure* of information (2) that is highly offensive to a reasonable person and (3) that is of no legitimate concern to the public."  *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 919 (Mich. Ct. App. 2014) (emphasis added) (citation omitted); *see also Doe v. Mills*, 536 N.W.2d 824, 828 (Mich. Ct. App. 1995).  Michigan privacy law uses the term "disclosure" precisely as Judge Sack describes the requirement—*i.e.*, to the public at large or in a manner substantially certain to become public knowledge.  *Henry Ford Health Sys.*, 865 N.W.2d at 919-20 (citing Restatement (Second) of Torts § 652D cmt. a, at 384); *Lansing Ass'n of Sch. Adm'rs v. Lansing Sch. Dist. Bd. of Educ.*, 549 N.W.2d 15, 21 (Mich. Ct. App. 1996) (communication "concerning the plaintiff's private life to a single person or even to a small group of persons" does not suffice to support a privacy claim) (citation omitted), *aff'd in part sub nom. Bradley v. Bd. of Educ. of the Saranac Cmty. Schs.*, 565 N.W.2d 650 (Mich. 1997); *see also Beaumont v. Brown*, 257 N.W.2d 522, 530 (Mich. 1977) (disclosure was sufficiently alleged where letter to Army official "was sure to be circulated through the Army's bureaucracy" and "submitted in the Civil Service [hearing] transcript and is now a matter of public record for all to view").  This would have been the Michigan Legislature's understanding in using the term "disclose" in the VRPA.  *See, e.g.*, *Evans v. United States*, 504 U.S. 255, 259 (1992) ("It is a familiar 'maxim that a statutory term is generally presumed to have its common-law meaning.'") (citation omitted); *People v. Couch*, 461 N.W.2d 683, 685 (Mich. 1990)

("[W]here [a legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.  In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.") (alteration in original) (citation omitted).  For this reason, the confidential communications between Hearst and its business associates challenged here do not suffice to support a privacy claim under Michigan law.  Only public disclosure will do.

Michigan principles of statutory construction as well as Michigan privacy law make clear that the VRPA's "disclosure" requirement means public disclosure or publicity.  Because Hearst did not publicly share any information about Plaintiff, her claim must fail.

### 3.  Hearst's Transmissions to Statutory "Employees" and "Agents" Bound to Maintain Confidentiality Were Not "Disclosures" under the VRPA.

Summary judgment is further warranted because the undisputed evidence demonstrates that any transmissions of information relating to Plaintiff were not statutory "disclosures" as they were made only to Hearst's statutory "employees" or "agents".

The VRPA groups together "a person, or an employee or agent of the person, engaged in the business of selling at retail," and collectively prohibits them from disclosing "a record or information concerning the purchase" of written materials.  *See* M.C.L. § 445.1712 ("a person, or an employee or agent of the person . . . shall not disclose"); *see also* William B. Murphy & John VandenHombergh, *Michigan Non-Standard Jury Instructions Crim.* § 44:3 (Aug. 2016) (employees or agents can be defendants along with employer or principal); *Deacon*, 885 N.W.2d at 630-31.  It necessarily follows as a matter of statutory construction that a retailer's sharing of information with employees and agents in the ordinary course of business cannot itself be a

32

statutory "disclosure".[15]  *Cf. Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 857-58 (Mich. 2005)

("[W]hen a statute says 'employer' means 'a person who has 1 or more employees, and *includes*

*an agent of that person,*' it must, if the words are going to be read sensibly, mean that the

Legislature intended to make the agent tantamount to the employer so that the agent

unmistakably is also subject to suit along with the employer.").

    Each of the trusted business associates to which Hearst may have communicated

Plaintiff's PRI were statutory "employees" or "agents" with respect to receipt of the information

provided.  The VRPA defines an "employee" as "a person who works for an employer in

exchange for wages or other remuneration."  M.C.L. § 445.1711(b).  Acxiom, Experian and

███████ unquestionably were Hearst's "employees" for purposes of the VRPA.  All were

remunerated for the services they performed for Hearst.  In the case of Acxiom, it is undisputed

that Hearst paid Acxiom to build and maintain its database of subscriber information, and that

Plaintiff's subscription information was provided to Acxiom in connection with that work.[16]  *See*

HSOF ¶ 115.  In the case of Experian, it is undisputed that Hearst paid Experian to append

certain demographic information to its subscriber files, including Plaintiff.  *See* HSOF ¶¶ 134-36,

146.  And in the case of ███████ it is undisputed that Hearst paid ███████ fees in order to

participate in the ███████ data co-op.  *See* HSOF ¶¶ 147, 158.  As a matter of pure statutory

interpretation, each of these entities were Hearst's "employees" as that term is defined under the

---

[15] Plaintiff appears to agree with respect to "employees", but not "agents".  *See* ECF No. 95 at 6
(arguing that "there is no exception under the VRPA for disclosure to third parties acting as
agents", but tacitly acknowledging that the VRPA does not criminalize sharing with employees).
But "employees" and "agents" are treated the same under the VRPA, and the statute cannot
reasonably be read to criminalize disclosures to either.

[16] To "remunerate" is to "pay a suitable equivalent in return for goods provided, services
rendered, or losses incurred".  *Remunerate*, Webster's Ninth New Collegiate Dictionary
(Merriam-Webster 1986).  In other words, any form of "compensation" is "remuneration".  *Id*.

VRPA.  *See, e.g.*, M.C.L. § 445.1711(b); *Windsor Charter Twp. v. Remsing*, No. 249688, 2004 WL 2413791, at *2 (Mich. Ct. App. Oct. 28, 2004) (per curiam) (an individual can be an "employee" within the meaning of a particular statute even if that individual might not meet the common law definition and even if the contract between the parties disclaims such a relationship).

Even if Acxiom, Experian and ███████ were not considered statutory "employees", they, along with Dunn Data and ██████ are Hearst's "agents" under the VRPA.  Indeed, Magistrate Judge Cott has already found that Acxiom was "effectively Hearst's agent".  ECF No. 81 at 2. The VRPA does not define the term "agent", but based on the language, history and purpose of the VRPA, "agent" in the statute must be read to include not only third parties acting in a traditional common-law "agency" role—such as Acxiom—but also trusted business associates who are authorized and obligated to protect Hearst's interests by safeguarding the confidentiality of Hearst's subscriber information and preventing its disclosure.  Michigan law requires this Court to give the term "agent" its ordinary meaning, consistent with its dictionary definition.  *See supra* at 7.  The ordinary meaning of "agent" is "one who acts for or in the place of another by authority from him."  *Agent*, Webster's Ninth New Collegiate Dictionary (1986).

Moreover, even under Michigan common law, agency "is a matter of fact, not terminology", and the definition of "agent" can vary depending on the context.  *Pasieka v. Chaves*, No. 304190, 2012 WL 5233619, at *4-5 (Mich. Ct. App. Oct. 23, 2012); *see also Elezovic v. Bennett*, 731 N.W.2d 452, 458 (Mich. Ct. App. 2007) (defining persons who are "agents" for purposes of the Civil Rights Act); *St. Clair Intermediate Sch. Dist. v. Intermediate Educ. Ass'n/Mich. Educ. Ass'n*, 581 N.W.2d 707, 717 (Mich. 1998) (examining "the meaning of the word agent as used in" the Public Employment Relations Act).  Under Michigan law, an

agent can be, *inter alia*, "one who undertakes to transact some business or manage some affairs for another by authority and on account of the latter, and to render an account of it." *Hayes v. Emerick*, 416 N.W.2d 350, 351 (Mich. Ct. App. 1987) (citations omitted); *cf. Barton-Spencer v. Farm Bureau Life Ins. Co. of Mich.*, No. 324661, 2016 WL 1125968, at *8 (Mich. Ct. App. Mar. 22, 2016) ("[T]he terms of the agent agreement and the agent commission schedule clearly establish that Farm Bureau 'affected or controlled a term, condition, or privilege of [Plaintiff's] employment.'") (citation omitted).[17]  That is what each of the entities to which Hearst purportedly transmitted Plaintiff's PRI did as a significant part of their arrangement with Hearst—undertake to manage some affairs for Hearst, most importantly, to safeguard Hearst subscribers' PRI at all times.  In each case, Hearst controlled the terms of its engagement with the third party and the third party's use of title information.

