**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JOSEPHINE JAMES EDWARDS, individually
and on behalf of all others similarly situated,

                        Plaintiff,

    v.

HEARST COMMUNICATIONS, INC.,

                        Defendant.

Civil Action No. 15-cv-09279-AT-JLC

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO HEARST'S MOTION
TO DISMISS AND FOR SUMMARY JUDGMENT**

Dated:  May 1, 2017

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
      jmarchese@bursor.com
      pfraietta@bursor.com

**CAREY RODRIGUEZ
MILIAN GONYA, LLP**
John C. Carey
David P. Milian*
Frank S. Hedin*
1395 Brickell Avenue, Suite 700
Miami, FL 33131
Telephone: (305) 372-7474
Facsimile: (305) 372-7475
Email: jcarey@careyrodriguez.com
      dmilian@careyrodriguez.com
      fhedin@careyrodriguez.com
*Admitted Pro Hac Vice

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ................................................................. 1

II.    HEARST'S ARGUMENT THAT PLAINTIFF LACKS ARTICLE III
STANDING IS WRONG ..................................................... 2

     A.     The Court Has Already Rejected Hearst's Challenge To Plaintiff's
Article III Standing ................................................... 2

     B.     Every Other Court To Consider Whether A Violation Of The
VRPA Alone Confers Article III Standing Has Held That It Does ........ 3

     C.     Second Circuit And Other Persuasive Authority Confirms That
Plaintiff Has Article III Standing .......................................... 4

III.   HEARST'S DISCLOSURES OF PLAINTIFF'S PRI VIOLATE THE
VRPA ............................................................................. 12

     A.     Hearst's Argument That These Disclosures Did Not Identify
Plaintiff As The "Purchaser" Is False And Meritless ................... 12

         1.     The VRPA Prohibits Disclosure Of "A Record Or
Information Concerning The Purchase" ......................... 12

         2.     Hearst's Disclosures Identified Plaintiff As The "Customer,"
"Subscriber," "Buyer," And "Purchaser" ...................... 13

     B.     Hearst's Argument That These Disclosures Were "Confidential" Is
False And Meritless ...................................................... 19

         1.     The VRPA Prohibits Disclosure To "Any Person, Other Than
The Customer" ...................................................... 20

         2.     Hearst's Disclosures Were Not Confidential; They Were
Made Publicly, And Hearst Specifically Authorized Acxiom,
██████, ██████ Dunn Data And ██████ To Make Further
Disclosures Of Plaintiff's Subscription Records ............... 23

     C.     Hearst's Argument That These Six Entities Are Statutory
Employees Or Agents Is Wrong ........................................ 25

IV.   HEARST'S ARGUMENT THAT FINDING A "DISCLOSURE" ON
THE FACTS OF THIS CASE WOULD VIOLATE DUE PROCESS BY
RENDERING THE VRPA UNCONSTITUTIONALLY VAGUE IS
WRONG ......................................................................... 34

V.     HEARST'S ARGUMENT THAT APPLICATION OF THE VRPA TO
THE FACTS OF THIS CASE WOULD VIOLATE THE FIRST
AMENDMENT IS WRONG ................................................. 36

     A.     The Court Has Already Rejected Hearst's First Amendment
Challenges To The Constitutionality Of The VRPA ................... 36

B.     Application Of The VRPA To The Facts Of This Case Does Not Violate The First Amendment ............................................................................ 37

      1.     Michigan Has A Substantial Interest In Protecting Consumer Privacy ................................................................................................. 37

      2.     Application Of The VRPA To This Case Directly Advances Michigan's Substantial Interest To A Material Degree ............................ 38

      3.     The VRPA Is Narrowly Tailored As Applied ............................................ 40

VI.     HEARST'S ARGUMENT THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS WRONG ................................................................................................................. 42

VII.     HEARST'S ARGUMENT THAT THERE IS NO BASIS TO TOLL THE THREE-YEAR STATUTE OF LIMITATIONS IS WRONG ........................................ 44

VIII.     CONCLUSION ............................................................................................................. 49

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*33 Seminary LLC v. City of Binghamton,*
2013 WL 2446306 (N.D.N.Y. June 5, 2013) ......................................................... 34

*Am. Farm Bureau Fed'n v. EPA,*
836 F.3d 963 (8th Cir. 2016) .................................................................................. 9

*American Pipe & Const. Co. v. Utah,*
414 U.S. 538 (1974) ............................................................................... 44, 46, 49

*Aranda v. Caribbean Cruise Line, Inc.,*
202 F. Supp. 3d 850 (N.D. Ill. 2016) ..................................................................... 7

*Arriaga v. Mukasey,*
521 F.3d 219 (2d Cir. 2008) ................................................................................. 34

*Austin-Spearman v. AMC Network Entm't LLC,*
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ...................................................... 8, 13, 19

*Bautz v. ARS Nat'l Servs., Inc.,*
2016 WL 7422301 (E.D.N.Y. Dec. 23, 2016) ............................................. 4, 5, 7

*Beaumont v. Brown,*
257 N.W.2d 522 (Mich. 1977) ........................................................................ 22, 24

*Birou v. Thompson-Brown,*
241 N.W.2d 265 (Mich. Ct. App. 1976) .............................................................. 27

*Bloomberg, L.P. v. United States Food and Drug Admin.,*
500 F. Supp. 2d 371 (S.D.N.Y. 2007) ................................................................. 12

*Boelter v. Advance Magazine Publishers, Inc.,*
210 F. Supp. 3d 579 (S.D.N.Y. 2016) ......................................................... passim

*Boelter v. Hearst Commc'ns, Inc.,*
2016 WL 361554 (S.D.N.Y. Jan. 28, 2016) ............................................ 2, 6, 7, 10

*Boelter v. Hearst Commc'ns, Inc.,*
192 F. Supp. 3d 427 (S.D.N.Y. 2016) ......................................................... passim

*Bowman v. Greene,*
2013 WL 5925995 (Mich. Ct. App. Nov. 5, 2013) .......................................... 13, 14

*Cain v. Redbox Automated Retail, LLC,*
   981 F. Supp. 2d 674 .................................................................................. 27

*Campbell-Ewald Co. v. Gomez,*
   136 S. Ct. 663 (2016) ............................................................................... 47

*Casey v. Merck & Co.,*
   653 F.3d 95 (2d Cir. 2011) ....................................................................... 45

*Chatin v. Coombe,*
   186 F.3d 82 (2d Cir. 1999) ....................................................................... 35

*Chilingirian v. City of Fraser,*
   486 N.W.2d 347 (Mich. Ct. App. 1992) ..................................... 25, 26, 29

*Chilingirian v. City of Fraser,*
   504 N.W.2d 1 (Mich. Ct. App. 1993) ....................................... 29, 30, 32, 33

*Clear Channel Outdoor, Inc. v. City of N.Y.,*
   608 F. Supp. 2d 477 (S.D.N.Y. 2009) ...................................................... 41

*Compressor Eng'g Corp. v. Comfort Control Supply Co.,*
   2016 WL 4502467 (E.D. Mich. Aug. 29, 2016) ....................................... 47

*Coulter-Owens v. Time, Inc.,*
   2016 WL 612690 (E.D. Mich. Feb. 16, 2016) ............................................ 3

*Cowles v. Bank West,*
   719 N.W.2d 94 (Mich. 2006) ....................................................... 45, 48, 49

*Crown, Cork & Seal Co. v. Parker,*
   462 U.S. 345 (1983) .......................................................................... 44, 46

*Deacon v. Pandora Media, Inc.,*
   885 N.W.2d 628 (Mich. 2016) .................................................................. 19

*Dep't of Agric. v. Appletree Mktg., L.L.C.,*
   779 N.W.2d 237 (Mich. 2010) .................................................................. 43

*Doe v. Bin Laden,*
   663 F.3d 64 (2d Cir. 2011) ................................................................ 25, 29

*Doe v. Henry Ford Health Sys.,*
   865 N.W.2d 915 (Mich. Ct. App. 2014) ................................................... 22

*Doe v. Mills,*
   536 N.W.2d 824 (Mich. Ct. App. 1995) ................................................... 22

*Edwards v. Hearst Commc'ns, Inc.*,
  2016 WL 6651563 (S.D.N.Y. Nov. 9, 2016) ....................................... 45, 46, 47, 48

*Fed. Ins. Co. v. Detroit Med. Ctr.*,
  2009 WL 136866 (E.D. Mich. Jan. 16, 2009) ............................................... 27

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) ....................................................................................... 41

*Foster v. Judnic*,
  963 F. Supp. 2d 735 (E.D. Mich. 2013) ............................................... 26, 29

*Gambles v. Sterling Infosystems, Inc.*,
  2017 WL 589130 (S.D.N.Y. Feb. 13, 2017) ............................................... 9

*Halaburda v. Bauer Pub. Co., LP*,
  2013 WL 4012827 (E.D. Mich. Aug. 6, 2013) ............................................. 6

*Haley v. Nunda Twp.*,
  2005 WL 94791 (Mich. Ct. App. Jan. 18, 2005) ................................... 12, 18

*Hart v. Comerica Bank*,
  957 F. Supp. 958 (E.D. Mich. 1997) .................................................... 26, 27

*Hoerstman Gen. Contracting, Inc. v. Hahn*,
  711 N.W.2d 340 (Mich. 2006) .................................................................... 25

*In re Hanford Nuclear Reservation Litig.*,
  521 F.3d 1028 (9th Cir. 2007) .................................................................... 45

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
  846 F.3d 625 (3d Cir. 2017) .......................................................................... 9

*In re LIBOR-Based Fin. Instrument Antitrust*,
  Litig., 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ................................. 46

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 262 (3d Cir. 2016) .......................................................................... 8

*In re Trade Partners, Inc. Inv'rs Litig.*,
  2008 WL 3875396 (W.D. Mich. Aug. 15, 2008) ....................................... 46

*Karaus v. Bank of N.Y. Mellon*,
  831 N.W.2d 897 (Mich. Ct. App. 2012) ..................................................... 43

*Kinder v. Meredith Corp.*,
  2014 WL 4209575 (E.D. Mich. Aug. 26, 2014) ....................................... 35

*Lansing Ass'n of School Adm'rs v. Lansing School Dist. Bd. of Educ.*,
549 N.W.2d 15 (Mich. Ct. App. 1996) ................................... 22

*Lee v. Grand Rapids Bd. of Educ.*,
384 N.W.2d 165 (Mich. Ct. App. 1986) ................................ 46

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ............................................................ 20

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................... 4

*Moeller v. Am. Media, Inc.*,
2017 WL 416430 (E.D. Mich. Jan. 27, 2017) ................... passim

*Mount v. PulsePoint, Inc.*,
2017 WL 1147191 (2d Cir. Mar. 27, 2017) ........................ 8, 10

*People v. Bragg*,
824 N.W.2d 170 (Mich. Ct. App. 2012) ............................... 21

*Perlin v. Time Inc.*,
2017 WL 605291 (E.D. Mich. Feb. 15, 2017) ................... passim

*Perry v. Cable News Network, Inc.*,
2017 WL 1505064 (11th Cir. Apr. 27, 2017) .......................... 8

*Potomic Leasing Co. v. The French Connection Shops, Inc.*,
431 N.W.2d 214 (Mich. Ct. App. 1988) ............................... 27

*Robainas v. Metro. Life Ins. Co.*,
2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015) ....................... 9, 10

*Ross v. AXA Equitable Life Ins. Co.*,
2017 WL 730266 (2d Cir. Feb. 23, 2017) .......................... 9, 10

*Ruiz v. Commissioner of Dept. of Transp. Of City of New York*,
679 F. Supp. 341 (S.D.N.Y. 1988) ..................................... 34

*Spokeo v. Robins*,
136 S. Ct. 1540 (2016) ................................................. passim

*State Farm Fire and Cas. Co. v. Old Republic Ins. Co.*,
644 N.W.2d 715 (Mich. 2002) ........................................... 20

*State Farm Mut. Auto. Ins. Co. v. Boellstorff*,
540 F.3d 1223 (10th Cir. 2008) ......................................... 45

vi

*Strubel v. Comenity Bank*,
842 F.3d 181 (2d Cir. 2016) ........................................................................ 4, 5, 11

*United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749 (1989) .............................................................................................. 8

*Van Patten v. Vertical Fitness Grp., LLC*,
847 F.3d 1037 (9th Cir. 2017) .............................................................................. 5

*Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ............................................................................................ 34

*Warren Consol. Schools v. W.R. Grace & Co.*,
518 N.W.2d 508 (Mich. Ct. App. 1994) ............................................................. 45

*Warth v. Seldin*,
422 U.S. 490 (1975) .............................................................................................. 4

*Whalen v. Roe*,
429 U.S. 589 (1977) .............................................................................................. 8

*Yershov v. Gannet Satellite Info. Network, Inc.*,
240 F. Supp. 3d 353 (D. Mass. 2016) .................................................................. 8

**STATUTES**

M.C.L. § 15.361(a) ............................................................................................ 26

M.C.L. § 15.361(c) ............................................................................................ 26