Each of Acxiom, Experian, ▮▮▮▮ Dunn Data and ▮▮▮▮ was contractually bound to (and by practice did) maintain the confidentiality of Hearst's proprietary subscriber information. *See, e.g.*, HSOF ¶¶ 106-91.  Each was contractually prohibited from sharing (and in practice did not share) subscriber PRI publicly or with any third party.  *See, e.g.*, *id.*  Each was contractually prohibited from using PRI provided by Hearst for their own commercial purposes, and there is no evidence that any such third party failed to comply with its contractual obligations in this regard.  *See, e.g.*, HSOF ¶¶ 106-91.  In each case, Hearst maintained ownership of any subscriber

---

[17]  The fact that certain of Hearst's contracts with third parties may disclaim a contractual "agency" relationship does not alter this result or speak to whether those third parties would be considered "agents" or "employees" as those terms are used in the statute.  "Indeed, one may be both an independent contractor and an agent." *Douglas v. Pontiac Gen. Hosp.*, 452 N.W.2d 845, 846 (Mich. Ct. App. 1990) (Batzer, J., dissenting) (citing 41 Am. Jur. 2d *Independent Contractors* § 2; Restatement (Second) of Agency § 2(3) (1958)), *rev'd for reasons stated in dissent*, 473 N.W.2d 68 (Mich. 1991); Restatement (Second) of Agency § 2(3) (an independent contractor "may or may not be agent").

data it transmitted.  *See, e.g.*, HSOF ¶¶ 110-11, 113, 115, 117-22, 127, 137-45, 149-56, 159, 162-70, 179-85, 187-88.  In fact, as Magistrate Judge Cott recognized, Hearst viewed Acxiom as the functional equivalent of an in-house IT department responsible for hosting and maintaining Hearst's subscriber database; sharing information with Acxiom was no different than sharing information with Hearst's own employees, and Hearst could not operate its own consumer marketing business (such as sending its subscribers direct mail offers) without Acxiom.  *See* ECF No. 81 at 2; HSOF ¶¶ 112-20, 122-24.  Hearst similarly relied on Experian to perform a service that it would be burdensome to perform on its own—collect and append demographic and probabilistic lifestyle data about its subscribers to better understand and respond to their likely interests.  HSOF ¶¶ 133-35.  And Hearst's relationships with ██████ Dunn Data and ██████ provided Hearst the ability to utilize marketing services from each entity, such as proprietary modeling, as well as access to a broader universe of marketing prospects.  *See* HSOF ¶¶ 147, 150, 158, 161, 175, 187; Findikyan Decl. Ex A ¶ 33; Ex. E ¶¶ 4, 6-7; Ex I (Murphy Dep.) at 285:16-287:5, 346:3-12; Ex. K (Dunn Dep.) at 11:13-12:21, 38:2-25, 45:16-47:10; Ex. PP ¶ A(1) and p. 03; Ex. TT at 1.  As noted, in every instance, Hearst maintained ownership and control of its subscriber's PRI, and each third party was bound to and complied with strict confidentiality provisions.

Even if any of Hearst's business associates were found not to be an employee or agent of Hearst, the transmissions of Plaintiff's PRI to those partners would not constitute a "disclosure" under the VRPA, for the reasons discussed above in Part II(B)(1) & (2).  In all cases, the applicable confidentiality agreements did not permit the sharing of Plaintiff's PRI beyond the business partner.  *See, e.g.*, HSOF ¶¶ 121-22, 125, 127, 137, 139, 141, 143, 145, 149, 151-56, 162-70, 178-88, 186-87.  There is no evidence that any business partner ever shared magazine

title information received from Hearst with any other party after its initial receipt from Hearst.

HSOF ¶¶ 126-28, 131, 138, 140, 142, 144-45, 152-57, 159-60, 165-70, 184-88, 191.  Certainly

there is no evidence that any such transmission ever resulted in any public transmission or

revelation of the sort contemplated by the VRPA.

In sum, there is **no** evidence at all that there was any "disclosure" of the sort prohibited

by the VRPA during the relevant time period (*see, e.g.*, HSOF ¶¶ 106-91), let alone that Hearst

ever rented Plaintiff's name on **any** mailing list (*see* HSOF ¶ 196).

C.     **Interpreting the VRPA to Find a "Disclosure" on the Facts of This Case
        Would Violate Due Process by Rendering the VRPA Unconstitutionally
        Vague.**

If accepted, Plaintiff's overbroad reading of the VRPA would raise serious due process

concerns under both the U.S. Constitution and Michigan law.  Plaintiff's reading of the VRPA

would require this Court to accept overbroad constructions of "disclosure" and "agent" that are at

odds with the ordinary meaning of those terms and legislative intent.  *See supra*, Part II(B)(2) &

(3).  It would also require this Court to disregard the fact that the statute is expressly limited to

purchaser information, and that the Legislature declined to extend its reach to subscriber

information, as Congress did with the earlier-enacted VPPA that was the model for the VRPA.

*See supra*, Part II(B)(1).  Adoption of Plaintiff's tortured reading would render the VRPA

incomprehensibly vague and subject Hearst and others to civil and criminal liability under an

indeterminate standard.  That would necessarily violate Hearst's right to due process of law

under the Fourteenth Amendment.  *See, e.g.*, *Stone v. Williamson*, 753 N.W.2d 106, 115 (Mich.

2008) (finding that because part of statute that "is incomprehensible as written . . . [it] is no

longer good law"); *State v. Pacquin*, 389 P.3d 897, 910-11 (Haw. 2016) (finding portions of state

statute criminalizing the "unauthorized possession of confidential personal information"

unconstitutionally vague under federal and state constitution because definition of "confidential

personal information" compelled one "to guess as to the actual scope and meaning of [the statute]" and "does not 'inform[] the actor as to how to avoid violating' the [statute at issue]") (alteration in original) (citation omitted); *Matter of Gentry*, 369 N.W.2d 889, 893 (Mich. Ct. App. 1985); Mich. Const. art. 1, § 17; *Johnson v. City of Kalamazoo*, 124 F. Supp. 2d 1099, 1106 (W.D. Mich. 2000) ("[D]ue process protections afforded by the Michigan Constitution are co-extensive with those afforded under the United States Constitution.").

The Fourteenth Amendment's guarantee of due process of law and resulting vagueness doctrine "requires crafting both civil and criminal laws 'with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them.'" *Kramer v. N.Y.C. Bd. of Educ.*, 715 F. Supp. 2d 335, 355 (E.D.N.Y. 2010) (quoting *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007)); *Matter of Gentry*, 369 N.W.2d at 893 ("A statute may be challenged for vagueness on three grounds: (1) it does not provide fair notice of the conduct proscribed; (2) it confers on the trier of fact unstructured and unlimited discretion to determine whether an offense has been committed; and (3) its coverage is overbroad and impinges on First Amendment freedoms.").