M.C.L. § 445.1711(a) ........................................................................................ 15

M.C.L. § 445.1711(b) ........................................................................................ 26

M.C.L. § 445.1711-1715 .................................................................................... 36

M.C.L. § 445.1712 ...................................................................................... passim

M.C.L. § 445.1713 ............................................................................................ 42

M.C.L. § 445.1713(a) ........................................................................................ 41

M.C.L. § 445.1713(a) ........................................................................................ 35

M.C.L. § 445.1713(d) ........................................................................................ 35

M.C.L. § 565.957 .............................................................................................. 13

M.C.L. § 600.2156 ............................................................................................ 21

N.Y. Ins. Law § 4226(a)(4) ................................................................................. 10

**RULES**

Fed. R. Civ. P. 23 ............................................................................................... 49

Fed. R. Civ. P. 23(d)(1)(B) ............................................................................... 49

Fed. R. Civ. P. 23(e)(1) ..................................................................................... 49

Fed. R. Civ. P. 56(c)(1)(A) ................................................................................. 1

Fed. R. Civ. P. 68 ............................................................................................... 47

M.C.R. 3.501(F)(1) ............................................................................................ 48

MCR 3.501(F) ..................................................................................................... 48

**OTHER AUTHORITIES**

Michigan H.B. No. 5331 ................................................................................ 20, 38

Restatement (Second) of Torts § 652D (1977) ............................................... 22

Sack on Defamation: Libel, Slander, and Related Problems § 12.4 (PLI 4th ed. 2010 [updated
   April 2016] ................................................................................................ 22

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*,
   4 Harv. L. Rev. 193 (1890) ......................................................................... 5, 6

# I.    INTRODUCTION

Hearst's 60-page summary judgment brief does not quote a single word from any deposition taken in this case.  Nor does it quote a single word from any of the contracts, correspondence, database records, or other documents produced during Phase I discovery.  Hearst's summary judgment brief contains only rhetoric and hyperbole, but no evidence.  No "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

Hearst ignores the evidence adduced during Phase I discovery because every piece of evidence – every document, every database record, every deposition – confirms that Hearst disclosed Plaintiff's magazine subscription records, including her name, address, and the magazine titles she purchased (her Personal Reading Information, or "PRI") 104 times to 6 third parties, at least 5 of whom acted as "middlemen" to sell or trade that information to additional third parties for direct marketing, charitable solicitations, or political campaigns.  Those evidentiary materials all support Plaintiff's motion for summary judgment, not Hearst's.  So, to learn the facts of the case as illuminated by the evidence, the Court should read Plaintiff's motion for partial summary judgment, which is filed herewith and is incorporated herein by reference.

Instead of addressing any of this evidence, Hearst resorts to repeating the same legal arguments that this Court has already rejected on Hearst's prior motions, and contorted readings of the VRPA that have no legal support and which, if accepted, would render the statute a nullity.  Hearst repeats again its argument that Plaintiff lacks Article III standing.  This Court has already rejected that argument twice before, and here the third time is not the charm.  *See* Part II, below.  Hearst asserts a hodgepodge of arguments attempting to justify its admitted disclosures of Plaintiffs' PRI, arguing they did not identify Plaintiff as the "purchaser" and they were made in a

"confidential" manner to "trusted business partners." Neither the evidence nor the law supports those arguments. *See* Part III, below. Hearst also repeats again the challenges to the constitutionality of the VRPA which this Court has rejected twice before. *See* Parts IV-V, below.

For the reasons explained herein, Hearst's motion for summary judgment should be denied. And for the reasons explained in Plaintiff's motion for partial summary judgment, submitted herewith, Plaintiff's motion for partial summary judgment should be granted.

## II. HEARST'S ARGUMENT THAT PLAINTIFF LACKS ARTICLE III STANDING IS WRONG

Hearst continues to argue, based on a fundamental misreading of the Supreme Court's decision in *Spokeo*, that Plaintiff lacks Article III standing because she has failed to demonstrate "concrete" injury <u>resulting from</u> Hearst's violations of the VRPA. 4/3/17 Hearst's SJ Br. at 19-25. The argument is nonsense. As this Court has held twice before, a violation of the VRPA satisfies the requirements of Article III <u>in and of itself</u>, without any additional showing of harm.

### A. The Court Has Already Rejected Hearst's Challenge To Plaintiff's Article III Standing

This Court has already held that "the VRPA creates for Plaintiff a specific, enforceable legal right to expect Defendant to keep private her identifying information … [and that] its violation constitutes a concrete, particularized deprivation. … If Defendant violated the statute by disclosing Plaintiff's personal information, it deprived Plaintiff of a right to which she was particularly entitled by law, constituting an injury-in-fact sufficient to confer standing." *Boelter v. Hearst Commc'ns, Inc.*, 2016 WL 361554, at *3 (S.D.N.Y. Jan. 28, 2016). After the Supreme Court issued its ruling in *Spokeo v. Robins*, 136 S. Ct. 1540 (2016), this Court reaffirmed its January 2016 holding. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 438 n.4 (S.D.N.Y. 2016) (holding that *Spokeo* "does not upset the Court's conclusion here that the

violation of a statute by itself is insufficient to confer standing to sue but that Defendant's

violation of the VRPA, as alleged, caused a concrete and particular injury to Plaintiffs").

**B.  Every Other Court To Consider Whether A Violation Of The VRPA Alone Confers Article III Standing Has Held That It Does**

Three other district courts have considered Article III standing in the context of the

VRPA since *Spokeo*, and all three have agreed with this Court that a violation of the VRPA

constitutes a concrete and particularized harm sufficient to confer Article III standing.  *See*

*Boelter v. Advance Magazine Publishers, Inc.*, 210 F. Supp. 3d 579, 589-90 (S.D.N.Y. 2016)

["*Condé Nast*"] (holding that violation of VRPA "suffices to assert a concrete, if hard to

measure, intrusion on protected privacy interests so as to give rise to injury in fact"); *Moeller v.*

*Am. Media, Inc.*, 2017 WL 416430, at *3 (E.D. Mich. Jan. 27, 2017) (holding that "although an

invasion of plaintiffs' privacy in violation of the PPPA may be 'intangible,' it is sufficiently

concrete"); *Perlin v. Time Inc.*, 2017 WL 605291, at *12 (E.D. Mich. Feb. 15, 2017) ("When the

Michigan Legislature enacted the VRPA, the legislature created a new right to privacy.  A

violation of this right results in real, concrete harm, even if the harm is not tangible."); *id.* at *14

("In sum, the Court concludes that a violation of the VRPA's disclosure prohibition results in a

concrete injury.").  *See also Coulter-Owens v. Time, Inc.*, 2016 WL 612690, at *5 (E.D. Mich.

Feb. 16, 2016) ("Although the court denied defendant's motion to dismiss on the grounds that

plaintiff lacks Article III standing, defendant raises the issue again.  Defendant argues that

plaintiff does not have Article III standing because the only injury alleged is a statutory injury

under the VRPA.  The court sees no reason to revisit its prior ruling.  For the reasons explained

in the court's order denying defendant's motion to dismiss, plaintiff has Article III standing.").

**C.     Second Circuit And Other Persuasive Authority Confirms That Plaintiff Has Article III Standing**

The Second Circuit's recent decision in *Strubel v. Comenity Bank*, 842 F.3d 181 (2d Cir. 2016), which clarified the concreteness analysis set forth in *Spokeo*, further confirms that violations of the VRPA manifest concrete harm sufficient to satisfy Article III.

To establish Article III standing, a plaintiff must show that:  (1) she has "suffered an injury in fact," (2) the injury is "fairly traceable to the challenged conduct of the defendant," and (3) the injury "is likely to be redressed by a favorable judicial decision."  *Spokeo*, 136 S. Ct. at 1547.  The first requirement (injury in fact) has two components: the injury must be both (1) particularized and (2) concrete.  *See id.*

With respect to the concreteness component of the injury in fact requirement, the Supreme Court in *Spokeo* explained that "'[c]oncrete' is not . . . necessarily synonymous with 'tangible.'  Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete."  *Id.* at 1549.  Moreover, the Supreme Court reaffirmed the longstanding principle that "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'"  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992)); *see also Spokeo*, 136 S.Ct. at 1553 (Thomas, J., concurring).  In other words, as the Second Circuit recently held, "Congress's authority to create new legal interests by statute, the invasion of which can support standing, is beyond question."  *Strubel,* 842 F.3d at 188 (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *see also Bautz v. ARS Nat'l Servs., Inc.*, 2016 WL 7422301, at *7 (E.D.N.Y. Dec. 23, 2016) ("Read together, *Spokeo* and *Strubel* reaffirm the long-standing principle that Congress can recognize new interests – either tangible or intangible – through legislation and confer private rights of action to protect those interests.").

Thus, "[i]n cases where a plaintiff sues to enforce a substantive legal right conferred by statute," *Spokeo* and *Strubel* make clear that "the infringement of that right constitutes, in and of itself, a concrete injury." *Bautz*, 2016 WL 7422301, at *8 (collecting cases). But even where a statutory violation is procedural in nature (i.e., does not directly harm the underlying legal interest created by the legislature), *Strubel* holds that such a violation can nonetheless "manifest concrete injury where Congress conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents a 'risk of real harm' to that concrete interest." *Strubel*, 842 F.3d at 190.

With this in mind, the first step in any Article III standing analysis is identifying the concrete interest underlying the statute, if any, that the legislature recognized. *See id.*; *accord Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017). In doing so, *Spokeo* instructs courts to consider: (1) whether the statute seeks to protect against a harm that bears a "close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," and (2) whether the legislature exercised its judgment to confer a right to be free from such harm. *Spokeo*, 136 S. Ct. at 1553.

In this case, "both history and the judgment of [the Michigan legislature]" demonstrate that the VRPA, as its name suggests ("Michigan Preservation Of <u>Personal</u> <u>Privacy</u> Act"), conferred a concrete interest in keeping personal reading information private. First, the right to privacy has been recognized as a basis for a lawsuit in American courts for over a century. *See, e.g.,* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 198 (1890) (Justice Brandeis recognizing a "a general right to privacy" at common law); *Perlin*, 2017 WL 605291, at *13 (same); *Moeller*, 2017 WL 416430, at *3 (same).

Second, in enacting the VRPA, the Michigan legislature exercised its judgment to further define the right to encompass privacy in the context of personal reading information. "The VRPA's plain language and legislative history demonstrate that it 'was created by [the Michigan] legislature to protect individual consumers from certain disclosures of their personal information.'" *Perlin*, 2017 WL 605291, at *12 (quoting *Halaburda v. Bauer Pub. Co., LP*, 2013 WL 4012827, at *6 (E.D. Mich. Aug. 6, 2013)); *see also Moeller*, 2017 WL 416430, at *3 ("[T]he Michigan Legislature recognized subscribers' right to privacy in their personal reading information, and through the enactment of the PPPA, 'define[d] the injury' and 'articulate[d] the chain of causation that gives rise to the injury.'") (quoting *Spokeo*, 136 S. Ct. at 1549). Indeed, the VRPA's long title states: "An act to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials, and to provide penalties and remedies for violation of this act." 1988 Mich. Pub. Act No. 378; *see also* Richards, *supra*, at 693-97 (explaining the privacy-based motivations for the federal Video Privacy Protection Act and related state laws, including the VRPA).

The VRPA thus defines, as a matter of substantive Michigan law, an individual's right to privacy in his or her personal reading information, and the statute protects that right by prohibiting the disclosure of such information to any other person. *See Boelter*, 2016 WL 361554, at *3 (holding "the VRPA creates for Plaintiff a specific, enforceable legal right to expect Defendant to keep private her identifying information"); *Perlin*, 2017 WL 605291, at *12 ("When the Michigan legislature enacted the VRPA, the legislature created a new right to privacy.").

Hearst's disclosures of Plaintiff's personal reading information are substantive as opposed to procedural statutory violations because they directly harmed Plaintiff's concrete

interest, conferred by the VRPA, in keeping such information private.  Accordingly, Hearst's statutory violations inflicted intangible concrete harm sufficient to satisfy the injury in fact requirement of Article III, without any additional showing of harm.  *See Bautz*, 2016 WL 7422301, at *8 ("[I]n cases where a plaintiff sues to enforce a substantive legal right conferred by statute, she has standing to pursue that claim without need to allege a 'material risk of harm' because the infringement of that right constitutes, in and of itself, a concrete injury."); *see also Boelter*, 2016 WL 361554, at *3 (this Court previously holding that Hearst's bare violation of the VRPA "constitutes a concrete, particularized deprivation," because "by disclosing Plaintiff's personal information, [Hearst] deprived Plaintiff of a right to which she was particularly entitled by law"); *Condé Nast*, 210 F. Supp. 3d at 589-90 (holding that violation of VRPA "suffices to assert a concrete, if hard to measure, intrusion on protected privacy interests so as to give rise to injury in fact"); *Moeller*, 2017 WL 416430, at *3 (holding that "although an invasion of plaintiffs' privacy in violation of the [VRPA] may be 'intangible,' it is sufficiently concrete").