"The degree of statutory vagueness that the Due Process Clause will tolerate 'depends in part on the nature of the enactment at issue.'" *Chatin v. Coombe*, 186 F.3d 82, 86 (2d Cir. 1999) (citation omitted).  Statutes imposing criminal punishment or significant civil penalties are least tolerable.  The VRPA does both.  It is a law not only with significant minimum civil penalties (which, at the class certification stage, is likely to create its own due process concerns) but also criminal penalties.  M.C.L. § 445.1714 (a person who violates the VRPA "is guilty of a misdemeanor").  As a result, the VRPA is subject to stricter constitutional scrutiny than statutes with only civil penalties.  *Id.*

38

To determine whether a statute is unconstitutionally vague, courts in the Second Circuit apply a two-prong test.  First, a court determines "whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited . . . ."  *Chatin*, 186 F.3d at 87 (quoting *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir. 1993)).  Second, a court considers "whether the law provides explicit standards for those who apply it."  *Id.*; *see also Kramer*, 715 F. Supp. 2d at 356.  Construction of the VRPA in accordance with its express terms, Michigan principles of statutory construction, and other Michigan law, results in an appropriately narrow scope that is easily understandable and related to the VRPA's purpose.  *See* Part II(B), *supra*.  Plaintiff's reading, on the other hand, would have the opposite result.

Because the VRPA, as Plaintiff urges it be read, would leave one to guess at the meaning of "disclosure" and "agent" (because it would vary from the accepted meaning of those terms) and ignore the law's express limitation to purchaser information (reinforced by its divergence from the VPPA which expressly included subscriber information within its scope), it would lack the requisite clarity to impose civil or criminal liability consistent with due process.  Indeed, it would freeze a publisher's ability to engage in any outsourcing, even to effect delivery of magazines.  *See infra* pp. 49-50.  For this additional reason, the Court should adopt the ordinary meanings of "disclosure" and "agent" discussed above to avoid a reading that would render the VRPA unconstitutional.  *See, e.g.*, *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 741 (2017) (construing statute to "provide[] an administrable construction"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2597 (2012) (construing statute to avoid constitutional concerns).

III.   **APPLICATION OF THE VRPA TO PUNISH CONFIDENTIAL COMMUNICATIONS OF SUBSCRIPTION INFORMATION TO TRUSTED BUSINESS ASSOCIATES CHARGED WITH SAFEGUARDING THAT INFORMATION FROM PUBLIC DISCLOSURE WOULD VIOLATE THE FIRST AMENDMENT.**

Summary judgment in this case is warranted for the independent reason that application of the VRPA to the facts relating to Plaintiff's individual claims would violate the First Amendment.  *See Boelter v. Advance Magazine Publishers Inc.*, 2016 WL 5478468, at *14 n.16. There is no question that the purported transmissions at issue are speech protected by the First Amendment.  *See Boelter v. Hearst*, 192 F. Supp. 3d at 444; *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 271-72 (2d Cir. 2010) ("The First Amendment protects even dry information . . . .") (quoted in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011)).  In *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2227 (2015), the Supreme Court affirmed that laws defining regulated speech by subject matter are content-based.  Under *Reed*, such content-based regulations on speech are subject to strict constitutional scrutiny, and Plaintiff does not argue that the VRPA can survive strict scrutiny.  *Id*. at 2227; ECF No. 18-2 at 25-29.  For purposes of this motion, however, Hearst assumes that under the law of the case, the speech at issue is commercial speech, that intermediate constitutional scrutiny applies, and that Michigan has a substantial state interest in consumer privacy (*see* 192 F. Supp. 3d at 445-52).  Even under this standard, the VRPA cannot survive First Amendment scrutiny under the facts learned during discovery.

The protection afforded commercial speech by the First Amendment is substantial.[18]  As the Second Circuit has noted, the Supreme Court has "declared that even purely commercial

---

[18] The protections for speech under the Michigan Constitution are coextensive with the First Amendment.  *See Burns v. City of Detroit*, 660 N.W.2d 85, 92-93 (Mich. Ct. App. 2002), *modified in part & leave to appeal otherwise denied*, 658 N.W.2d 468 (Mich. 2003); *Mich. Beer & Wine Wholesalers Ass'n v. Att'y Gen.*, 370 N.W.2d 328, 336-37 (Mich. Ct. App. 1985), *cert. denied*, 479 U.S. 939 (1986).

speech enjoys a significant degree of First Amendment protection." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 229 (2d Cir. 1996) (citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996)). Time and again, the Supreme Court has reaffirmed that "the free flow of commercial information is 'indispensable to the proper allocation of resources in a free enterprise system . . . .'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) (citation omitted).

Attempts to regulate commercial speech have traditionally been governed by the demanding four-part test first articulated by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566, 591 (1980): assuming that the speech in question is (1) not misleading and concerns lawful activity, one seeking to punish that speech must show, (2) that the government's asserted interest is substantial, (3) that the regulation at issue directly advances that interest, and (4) that the restriction is "not more extensive than necessary."[19]  Here, it is clear that Hearst's

---

[19] Virtually every appellate court to consider cases of commercial or other forms of speech traditionally subject to intermediate scrutiny after *Sorrell* have applied some form of heightened scrutiny to content-based regulations even greater than what is required under *Central Hudson*. *See United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012); *Retail Digital Network, LLC v. Appelsmith*, 810 F.3d 638, 648 (9th Cir. 2016) (collecting cases and holding that "*Sorrell* modified the *Central Hudson* test for laws burdening commercial speech" and requires application of "heightened judicial scrutiny"—but not quite "strict scrutiny"—for laws "burdening non-misleading commercial speech about legal goods or services [that is] content- or speaker-based"), *reh'g en banc granted sub nom.*, *Retail Digital Network, LLC v. Gorsuch*, 842 F.3d 1092 (9th Cir. Nov. 16, 2016).  After *Reed*, appellate courts have gone even farther—suggesting that not just heightened, but *strict* scrutiny is the proper standard to be applied to *all* content-based restrictions.  Since *Reed*, appellate courts have recognized the breadth of the Supreme Court's decision, and its application (or potential application) outside of noncommercial speech. *See Ocheesee Creamery LLC v. Putnam*, No. 16-12049, --- F.3d ---, 2017 WL 1046104, at *4 n.7 (11th Cir. Mar. 20, 2017) (noting whether *Central Hudson* survives *Reed* is an open question but declining to resolve because regulation in question failed even intermediate scrutiny); *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) (same); *Cahaly v. LaRosa*, 796 F.3d 399, 405 (4th Cir. 2015) (applying strict scrutiny to anti-robocall statute that applied only to commercial and political calls, finding statute did not

communications concern a lawful activity (magazine subscriptions) and are not misleading, and Hearst accepts for purposes of this motion that Michigan's stated interest in preventing public disclosure of certain magazine purchasers' identities to "gossipy publications" (or others) is substantial.  But the VRPA's stated purpose is not implicated at all by the confidential transmissions that are at issue here.  And the VRPA fails to satisfy prong three or four of the *Central Hudson* analysis as applied to the communications at issue here.  For each of these reasons, as demonstrated below, Plaintiff's VRPA claim must fail.