Hearst's violation of the VRPA is far more invasive of privacy than the violation of other privacy-based statutes that courts have found sufficient to confer Article III standing.  Indeed, if the receipt of an unsolicited phone call is invasive enough to constitute a concrete harm, then the disclosure of personal reading selections to data miners surely is as well. *See, e.g., Aranda v. Caribbean Cruise Line, Inc*., 202 F. Supp. 3d 850, 857 (N.D. Ill. 2016) (holding that the Telephone Consumer Protection Act's prohibition on unsolicited telemarketing "establishes substantive, not procedural, rights to be free from telemarketing calls consumers have not consented to receive," the bare violation of which "is sufficient to constitute a concrete, *de facto* injury.").

Federal VPPA case law is also instructive. In *Perry v. Cable News Network, Inc.*, -- F.3d --, 2017 WL 1505064 (11th Cir. Apr. 27, 2017), the Eleventh Circuit held that a plaintiff "has satisfied the concreteness requirement of Article III standing, where the plaintiff alleges a violation of the VPPA for a wrongful disclosure." *Id.* at *3. As the Eleventh Circuit explained, "Supreme Court precedent has recognized in the privacy context that an individual has an interest in preventing disclosure of personal information." *Id.* (citing *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989) ("[C]ases sometimes characterized as protecting 'privacy' have in fact involved . . . the individual interest in avoiding disclosure of personal matters . . . ." (quoting *Whalen v. Roe*, 429 U.S. 589, 598–600 (1977))). And in *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262 (3d Cir. 2016), the Third Circuit held that a violation of the VPPA confers Article III standing, because "the harm is … concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information." *Id.* at 274; *see also Yershov v. Gannet Satellite Info. Network, Inc.*, 240 F. Supp. 3d 353, 361 (D. Mass. 2016) (holding that consumers alleging a defendant violated the VPPA by "knowingly disclos[ing] their [personally identifiable information] to a third party without their consent have satisfied the concreteness requirement for Article III standing"); *Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666 (S.D.N.Y. 2015) ("Notably, every court to have addressed this question has reached the same conclusion, affirming that the VPPA establishes a privacy right sufficient to confer standing through its deprivation").

Simply put, the substantive harm associated with the disclosure of personal reading information in violation of the VRPA, like violations of other privacy rights prohibited by statute, "satisf[ies] the requirement of concreteness." *Mount v. PulsePoint, Inc.*, 2017 WL

1147191, at *1 (2d Cir. Mar. 27, 2017) (concluding that the "unauthorized accessing and monitoring of plaintiffs' web-browsing activity," in bare violation of a state consumer protection statute, "implicates harms similar to those associated with the common law tort of intrusion upon seclusion so as to satisfy the requirement of concreteness"); *Gambles v. Sterling Infosystems, Inc.*, 2017 WL 589130, at *10 (S.D.N.Y. Feb. 13, 2017) (holding that a bare violation of the FRCA conferred Article III standing and noting that "[t]his holding aligns with other cases holding that the dissemination of information about a plaintiff in violation of a statute aimed at securing privacy or consumer protection results in concrete injury conferring standing to sue"); *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 966, 968-69 (8th Cir. 2016) (members of farm association had standing to sue when EPA released without consent certain farmers' names, mailing addresses, email addresses, and primary telephone numbers in response to Freedom Of Information Act request, because "the nonconsensual dissemination of personal information" "is sufficient to establish a concrete and particularized injury in fact" even though the information was otherwise publicly available); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 640 (3d Cir. 2017) (holding that the "unauthorized dissemination of [plaintiffs'] own private information – the very injury the FCRA is intended to prevent" constituted "a *de facto* injury that satisfies the concreteness requirement" regardless of "whether or not the disclosure of that information increased the risk of identity theft or some other future harm").

Hearst's reliance on *Ross v. AXA Equitable Life Ins. Co.*, 2017 WL 730266 (2d Cir. Feb. 23, 2017) is misplaced.[1]  In *Ross*, the plaintiffs argued that the alleged violation of a New York Insurance Law providing that an insurer shall not "make any misleading representation, or any

---

[1] *Ross* was a consolidated appeal that included *Robainas v. Metro. Life Ins. Co.*, 2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015).  Hearst heavily relied on *Robainas* in arguing that Ms. Boelter lacked Article III standing on her motion for preliminary injunction.

misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates," conferred Article III standing. N.Y. Ins. Law § 4226(a)(4); *see also Ross*, 2017 WL 730266, at *2. But that type of procedural requirement is distinguishable from the VRPA. As explained above, the VRPA is a substantive statute aimed at protecting the privacy of Michiganders. This Court recognized that distinction in its January 28, 2016 Order on Ms. Boelter's Motion For Preliminary Injunction. *See Boelter*, 2016 WL 361554, at *3 ("[T]he VRPA creates for Plaintiff a specific, enforceable legal right to expect Defendant to keep private her identifying information, and unlike the speculative, generalized harm alleged in *Robainas* [or *Ross*], its violation constitutes a concrete, particularized deprivation."). The Second Circuit also embraced that distinction in *PulsePoint*, where it held that the plaintiffs had Article III standing based solely on the "loss of privacy" even where a statute codifying the privacy right did not exist. *PulsePoint*, 2017 WL 1147191, at *1.

Furthermore, in *Ross*, the plaintiffs "fail[ed] to allege that they would not have purchased the life insurance and annuity riders provided by AXA and MLIC had they known of AXA's and MLIC's alleged shadow insurance practices." *Ross*, 2017 WL 730266, at *2. Here, by contrast, Plaintiff testified that she would not have purchased a subscription to any Hearst magazine if she knew that Hearst would disclose her PRI as a result:

> Q: What would you have been willing to pay for a subscription to Good Housekeeping magazine without the statutory privacy protection?
>
> A: I would not have subscribed.
>
> Q: You wouldn't have subscribed even if the magazine was free?
>
> A: Not if they're using my information.
>
> …

> Q: … Are you testifying now that it [the subscription] had no value to you without those protections?
>
> A: The protections are more important to me than the value of the magazine. So I don't know how you want to interpret that, but my privacy is more important than a magazine.

Deposition of Josephine James Edwards ("Edwards Dep.") at 192:9-193:25, Ex. 38.[2]  This testimony confirms that there is an additional basis for Article III standing, namely that Plaintiff suffered an out-of-pocket monetary loss.

Moreover, even if Hearst's violation of the VRPA was a "procedural" violation, it would still confer Article III standing under *Strubel*.  In *Strubel*, the Second Circuit held that the failure to provide a plaintiff with notice of his statutory rights under TILA was a sufficient injury to confer Article III standing because "[a] consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him." *Strubel*, 842 F.3d at 191.  Here, like in *Strubel*, the undisputed evidence demonstrates that Hearst failed to provide Plaintiff with notice that Hearst was disclosing her PRI to third parties, and that Hearst failed to provide Plaintiff with the ability to "remove her name at any time by written notice" to the defendant, as required by the VRPA.  *See* 5/1/17 Plaintiff's SJ Br. at Part II.J.  This also confers Article III standing.  *See Condé Nast*, 210 F. Supp. 3d at 589 ("The harm resulting from failing to satisfy [the VRPA's] notice requirement is not simply lack of notice itself, but denial of the right to prevent disclosure.  … If … [Defendant] failed to give [Plaintiff] notice and an opportunity to opt out, then disclosure of her PRI would have violated the PPPA's substantive disclosure prohibition.").

---

[2]  Unless otherwise noted, all Exhibits are attached to the Declaration of Joseph I. Marchese In Support Of Plaintiff's Motion For Partial Summary Judgment.  Moreover, objections are omitted from all deposition excerpts quoted throughout this brief.

# III. HEARST'S DISCLOSURES OF PLAINTIFF'S PRI VIOLATE THE VRPA

## A. Hearst's Argument That These Disclosures Did Not Identify Plaintiff As The "Purchaser" Is False And Meritless

Hearst argues "[t]he VRPA quite specifically bars disclosure of information identifying the 'purchaser' of written materials, but does not prohibit disclosure identifying 'subscribers' to those materials."  4/3/17 Hearst SJ Brief at 6.  In this vein, Hearst argues "[t]here is no evidence that Hearst ever disclosed "a record or information concerning the purchase of any Hearst magazine identifying Plaintiff as the purchaser."  *Id*; *see also id.* at 27 ("[N]othing in any of the transmissions at issue in this case identify Plaintiff as the purchaser of any of her magazine subscriptions.").  Hearst's arguments concerning the statute's requirements and the evidence in this case are wrong on both points.

### 1. The VRPA Prohibits Disclosure Of "A Record Or Information Concerning The Purchase"

As an initial matter, Hearst's reading of the VRPA – requiring that the disclosed record identify Plaintiff as the "purchaser" of her magazine subscriptions – misstates the VRPA's broad prohibitions on disclosure.  The VRPA states, in pertinent part, that retailers "shall not disclose to any person, other than the customer, a record or information ***concerning*** the purchase" of customers' magazine subscriptions.  M.C.L. § 445.1712 (emphasis added).  "The use of the word 'concerning' in this context is significant because it does not suggest an exclusive or definitive source of the information."  *Bloomberg, L.P. v. United States Food and Drug Admin.*, 500 F. Supp. 2d 371, 377 (S.D.N.Y. 2007).  "Instead, the word 'concerning' in its ordinary meaning is much more broadly understood.  Its definition is 'relating to; to be about; to bear on.'"  *Id.* (citing "Concerning," *Merriam-Webster*).  Thus, the VRPA prohibits a broad range of disclosures.  It prohibits Hearst from disclosing a record concerning Plaintiff's magazine subscription, as such a record necessarily "concerns" the purchase of the subscription.  *See, e.g., Haley v. Nunda Twp.*,

2005 WL 94791, at *2 (Mich. Ct. App. Jan. 18, 2005) ("[T]he plain and ordinary meaning of the word 'subscription' implies an advance payment of a sum certain in order to receive the material for a set period of time."); *Austin-Spearman*, 98 F. Supp. 3d at 669 ("Conventionally, 'subscription' entails an exchange between subscriber and provider whereby the subscriber imparts money … in order to receive a future and recurrent benefit … for instance, periodical magazines.").

The Michigan Court of Appeals' decision in *Bowman v. Greene*, 2013 WL 5925995 (Mich. Ct. App. Nov. 5, 2013) is instructive. There, the Court interpreted a Michigan statute which required disclosure of certain environmental issues. *Id.* at *10. The statute stated, in pertinent part, that "[t]his statement is a disclosure of the condition and information *concerning* the property." *Id.* (citing M.C.L. § 565.957) (emphasis added). In interpreting the statute, the Court noted that the "word 'concerning' is defined as 'relating to; regarding; about." *Id.* Therefore, the Court held that "the statutory text supports broad disclosure of information about, relating to, or regarding." *Id.* Here, likewise, the statutory text of the VRPA prohibits disclosure of a "record or information *concerning* the purchase," in other words, it broadly prohibits "disclosure of information about, relating to, or regarding" Plaintiff's magazine subscription.

## 2. Hearst's Disclosures Identified Plaintiff As The "Customer," "Subscriber," "Buyer," And "Purchaser"

Even if the Court were to adopt Hearst's overly narrow reading of the statute, Hearst's summary judgment motion would still fail because Hearst disclosed a record or information concerning the purchase of Plaintiff's subscription that identified Plaintiff as the customer 104 times. *See* PSOF ¶ 231.

Hearst ignores the record and argues that its "database does not include any code or data field identifying *who* paid for a given subscription." 4/3/17 Hearst's SJ Br. at 27-28. But

Hearst's database includes codes which indicate whether the subscription was a "gift subscription" or not.  *See* Ex. 3 █████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ ███ █████████████████████████████ ███ ████████

███████████████████████████████████[3]

Moreover in *Grenke v. Hearst Comm'cns, Inc.*, Case No. 12-cv-14221 (E.D. Mich.), Hearst

admitted that it "provided … its ***Customers'*** Personal Reading Information" to numerous third

parties, including "Acxiom Corporation" and "Experian Marketing Solutions, Inc."  *See*

Supplemental Declaration of Joseph I. Marchese, Ex. 46 (Defendant Hearst Communications,

Inc.'s Amended And Supplemental Objections and Responses To Plaintiff David Grenke's First

Set Of Interrogatories) at No. 9 (emphasis added).  There, Hearst defined "Customer" to mean

"***any person who purchased a subscription to*** and received *Country Living* magazine at an

address located in the State of Michigan within the Relevant Time Period."  *Id.* at 4-5 (emphasis

added).  That admission belies any argument that Hearst does not maintain records regarding

who purchased a given magazine subscription.