**A.      Michigan's Stated Interest Is Substantial Only Insofar as It Is Limited to Public Disclosures of Genuinely Private Information, and Does Not Apply to the Confidential Transmissions at Issue Here.**

Before turning to the First Amendment considerations under prongs three and four of the *Central Hudson* test, we address and urge the Court to reject out of hand Plaintiff's suggestion that Michigan's purpose in enacting the VRPA extends to the circumstances here—namely, that the Legislature intended to prevent transmissions between publishers and trusted business associates to whom they outsource operations and share information about subscribers on a strictly confidential basis.  There is no support for Plaintiff's suggestion that Michigan intended the VRPA to have that broad a scope in the legislative history, the text of the law, or in its enforcement history.  Neither Plaintiff nor the Court may substitute its own view of Michigan's

---

survive); *Free Speech Coal., Inc. v. Att'y Gen. United States*, 825 F.3d 149, 153-54 (3d Cir. 2016) (strict scrutiny applied to statute that "criminalized both the commercial and noncommercial use of children in sexually explicit materials")*; Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (*Reed* "sought to clarify the level of review due to certain speech prohibitions.  *That test focused on whether a law was content-based at all, rather than the type of content the law targeted*.") (emphasis added); *Cent. Radio Co. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (applying strict scrutiny to sign code that applied only to "art that referenced a product or service").  Hearst understands that this Court is not prepared to extend *Reed*'s strict scrutiny analysis to commercial speech, but reserves all rights with respect to the application of *Reed* and strict scrutiny to this case.

purpose in enacting the VRPA for that of the State.  The *Central Hudson* standard "does not

permit [a court] to supplant the precise interests put forward by the State with other

suppositions." *Wollschlaeger*, 848 F.3d at 1312 (quoting *Edenfield v. Fane*, 507 U.S. 761, 768

(1993)).

In enacting the VRPA, the legislative record reflects that Michigan's interest was to

prevent public disclosure of one's purchase of specific reading material in "gossipy publications"

and through other means of publicity that might result in such information being known at one's

place of employment, clubs one may wish to join or already belong to, and more generally.  As

this Court noted more specifically in ruling on Hearst's prior motion to dismiss, "the [VRPA's]

passage reflects the public's dismay with the revelation of Robert Bork's video rental history [in

a newspaper] during his Supreme Court nomination hearings . . . ." *Boelter v. Hearst*, 192 F.

Supp. 3d at 447-48.  The language of the VRPA reflects this specific concern with publicity by

carefully choosing the word "disclosure".  *See supra* Part II(B)(2).

Michigan's interest in regulating speech through the VRPA can only be considered

substantial to the extent that it is limited to preventing public disclosure of genuinely private

information.  Michigan has no substantial interest in preventing non-public transmissions, or

disclosures of information not considered or maintained as private.  Significantly, for First

Amendment purposes, there is no legislative record or other evidence of any harm stemming

from such speech.  The *Central Hudson* analysis does not permit regulation unless it is supported

by empirical evidence of actual harm stemming from the speech at issue.[20]  Here, there is no

---

[20]  The Supreme Court has closely evaluated, with skepticism and care, the evidentiary showings
proffered to justify its regulations, and the Court has become ever more vocal in emphasizing
that it is the affirmative burden of those seeking to punish commercial speech to make such
showings by way of real evidence and not mere common sense judgments.  *See Rubin*, 514 U.S.
at 486-87; *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 143-44 (1994);

empirical evidence of actual harm considered by the Michigan Legislature at all—only anecdotal speculation related to Judge Bork.[21]  Based on this record, assuming that Michigan's interest in the VRPA may be viewed as substantial at all, its substantiality is necessarily limited.  Rooted in concern over the Bork disclosure, and the real or perceived harm it may have caused, the Michigan Legislature's interest may be considered "substantial" only insofar as it relates to concern over similar public disclosures.  The Legislature's follow-on commentary that "one's choice in videos, records, and books is nobody's business but one's own" does nothing to broaden that concern.  To the contrary, it places another limitation on the scope of the privacy interest at issue.  To the extent one does not consider his or her purchase of particular reading material to be a private fact—because one does not treat it as if it is "nobody's business but one's own"—there is no genuine privacy interest, substantial or otherwise, in preventing disclosure of that information.[22]

This limited view of Michigan's interest in passing the VRPA is not only consistent with its enactment history, text, and enforcement history, it is consistent with extant privacy law in Michigan and elsewhere.  That law recognizes an interest in preventing public disclosures of

---

*Edenfield*, 507 U.S. at 770-71; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416-18 (1993).

[21] *See Boelter v. Hearst*, 192 F. Supp. 3d at 447-48 (noting dismay over Judge Bork).  As Judge Buchwald found, there is "no record of studies or other similar evidence supporting the privacy interests the [VRPA] serves", nor is there any evidence that Michigan has ever enforced the VRPA's criminal provision.  *See Boelter v. Advance Magazine Publishers Inc.*, 2016 WL 5478468, at *14 n.16 (noting evidence that should be adduced to sustain a First Amendment claim on summary judgment).

[22] Nor can there be any state interest, let alone a substantial one, in enforcing the VRPA in the absence of an actual injury.  The Michigan Attorney General has explicitly recognized that enforcing laws without an injury requirement "raises the spectre of over-enforcement", and that requiring a plaintiff to prove an actual injury serves as a check on that risk.  *See* Brief of States Attorneys General at 28-29, *Spokeo v. Robins*, 136 S. Ct. 1540 (2016) (No. 13-1339).

genuinely private facts.  *See supra* Part II(B)(2).  Privacy law from the beginning has been

focused on preventing "gossip" in the press.  *See* Sack, *supra*, § 12:2.1 at 12-6 n. 15 (quoting

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. at 196 (1890));

*cf. Beaumont*, 257 N.W.2d at 526-27 (citing Warren & Brandeis, *supra*).  That is precisely what

the Michigan Legislature sought to prevent a century later after the article about Judge Bork's

video rental history—the VRPA was aimed at disclosure in "gossipy publications".  *See* Consol.

Compl. ¶ 19 (citing Michigan H.B. No. 5331, Jan. 20, 1989).  Privacy law is also aimed at

protecting genuinely private facts, which are embarrassing facts that one wishes to keep secret

from the public.  *See, e.g.*, Sack, *supra*, § 12:4.4[A] at 12-44 ("The gist of the [private facts] tort

is the act of making public theretofore private embarrassing facts."); *Beaumont*, 257 N.W.2d at

527-28 (Michigan private facts claim requires private embarrassing facts); *Lansing Ass'n*, 549

N.W.2d at 21 (same).  Michigan law strongly suggests that there is no interest in preventing the

type of marketing-related disclosures challenged in this case.  *See, e.g.*, *Tobin v. Mich. Civil

Serv. Comm'n*, 331 N.W.2d 184, 190 (Mich. 1982).  The Michigan Supreme Court has

recognized that disclosure of subscriber names and addresses is *not* a common-law invasion of

privacy.  *See id*. at 190 & n.15 ("No other jurisdiction has ever recognized a cause of action

based on the release of an individual's name and address, without more."); *see also Geiling v.

Wirt Fin. Servs., Inc.*, No. 14-11027, 2014 WL 8473822, at \*47 (E.D. Mich. Dec. 31, 2014)

("Matters of public record are not private.").

   For all of these reasons, Michigan's interest in enacting the VRPA, insofar as it is to be

deemed a substantial interest, is properly viewed as preventing public disclosures of genuinely

private information only, and there is no evidentiary basis to support any broader view.