---

[3] Hearst also argues in a footnote that "there is no evidence in the record that Plaintiff herself paid for any of her subscriptions."  HMSJ at 28 n.13.  That is wrong.  Plaintiff testified at her deposition that she purchased her subscriptions to *O, The Oprah Magazine* and to *Good Housekeeping* magazines.  *See* Declaration of Josephine James Edwards ¶¶ 4, 7.  Plaintiff also produced documentation indicating that she paid for her *Good Housekeeping* subscription.  *Id.* ¶¶ 5-6.  Plaintiff was not asked at her deposition if she had personally paid for her subscriptions to *Redbook* and *Woman's Day* magazines, but if she had been asked she "would have testified that [she] did personally pay money for those subscriptions."  *Id.* ¶ 8.  "To be clear, [Plaintiff] personally paid money for every one of [her] subscriptions to *Good Housekeeping*, *O, The Oprah Magazine*, *Redbook*, and *Woman's Day* magazines."  *Id.* ¶ 9.  Plaintiff further notes that for her subscription records, the ███████ and ███████████ fields are null, *see* Ex. 3 █████████, and that the ███████ is flagged to ██████ meaning the subscriptions were not gifts.  *See id.* at ███████

Hearst also argues that the "only evidence in the record is that Hearst may have shared Plaintiff's basic subscription information," but did not "identify[] her as having been the *purchaser* of that subscription." 4/3/17 Hearst's SJ Br. at 28. That is wrong for at least four reasons.

<u>First</u>, Hearst's contracts with Dunn Data, Acxiom, and ██████ all required Hearst to provide its "customer" records.[4] The VRPA defines "customer" as the "person who purchases … [a] written material." M.C.L. § 445.1711(a); *see also* "Customer," *The Random House Dictionary*, http://www.dictionary.com/browse/customer?s=t ("A person who purchases goods or services from another."). Therefore, those entities received data from Hearst "concerning the purchase" of magazine subscriptions that "indicate[d] the identity of the customer." M.C.L. § 445.1712.

<u>Second</u>, Hearst's transmissions to ██████ Dunn Data, ██████ and Experian all included the latest purchase date, and the amount Plaintiff paid for her subscription. *See* Ex. 15 (██████ Tab, Rows 40-41; Dunn Data Tab, Rows 39-40; ██████ Tab, Rows 40-41; Experian Refresh – Yearly Tab, Rows 40-41). The record Hearst transmitted to ██████ Exhibit 33, is instructive:

---

[4] *See* Ex. 21 (Hearst-Dunn Data Contract) at DUNN\HEARST0001 ("Client [Hearst] has given Dunn DataCo approval to incorporate certain data from active and former ***customer records*** into Dunn DataCo's Consumer Database Products.") (emphasis added); Ex. 9 (Hearst-Acxiom Requirements Document) at ACXM0321 ("Supports the recognition of different Hearst ***customer*** types including magazine subscribers.") (emphasis added); Ex. 26 (Hearst-██████ Contract) at 01 § B(1) (Hearst "[a]gree[s] to participate in the ██████ program including, without limitation, contributing [its] ***customer file*** at the beginning of relationship and sending complete previous-month ***customer history transaction information*** to ██████ on a monthly basis") (emphasis added).

| Field | customer_id | insert_date | update_date | user_data1 | user_data2 | latest_purchase_date | latest_purchase_gross_amt |
|---|---|---|---|---|---|---|---|
| Suzanne Boelter | 44419879 | 11/5/2013 9:12 | 10/9/2014 10:46 | CLG | \N | 8/3/2012 | 12 |
| Josephine Edwards | **not provided by client | 11/5/2009 18:19 | 4/7/2011 5:33 | 15 | DB | 1/2/2007 | 9,99 |
| NOTES: | | | | | | | |
| | Customer ID sent by client | Date consumer originally received by ▆ from client | Date of most recent update for consumer received by ▆ from client | Client code for publication that is source of the consumer data<br><br>CLG = Country Living<br><br>15 = Women's Day | Client defined field for "paid status code" on older files sent by client; indicated payment method on older files<br><br>\N = not tracked by ▆<br><br>DB = unknown | Latest purchase date for consumer provided by client | Amount of latest purchase by consumer provided by client |

▆ Rule 30(b)(6) designee confirmed that "latest_purchase_date" and

"latest_purchase_gross_amt" identify Plaintiff as the customer:

> Q: Okay. Moving on to the last [sic] purchase date column. Was this data provided by Hearst?
>
> A: It was. Latest purchase date for consumer provided by client.
>
> Q: Okay. And that's the latest purchase date of *Woman's Day* publication; correct?
>
> A: Correct.
>
> Q: Okay. The last – the next column, the last purchase date – or last purchase gross amount, it states 9.99, where did that data come from?
>
> A: That was provided by client.
>
> Q: "The client" being Hearst?
>
> A: Yes.
>
> Q: Okay. And what does that number represent?
>
> A: I read that as $9.99.
>
> Q: So that would be the amount that Ms. Edwards paid for her subscription to *Woman's Day*?
>
> A: Correct.

Deposition of ▆ ▆ at 97:23-98:22, Ex. 31. As ▆ testimony

makes clear, Hearst's transmissions to ▆ Dunn Data, ▆ and Experian – all of which

included the latest purchase date, and the amount Plaintiff paid for her subscriptions – identified Plaintiff as the customer.

 <u>Third</u>, the evidence shows that the transmissions to each entity included at least one field that would "indicate[] the identity of the customer."  Hearst's transmissions to ███ identified Plaintiff as the "BUYER" of her subscriptions, by including a "MULTIPLE_BUYER_FLAG," which was marked "Y" ("Yes") for each transmission of Plaintiff's PRI.

| MULTI-BUYER-FLA | MAG-CD | MAG DECODE |
| --- | --- | --- |
| Y | GHK | Good Housekeeping |
| Y | OPR | Oprah |
| Y | RBK | Redbook |
| Y | WDY | Women's Day |

███████████████████████

Ex. 19; *see also* Ex. 15 (███ Tab, Row 32) ("MULTIPLE_BUYER_FLAG"); Ex. 16 (Hearst-███ Contract) at Ex. A ("Hearst shall supply the following data elements for each of the publications listed below … Multiple Buyer Flag.").  Hearst's transmissions to Dunn Data, Experian, ███ and ███ included the "SET_CD" field, which "indicates the type of order."  *See* Ex. 15 (Dunn Data Tab, Row 33; Experian Refresh – Yearly Tab, Row 34; ███ Tab, Row 34; ███ Tab, Row 34); Ex. 41 ████████████████ ███████████████ For each of her magazine subscriptions (and therefore each transmission of her PRI), Plaintiff's SET_CD was set to ███ (non-gift), meaning that the transmitted record "indicate[d] her identity as the customer."  For example, the transmission record produced by ███ Exhibit 27, states that ███ ███████████████

Moreover, in the *Grenke* action, Hearst admitted that it transmitted its Customer's

Personal Reading Information to Acxiom and Experian, where "customer" was defined as "any

person who purchased a subscription to and received *Country Living* magazine at an address

located in the State of Michigan within the Relevant Time Period."  Ex. 46 (Defendant Hearst

Communications, Inc.'s Amended And Supplemental Objections and Responses To Plaintiff

David Grenke's First Set Of Interrogatories) at 4-5, No. 9.  Indeed, Acxiom's 30(b)(6) designee

testified that Hearst transmits "customer records" to Acxiom, and Acxiom then transmits those

"customer records" to Experian at Hearst's instruction.

> Q:    So Hearst customer records come to Acxiom.  Acxiom then
>        sends them to Experian to append some additional data.
>        And then they come back to Acxiom, right?
>
> A:    Yes.

Deposition of James Vanthournout ("Vanthournout Dep.") at 218:1-6, Ex. 5.

Fourth, Hearst's attempt to distinguish "purchaser" and "subscriber" fails.  As The

Michigan Court of Appeals has held, "the plain and ordinary meaning of the word 'subscription'

implies an advance payment of a sum certain in order to receive the material for a set period of

time."  *Haley*, 2005 WL 94791, at *2.  Judge Buchwald of this District applied a similar

definition to "subscriber" under the federal VPPA.  *See Austin-Spearman*, 98 F. Supp. 3d at 669

("Conventionally, 'subscription' entails an exchange between subscriber and provider whereby

the subscriber imparts money … in order to receive a future and recurrent benefit … for instance,

periodical magazines.").  Numerous dictionaries also define subscriber to mean "[a] person who

receives a publication regularly by paying in advance."  "Subscriber," *Oxford English

Dictionary*, https://en.oxforddictionaries.com/definition/subscriber; *see also* "Subscription,"

*Random House Dictionary*,[5] http://www.dictionary.com/browse/subscription?s=t ("[T]he right to

receive a periodical for a sum paid, usually for an agreed number of issues."); "Subscription,"

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/subscription ("[A]n

arrangement for providing, receiving, or making use of something of a continuing or periodic

nature on a prepayment plan.").  Given the plain meaning of the term "subscriber," Hearst's

transmissions of Plaintiff's PRI that identified her as an "expired subscriber" necessarily

"indicate[d] her identity as the customer."

### B.    Hearst's Argument That These Disclosures Were "Confidential" Is False And Meritless

Hearst argues that the VRPA prohibits only "public disclosures," and that Hearst's

"confidential communications" with Acxiom, Experian, ██████ ██████ Dunn Data and

██████ do not support a claim under the VRPA because "only public disclosure will do."

4/3/17 Hearst SJ Br. at 29-32.  That argument contradicts the plain text of the statute.  It also

ignores clear evidence establishing that Hearst's disclosures were <u>not</u> confidential at all.

---

[5] The Michigan Supreme Court looked to the *Random House Dictionary* when interpreting the terms "rent" and "borrow" as used in the VRPA.  *See Deacon v. Pandora Media, Inc.*, 885 N.W.2d 628, 631-33 (Mich. 2016).

1. **The VRPA Prohibits Disclosure To "Any Person, Other Than The Customer"**

As an initial matter, Hearst's confidentiality argument is irrelevant because the VRPA prohibits Hearst from "disclos[ing] to any person, other than the customer." M.C.L. § 445.1712. The VRPA does not state that the disclosures must be "public," nor does it provide an affirmative defense for non-public disclosures among its five enumerated affirmative defenses. *Id.* §§ 445.1712-13.

Nonetheless, Hearst argues that the word "disclose" requires "mak[ing] public information that was not previously known." 4/3/17 Hearst SJ Br. at 30. That is wrong.

First, even if the word "disclose" required making information publicly known (and it does not), the Michigan Legislature modified that word by including the phrase "to any person, other than the customer." M.C.L. § 445.1712. It is a core tenet of statutory interpretation that "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire and Cas. Co. v. Old Republic Ins. Co.*, 644 N.W.2d 715, 717 (Mich. 2002); *see also Leocal v. Ashcroft*, 543 U.S. 1, 13 (2004) ("[W]e must give effect to every word of a statute wherever possible."). Hearst's reading of the statute requiring "public disclosure" would render the phrase "to any person, other than the customer" superfluous, and it must therefore be rejected.[6]

Second, Hearst attempts to cherry-pick a definition of the word "disclose" from one dictionary to argue that it means only public disclosure. 4/3/17 Hearst SJ Br. at 30. However, the vast majority of dictionaries define "disclose" as "to cause to appear; allow to be seen; lay

---

[6] This statutory reading is also supported by the VRPA's legislative history. The Michigan Legislature's stated justification for passing the VRPA was that "a person's choice in reading … is a private matter and not a fit subject for consideration by gossipy publications, employers, clubs, *or anyone else for that matter*." Michigan H.B. No. 5331, Jan. 20, 1989, Compl. Ex. A (emphasis added).

open to view."  "Disclose," *The Random House Dictionary*,

http://www.dictionary.com/browse/disclose?s=t; *see* "Disclose," *Oxford English Dictionary*,

https://en.oxforddictionaries.com/definition/disclose (to "allow to be seen"); "Disclose," *The*

*American Heritage Dictionary of the English Language*,

https://ahdictionary.com/word/search.html?q=disclose ("to expose to view"); "Disclose,"

*Merriam-Webster*, https://www.merriam-webster.com/dictionary/disclose ("to open up" or "to

expose to view").  Indeed, Michigan courts have held that "[t]he Legislature's use of the broad

term 'disclose' precludes … revealing the covered statements to anyone."  *People v. Bragg*, 824

N.W.2d 170, 181 (Mich. Ct. App. 2012).

Bragg is particularly instructive.  In *Bragg*, the statute at issue stated that "[n]o minister

of the gospel, or priest of any denomination whatsoever … shall be allowed to disclose any

confessions made to him in his professional character."  M.C.L. § 600.2156; *see also Bragg*, 824

N.W.2d at 181.  In interpreting the statute, the court held that the word "'disclose' means to

'bring into view by uncovering; to expose; to make known.'"  *Bragg*, 824 N.W.2d at 181

(quoting *Black's Law Dictionary* (6th ed.); *Webster's New World Dictionary of the American*

*Language* (2d. college ed.)).  Based on the ordinary meaning of "the broad term 'disclose,'" the

*Bragg* court held that the statute "preclude[d] a cleric from revealing the covered statements to

anyone."  *Bragg*, 824 N.W.2d at 181.  The *Bragg* court did not read the statute to prohibit only

"public disclosure."