Case 1:15-cv-03934-AT-JLC   Document 152   Filed 04/03/17   Page 58 of 73

**B.      Discovery Has Shown that Applying the VRPA to This Case Would Not Directly Advance Any Substantial Interest in Privacy to a Material Degree.**

On the third prong of the *Central Hudson* test, Plaintiff bears the heavy burden of affirmatively demonstrating that application of the Michigan VRPA to this case will in fact advance the government's stated interest "in a direct and material way." *Edenfield*, 507 U.S. at 767.  This burden has repeatedly and ever more forcefully been emphasized by the Supreme Court over the years:  "mere speculation or conjecture" or conclusory statements will not do. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quoting *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999)); *Ibanez*, 512 U.S. at 143.  The requirement that Plaintiff justify the statute with real evidence is "critical".  *Rubin*, 514 U.S. at 487.  As the Second Circuit has concluded, a restriction "will fail this third part of the *Central Hudson* test if it 'provides only ineffective or remote support for the government's purpose.'" *Bad Frog Brewery Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir. 1998) (citations omitted).

Here, Plaintiff cannot satisfy her burden.  The VRPA's stated purpose is to prevent public disclosures of purchasers' choice of reading materials.  *See supra* Part III(A).  In order for the law to be sustained as applied here, there must be an "immediate connection" between the prohibition on truthful speech and its asserted end.  *Central Hudson*, 447 U.S. at 569.  Yet applying the VRPA to punish strictly confidential communications between Hearst and its business associates, who are obligated to safeguard subscriber information from public disclosure, has no "immediate connection" with the State's goal of preventing Plaintiff's PRI from becoming public knowledge.

The record—like the legislative findings—is bereft of any evidence that application of the VRPA to Hearst on the facts discovered here will directly result in preventing public

46

disclosure of Plaintiff's PRI.[23]  To conclude otherwise would necessitate counter-factual speculation that Hearst's employees, agents, and other third parties who are charged with maintaining the secrecy of Hearst's subscription records will breach their confidentiality agreements and make public Plaintiff's PRI.  There is no basis for such speculation.  To the contrary, the record establishes that those third parties have scrupulously adhered to their confidentiality obligations.  It also shows that applying the VRPA to the facts of this case would do nothing to further Michigan's stated interest in protecting consumer privacy.  Three key, undisputed facts demonstrate this point:  *First*, Plaintiff has little or no genuine privacy interest in her PRI.  Her name and address are matters of public record,[24] and it is undisputed that Plaintiff did not treat and does not consider the fact she subscribed to *Good Housekeeping* magazine as a "secret" or embarrassing in any way.  *See* HSOF ¶¶ 17-20, 23-25, 89, 93-95;

---

[23] Where a law's effectiveness is premised on "anecdotes and nothing more" (2016 WL 5478468, at *14)—and "no other evidence, empirical or otherwise"—the state (and Plaintiff) will be hard-pressed to "demonstrate harms that are 'real, [and] not merely conjectural,' such that the [statutory] provisions 'will in fact alleviate these harms in a direct and material way.'" *Wollschlaeger*, 848 F.3d at 1312 (first alteration in original) (citation omitted).  As the Eleventh Circuit recently noted, "[i]n *Edenfield*, . . . the Supreme Court struck down an anti-solicitation regulation for CPAs in part because the State Board of Accountancy had not presented any 'studies that suggest personal solicitation of prospective business clients by CPAs creates the dangers . . . that the Board claim[ed] to fear,' and had not provided 'any anecdotal evidence . . . that validate[d] the Board's [interests].'  Two years later, the [Supreme] Court distinguished *Edenfield* and upheld a direct-mail solicitation regulation for Florida lawyers because the Florida Bar had 'submitted a 106-page summary of its [two]-year study of lawyer advertising and solicitation . . . contain[ing] data—both statistical and anecdotal—supporting the Bar's [position] that the Florida public view[ed] direct-mail solicitations in the immediate wake of accidents as an intrusion on privacy that reflect[ed] poorly upon the profession." *Id.* (citations omitted).  There is no such evidence supporting the Michigan legislature's enactment of the VRPA, let alone the application of the VRPA to routine business practices or magazine subscriptions.  There is no evidence that the Michigan legislature had any concern about the types of confidential disclosures in the ordinary course of business at issue here.

[24] Because public records are by definition public, communication of matters of public record may not be punished on grounds of privacy without violating the First Amendment. *See, e.g.*, *Fla. Star v. B.J.F.*, 491 U.S. 524 (1989) (invalidating state privacy statute as applied to publication of matter of public record); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) (same).

Findikyan Decl. Ex. H (Edwards Dep.) at 66:7-13 ("Q:  Is the fact that you were a *Good Housekeeping* magazine subscriber a secret? . . . A:  It's just never come up.  Q: Okay.  But would you consider it a secret?  A:  No.").  Nor did Plaintiff ever seek to opt out of having Hearst share her PRI with others (for marketing purposes or otherwise) prior to filing this lawsuit, despite the fact that she received notice of how to do so, and hundreds of thousands of consumers do so every year.  *See* HSOF ¶¶ 77, 78.  *Second*, it is undisputed that Hearst has never made public the fact that Plaintiff subscribes to any Hearst magazine (much less that she herself purchased any subscription).  *See id.* ¶¶ 106-91.  *Third*, it is undisputed that the only transmissions of *any* information about Plaintiff (namely, her PRI) were made only to business associates who were subject to and abided by strict confidentiality provisions and other limitations on the use of Hearst subscriber data, and there is no evidence that the fact that Plaintiff subscribed to any Hearst magazine (let alone that she was the purchaser of any magazine) was ever made known beyond those limited-purpose transmissions.  *Id.* ¶¶ 10, 106-91.

In any event, even if it could be shown that restricting Hearst from transmitting Plaintiff's PRI to its business associates pursuant to strict confidentiality agreements will in fact directly advance the Legislature's interest in preventing public disclosures, Plaintiff cannot prove, as she must, that it will do so "to a material degree."  In *44 Liquormart*, the Supreme Court rejected defendants' argument that a ban on liquor price advertising would promote the State's interest in encouraging temperance absent evidence that the ban would advance that interest "significantly", notwithstanding the Court's conclusion that it was reasonable to assume that the ban would keep prices higher and demand lower.  *44 Liquormart*, 517 U.S. at 505; *see also Bad Frog*, 134 F.3d at 99 ("[A] prohibition that makes only a minute contribution to the advancement of a state interest can hardly be considered to have advanced the interest 'to a material degree.'") (citation

omitted); *Mich. Beer & Wine*, 370 N.W.2d at 336-37 (finding regulation prohibiting certain truthful liquor advertisements unconstitutional under First Amendment and Michigan Constitution where plaintiff failed to meet its burden of demonstrating regulations directly advanced state's interest).

### C.    The VRPA Is Not Narrowly Tailored to Survive First Amendment Scrutiny If Held to Apply to the Facts Here.

At a minimum, to satisfy the fourth prong of *Central Hudson*, restrictions on commercial speech must be "narrowly tailored" and their costs "carefully calculated" to accomplish their asserted purpose.  *Cincinnati*, 507 U.S. at 416 n.12; *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).  That requirement has, in turn, been held to require affirmative proof by Plaintiff that there is a "reasonable fit" between the regulatory means and their asserted ends. *Lorillard*, 533 U.S. at 566, 561-63 (finding broad sweep of outdoor tobacco advertising regulations did not meet standard); *Greater New Orleans*, 527 U.S. at 188-89; *Bd. of Trs.*, 492 U.S. at 480.  Laws that disregard far less restrictive and more precise means of achieving the government's asserted objectives are not narrowly tailored.  *Rubin*, 514 U.S. at 489-93; *Cincinnati*, 507 U.S. 417 n.13.  As the Second Circuit has noted, Supreme Court decisions have "placed renewed emphasis on the need for narrow tailoring of restrictions on commercial speech."  *Bad Frog*, 134 F.3d at 101; *see also Caronia*, 703 F.3d at 167.