Hearst argues that reading the word "disclose" to require public disclosure "is fully

consistent with its meaning in U.S. [and Michigan] privacy law."  4/3/17 Hearst's SJ Br. at 30-

31.  But the authorities Hearst cites concern the tort of "invasion of privacy through ***public***

*disclosure* of private facts."[7]  As these authorities make clear, the word "disclose" does not require a "public" disclosure by itself.  Rather, it only requires "public" disclosure when it is modified by the word "public."

Prohibitions on "disclosure" arise in myriad legal contexts, and no one could reasonably think they prohibit only "public" disclosures.  For example, parties routinely enter non-disclosure agreements.  It would strain credulity to argue that such agreements would be violated only by a "public" disclosure.  Indeed, the protective order entered in this very case, Doc. No. 42, belies Hearst's argument.  Surely Hearst would not argue that either party may disclose confidential information so long as the disclosure is not "public."  Perhaps most notably, paragraph 11 of the protective order provides that disclosure of information in discovery – i.e., just between the parties to this action – shall be permitted even though it otherwise "could be deemed to be a violation of the [VRPA]."  Doc. No. 42 ¶ 11.  Thus, the parties to this case themselves have acknowledged that even the sharing of information between themselves in the limited context of litigation discovery could constitute "disclosure" under the VRPA.

Indeed, at oral argument in *Coulter-Owens v. Time, Inc.*, Case No. 16-1321 (6th Cir.), Judge Jane Branstetter Stranch said to Time's counsel:

> I think you would have to concede that part of the goal of this Act
> [the VRPA] is to enable people to have some … privacy about

---

[7] *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 919 (Mich. Ct. App. 2014) ("[T]o prove invasion of privacy through the ***public disclosure*** of private facts … .") (emphasis added); *see also Doe v. Mills*, 536 N.W.2d 824, 828 (Mich. Ct. App. 1995) ("A cause of action for ***public disclosure*** of embarrassing private facts requires … .") (emphasis added); *Lansing Ass'n of School Adm'rs v. Lansing School Dist. Bd. of Educ.*, 549 N.W.2d 15, 21 (Mich. Ct. App. 1996) ("Under the second theory of privacy, ***public disclosure*** of embarrassing private facts, plaintiffs must show … .") (emphasis added); *Beaumont v. Brown*, 257 N.W.2d 522, 527 (Mich. 1977) (addressing the tort of "***[p]ublic disclosure*** of embarrassing private facts about the plaintiff") (emphasis added); *Restatement (Second) of Torts* § 652D (1977) ("***Publicity*** Given to Private Life.") (emphasis added); Robert D. Sack, *Sack on Defamation:  Libel, Slander, and Related Problems* § 12.4 at 12-36 (PLI 4th ed. 2010 [updated April 2016]) ("***Public*** Disclosure Of Private Facts") (emphasis added).

their reading material … the names of these people were provided to Acxiom and [REDACTED] for the purpose of collecting more information. That's the undergirding concern because it's not only that I've purchased this magazine, but now my name is in a co-op and the co-op is collecting all this other information about me and my family, and then is able to share with … everyone else who is a member of the co-op. Isn't that sort of consolidation of private information on individuals the undergirding concern of this Act? … I don't understand how that cannot be what undergirds this and how the Acxiom relationship and the [REDACTED] relationship aren't exemplary of the problem. …. I don't understand how you can argue that it's not the issue that undergirds this, because it is that dissemination of information that is the concerning factor.

4/26/17 Oral Argument Audio Transcript at 23:33-25:32.[8]

In sum, the Michigan Legislature chose to use the word "disclose" and chose not to modify that word with the word "public." Instead, the Michigan Legislature chose to modify the word "disclose" with the phrase "to any person, other than the customer." M.C.L. § 445.1712. The statute, therefore, unambiguously prohibits any disclosure, not just public disclosure.

> **2. Hearst's Disclosures Were Not Confidential; They Were Made Publicly, And Hearst Specifically Authorized Acxiom, [REDACTED] [REDACTED] Dunn Data And [REDACTED] To Make Further Disclosures Of Plaintiff's Subscription Records**

Hearst's confidentiality argument also fails because the evidence establishes that Hearst's disclosures were not kept confidential.

First, Hearst's publication of Plaintiff's PRI through Hearst's website, buysub.com, was made public. That website was entirely open and available to the public, with no password-protection or security of any kind. Anyone with access to the Internet could enter the Plaintiff's

---

[8] http://www.opn.ca6.uscourts.gov/internet/court_audio/aud2.php?link=recent/04-26-2017%20-%20Wednesday/16-1321%2016-1380%20Rose%20Coulter-Owens%20v%20Time%20Inc%20et%20al.mp3&name=16-1321/2016-1380%20Rose%20Coulter-Owens%20v%20Time%20Inc%20et%20al

name and address into this website to obtain the titles of any Hearst publications Plaintiff had purchased, the status of her subscriptions, whether the account was "Paid" or if payment was due, and the date of her last payment. *See* 5/1/17 Plaintiff's SJ Br. at Part II.G.

      <u>Second</u>, Hearst's contracts with ████ Dunn Data, ████ and ████ all allow those entities to incorporate the data transmitted by Hearst into their consumer databases for rental by third parties.[9] Through each of these contracts, Hearst explicitly authorized these entities to make further disclosures of Hearst's customers' names and addresses, including Plaintiff's, for rental to charities, political campaigns, direct mail-marketers, or for other purposes. Moreover, the confidentiality provisions in some of the contracts did not require Hearst's counterparty to destroy or return the PRI. For example, Hearst cancelled its contract with Dunn Data in May 2013, yet Dunn Data still maintains records of Plaintiff's PRI several years after their contractual relationship terminated. *See* PSOF ¶¶ 76, 78 (undisputed).

      <u>Third</u>, with respect to Acxiom, Hearst's contract with Acxiom requires Acxiom to transmit, or extract, Hearst's customer data to third parties. *See* Ex. 14 at Ex. G (listing entities to whom data is extracted). Acxiom did in fact make transmissions of Plaintiff's PRI to ████ Dunn Data, Experian, ████ and ████ at Hearst's instruction. *See id.*; *see also*

---

[9] *See* Ex. 16 (contract with ████ ¶ 4 ("Company [Hearst] Data may be used by ████ for analysis and in data products and services provided to its customers. ████ may distribute the Company Data through any type of media. Further, ████ may use brokers, resellers or other distribution channels in the sale and delivery of its products and services that contain the Company Data."); Ex. 21 (contract with Dunn Data) at DUNN\HEARST001 ("Client [Hearst] has given Dunn DataCo approval to incorporate certain data from active and former customer records into Dunn DataCo's Consumer Database Products; specifically MarketShare and CPI (Consumer Passion Index)."); Ex. 26 (contract with ████ at 01 ¶ B(5) (Hearst "grant[s] ████ a non-exclusive, royalty-free license to use Company Data for the purpose of creating the ████ file and to use and grant to other ████ members the right to use the Company Data for marketing and ████ related purposes"); Ex. 30 (contract with ████ at ████ ¶ 1 ("Member [Hearst] grants ████ permission to use Member Data … . … as part of the ████ Cooperative Database for the mutual benefit of Members.").

PSOF ¶¶ 48, 76, 91-94, 108, 135-139; Vanthrounout Dep. at 127:4-14, Ex. 5. Acxiom, therefore, did not keep Hearst's customer's PRI, including Plaintiff's PRI, confidential.

### C. Hearst's Argument That These Six Entities Are Statutory Employees Or Agents Is Wrong

Hearst argues that its disclosures of Plaintiff's PRI to Acxiom, Experian, ███████

████ Dunn Data, and ██████ "were not statutory 'disclosures' as they were made only to

Hearst's statutory 'employees' or 'agents.'" 4/3/17 Hearst SJ Br. at 32. That argument is doubly

wrong. First, because the statute prohibits disclosure to "any person, other than the customer,"

M.C.L. § 445.1712, it creates no exception for disclosures to "employees" or "agents." Indeed

since the statute expressly enumerates exceptions, the Legislature is presumed not to have

authorized other unstated exceptions. *See Hoerstman Gen. Contracting, Inc. v. Hahn*, 711

N.W.2d 340, 346 (Mich. 2006) (holding that where a statute "contains exceptions," "[t]heir

enumeration eliminates the possibility of there being other exceptions under the legal maxim

*expressio unius est exclusio alterius*"); *Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011)

(applying *expressio unius est exclusio alterius* canon of construction in declining to read

additional exceptions into statute).

Second, even if the VRPA did contain an exception for disclosures to "employees" or

"agents," none of these six entities is an employee or agent of Hearst under the terms of the

statute or under Michigan law. In *Chilingirian v. City of Fraser*, 486 N.W.2d 347 (Mich. Ct.

App. 1992), the Michigan Court of Appeals explained that when a statute defines an employee as

someone who performs work for an employer in exchange for "wages or other remuneration,"

courts should look to the "economic reality test" to determine whether an employer-employee

relationship has been established. *Id.* at 349 (explaining multi-factor "economic reality test" for

determination existence of employer-employee relationship, where statute defined employee as,

inter alia, a "person," and defined "person" as "an individual, sole proprietorship, partnership, corporation, association, or any other legal entity") (quoting M.C.L. 15.361(a), (c)); *see also Foster v. Judnic*, 963 F. Supp. 2d 735, 764-765 (E.D. Mich. 2013) (same). The economic reality test comprises four factors:

> (1)    control of a worker's duties;
>
> (2)    payment of wages;
>
> (3)    right to hire, fire, and discipline; and
>
> (4)    performance of the duties as an integral part of the employer's business toward the accomplishment of a common goal.

*Id.*[10] None of the six entities is an employee under the economic reality test.

Similarly for principal-agency questions, Michigan courts generally "will look to a host of factors in determining whether or not" a principal-agent relationship has been established. *See Hart v. Comerica Bank*, 957 F. Supp. 958, 978 (E.D. Mich. 1997). Those factors are:

> (1)    whether the alleged principal provided the materials and place of work for the alleged agent;
>
> (2)    whether the alleged agent, independent of the alleged principal, offers his services to the public at large;
>
> (3)    whether the alleged principal has the right to terminate the alleged agent as an employee at will;
>
> (4)    whether the alleged agent was receiving compensation from the alleged principal; and

---

[10] Hearst essentially argues that the fact that it controlled some aspects of its relationship with these six entities deems them its "employees" or "agents." HMSJ at 33-36. But the Michigan Court of Appeals rejected a "control test" in interpreting a statute that defined "employee" as "a person who performs a service for wages or other remuneration," in favor of the economic reality test. *Chilingirian*, 486 N.W.2d at 349. Because the VRPA defines "employee" in a nearly identical manner, *see* M.C.L. § 445.1711(b), this Court should also reject the control test in favor of the economic reality test.

> (5)    whether the principal had the ability to control the agent's
>          daily work and responsibilities.

*Id.* None of the six entities is an agent under those factors.

**Acxiom is not Hearst's employee or agent.** Hearst's contract with Acxiom expressly disclaims any employee or agency relationship. It states that Acxiom will perform all services as an "independent contractor, and nothing herein shall be deemed to create any employment, association, partnership, joint venture, or relationship of principal and agent or master and servant" between Hearst and Acxiom. Ex. 10, ¶ 13. Given this clear contractual language, the Court can determine as a matter of law that Acxiom is not an employee or agent of Hearst. *See Fed. Ins. Co. v. Detroit Med. Ctr.*, 2009 WL 136866, at *9 (E.D. Mich. Jan. 16, 2009) ("Agency is a question of law when based on an unambiguous contract.") (citing *Birou v. Thompson-Brown*, 241 N.W.2d 265, 268 (Mich. Ct. App. 1976)); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 684-85 ("If a written agreement defines the scope of an agent-principal relationship … a Court must determine the nature of the relationship."); *see also Potomic Leasing Co. v. The French Connection Shops, Inc.*, 431 N.W.2d 214, 216 (Mich. Ct. App. 1988) (finding no genuine issue of material fact regarding agency where parties' contract specifically disclaimed any agency relationship).[11] In addition to this clear contractual language, Acxiom's Rule 30(b)(6) designee testified that Acxiom has never been Hearst's employee or agent:

> Q:    It [Exhibit 10] says "Acxiom shall perform all services
>          hereunder as an independent contractor, and nothing
>          contained herein shall be deemed to create any
>          employment, association, partnership, joint venture, or
>          relationship of principal and agent or master and servant
>          between the parties hereto … ." Do you see that?

---

[11] Hearst attempts to rebut this argument by arguing that "one may be both an independent contractor and an agent." 4/3/17 Hearst SJ Br. at 35 n.17. But Hearst does not address the fact that the contract expressly disclaims any employee or agency relationship.

A:      Yes.

Q:      And is that how Acxiom performed its services?

A:      Yes.

Q:      So you've never been an employee of Hearst; is that right?

A:      No, I have not.

Q:      And you have not ever had any partnership, joint venture or principal agent relationship with Hearst, right?

A:      No, I have not.

Q:      Nor has the Acxiom company?

A:      No.