If applied to Hearst's transmissions at issue here, as urged by Plaintiff, the VRPA would sweep so broadly that it would effectively ban—and criminalize—all outsourcing by publishers of any functions that involve access to basic subscriber information.  This would include database hosting, analytics, the printing of magazine mailing labels, and the delivery of addressed magazines.  It would necessarily sweep so far as to prohibit Hearst from even providing addressed magazines to the U.S. Postal Service for delivery.  Such a blanket ban on

*any* communications identifying any purchaser of any magazine subscription in the hope of averting the possibility of a public disclosure—even when there are strict confidentiality agreements in place and no prior instance of breach, much less disclosure—is just the sort of sweepingly overbroad rule that cannot possibly be justified as providing a "reasonable fit". Prophylactic restrictions on speech are the antithesis of "narrow tailoring".

Here, the most obvious means to advance Michigan's objective without running afoul of the First Amendment is to decline Plaintiff's invitation to give the VRPA an overboard reading and maintain its proper scope—as a prohibition on public disclosures, consistent with its text and articulated legislative purpose. This would address Michigan's goal directly without burdening non-public, confidential communications between publishers and the trusted business associates they depend upon. It is also consistent with other narrowly tailored privacy regimes, such as HIPAA. The HIPAA "Privacy Rule" set forth throughout 45 C.F.R. Parts 160 & 164 (Subparts A and E) generally prohibits the disclosure of personal medical information by a covered health care entity. However, the Privacy Rule also expressly permits personal medical information to be shared by a covered entity with its workforce and its business associates subject to confidentiality safeguards. *See, e.g.*, 45 C.F.R. § 164.308(b); 45 C.F.R. § 164.502(e)(1). Thus even in the context of highly sensitive personal medical information, there is explicit recognition within the regulatory framework that many specialized services and functions are outsourced to increase efficiency and proficiency while lowering costs to consumers, and that sharing information with business associates pursuant to confidentiality agreements does not jeopardize even the most sensitive privacy interests. *See, e.g.*, Standards for Privacy of Individually Identifiable Health Information, 67 Fed. Reg. 53182, 53248 (Aug. 14, 2002) ("The Department recognizes that most covered entities do not perform all or carry out all of their health care activities

and functions by themselves, but rather use the services of, or receive assistance from, a variety

of other persons or entities.  Given this framework, the Department intended these provisions to

allow such business relationships to continue while ensuring that identifiable health information

created or shared in the course of the relationships was protected.").  The HIPAA Privacy Rule is

thus emblematic of the kind of narrow tailoring that can adequately protect private information

from public disclosure while at the same time permit confidential communications by business

entities with those they rely upon in the normal course of business.

Of course, it is easier to broadly ban speech.  It is also more expedient.  But it is also

unconstitutional.  *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471

U.S. 626, 644 (1985) (rejecting state's argument that a prophylactic rule may be applied to ads

that have "none of the vices that allegedly justify the rule . . . .").  The premise of the narrow-

tailoring requirement is that commercial speech is valuable and that it may thus only be restricted

when it is necessary to do so.  "Precision of regulation must be the touchstone in an area so

closely touching our most precious freedoms."  *Edenfield*, 507 U.S. at 777 (citing *NAACP v.

Button*, 371 U.S. 415, 438 (1963)).  If the VRPA is held to apply here, indiscriminately

punishing non-public confidential communications, which contain no genuinely private

information concerning Plaintiff in any event, Michigan's law would not be narrowly tailored at

all and therefore fail to satisfy the First Amendment.

## IV.    HEARST IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DERIVATIVE UNJUST ENRICHMENT CLAIM.

Because Plaintiff's claim for unjust enrichment is premised entirely on a purported

violation of the VRPA, Hearst also is entitled to summary judgment on that claim.  Plaintiff's

unjust enrichment claim is based on her unsupported allegation—which discovery has proven to

be false—that the price she paid for her Hearst magazine subscriptions included a "premium" for

51

non-disclosure of her PRI, a theory derived from her view of the VRPA but without any basis in fact.  Consol. Compl. ¶¶ 8 (noting Plaintiff is "entitled by law to privacy in her [PRI]"), 70, 79-81, 83; HSOF ¶¶ 43-44; Findikyan Decl. Ex. H (Edwards Dep.) 71:3-6, 71:20-72:20, 83:9-14, 87:19-89:15.  Indeed, discovery has revealed that Plaintiff had no knowledge of the VRPA prior to subscribing to any Hearst magazine.  HSOF ¶¶ 43-47.  Plaintiff's unjust enrichment claim fails both as a matter of law and of fact.

As a matter of law, even assuming, contrary to the evidence, that Plaintiff could prove a violation of the VRPA, the VRPA would provide her with a full, complete and adequate legal remedy for any alleged disclosure of her PRI.  Plaintiff has offered no evidence of why the VRPA's remedy—including $5,000 in statutory damages—would not fully compensate her for any purported "disclosure" in violation of the VRPA.  Indeed, she has offered no evidence that she suffered any injury other than a purported statutory violation at all.  As a result, she does not have an equitable claim for unjust enrichment.  In other words, Plaintiff either has a claim under the VRPA for Hearst's allegedly improper "disclosures" (in which case the VRPA provides her a complete and adequate remedy), or she does not (in which case, Hearst cannot have been unjustly enriched under Plaintiff's theory).  Because the VRPA provides the exclusive remedy, if any, for Plaintiff's claims, and because that remedy will provide Plaintiff with an adequate remedy at law, Hearst is entitled to summary judgment on Plaintiff's unjust enrichment claim. *See Duffie v. The Mich. Grp., Inc.*, No. 14-cv-14148, 2016 WL 28987, at *17 (E.D. Mich. Jan. 4, 2016) (recognizing that under Michigan law "additional recovery under the theory of unjust enrichment is precluded by" the existence of "a legal remedy", and that a "plaintiff does not have to actually recover under the legal theory for the equitable claim to be barred. Instead, the opportunity for plaintiff to recover under a legal theory is sufficient to bar the equitable claim")

(citations omitted); *Pacheco v. Boar's Head Provisions Co.*, No. 1:09-CV-298, 2010 WL 1323785, at *4-5 (W.D. Mich. Mar. 30, 2010) (dismissing unjust enrichment claim because "Michigan cases have consistently held that '[e]quity will not take jurisdiction where there is a full, complete, and adequate remedy at law, unless it is shown that there is some feature of the case peculiarly within its jurisdiction.' . . . Plaintiffs have not suggested that they do not have a full, complete, and adequate remedy at law under the FLSA, nor have they shown that there is some feature of their case that is peculiarly within the province of a court of equity.") (alteration in original) (citations omitted); *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 241-43 (Mich. 2010) (recognizing as the "correct statement of law" that "[i]f a statute gives new rights and prescribes new remedies, such remedies must be strictly pursued; and a party seeking a remedy under the act is confined to the remedy conferred thereby and to that only," but finding common law claims could be pursued where statute at issue explicitly provided that its remedies were "in addition to any other remedy provided by law") (alteration in original) (citation and quotation marks omitted); *accord Trilogy Mktg., Inc. v. Memsic, Inc.*, No. 12-13967, 2014 WL 4265788, at *8 (E.D. Mich. Aug. 29, 2014) ("The court has already granted summary judgment in favor of Trilogy on its breach-of-contract claim, thus providing it with an adequate remedy at law. In its response to the court's order, Trilogy did not advance any reason why its claim for unjust enrichment should not be dismissed with prejudice. Therefore, the court will dismiss Trilogy's claim for unjust enrichment.").[25]

---

[25] The VRPA, unlike other Michigan statutes, contains no savings provision providing that its remedies are in addition to those at common law. *Compare, e.g.*, M.C.L. § 600.2919a(2); *Appletree Mktg.*, 779 N.W.2d at 241 (discussing Michigan Commodities Marketing Act, M.C.L. § 290.669).