Q:      And if I asked you the same questions with respect to all of Hearst subsidiaries and affiliates, your answers would be the same, right?

A:      Yes, they would be the same.

Vanthournout Dep. at 99:10-100:23, Ex. 5. Acxiom also: (1) does not share facilities with Hearst, (2) does not do any work on Hearst's premises; and (3) has many clients other than Hearst:

Q:      So you, "you" being Acxiom, didn't do any work on Hearst's premises?

A:      No.

…

Q:      Acxiom has many clients other than Hearst, right?

A:      Yes.

Q:      Acxiom offers its services in the marketplace to many companies, right?

A:      Yes.

Q:      You don't have any kind of exclusive relationship with Hearst?

A:      No.

*Id.* at 98:7-24.  Hearst also does not:  (1) have the authority to hire or fire Acxiom employees, (2)

control how Acxiom employees carry out their day-to-day work, and (3) train the Acxiom

employees on how to carry out their day-to-day work:

                    Q:      Does Hearst have the authority to hire or fire Acxiom
                            employees?

                    A:      From the account, but not from Acxiom.

                    Q:      Does Hearst have control over how Acxiom employees
                            carry out their day-to-day work?

                    A:      No, they do not.

                    Q:      Does Hearst train the Acxiom employees on how to carry
                            out their day-to-day work?

                    A:      They don't train … .

*Id.* at 101:7-18.  Finally, Acxiom does not receive wages from Hearst.  Rather, it receives

payment for services "in accordance with the pricing set forth in each Statement of Work,"

"within thirty (30) days from the date of invoice."  Ex. 10 ¶¶ 4.1, 4.4.  Where, as here: (1) Hearst

was only one of Acxiom's many clients, (2) Acxiom provided services to a number of other

clients, (3) Acxiom maintained its own offices, (4) Acxiom did not receive wages, but rather

received payment based on invoices, (5) Acxiom was not subject to Hearst's control with respect

to the method of its work, and (6) Acxiom did not devote all of its time to work for Hearst, and

held itself out to the public as performing an independent business, Michigan courts have refused

to find an employee or agency relationship, even under a nearly identical statutory definition of

employee.  *See Chilingirian*, 486 N.W.2d at 349; *see also Chilingirian v. City of Fraser*, 504

N.W.2d 1, 2 (Mich. Ct. App. 1993) (same); *Foster*, 963 F. Supp. 2d at 764-65 (same).[12]

_____

[12] Hearst's argument that Magistrate Judge Cott "has already found that Acxiom was 'effectively
Hearst's agent,'" is misleading.  4/3/17 Hearst SJ Br. at 34.  Magistrate Judge Cott's ruling was

**Experian is not Hearst's employee or agent.**  Hearst's contract with Experian expressly disclaims any employee or agency relationship.  It states that Experian and Hearst are "independent contractors," and "[n]othing contained in this MSA shall be deemed to create any association, partnership, joint venture, or relationship of principal and agent or master and servant between the parties."  Ex. 24, at H000014525, ¶ 8.7.  The contract also gives Experian "the right to employ such methods and procedures in the performance of Services as Experian shall deem appropriate," the "right to refuse to perform services for a Client [Hearst] where the performance of Services by Experian would adversely reflect on Experian's reputation or integrity," the right to "modify or amend … [the] fees set forth … with 30 days written notice," and requires Hearst to submit its customer data "in a format and upon such computer media as will meet Experian's computer processing specifications."  *Id.* at H000014519-20, ¶¶ 3.1-3.2. As for payment, the contract states that Experian will invoice Hearst, and Hearst "will pay Experian for the Services in the amounts agreed upon and set forth in the applicable Experian Work Order and/or the Experian Pricing Schedule A (if applicable)."  *Id.* at H000014520-21 ¶ 4.1.

**██████ is not Hearst's employee or agent.**  Hearst's contract with ██████ requires Hearst to "grant ██████ a non-exclusive, royalty-free license to use Company Data for the purpose of creating the ████████████ file and to use and to grant to other ████████ members the right to use the Company Data for marketing and ██████ related purposes."  Ex.



in the context of the agency exception to the attorney-client privilege.  *See* Doc. No. 81, at 1. That test utilizes different factors than the agency test under Michigan law.  *See id.* at 1-2 ("[T]he issues presented here are (1) whether there was 'a reasonable expectation of confidentiality under the circumstances,' and (2) whether the disclosure to Acxiom 'was necessary for [Hearst] to obtain informed legal advice.'") (citation omitted).  Moreover, even if the Court found, as a matter of law, that Acxiom was Hearst's agent, and then proceeded to create an agency exception to statutory liability under the VRPA, Hearst would still be liable for its disclosures of Plaintiff's (and 20 million other consumers') PRI to Experian, ██████ ██████ Dunn Data, and ██████

26, at 01, ¶ B(5). ███████ is a data cooperative, and has many other members in addition to Hearst. PSOF ¶¶ 100-101. And Hearst "pay[s] ██████ per [a] price schedule." Ex. 26, at 01 ¶ B(6), 03 (rate card).

**███████ is not Hearst's employee or agent.** ███████ is a data cooperative with many members in addition to Hearst, including political organizations and charitable fundraising organizations. PSOF ¶¶ 118-119 (undisputed). ██████ 30(b)(6) designee testified that ████████ has never had a partnership, joint venture, or principal/agent relationship with Hearst:

> Q:     Has ██████ ever had a partnership, joint venture, or
>        principal/agent relationship with Hearst?
>
> A:     No.

███████. at 36:24-37:2, Ex. 31.

> Q:     Hearst and ██████ are two completely separate companies;
>        correct?
>
> A:     Correct.
>
> Q:     With separate facilities?
>
> A:     Correct.
>
> Q:     And separate premises?
>
> A:     Correct.
>
> Q:     So ██████ and Hearst don't share facilities?
>
> A:     No.
>
> Q:     And Hearst doesn't do any work on ███████ premises?
>
> A:     No.
>
> Q:     And ██████ doesn't do any work on Hearst's premises?
>
> A:     No.
>
> Q:     Okay. And ██████ has many clients; correct?

A:     Correct.

Q:     And in performing its service for Hearst, pursuant to this
       agreement [Exhibit 30], did ███████ use its own equipment?

A:     Yes.

*Id.* at 36:1-23; *see also* PSOF ¶¶ 126-131 (all undisputed).  Finally, ███████ does not receive

wages from Hearst.  Rather Hearst paid ███████ pursuant to "Pricing & Payment Terms."  Ex. 30,

at ████████████

**__Dunn Data is not Hearst's employee or agent.__**  Dunn Data paid Hearst under the terms

of their relationship; Hearst did not pay Dunn Data.  *See* 5/1/17 Plaintiff's SJ Br. at Part II.E.

Employees do not pay their employers, and agents do not pay their principals.

Moreover, Dunn Data's Rule 30(b)(6) designee testified that Dunn Data is not an

employee of Hearst:

Q:     Is Dunn Data an employee of Hearst?

A:     No.

Dunn Dep. at 60:15-17, Ex. 22.  Mr. Dunn also testified that Dunn Data's relationship with

Hearst did not meet the factors for an employee or agent under Michigan law:

Q:     Okay.  Did Hearst provide the equipment for Dunn Data to
       do its obligations under the contract?

A:     No.

Q:     Did Dunn Data work in Hearst's offices?

A:     No.

Q:     Dunn has its own offices, correct?

A:     Correct.

Q:     And its own computer equipment?

A:     Yes.

…

Q:     … .  Does Dunn offer its services to more companies
       besides Hearst?

A:     Yes.

Q:     Okay.  So Hearst is not the only company, correct?

A:     Correct.

…

Q:     Mr. Dunn, did Hearst control the daily work of Dunn data?

A:     No.

Q:     And did Hearst train Dunn's employees?

A:     No.

*Id.* at 60:24-62:15.

███████ **is not Hearst's employee or agent.**  Like Dunn Data, ██████ paid Hearst

under the terms of their relationship; Hearst did not pay ██████  *See* 5/1/17 Plaintiff's SJ Br. at

Part II.F.  Again, employees do not pay their employers, and agents do not pay their principals.

Moreover, Hearst's contract with ██████ states that "[t]he parties are independent

contractors under this Agreement and no other relationship is intended, including, but not limited

to, customer, franchise, joint venture, agency, employer/employee, fiduciary, master/servant

relationship, or other special relationship.  Neither party shall act in a manner that expresses or

implies a relationship other than that of independent contractor, nor bind the other party."  Ex. 16

¶ 12.  The contract also gives ██████ permission to use Hearst data "for analysis and in data

products and services provided to its customers."  *Id.* ¶ 4.

## IV. HEARST'S ARGUMENT THAT FINDING A "DISCLOSURE" ON THE FACTS OF THIS CASE WOULD VIOLATE DUE PROCESS BY RENDERING THE VRPA UNCONSTITUTIONALLY VAGUE IS WRONG

Hearst argues that Plaintiff's reading of the VRPA would "render the VRPA incomprehensibly vague," and would therefore "violate Hearst's right to due process of law under the Fourteenth Amendment." 4/3/17 Hearst's SJ Br. at 37. That is wrong.

As an initial matter, the Second Circuit has held that "[t]he 'void for vagueness' doctrine is chiefly applied to criminal legislation. Laws with civil consequences receive less exacting vagueness scrutiny." *Arriaga v. Mukasey*, 521 F.3d 219, 222-23 (2d Cir. 2008) (citing *Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)). "An economic regulation imposing only civil fines is void for vagueness only if it is so vague and indefinite as really to be no rule or standard at all." *33 Seminary LLC v. City of Binghamton*, 2013 WL 2446306, at *7 (N.D.N.Y. June 5, 2013) (citing *Ruiz v. Commissioner of Dept. of Transp. Of City of New York*, 679 F. Supp. 341 (S.D.N.Y. 1988)). The Supreme Court explained the rationale for this distinction in *Hoffman Estates*:

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

455 U.S. at 498. As in *Hoffman Estates*, Hearst had the ability to consult the VRPA before establishing a sophisticated network of third-party data-mining companies to store and transmit its subscribers' PRI to anyone that would pay for it. But it did not. The Court should decline to Hearst's invitation to excuse its failure to consult the VRPA.[13]

---

[13] While the VRPA does have a criminal aspect, this is not a criminal case. Thus, the Court should not consider Hearst's void for vagueness challenge as if this were a criminal case. *See*

If the Court were to apply the Second Circuit's void for vagueness test, it would find that the VRPA is constitutional. Courts in the Second Circuit apply a two-prong test to determine whether a statute is void for vagueness. First, a court determines "whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited … ." *Chatin v. Coombe*, 186 F.3d 82, 86 (2d Cir. 1999). Second, a court considers "whether the law provides explicit standard for those who apply it." *Id.*

As to the first prong, the VRPA does give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. The VRPA prohibits persons "engaged in the business of selling at retail, renting, or lending book or other written materials" from "disclos[ing] to any person, other than the customer," information about the customer that "indicates [her] identity." M.C.L. § 445.1712. The VRPA also provides five exceptions – none of which Hearst contends apply here – including "[w]ith the written permission of the customer," or "[i]f the disclosure is for the exclusive purpose of marketing goods and services directly to the consumer. The person disclosing the information shall inform the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." M.C.L. § 445.1713(a), (d). The statute is crystal clear – Hearst may not disclose its customers' PRI unless it does so in accordance with the five enumerated exceptions. Hearst's argument is also belied by the fact that it knew exactly what to do to comply with the VRPA when it issued its March 2015 directive, after it was sued by one of its customers in *Grenke*. Hearst knew that it could not "provide names of individuals currently residing in Michigan," to "list coops such as ████ … and ████ so it stopped doing so. PSOF ¶ 147 (undisputed). Hearst knew that it could not "provide … data as it relates to individuals currently residing in Michigan," to "certain

*Kinder v. Meredith Corp.*, 2014 WL 4209575, at *3-4 (E.D. Mich. Aug. 26, 2014) (refusing to apply rule of lenity because the "VRPA has separate criminal and civil damages provisions").

Partners [Dunn Data and █████ to whom "Hearst ha[d] established contracts to sell …

various data," so it stopped doing so. PSOF ¶ 148 (undisputed). And Hearst knew that it could

not include magazine "title … in [the] feed to Experian for demographic append," so it stopped

doing so. PSOF ¶ 152 (undisputed). Hearst and its lawyers knew exactly how to comply with

the VRPA. Hearst just failed to do so until after one of its customers filed a lawsuit.[14]

As to the second prong of the void for vagueness test, the VRPA does provide explicit

standards for those who apply it. The VRPA defines statutory terms, proscribes what conduct is

prohibited, provides five enumerated exceptions, and provides remedies, including statutory

damages. *See* M.C.L. § 445.1711-1715. Every court that has heard a VRPA case has had no

trouble applying the statute.

## V.     HEARST'S ARGUMENT THAT APPLICATION OF THE VRPA TO THE FACTS OF THIS CASE WOULD VIOLATE THE FIRST AMENDMENT IS WRONG

### A.     The Court Has Already Rejected Hearst's First Amendment Challenges To The Constitutionality Of The VRPA

This Court has already rejected Hearst's First Amendment challenges to the VRPA.