Plaintiff's unjust enrichment claim also fails as a matter of fact.  Even if Plaintiff were permitted to seek remedies in addition to those provided under the VRPA for the allegedly improper disclosure of a Hearst magazine subscription purchase, and even if Plaintiff had established a predicate violation of the VRPA, Plaintiff has failed to come forward with any evidence that Hearst was unjustly enriched by any purported "disclosure" of Plaintiff's individual information.  There is simply no evidence in this case that (i) Plaintiff relied on the VRPA's purported privacy protections before subscribing to any Hearst magazine (HSOF ¶¶ 43-44); (ii) that Plaintiff even paid for any of her subscriptions so that she could have "overpaid" for any subscription (*see, e.g.*, HSOF ¶¶ 8, 10); (iii) that Plaintiff could have paid less for a subscription without those protections; and (iv) that Hearst was enriched at all by any disclosure of Plaintiff's individual subscription information, let alone *unjustly* enriched.

Moreover, the "correct measure of damages in an unjust enrichment claim is the value of the benefit received by the defendant . . . ."  *Allor v. DeClark, Inc.*, No. 300953, 2012 WL 555779, at *2 (Mich. Ct. App. Feb. 21, 2012), *appeal denied*, 825 N.W.2d 79 (Mem.) (Mich. 2013) (unpublished) (citations omitted).  But that benefit must be an *unjust* benefit—not one the defendant would otherwise be entitled to, such as a fee for a magazine subscription.  *See Capital Title Ins. Agency Inc. v. Towne Mortg. Co.*, No. 278712, 2009 WL 609561, at *2 (Mich. Ct. App. Mar. 10, 2009) ("[T]he allegedly unjust benefit is the same benefit that MFM expected and not an independent benefit unjustly received as a result of plaintiff's transaction with [a third party].").  There is no evidence that Hearst received any unjust benefit from Plaintiff here. Setting aside that there is no evidence that Plaintiff herself paid for any subscription subject to the VRPA, there also is no evidence, for example, that Hearst charged Plaintiff more than non-Michigan subscribers, or that it would have charged less for her subscriptions had it not disclosed

54

her information or if the VRPA did not exist.  *Cf. Smith v. Glenmark Generics, Inc., USA*, No. 315898, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014) (Michigan law requires that any benefit "must be received *directly* from the plaintiff"); *In re Google, Inc. Privacy Policy Litig.*, No. 5:12-cv-1382, 2015 WL 4317479, at *5 n.63 (N.D. Cal. July 15, 2015); *In re DoubleClick, Inc. Privacy Litig,*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) ("[W]e are unaware of any court that has held the value of this collected [demographic] information constitutes damage to consumers or unjust enrichment to collectors.").  Nor is there any evidence that Hearst did not provide Plaintiff with value in return for any purported payment (by Plaintiff or anyone else)—a subscription to Hearst magazines.  *See Isom v. NE Lots LLC*, No. 288378, 2010 WL 143470, at *6 (Mich. Ct. App. Jan. 14, 2010) (unpublished) (no unjust enrichment counterclaim stated where defendant received the benefit of its bargain).  Finally, there is no evidence that Hearst benefitted in any way from transmission of Plaintiff's PRI.  *See, e.g.*, HSOF ¶¶ 115, 146, 158, 172, 189-90.  Under these facts, even if Plaintiff could pursue her equitable unjust enrichment claim in addition to her statutory claim, Hearst would be entitled to summary judgment.

## V.    THERE IS NO BASIS TO TOLL THE THREE-YEAR STATUTE OF LIMITATIONS IN THIS CASE.

The Court should grant partial summary judgment holding that the applicable three year statute of limitations is not tolled.  *See* ECF No. 120 ¶ 196.  When Plaintiff filed this action and commenced discovery, Plaintiff proceeded in accordance with the applicable three-year statute of limitations under Michigan law.  *See, e.g.*, M.C.L. § 600.5805(10); ECF No. 69-1 (Plaintiff's First Set of Requests for Production of Documents) ¶ 7 ("The term 'CLASS PERIOD' shall be construed to mean the following time period: May 21, 2012 through the date of your final production in response to these requirements."); *id*. at Request No. 16; ECF No. 69-2 (Plaintiff's

First Set of Interrogatories) at Definition 7 and Interrogatories Nos. 1, 3, 4, 5 & 6.  The three year

limitations period should extend back until three years before the filing of Edwards' initial

complaint, until November 25, 2012.  Plaintiff has conceded that there were no disclosures of her

PRI by Hearst in violation of the VRPA after October 7, 2015.  ECF No. 95 at 6.  Therefore, the

"relevant time period" for this motion for summary judgment is November 25, 2012 to October

7, 2015.[26]

A year after Plaintiff filed her complaint and after it became apparent in discovery that

there was no evidence to support her allegations of any transmissions of her PRI during the

three-year class period, Plaintiff argued for the first time that she was entitled to a tolling of the

applicable three year statute of limitations back to March 18, 2010 on the basis of two previously

filed and dismissed class actions against Hearst, namely, *Boelter v. Hearst Communications, Inc.*

(to which Plaintiff's action was previously consolidated for pretrial purposes) filed in this Court

on May 21, 2015 and voluntarily dismissed in October 2016, and *Grenke v. Hearst*

*Communications, Inc.* filed September 24, 2012 in the Eastern District of Michigan and

voluntarily dismissed on February 23, 2015.  ECF No. 68 at 3.  Plaintiff raised the tolling issue

during discovery before Judge Cott.  Observing that the tolling issue "turns on unsettled

questions of Michigan state law, which the Court declines to resolve at this juncture," for

discovery purposes only Judge Cott granted Plaintiff the benefit of tolling for the period during

which a class certification motion was pending in the previous actions, and moved back the

beginning of the relevant time period for discovery from November 2012 to June 25, 2011.  ECF

No. 77at 8-10.

---

[26] Applying the statute of limitations originally relied up on by Plaintiffs—without any tolling—
removes all purported transmissions to Dunn Data from potential liability under the VRPA.
HSOF ¶ 177 & n.3.