Twice. In its Order denying Hearst's motion to dismiss, this Court held that "[t]he VRPA is

sufficiently tailored to meet the state's goals without intolerably burdening Defendant's speech.

Therefore, the VRPA is not unconstitutional as applied to Defendant." *Boelter*, 192 F. Supp. 3d

at 451. In its Order denying Hearst's motion for interlocutory appeal, this Court held that there

was not a "substantial ground for difference of opinion" as to "the appropriate level of

---

[14] Hearst also repeats its arguments that Plaintiff's construction of the terms "disclosure" and "agent" "are at odds with the ordinary meaning of those terms and legislative intent," and that the VRPA "is expressly limited to purchaser information." Those arguments are wrong for the reasons stated in Part III, *supra*.

[constitutional] scrutiny to apply to the VRPA, a content-based restriction on commercial speech." 8/2/16 Order at 1, Doc. No. 34. Since that time, one other district court has considered whether the VRPA is constitutional under the First Amendment, and that court agreed that it is. *See Condé Nast*, 210 F. Supp. 3d at 599 ("In concluding that the PPPA is constitutional as applied to Condé Nast's speech, we adopt much of the analysis set forth in *Hearst*.").

## B. Application Of The VRPA To The Facts Of This Case Does Not Violate The First Amendment

### 1. Michigan Has A Substantial Interest In Protecting Consumer Privacy

Hearst contends that "Michigan's interest in enacting the VRPA" is limited to "preventing public disclosures of genuinely private information only," such as one's purchase of "gossipy publications," and does not include "preventing non-public transmissions, or disclosures of information not considered or maintained as private." 4/3/17 Hearst's SJ Br. at 43-45. This argument ignores the substantial interest that the Court previously identified and mischaracterizes the nature of Hearst's privacy violations.

This Court has already noted that "[t]he Michigan Legislature's stated interest in enacting the VRPA is the protection of consumer privacy." *Boelter*, 192 F. Supp. 3d at 447. The State of Michigan itself has likewise submitted briefing in this case identifying its interest as "protecting the privacy of its citizens" Mich. A-G's Br. (Doc. No. 63) at 1; *id.* at 5 ("the Act is sufficiently tailored to directly advance a substantial interest the State has in protecting the privacy of its citizens"); *id.* at 10 ("the State of Michigan has a 'substantial interest' in protecting its citizens from unwanted intrusions into their private affairs."). This Court held that Michigan's interest in protecting consumer privacy "constitutes a substantial state interest." *Boelter*, 192 F. Supp. 3d at 448; *Condé Nast*, 210 F. Supp. 3d at 599 ("Michigan's interest in protecting consumer privacy is a substantial one.").

Hearst now asks the Court to apply a severely narrowed view of Michigan's substantial interest. According to Hearst, consumers' privacy interests are limited to the protection of "embarrassing facts" that they "wish[] to keep secret from the public" so as to avoid "'gossip' in the press," but do not include "the type of marketing-related disclosures challenged in this case." 4/3/17 Hearst's SJ Br. at 45. That is not true; consumers' privacy interests are not limited to protecting only "embarrassing" information. Indeed, this Court has already recognized that "the belief that 'one's choice in videos, records, and books is nobody's business but one's own' . . . constitutes a substantial state interest." *Boelter*, 192 F. Supp. 3d at 448 (quoting House Legislative Analysis Section, Privacy: Sales, Rentals of Videos, Etc., H.B. 5331, (Jan. 20, 1989)). In addition, "[c]ompilations of one's choices in books, magazines, and videos may reveal a great deal of information that a person may not want revealed, ***even if the choices are uncontroversial*** and are necessarily disclosed to the content provider." *Condé Nast*, 210 F. Supp. 3d at 599 (emphasis added).

Nor are consumers' privacy interests only implicated when personal reading information is disseminated to the public at large. In prohibiting the disclosure of customer records "to any person," the VRPA recognizes that privacy concerns are implicated when private information is shared with even one person or company. M.C.L. § 445.1712 (emphasis added). Whether PRI is shared with a single data company or printed on the front page of the New York Times does not matter. In either scenario, the state has a substantial interest in protecting the privacy of consumers.

## 2. Application Of The VRPA To This Case Directly Advances Michigan's Substantial Interest To A Material Degree

Hearst argues that the VRPA "does not advance the government's stated interest" because (1) "Plaintiff has little or no privacy interest in her PRI," (2) "Hearst has never made

public the fact that Plaintiff subscribes to any Hearst magazine," and (3) the only transmissions of Plaintiff's PRI were made "to business associates who were subject to and abided by strict confidentiality provisions."  Hearst's SJ Br. at 47-48.  These arguments are false for the reasons stated above.  *See supra* Part III.B.2.  But even so, none of these arguments require reexamination of the Court's conclusion that "[t]he VRPA's data disclosure restrictions directly advance the state's asserted interest in protecting consumer privacy regarding the purchase or rental of videos, audio recordings, and written materials."  *Boelter*, 192 F. Supp. 3d at 448.

Hearst's contention that "Plaintiff has little or no privacy interest in her PRI" is belied by Ms. Edwards' own testimony:

> Q:     Okay.  Is the fact that you were a Good Housekeeping
>         magazine subscriber a secret?
>
> A:     It's just never come up.
>
> Q:     Okay. But would you consider it a secret?
>
> A:     No.
>
> Q:     Would you consider it an intimate, private fact about you?
>
> A:     Well, what I read is really nobody's business.  It's
>         nobody's business.
>
> Q:     I understand.  But is it an intimate, private fact about you?
>
> A:     Whatever I read is for my own benefit.  It really has no
>         bearing on anyone else, and I think it's nobody's business.
>
> Q:     Are you concerned that other people might know that
>         you're a Good Housekeeping subscriber or were a Good
>         Housekeeping subscriber?
>
> A:     No. I just think it's my own personal reading choice, and
>         nobody needs to know what I read.
>
> …
>
> Q:     So it's not really a private fact that you subscribe to Good
>         Housekeeping magazine, is it?

> A:    What I subscribe to is my business, and I think filing the
>        lawsuit with my name, that again, that's my business.
>
> …
>
>        What I read is private.  And the fact that this is being
>        disclosed to outside sources, to different companies and
>        then they can use it for their own purposes.  And my
>        privacy is really important to me.

James Edwards Dep. at 66:7-69:11, 83:19-23, Ex. 38.  The fact that Ms. Edwards does not consider her subscription to *Good Housekeeping* a secret or embarrassing is immaterial.  It is private nonetheless.

Moreover, that these disclosures were made to third-party companies that Hearst considers "business associates" is immaterial.  So too is its contention that these companies were "subject to and abided by strict confidentiality provisions."  Plaintiff's privacy interests are not diminished in the slightest simply because her PRI was disclosed to *only* six different independent companies – all of whom then disclosed her information further.  *See* 5/1/17 Plaintiff's SJ Br. at Parts II.A-H.  All that matters is that Plaintiff's PRI was disclosed to third-parties without her consent.  That was a violation of personal privacy that the VRPA is designed to prevent.  *See* 4/26/17 *Coulter-Owens v. Time* Oral Argument, at 25:05-25:32 ("I don't understand how that cannot be what undergirds this and how the Acxiom relationship and the ███████ relationship aren't exemplary of the problem.  …. I don't understand how you can argue that it's not the issue that undergirds this, because it is that dissemination of information that is the concerning factor.") (Branstetter Stranch, J.).

### 3.    The VRPA Is Narrowly Tailored As Applied

Hearst argues that the VRPA is not narrowly tailored to Michigan's asserted purpose of protecting consumer privacy because "it would effectively ban – and criminalize – all outsourcing by publishers of any functions that involve access to basic subscriber information."

4/3/17 Hearst's SJ Br. at 49.  That is incorrect.  The disclosures at issue in this case do not involve outsourcing needed to run Hearst's publishing business.  Rather, Hearst sold Plaintiff's PRI for money.  For instance, ███████ paid Hearst annual license fees of ██████ and ██████.  PSOF ¶¶ 38, 42.  Likewise, Dunn Data paid Hearst $156,000 in exchange for Hearst's customer data, including PRI.  *Id.* ¶ 72.  Hearst's contention that application of the VRPA to this case would prohibit "database hosting, analytics, the printing of magazine mailing labels, and the delivery of addressed magazines" is thus not a proper as-applied challenge.  None of those activities are at issue in this case and Hearst's facial challenge has already been rejected.[15]  Moreover, Hearst did not even need to include its customers' PRI in some of the transmissions at issue.  For example, in March 2015, Hearst ceased sending subscription magazine titles as part of the transmissions of its customer information to Experian, but Hearst continues to utilize Experian for demographic appending.  *See* PSOF ¶¶ 96-98.

Hearst also argues that the VRPA is not narrowly tailored because "the most obvious means to advance Michigan's objective" would be a "prohibition on public disclosure."  4/3/17 Hearst's SJ Br. at 50.  That argument fails for at least two reasons.  First, as the Court has already noted, "[t]he law need not be the 'least restrictive means' or the 'single best disposition.'"  *Boelter*, 192 F. Supp. 3d at 449 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632, 115 (1995)).  "[N]or must it select the very best alternative."  *Id.* at *12 (quoting *Clear Channel Outdoor, Inc. v. City of N.Y.*, 608 F. Supp. 2d 477, 503 (S.D.N.Y. 2009)).  Rather, the statute just needs to be reasonably tailored to the state's goals.  *Id.*  Because the VRPA's "disclosure

---

[15] Hearst's argument is also incorrect.  The VRPA permits Hearst to disclose its customers' PRI "[w]ith the written permission of the customer."  M.C.L. § 445.1713(a).  When a customer subscribes to a magazine, that customer necessarily gives Hearst written permission to disclose her PRI to the post office and the print label shop in order to receive delivery of addressed magazines.

restrictions directly advance the state's asserted interest in protecting consumer privacy," while also containing common-sense exceptions, the law is "sufficiently tailored to meet the state's goals without intolerably burdening Hearst's speech." *Id.* at 449-451. Moreover, the VRPA contains five enumerated exceptions. *See* M.C.L. § 445.1713. As this Court held:

> These carve-outs allow Defendant to use the information obtained from its consumers in ways commensurate with operating a business, including to advertise and get paid for its products and services, and to comply with the law. Defendant is only prohibited – unless the consumer permits otherwise – from sharing identifying information it obtains with a party unrelated to its transaction with the consumer. Such a measured restriction advances the state's goals without unduly burdening Defendant's ability to engage in commerce.

*Boelter*, 192 F. Supp. 3d at 449.

Second, Hearst's tailoring argument fails because this case *does* involve public disclosures of PRI. Hearst publicly disclosed Plaintiff's PRI on a website that was accessible to anybody with an Internet connection. *See* 5/1/17 Plaintiff's SJ Br. at Part II.G. And while Hearst attempts to distinguish disclosures of PRI to the public at large and PRI sold to just a few companies, this is not a meaningful difference. Michigan's interest is passing the VRPA is the privacy of its citizens. Whether Hearst disclosed Plaintiff's PRI to six independent third-party companies or the public at large is immaterial; Hearst violated her privacy rights either way. And because the data companies who purchased Plaintiff's PRI were not parties to the transactions at issue, or agents of Hearst, they received the PRI as members of the public. Preventing these disclosures directly advances the interests of the state.

## VI. HEARST'S ARGUMENT THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS WRONG

Hearst argues that "Plaintiff's unjust enrichment claim fails both as a matter of law and of fact." 4/3/17 Hearst's SJ Br. at 52. That is wrong.

First, the Court already rejected Hearst's argument that the VRPA provides Plaintiff's "full, complete and adequate legal remedy for any alleged disclosure of her PRI." *Id.* As the Court explained, under Michigan law "statutes only operate to exclude common law claims when they feature express language to that effect, or when they are part of a 'comprehensive' legislative scheme." *Boelter*, 192 F. Supp. 3d at 454. "The VRPA does not include express language limiting a plaintiff's other potential remedies and is not part of a comprehensive legislative scheme. Therefore, it does not preclude Plaintiffs' unjust enrichment claim." *Id.*

The Michigan Supreme Court's decision in *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237 (Mich. 2010) supports the Court's ruling. There, the Court held that a statute should not be presumed to preclude common law claims unless it "contain[s] an exclusive remedy provision that would explicitly prevent such cumulative claims." *Id.* at 242. Because the VRPA does not contain such a provision, it does not preclude Plaintiff from recovering on an unjust enrichment claim. *See Moeller*, 2017 WL 416430, at *6 ("Because the PPPA does not expressly displace common-law remedies, it does not preempt plaintiffs' well-pled unjust enrichment claim here."); *Perlin*, 2017 WL 605291, at *15 (same); *Condé Nast*, 210 F. Supp. 3d at 604 (same).