Now on summary judgment, Plaintiff contends that she is entitled to toll the statute of limitations as far back as December 20, 2009.  *See* ECF No. 120 ¶ 196 ("Plaintiff's position is that the relevant time period is from December 20, 2009 to the present.").  Under federal and Michigan law, the burden is on the litigant seeking to invoke tolling to prove entitlement to that tolling.  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *McLaughlin v. Aetna Life Ins. Co. of Hartford, Conn.*, 191 N.W. 224, 225-26 (Mich. 1922).  Plaintiff has not met and cannot meet that burden.  Because there is no basis for tolling for the pendency of either the *Boelter* or *Grenke* actions, Plaintiff's entire tolling theory must be rejected.[27]

There is no legal support for tolling on the facts of this case.  "[A] federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action in another jurisdiction."  *Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011) (certifying question of whether Virginia law permits equitable or statutory tolling of a state statute of limitations due to the pendency of a putative class action in another jurisdiction to the Virginia Supreme Court).  As a result, Michigan law controls the issue of whether Plaintiff is entitled to the benefit of any tolling.  Michigan law, however, no longer recognizes equitable tolling, instead requiring that any tolling of a statute of limitations be dictated by statute.  *See, e.g.*, *Colen v. Corizon Med. Servs.*, No. 14-12948, 2017 WL 389960, at *8 (E.D. Mich. Jan. 25,

---

[27] To the extent Plaintiff bases any purported "injury" on a theory of "overpayment", her claim in this action would be barred in its entirety by the statute of limitations and she would not have been a member of the *Grenke* class (thereby depriving her of any conceivable basis for tolling under any theory).  The *Grenke* complaint was filed on September 24, 2012.  At best, its class included members who purchased a subscription to a Hearst title from September 24, 2009 through dismissal of that case on February 23, 2015.  Setting aside that there is no evidence that Plaintiff purchased any of her subscriptions, it is undisputed that no orders were placed in Plaintiff's name for any Hearst magazine during that time period, or any period from October 2008 to October 2015.  *See* HSOF ¶¶ 45, 47; Findikyan Decl. Exs. GG, LL, JJ.

2017) ("Michigan has essentially eliminated the application of equitable tolling."); *Weathers v. Holland Police Dep't*, No. 13-cv-1349, 2015 WL 357058, at *5 (W.D. Mich. Jan. 27, 2015) (recognizing "Michigan no longer recognizes a common law equitable tolling doctrine; rather, a plaintiff's right to equitable tolling must be based on a statutory right to tolling") (citations omitted); *Trentadue v. Buckler Lawn Sprinkler*, 738 N.W.2d 664, 671-72 (Mich. 2007) (rejecting tolling based on "discovery rule"); *Guastello v. Lafon*, No. 313725, 2014 WL 10588248, at *3 (Mich. Ct. App. Sept. 23, 2014) (rejecting tolling based on "continuing harm" doctrine); *see also Niedoliwka v. Inglin*, No. 327576, 2016 WL 6127696, at *7 (Mich. Ct. App. Oct. 18, 2016) ("*Trentadue* instructed courts to 'not employ an extrastatutory discovery rule to toll accrual in avoidance of the plain language of' a controlling statute that 'negate[s] the application of equity.' We therefore reject the employment of equitable estoppel as a tolling mechanism here.") (alteration in original) (citation omitted); *Devillers v. Auto Club Ins. Ass'n*, 702 N.W.2d 539 (Mich. 2005) (overruling prior precedent recognizing an equitable tolling mechanism); *Secura Ins. Co. v. Auto-Owners Ins. Co.*, 605 N.W.2d 308 (Mich. 2000). Michigan provides for statutory tolling in only two defined circumstances, neither of which Plaintiff has argued apply to the facts of this case (because they do not). *See* M.C.L. § 600.5856 (applying when the parties to two actions are identical); Michigan Court Rule ("MCR") 3.501(F) (modelled after *American Pipe* tolling and applying to prior state court class actions). As a result, there is no basis under Michigan law to provide Plaintiff the benefit of any tolling in this case.

Even if Michigan did recognize some sort of equitable tolling, there is no reason to believe a Michigan court would find tolling warranted on the facts of this case. There is no evidence in the record, for example, that Plaintiff waited to file her lawsuit until November 2015 in reliance on her belief that she was a member of the putative classes in either the September

2012-filed *Grenke* or the May 2015-filed *Boelter*. *See, e.g.*, HSOF ¶¶ 39-44, 52. To the

contrary, Plaintiff did not consider herself a part of Suzanne Boelter's putative class, or she

would not have (a) subscribed to *Good Housekeeping* and *O, the Oprah Magazine* in October

2015; or (b) filed her own lawsuit, with its own alleged putative class, in November 2015 while

*Boelter* was still active. *See* Ex. H (Edwards Dep.) at 102:25-103:14; *Fambro v. Henry Ford

Health Sys.*, No. 257556, 2006 WL 707483, at *2-3 (Mich. Ct. App. Mar. 21, 2006) (under

Michigan law, declining to allow plaintiff to toll the limitation period for the pendency of a class

action case that plaintiff, in virtue of filing her own lawsuit, chose not to join, stating "there is no

public policy reason to allow a plaintiff to enjoy the tolling benefit of a class action in which it

chose not to join, and to file an otherwise stale cause of action" (quoting *Warren Consol. Schs. v.

W.R. Grace & Co.*, 518 N.W.2d 508, 510-11 (Mich. Ct. App. 1994)). Nor did Plaintiff consider

herself a part of the *Grenke* case at any point during that case's pendency. Not only did she

allege (falsely) in her original complaint that she subscribed to *Good Housekeeping* in 2013 and

2014 (ECF No. 1 ¶ 28)—*after* the *Grenke* complaint was filed in September 2012—she also

testified in her deposition that she was unaware of the Michigan VRPA, let alone the *Grenke*

case, until approximately November 2015. *See* HSOF ¶¶ 43-44; Findikyan Decl. Ex. H

(Edwards Dep.) at 72:15-20 (Plaintiff found out about the Hearst practices she is complaining of

only a few weeks before filing her current lawsuit) and 83:5-10 (Plaintiff was aware of no

previous filed lawsuits prior to filing her own lawsuit).

      Plaintiff cannot have it both ways—she cannot testify under oath that she subscribed to

*Good Housekeeping* and *O, The Oprah Magazine* most recently in October 2015 or any time

after the *Grenke* complaint was filed completely unaware of the prior complaints and of the

disclosure practices alleged in both her complaint and the *Grenke* and *Boelter* complaints, and at

the same time avail herself of an equitable tolling doctrine based on the fiction of her reliance on the pendency of the *Grenke* and *Boelter* complaints.  And of course, neither *Grenke*, *Boelter* nor this action could have been brought as class actions in state court.  *See* M.C.R. 3.501(A)(5).  It therefore is difficult to imagine a Michigan state court rewarding class counsel's end-run around Michigan law with the benefit of tolling based on serial federal court class actions.  There is simply no support in Michigan law for the tolling Plaintiff seeks.  Hearst is entitled to partial summary judgment applying a three-year statute of limitations, without tolling, to this case.

## CONCLUSION

For the reasons set forth above, Hearst respectfully requests that this Court dismiss this action in its entirety with prejudice, together with costs, attorneys' fees, and such other relief as the Court deems appropriate.

Dated:  April 3, 2017

/s/ Jonathan R. Donnellan
Jonathan R. Donnellan
Kristina E. Findikyan
Stephen H. Yuhan
The Hearst Corporation
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 841-7000
Fax: (212) 554-7000
jdonnellan@hearst.com

*Attorney for Defendant Hearst Communications, Inc.*

Of Counsel:

Andrea R. Butler
Kristen L. Hauser
Evan J. Saucier

60

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on April 3, 2017.

/s/ Jonathan R. Donnellan
Jonathan R. Donnellan