Second, the evidence adduced through discovery supports Plaintiff's unjust enrichment claim. To establish a claim for unjust enrichment under Michigan law, Plaintiff must establish "(1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v. Bank of N.Y. Mellon*, 831 N.W.2d 897, 905 (Mich. Ct. App. 2012). Plaintiff provided Hearst benefits in the form of subscription fees paid by Plaintiff to Hearst, *see* 5/1/17 Plaintiff's SJ Br. at Introduction; *see also* Declaration of Josephine James ¶¶ 4-6, 9, and in the form of her

personal information. *See Perlin*, 2017 WL 605291, at *15. Hearst then used her personal

information to make money, in violation of the VRPA. *See* 5/1/17 Plaintiff's SJ Br. at Part II.A-

H. Hearst even sold her information to Dunn Data and ███████ *See id.* at Part II.E-F. And

Hearst continues to retain Plaintiff's subscription fees and personal information. These facts

establish a claim for unjust enrichment.

## VII.  HEARST'S ARGUMENT THAT THERE IS NO BASIS TO TOLL THE THREE-YEAR STATUTE OF LIMITATIONS IS WRONG

Hearst argues that "there is no basis for tolling for the pendency of either the *Boelter* or

*Grenke* actions." 4/3/17 Hearst's SJ Br. at 57.[16] Hearst is wrong. The statute of limitations on

Plaintiff's claims was tolled back to December 20, 2009, by *Grenke v. Hearst Commc'ns, Inc.*,

Case No. 12-cv-14221 (E.D. Mich.) and by *Boelter v. Hearst Commc'ns, Inc.*, Case No. 15-cv-

03934 (S.D.N.Y.). It is well-established that the statute of limitations for <u>federal</u> claims in a

federal lawsuit is tolled while a putative class action is pending. The United States Supreme

Court established this principle in *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 560-61

(1974), where an individual class member sought to intervene in a timely class action after the

statute of limitations had run out on the individual's claim. The U.S. Supreme Court later

applied this rule in the more common situation in which a class member files a separate suit after

the putative class action is denied certification. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S.

---

[16] Hearst also argues that "[t]o the extent Plaintiff bases any purported 'injury' on a theory of 'overpayment,' her claim in this action would be barred in its entirety by the statute of limitations and she would not have been a member of the *Grenke* class," because "it is undisputed that no orders were placed in Plaintiffs name for any Hearst magazine … from October 2008 to October 2015." That is false. First, Hearst admitted that "[o]n October 20, 2008, Plaintiff subscribed to *Good Housekeeping* through an automatic renewal directly with Hearst." PSOF ¶ 192 (undisputed). Second, the *Grenke* class was defined as "[a]ll Michigan residents who had their Personal Reading Information disclosed to third parties by Hearst without consent." PSOF ¶ 141 (undisputed). Thus, the appropriate inquiry is not when Plaintiff made her magazine purchases, but rather when Hearst disclosed her PRI.

345, 354-55 (1983). Most federal courts have further extended this rule to cases in which a class member seeks to file an individual suit before certification is denied in the associated class action. *See, e.g.*, *In re WorldCom Sec. Litig.*, 496 F.3d 245, 254-56 (2d Cir. 2007) (applying class action tolling to a class member who files his separate case while the associated class action is still viable); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir. 2008) (same, under Colorado law), *In re Hanford Nuclear Reservation Litig.*, 521 F.3d 1028, 1038–39 (9th Cir. 2007) (same, under federal law), *amended*, 534 F.3d 986, 1008-09 (9th Cir. 2008).

However, *American Pipe* is not directly applicable for federal courts considering state law claims in diversity cases. Rather, the Second Circuit has concluded that "a federal court evaluating the timeliness of state law claims must look to the law of the relevant state to determine whether, and to what extent, the statute of limitations should be tolled by the filing of a putative class action in another jurisdiction." *Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011). Nonetheless, as Magistrate Judge Cott already noted in this action "state and federal case law … confirm[s] that Michigan recognizes cross-jurisdictional tolling as a general matter." *Edwards v. Hearst Commc'ns, Inc.*, 2016 WL 6651563, at *2 (S.D.N.Y. Nov. 9, 2016); *see also Cowles v. Bank West*, 719 N.W.2d 94, 101 (Mich. 2006) ("In general, periods of limitations are tolled with regard to all class members upon the filing of a complaint asserting a class action."); *Warren Consol. Schools v. W.R. Grace & Co.*, 518 N.W.2d 508, 511 (Mich. Ct. App. 1994) ("Where class certification is later denied, the commencement of a class action suspends the applicable period of limitation with respect to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. … To hold otherwise would frustrate the function of a class action, which is to avoid multiplicity of activity.") (citing

*Crown*, 462 U.S. at 353; *American Pipe*, 414 U.S. at 554); *Lee v. Grand Rapids Bd. of Educ.*, 384 N.W.2d 165, 168 (Mich. Ct. App. 1986) ("This Court has previously held that the filing of a federal lawsuit tolls the operation of the statute of limitations."); *In re LIBOR-Based Fin. Instrument Antitrust Litig.*, 2015 WL 6243526, at *139 (S.D.N.Y. Oct. 20, 2015) (recognizing that Michigan has adopted cross-jurisdictional tolling); *In re Trade Partners, Inc. Inv'rs Litig.*, 2008 WL 3875396, at *4 (W.D. Mich. Aug. 15, 2008) (same). Thus, under Michigan law, the filing of a putative class action tolls the statute of limitations for all putative class members.

The relevant inquiry, therefore, is whether Plaintiff was a putative class member in *Grenke* and *Boelter*. She undoubtedly was. *Grenke* was filed on September 24, 2012, and sought to represent a class defined as "[a]ll Michigan residents who had their Personal Reading Information disclosed to third parties by Hearst without consent." PSOF ¶¶ 140-141 (undisputed); *see also* Ex. 34 (*Grenke* Complaint). *Boelter* was filed on May 21, 2015, and also sought to represent a class defined as "all Michigan residents who had their Personal Reading Information disclosed to third parties by Hearst without consent." *See Boelter*, Case No. 15-cv-03934-AT, Doc. No. 1 ¶ 46. Plaintiff, as a Michigan resident whose Personal Reading Information was disclosed to third parties by Hearst without her consent, was therefore a putative class member in both actions.

*Grenke* was voluntarily dismissed on February 23, 2015. PSOF ¶ 143 (undisputed). *Boelter* was voluntarily dismissed on October 14, 2016, while this action was pending. *See Boelter*, Case No. 15-cv-03934-AT, Doc. No. 122. Therefore, the statute of limitations for Plaintiff's claims was tolled back three years from the filing of *Grenke*, minus the 87 days between *Grenke*'s dismissal and *Boelter*'s commencement, for a total of two years and 278 days. *See Edwards*, 2016 WL 6651563, at *1 n.1. The statute of limitations on Plaintiff's claims was

therefore tolled back to December 20, 2009 (or September 24, 2012 minus two years and 278 days).  *See id.*

Plaintiff notes that while Magistrate Judge Cott recognized that Plaintiff was likely entitled to tolling, he held that the beginning of the relevant time period for discovery was June 25, 2011.  *Edwards*, 2016 WL 6651563, at *4.  Magistrate Judge Cott imposed that limitation because "the *Grenke* plaintiff withdrew his motion for class certification on August 20, 2013." *Id.* at *3.  Respectfully, *Grenke*'s voluntary withdrawal of his class certification motion has no bearing on the tolling analysis.  Prior to the United States Supreme Court's decision in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), plaintiffs would often file "placeholder" motions for class certification with their complaints, to protect against any attempt by defendants to "pick-off" the named plaintiff's individual claims by making a Fed. R. Civ. P. 68 offer of judgment above what the individual plaintiff could recover in the lawsuit.  *See, e.g.*, *Compressor Eng'g Corp. v. Comfort Control Supply Co.*, 2016 WL 4502467, at *1 (E.D. Mich. Aug. 29, 2016).  After discovery, Plaintiffs would then file bona fide motions for class certification.  That is exactly what happened in *Grenke*.  In *Grenke*, the plaintiff filed a placeholder motion for class certification on the same day he filed his complaint.  *See* Ex. 35 (*Grenke* Docket) Nos. 1, 2.  On August 20, 2013, Plaintiff Grenke withdrew that placeholder motion by stipulation with Hearst. *See id.* No. 39 at 3.  The stipulation provided that Plaintiff Grenke would "withdraw [his] motion[] for class certification on condition that, in exchange, … Hearst Communications Inc. will not, directly or indirectly, without the prior written consent of Plaintiffs' counsel, attempt to negotiate or otherwise settle Plaintiff[] Grenke's … claims (which is commonly referred to as a 'pick off')."  *Id.*  Plaintiff Grenke, therefore, had every intention to file a bona fide motion for class certification after discovery.  Thus, Plaintiff Grenke's withdrawal of his class certification

motion should not be considered "tantamount to denial" under these circumstances, and it has no

bearing on the tolling analysis. *Edwards*, 2016 WL 6651563, at *3.

Hearst's attempts to gloss over Magistrate Judge Cott's holding and the case law cited

above fail.

<u>First</u>, Hearst argues that "Michigan law … no longer recognizes equitable tolling, instead

requiring that any tolling of a statute of limitations be dictated by statute."  4/3/17 Hearst's SJ Br.

at 57.  But Michigan law provides, by statute, that "[t]he statute of limitations is tolled as to all

persons within the class described in the complaint on the commencement of an action asserting

a class action."  M.C.R. 3.501(F)(1).  As the Michigan Supreme Court explained, "MCR

3.501(F) was modeled after the United States Supreme Court's decision in *American Pipe*,"

which created the class-action tolling doctrine.  *Cowles*, 719 N.W.2d at 103.  MCR 3.501(F)

serves an important public policy:

> [T]he class-action tolling doctrine [is] needed to promote the
> judicial economy of the class-action mechanism.  …  if the class-
> action tolling doctrine were not adopted, individual plaintiffs
> would be forced to intervene or file duplicative protective suits just
> in case the class was not certified or the action was dismissed on
> procedural grounds.  This would frustrate the purpose of the class-
> action mechanism, whereby putative class members are
> encouraged to remain passive during the early stages of the class
> action.  …  Accordingly … the class-action tolling doctrine best
> serves the principal purposes of the class-action procedure –
> promotion of efficiency and economy of litigation.

*Cowles*, 719 N.W.2d at 104 (citations omitted).  Not affording Plaintiff the benefit of tolling in

this case would directly undercut that public policy.

<u>Second</u>, Hearst argues that *Grenke* does not toll Plaintiff's claims because "she testified

in her deposition that she was unaware of the Michigan VRPA, let alone the *Grenke* case, until

approximately November 2015."  4/3/17 Hearst's SJ Br. at 59.  But there is no knowledge

requirement for class-action tolling.  Individuals are not required to monitor federal and state court dockets to enjoy the benefit of class-action tolling, and Hearst does not cite any authorities holding otherwise.  *See Cowles*, 719 N.W.2d at 104 ("[N]ot until the class is certified 'does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it.'") (quoting *American Pipe*, 414 U.S. at 552).  Indeed, a knowledge requirement would render useless the notice provisions of Fed. R. Civ. P. 23.  *See* Fed. R. Civ. P. 23(d)(1)(B), (e)(1).  If class members were expected to monitor federal and state court dockets for class actions in which they are putative class members, then why provide notice at all?

Third, Hearst argues that *Boelter* does not toll Plaintiff's claims because "Plaintiff did not consider herself a part of Suzanne Boelter's putative class," since she "filed her own lawsuit while *Boelter* was still active."  4/3/17 Hearst's SJ Br. at 59.  But again there is no evidence that Plaintiff was aware of *Boelter* when she filed her lawsuit.  To the contrary, Plaintiff testified that she had learned of other VRPA lawsuits within a "couple of months" of her deposition, which took place nearly a year after she filed her lawsuit.  James Edwards Dep. at 103:5-7, Ex. 38.  Moreover, even if Hearst is correct and Plaintiff's claims were not tolled by *Boelter*, the statute of limitations for her claim would still be tolled back to June 25, 2010 by *Grenke*.[17]

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Hearst's motions to dismiss and for summary judgment in their entirety.

---

[17] To reach that date, Plaintiff goes back three years from the filing of *Grenke*, and then adds 274 days (the time between *Grenke*'s dismissal and *Edwards*' commencement).  The statute of limitations on Plaintiff's claims would therefore tolled back to June 25, 2010 (or September 24, 2012 minus two years and 91 days).

Dated: May 1, 2017

Respectfully submitted,

By:  */s/ Scott A. Bursor*
Scott A. Bursor

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
jmarchese@bursor.com
pfraietta@bursor.com

**CAREY RODRIGUEZ
MILIAN GONYA, LLP**
John C. Carey
David P. Milian*
Frank S. Hedin*
1395 Brickell Avenue, Suite 700
Miami, FL 33131
Telephone: (305) 372-7474
Facsimile: (305) 372-7475
Email: jcarey@careyrodriguez.com
dmilian@careyrodriguez.com
fhedin@careyrodriguez.com
*Admitted Pro Hac Vice

*Attorneys for Plaintiff*